IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT
OF TEXAS LAREDO DIVISION

| | | |
|---|---|---|
| ZAPATA COUNTY, TEXAS, MELISSA CIGARROA, CCMD, LLC & GEORGE C. RINCON, | § § § § § | |
| *Plaintiffs,* | § § | CIVIL ACTION NO. _____ |
| v. | § § § | JURY TRIAL DEMANDED |
| DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES; CHAD WOLF, as the Purported Acting Secretary of THE UNITED STATES OF AMERICA'S DEPARTMENT OF HOMELAND SECURITY and MARK A. MORGAN, as the Acting Commissioner of THE UNITED STATES CUSTOMS AND BORDER PROTECTION, | § § § § § § § § § § § § | |
| *Defendants.* | § § | |

"Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws."

*Hernandez v. Texas*, 347 U.S. 475 (1954) (argued by Gustavo "Gus" C. Garcia, Laredo's native son)

"When he [Donald J. Trump] landed, he asked, 'Is it safe for me to get down (off the plane)?' In his mind, in his own consciousness, he perceived danger[.]"[1]

City of Laredo Mayor Pete Saenz recalling a conversation with Donald J. Trump, who asked if it was safe to step out of a plane in Laredo, Texas (September 2016).

The Fifth Amendment to the US Constitution provides a right to due process, which guarantees equal protection to any person in the United States.

*Bolling v. Sharpe*, 347 U.S. 497, 500 (1954).

---

[1] Tilove Jonathan, *Donald Trump persuaded by Laredo mayor to temper border wall plan*, Austin American-Stateman, https://www.statesman.com/NEWS/20160904/Donald-Trump-persuaded-by-Laredo-mayor-to-temper-border-wall-plan (Posted Sep 4, 2016).

<u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

Now come, Zapata County, Texas, along with Melissa Cigarroa, CCMD, LLC, and George C. Rincon, (collectively defined as "Plaintiffs") and file suit against Donald J. Trump, in his capacity as the President of the United States, Chad Wolf in his capacity as the purported Acting Secretary of the United States of America's Department of Homeland Security and Mark A. Morgan in his capacity as the acting commissioner of the United States Customs and Border Protection (collectively defined as "Defendants") and would show the Court as follows:

## I.    INTRODUCTION

1.    The U.S. Department of Homeland Security ("DHS"), along with U.S. Customs and Border Protection ("CBP"), at the direction of President Donald J. Trump ("President Trump" or "Mr. Trump"), are engaged in a full-on assault against the people who reside in Zapata County and Webb County, Texas. Their weapons: (1) Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") codified at 8 U.S.C. §1103, (2) the Real ID Act codified at IIRRA §102, and (3) Executive Order Number 13767. The Defendants reliance on and use of said legal weapons against the Plaintiffs reveal government action that violates the United States Constitution.

2.    The people of Zapata County and Webb County, who are overwhelmingly Mexican American, are the targets of an animus that demonizes immigrants, Mexicans, Mexican Americans, and people who live on the border. As candidate Trump declared: "We have some bad hombres here and we're gonna get them out."[2] Time and again President Trump speaks of immigrants, Mexicans, Mexican Americans and people from the border as criminals and dehumanizes them in order to justify the construction of a border wall, while simultaneously ignoring the objections of border residents in Zapata County and Webb County, who do not believe a border wall is necesary. In short, United

---

[2] Prokop Andrew, *Trump says at the debate that he'll get "bad hombres" out of the US*, Vox https://www.vox.com/2016/10/19/13341538/trump-debate-bad-hombres (posted October 19, 2016).

States citizens living in the United States/Mexico border are not fully vested citizens. These people, mostly of Mexican heritage and culture, have become the victims of Defendants' attempt to create a constitution-free zone. Like other communities of color, who have suffered comparable or worse injustice(s) at the hands of the United States government, the Plaintiffs seek refuge in the Fifth Amendment to the United States Constitution on multiple grounds. Furthermore, Zapata County and the people of Zapata County and Webb County seek protection under the Tenth Amendment as well as protection from the limits imposed by Article 1, Section 1 of the United States Constitution. As outlined below, constitution-free zones do not exist on the U.S./Mexico border.

## II.    THE PARTIES

3.    The County of Zapata ("Zapata County") is a corporate and political body formed under the Texas Constitution, pursuant to Article IX, Section 1, which states: "[t]he Legislature shall have power to create counties for the convenience of the people"; Article XI, Section 1, which states: "[t]he several counties of this State are hereby recognized as legal subdivisions of the State"; and formed pursuant to Tex. Local Gov't Code § 71.001. Zapata County brings suit on its own and on behalf of its residents.

4.    Melissa Cigarroa ("Mrs. Cigarroa") is an individual who resides in Laredo, Webb County, Texas, and who owns an undivided interest in CCMD, LLC.

5.    CCMD, LLC ("CCMD") is a limited liability company formed under the laws of the State of Texas that owns approximately 173 acres located in Zapata County, Texas.

6.    George C. Rincon ("Mr. Rincon") is an individual who resides in San Ygnacio, Zapata County, Texas.

7.    Defendat President Donald J. Trump is the President of the United States of America. He is sued in his official capacity.

8.    Defendant United States Department of Homeland Security is the federal agency responsible for providing border security along the United States-Mexico border in a manner consistent with the

laws and Constitution of the United States. United States Customs and Border Protection ("CBP") falls within DHS. Defendant Chad F. Wolf is the purported Acting Secretary of DHS. He is responsible for overseeing DHS and CBP and ensuring that DHS and CBP actions comply with applicable laws. Plaintiffs sue Defendant Wolf in his official capacity as purported acting Secretary.

9.      Defendant United States Customs and Border Protection is the federal agency responsible for providing border security along the United States-Mexico border in a manner consistent with the laws and Constitution of the United States. United States Customs and Border Protection falls within DHS. Defendant Mark A. Morgan is Acting Commissioner of CBP. He is responsible for overseeing CBP and ensuring that CBP actions comply with applicable laws. Plaintiffs sue Defendant Morgan in his official capacity.

### III.    JURISDICTION & VENUE

10.     This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under Article I, section 9, clause 7 of the United States Constitution, and other federal statutes.

11.     The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. § 706(2), and its equitable powers.

12.     The Court is further authorized to review the constitutional challenges asserted herein pursuant to IIRIRA Sec. 102(c). which states:

> (1) In general.
>
> Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.
>
> (2) Federal court review.

(A) In general. The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

(B) Time for filing of complaint. Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

(C) Ability to seek appellate review. An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.

13.    [C]ourts have consistently conducted judicial review of facial, ultra vires claims despite a statutory bar on judicial review. *In re Border Infrastructure Envtl. Litig.*, No. CV 17-1215 GPC (WVG), 284 F. Supp. 3d 1092, 2018 U.S. Dist. LEXIS 31847, 2018 WL 1071702, at *1 (S.D. Cal. Feb. 27, 2018).

14.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and (e), because the violations are occurring here, and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made by DHS and CBP, and/or failure(s) to act by DHS and CBP.

IV.    STATEMENT OF THE LAW

A.    THE CONSTITUTIONAL PROVISIONS VIOLATED BY DEFENDANTS.

15.    The Fifth Amendment states:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, **nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation**. (emphasis added).

U.S. CONST. AMEND. V. Below is a summary of some applicable case law that identifies the parameters of a Fifth Amendment's due process/equal protection claims against unconstitutional government action:

a) The Fifth Amendment to the US Constitution provides a right to due process, which guarantees equal protection to any person in the United States. *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954). Racial discrimination can be violative of due process. *Id* at 499.

b) Mexicans Americans are a protected class under the Equal Protection Clause. *Hernandez v. Texas*, 347 U.S. 475 (1954).

c) Statutes or government policies that infringe fundamental rights, or that make distinctions based upon suspect classifications, such as race or national origin, are subject to strict scrutiny, which requires that the statute be narrowly tailored to achieve a compelling government interest. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985).

d) The Equal Protection Clause restricts government action inconsistent with elemental constitutional premises. *Plyler v. Doe*, 457 U.S. 202, 216 (1982).

16.    Article 1, Section 1 of the Constitution states: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. CONST. ART. 1, SEC. 1.

a) Congress may not constitutionally delegate its powers to another branch of government. *Touby v. United States*, 500 U.S. 160, 165 (1991).

b) The Nondelegation Doctrine requires Congress to lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

17.    The Tenth Amendment states: "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. AMEND. X.

   a)   Under the Tenth Amendment to the US Constitution, the federal government may not compel the states to enact or administer a federal regulatory program. *New York v. U.S.*, 505 U.S. 144, 188 (1992).

   b)   A departure from the fundamental principle of equal sovereignty between the federal government and the states requires a showing that the enacted law is sufficiently related to the problem it targets. *Shelby County v. Holder*, 570 U.S. 529 (2013).

**B.    Ultra Vires Acts.**

18.    Alternatively, Defendants have further violated the clear mandate in IIRIRA Sec. 102(b)(1)(C), which requires:

> In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

The U.S. Supreme Court has identified a narrow exception to an express statutory bar on judicial review when there is a claim that an agency acted beyond its statutory authority. *See Leedom v. Kyne*, 358 U.S. 184 (1958); *Bd. Of Governors of Fed. Reserve Sys. V. MCorp. Fin., Inc.*, 502 U.S. 32 (1991).

**C.    The Appointments Clause & the Federal Vacanies Reform Act.**

19.    Pursuant to the Appointments Clause of the U.S. Constitution, officers of the United States may be appointed by the President only with the "Advice and Consent of the Senate." U.S. Const. art. II, §2, cl. 2. This is not merely a matter of "etiquette or protocol; it is among

the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (quoting *Buckley v. Valeo*, 424 U.S. 1, 125 (1976)).

20.     Because following the constitutional process involving the Senate confirmation of the President's nominee can take time, "Congress has given the President limited authority to appoint acting officials…without first obtaining Senate approval." *NLRB v. SW Gen., Inc.*, 137 S.Ct. 929, 935 (2017). The Federal Vacancies Reform Act (FVRA) "is the most recent iteration of that interbranch accommodation." *Guedes v. ATF*, 920 F.3d 1, 11 (D.C. Cir. 2019).

21.     Under the FVRA, an individual may serve in an acting capacity whenever "an officer of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(A).

22.     In the event of death, resignation, or inability to perform, the default rule under the FVRA is that "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(A)(1).

23.     The FVRA provides for some additional alternatives. Under 5 U.S.C. § 3345(a)(2), the President may select another temporary officer so long as the person "served in an office for which appointment is required and made by the President, by and with the advice and consent of the Senate." Under 5 U.S.C. § 3345(a)(3), the President may select a temporary officer who has "served in a position in [the] agency for not less than 90 days" at the GS-15 rate of pay.

24.     The FVRA further provides for the time limitation of temporary appointments made pursuant to 8 U.S.C. § 3345. Under 8 U.S.C. § 3346(a), an acting officer may only serve in an acting capacity for 210 days. The only extensions granted under 8 U.S.C. § 3346 occur once a nomination for the vacant office has been made.

25.      The FVRA further provides that certain actions taken by any person who is not acting lawfully under statute "shall have no force or effect." 5 U.S.C. § 3348.

V.    FACTS

MEXICAN AMERICAN COMMUNITIES ON THE BORDER

**A.      Zapata County.**

26.      Zapata County is a county located in the State of Texas, named after Colonel Jose Antonio de Zapata, a rancher from the area who rebelled against Mexico. Founded on or about January 22, 1858, Zapata County encompasses an area of approximately 1,058 square miles, which includes 998 square miles of land and 60 square miles of water in lakes and creeks.

27.      According to the 2010 U.S. Census, Zapata County has approximately 14,018 inhabitants. As of 2010, Zapata County's population is approximately 85% Hispanic or Mexican American.

28.      Zapata County's southern boundary is situated along the U.S./Mexico border and ends at the banks of the Rio Grande River. Unlike communities in New Mexico, Arizona, and California, the border in Zapata County is defined by the Rio Grande River, which forms a natural barrier.

29.      Pursuant to President Trump's Executive Order 13767 ("Trump Order"), DHS and/or CBP intend to construct a border wall in Zapata County, Texas, and Webb County, Texas, in violation of the Fifth Amendment (due process clause and equal protection), the Tenth Amendment's protection against federal encroachment of states' rights, and in violation of Article 1, Section 1 of the United States Constitution. Additionally, the waivers issued by DHS on or about May 15, 2020, also violate multiple provisions of the United States Constitution.

30.      Zapata County owns two parcels of land already in condemnation proceedings for a right of entry ("ROE") in Civil Action No. 5:20-cv-00077; *United States of America v. 3.817 Acres of Land, More or Less, Situated in Zapata County, State of Texas*; pending in the Southern District of Texas, Laredo Division ("Condemnation Matter").

31.     Zapata County's duties and responsibilities to the land at issue in the Condemnation Matter and to the citizens of Zapata County are varied and critical, and involve the following rights and obligations:

a) Enforce laws to promote public health. TEXAS HEALTH & SAFETY CODE §121.003(A) ("The governing body of a municipality or the commissioners court of a county may enforce any law that is reasonably necessary to protect the public health.")

b) May set standards regarding construction in flood plains. TEXAS WATER CODE §16.311 *et seq.*

c) Regulation of water rates and services. CHAPTER 13 OF TEXAS WATER CODE.

d) Enforcement of water quality controls. TEXAS WATER CODE §26.171 *et seq.*

e) Development of local and regional water plans. TEXAS WATER CODE §16.051 *et seq.*

f) May inspect public waters for certain purposes. TEXAS WATER CODE §26.171 *et seq.*

g) May acquire land, construct facilities for public recreation. TEXAS PARK & WILDLIFE CODE §13.304.

h) May regulate operations and equipment of boats in public waters and may designate certain areas for swimming and fishing. TEXAS PARK & WILDLIFE CODE §31.092.

i) Sale or lease county property. CHAPTER 263 OF TEXAS LOCAL GOV'T CODE.

j) May levy taxes for flood control. TEXAS TRANSPORTATION CODE § 256.054.

k) All counties may operate and maintain parks, playgrounds, and historical museums and sites. TEXAS LOCAL GOV'T CODE §331.001.

l) May administer or engage in certain community and economic development projects. TEXAS LOCAL GOV'T CODE §381.003.

m) May provide for the abatement of public nuisances. CHAPTER 343 OF THE TEXAS HEALTH & SAFETY CODE.

n) May contract with political subdivisions for joint right-of-way, construction, maintenance of canals, drains, and levees for flood control. TEXAS LOCAL GOV'T CODE §561.002.

o) May establish public improvement districts. CHAPTER 372 OF TEXAS LOCAL GOV'T CODE.

p) Ordinance-making powers of certain counties along Rio Grande River with no incorporated territory. TEXAS LOCAL GOV'T CODE §81.033.

q) May contract with various federal, state, and local entities for carrying out flood control and soil conservation programs. TEXAS LOCAL GOV'T CODE §561.003.

r) May acquire, own, or operate water or wastewater utility system to serve unincorporated territory. TEXAS LOCAL GOV'T CODE §562.016.

s) Regulation of wildlife through development of regional habitat conservation plans for endangered species. TEXAS PARK & WILDLIFE CODE §83.011, et seq.

**B.    Zapata County Proposed Condemnation Sites.**

32.    To date, DHS/CBP identified the following property, owned by Zapata County, to be condemned for border wall construction: Tracts: LRT-LZT-1012 and/or LRT-LZT-1017 totaling 3.817 acres (collectively, "Subject Property").

33.    The Subject Property has the following legal descriptions:

### Tract LRT-LZT-1012

0.817 acres, more or less, being Lot 9, Block 1, (Tinaja Park) San Ygnacio Subdivision; also being Tax Parcel ID 6990, Zapata County Appraisal District, Texas.

### Tract LRT-LZT-1017
### (Parcel ID A)

Being a 3.0 acre parcel of land, more or less, being situated in San Ygnacio Subdivision, Block 4, Zapata County, Texas; and more particularly described as:

Bounded on the North by Property ID 7002 and Property ID 7008;

Bounded on the East by Property ID 7009, Property ID 7010, Property ID 7011, Property ID 7012, Property ID 7013, Property ID 7014;

Bounded on the South corner by the Norther 800 Block of Grant Avenue, and the South Southwest corner of Property ID 7014;

Bounded on the West by the gradient boundary of the Rio Grande.

**C.    San Ygnacio, Texas.**

34.    San Ygnacio, a small community situated in Zapata County, is managed by Zapata County as an unincorporated town. San Ygnacio is situated along the banks of the Rio Grande River and has a

deep cultural identity tied to the Rio Grande River. As of 2010, San Ygnacio had an approximate population of 667 residents, and over 92% of its residents are Mexican American.

35.    San Ygnacio, originally a Mexican pueblo, was founded in 1830 by settlers from nearby Guerrero, Tamaulipas, on the outskirts of the Uribeño Ranch. Frequent Comanche attacks in the early days of San Ygnacio necessitated the use of defensive stone architecture which remain as historical sites from that period. San Ygnacio's historic district has at least 115 sites and/or buildings designated as contributing historic sites and many more non-contributing historic sites and/or buildings ("San Ygnacio Historic District").[3] According to the map made a part of the Continuation Sheet, many of the historic sites are within a block or two from the Rio Grande River and susceptible to irreparable harm if there is flooding as a result of the border wall.

36.    San Ygnacio has already been subject to federal land seizure resulting from the construction of the Falcon Dam located approximately 14 miles south of this city. Falcon Dam was intended to provide flooding relief and water for agricultural business interests further downstream from San Ygnacio. Construction of the dam resulted in the loss of land for Mexican Americans whose titles had originated from Spanish Land Grants from the 1600s.

37.    A predominately Catholic community, San Ygnacio is named for the prominent Saint Ignatius of Loyola, and the portion of the community between the Rio Grande River and U.S. Highway 83 is listed on the National Register of Historic Places known as the San Ygnacio Historic District.

**D.    San Ygnacio Bird Sanctuary.**

38.    San Ygnacio is also home to a bird and butterfly sanctuary located at the end of Washington Avenue. The lush strip of land is home to some of the most diverse bird species in North America. The bird sanctuary is one of the best bird-viewing areas for the tiny white-collared seedeater (now

---

[3] Attached as **Exhibit 1** is a true and correct copy the National Register of Historic Places Continuation Sheet prepared by the United States Department of the Interior ("Continuation Sheet"), which contains a map of the San Ygnacio Historic District and pages identifying the historic sites.

called Morelet's Seed-eater) and the scissor-tailed flycatcher, as well as various butterfly species, like the American snout. The Morelet's Seed-eater is found only in South Texas.

39.     The entrance to the bird sanctuary is next to a white house that once served as a United States Customs house. This historic structure served as a customs house from 1800 to 1969 and has a plaque with a dedication honoring and recognizing two centuries of service by men and women of the U.S. Customs Service.

40.     Zapata County holds an interest in the bird sanctuary pursuant to a deed of gift with limitation provision, which allows the county to own the land "for so long as it is used, operated and maintained solely for public purposes and only as a wildlife refuge and sanctuary for birds and bird watchers. . . ("Gift Deed")" The Gift Deed further states: "should the property ever cease to be used or maintained for such purposes by grantee, then title in grantee shall terminate and vest in the Farallon Island Foundation, its successors and assigns. . ." The bird sanctuary is a major tourist attraction for San Ygnacio and the region.

**E.      Waterworks Facilities.**

41.     On or about September 8, 2015, Zapata County entered into an agreement with the San Ygnacio Municipal Utility District to take over the operation and control of the San Ygnacio Water Works ("SYWW") facility located at 501 Houston Street, San Ygnacio, Texas.

42.     SYWW's facility has a pump located in the Rio Grande River at the end of Grant Street. SYWW uses the pump to capture water from the Rio Grande River, and then SYWW transports the water through a water pipe system to a water works facility approximately two blocks north of the Rio Grande River.

43.     SYWW then utilizes a water filtration process. Once the water is potable, it is sent to households and businesses in San Ygnacio that purchase the water from SYWW.

44.     Zapata County owns and operates the Henry Mercy Martinez Community Center ("Community Center") located approximately one mile away from the proposed condemnation sites near the Rio Grande River. The Community Center, like the residents of San Ygnacio, rely on the water from SYWW for drinking water.

45.     SYWW also provides drinking water to the residents of the unincorporated town of Ramireño, Texas, which is located approximately 4.5 miles from the condemnation sites. In all, approximately 410 households and/or properties rely on SYWW for water.

**F.    Laredo, Texas, and South Texas.**

46.     Laredo, known as the largest international port in the United States, sits approximately 35 miles northwest of Zapata County and in Webb County, Texas.

47.     Like Zapata County, portions of Laredo's southern boundary end at the Rio Grande River. Laredo is comprised of nearly 95.6% Mexican Americans, many of whom have deep roots in the region. Many people in Laredo and Zapata County have personal, commercial, and/or family ties to Mexico.

48.     According to the 2010 census, Laredo's population was approximately 236,091, making it the tenth-most populous city in the state of Texas and third-most populated on the Mexican border, following San Diego, California, and El Paso, Texas. Its metropolitan area is the 178th-largest in the U.S. and includes all of Webb County, with a population of 250,304. Laredo is also part of the cross-border Laredo-Nuevo Laredo Metropolitan Area with an estimated population of 636,516.

ANIMUS TOWARDS MEXICANS, MEXICAN AMERICANS & BORDER COMMUNITIES

**A.    Trump's Initial Statements.**

49.     On or about June 16, 2015, Mr. Trump announced his candidacy for president, and in his opening remarks said the following about Mexico and the border:

When do we beat Mexico at the border? They're laughing at us, at our stupidity. And now they are beating us economically. They are not our friend, believe me. But they're killing us economically. Thank you. It's true, and these are the best and the finest. When Mexico sends its people, they're not sending their best. They're not sending you. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with [sic] us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people. But I speak to border guards and they tell us what we're getting. And it only makes common sense. It only makes common sense. They're sending us not the right people.[4]

50.     While many Americans were appalled by the racist comments made in his announcement, members of the National Border Patrol Council Local 2455 ("Local 2455"), located in Laredo, Texas, agreed with Mr. Trump. In fact, Local 2455 invited Mr. Trump to Laredo, an act intended to show its support for the message conveyed at the announcement.[5]

51.     Local 2455 had to rescind its invitation "after 'careful consideration' and speaking with officials from the National Border Patrol Council ("National Union")."[6]

52.     However, the National Union endorsed Mr. Trump nine months after candidate Trump referred to Mexicans as rapists. The Texas Tribune reported the following:

The national union that represents more than 16,000 agents of the United States Border Patrol issued its first-ever endorsement of a presidential candidate on Wednesday by throwing its support behind Republican Donald Trump.

Lauding Trump as an outsider who bucks political correctness, a National Border Patrol Council spokesperson said in a statement that Trump's honesty on immigration, though ill-received by some, is what the nation needs to stop the "open borders" mentality of current office holders.[7]

---

[4] Time Staff, *Here's Donald Trump's Presidential Announcement Speech,* Time Magazine, https://time.com/3923128/donald-trump-announcement-speech/ (posted June 16, 2015).

[5] Chapa Sergio, *Laredo Border Patrol cancels on Trump, GOP presidential hopeful still headed for border*, San Antonio Business Journal, https://www.bizjournals.com/sanantonio/news/2015/07/23/laredo-border-patrol-cancels-on-trump-gop.html (posted July 23, 2015).

[6] *Id.*

[7] Aguilar Julian, *Border Patrol Union Endorses Trump for President*, Texas Tribune, https://www.texastribune.org/2016/03/30/border-patrol-union-endorses-trump-president/ (posted March 30, 2016).

53.    Nearly three months after receiving the National Union endorsement, Mr. Trump escalated

his racist rhetoric against Mexicans, Mexican Americans, and border communities. In a June 2016

CNN interview[8] with John Tapper, candidate Trump revealed his thinking about Federal Judge

Gonzalo Curiel, who is Mexican American, and made explicit racist statements regarding the border

wall and Mexican Americans:

TAPPER: What does this have to do with his heritage?

TRUMP: I'll tell you what it has to do. I've had ruling after ruling after ruling that's been bad

rulings, OK? I've been treated very unfairly. Before him, we had another judge. If that judge

was still there, this case would have been over two years ago.

Let me just tell you, I've had horrible rulings, I've been treated very unfairly by this judge.

**Now, this judge is of Mexican heritage**. **I'm building a wall, OK? I'm building a wall.**

**I am going to do very well with the Hispanics, the Mexicans --**

TAPPER: So, no Mexican judge could ever be involved in a case that involves you?

TRUMP: Well, he's a member of a society, where -- you know, very pro-Mexico, and that's

fine. It's all fine, but --

TAPPER: Except that you're calling into question his heritage.

TRUMP: I think he should recuse himself.

TAPPER: Because he's Latino?

TRUMP: Then, you also say, does he know the lawyer on the other side? I mean, does he

know the lawyer? You know, a lot of people say --

TAPPER: But I'm not talking about that. I'm talking about --

TRUMP: That's another problem.

---

[8] Wolf Byron, *Trump's attacks on Judge Curiel are still jarring to read*, CNN
https://www.cnn.com/2018/02/27/politics/judge-curiel-trump-border-wall/index.html (posted February 27, 2018).

**TAPPER: You're invoking his race, talking about whether or not he can do his job.**

**TRUMP: Jake, I'm building a wall. OK? I'm building a wall. I'm trying to keep business out of Mexico. Mexico's fine.**

**TAPPER: But he's an American.**

**TRUMP: He's of Mexican heritage and he's very proud of it, as I am where I come from, my parents.**

TAPPER: But he's an American. You keep talking about it's a conflict of interest because of Mexico.

---------

TRUMP: No. He's proud of his heritage. I respect him for that.

TAPPER: But you're saying you can't do his job because of that.

TRUMP: Look, he's proud of his heritage, OK? I'm building a wall.

Now, I think I'm going to do very well with Hispanics because they are going to get jobs right now. They are going to get jobs. I think I'm going to do very well with Hispanics.

**We are building a wall. He's a Mexican.** We're building a wall between here and Mexico. The answer is, he is giving us very unfair rulings, rulings that people can't even believe. This case should have ended years ago in summary judgment. The best lawyers, I have spoken to so many lawyers, they said, this is not a case. This is a case that should have ended.

TAPPER: I --

**TRUMP: This judge is giving us unfair rulings. Now, I say why? Well, I'm building a wall, OK? And it's a wall between Mexico. Not another country.**

**TAPPER: But he's not from Mexico. He's from Indiana.**

TRUMP: He's of Mexican heritage and he's very proud of it. (emphasis added).

**B.      Trump's Focus on Race.**

54.      Since 2013, President Trump (before and after taking office) has **made hostile and racist**

**remarks** against Mexicans and Mexican Americans. The following statements provide evidence of

President Trump's intent to discriminate against Mexicans and Mexican Americans living in "Border

States":

a)   On or about June 5, 2013, President Trump tweeted: "Sadly, the overwhelming amount of violent crime in our major cities is committed by blacks and Hispanics-a tough subject-must be discussed."[9]

b)   On or about July 6, 2015, President Trump tweeted and subsequently deleted: "@RobHeilbron: @realDonaldTrump #JebBush has to like the Mexican Illegals because of his wife."[10]

c)   On or about July 7, 2015, President Trump said: "The worst elements in Mexico are being pushed into the United States by the Mexican government. The Border Patrol knows this. Likewise, tremendous infectious disease is pouring across the border."[11]

d)   On or about July 21, 2016, President Trump said: "Of all my travels in this country, nothing has affected me more deeply than the time spent with the mothers and fathers who have lost their children to violence spilling across our border."

Further, he said: "We are going to build a great border wall to stop illegal immigration, to stop the gangs and the violence, and to stop the drugs from pouring into our communities…"[12]

e)   On or about August 31, 2016, President Trump said: "While there are many illegal immigrants in our country who are good people, this doesn't change the fact that most illegal immigrants are lower-skilled workers with less education, who compete directly against vulnerable American workers, and that these illegal workers draw much more out from the system than they can ever pay in."[13]

f)   On or about September 27, 2016, President Trump said: "We have gangs roaming the street. And in many cases, they're illegally here, illegal immigrants. And they have guns.

---

[9] Donald J. Trump (@realDonaldTrump), TWITTER (Jun. 5, 2013, 3:05 AM), https://twitter.com/realDonaldTrump/status/342190428675796992.
[10] Candace Smith, *Donald Trump Deletes Tweet About Jeb Bush's Wife*, ABC NEWS (Jul. 6, 2015, 3:08 PM), https://abcnews.go.com/Politics/donald-trump-deletes-tweet-jeb-bushs-wife/story?id=32256986.
[11] Jesse Byrnes, *Trump: 'Infectious disease is pouring across the border'*, THE HILL (Jul. 6, 2015, 5:35 PM), https://thehill.com/blogs/ballot-box/246982-trump-infectious-disease-is-pouring-across-the-border.
[12] *Full text: Donald Trump 2016 RNC Draft Speech Transcript*, POLITICO (Jul. 21. 2016, 6:21 PM), https://www.politico.com/story/2016/07/full-transcript-donald-trump-nomination-acceptance-speech-at-rnc-225974.
[13] *Full text: Donald Trump Immigration Speech in Arizona,* POLITICO (Aug. 31, 2016, 10:54 PM), https://www.politico.com/story/2016/08/donald-trump-immigration-address-transcript-227614.

And they shoot people. And we have to be very strong. And we have to be very vigilant."[14]

g) On or about October 19, 2016, President Trump said: "We have some bad hombres here and we're gonna get them out."[15]

h) On or about February 16, 2017, President Trump said: "We're going to show great heart. DACA is a very, very difficult subject for me, I will tell you. To me it's one of the most difficult subjects I have. Because you have these incredible kids, in many cases, not in all cases. In some of the cases they're having DACA and they're gang members and they're drug dealers, too."[16]

i) On or about June 18, 2018, President Trump tweeted: "Why don't the Democrats give us the votes to fix the world's worst immigration laws? Where is the outcry for the killings and crime being caused by gangs and thugs, including MS-13 coming into our country illegally?"[17]

j) On or about June 24, 2018, President Trump tweeted: "We cannot allow all of these people to invade our Country. When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came. Our system is a mockery to good immigration policy and Law and Order. Most children come without parents…"[18]

k) On or about July 1, 2018, President Trump tweeted: "The Liberal Left, also known as the Democrats, want to get rid of ICE, who do a fantastic job, and want Open Borders. Crime would be rampant and uncontrollable! Make America Great Again"[19]

l) On or about July 5, 2018, President Trump tweeted: "A vote for Democrats in November is a vote to let MS-13 run wild in our communities, to let drugs pour into our cities, and to take jobs and benefits away from hardworking Americans…"[20]

m) On or about October 22, 2018, President Trump said: "You know, they have a word – it's sort of became old-fashioned – it's called a nationalist. And I say, really, we're

---

[14] *Full Transcript from the First 2016 Presidential Debate Between Trump, Clinton*, NBC NEWS (Sept. 26, 2016, 11:13 PM), https://www.nbcnews.com/storyline/2016-presidential-debates/full-transcript-first-presidential-debate-between-trump-clinton-n655141.

[15] Maya Rhodan, *Donald Trump Raises Eyebrows With 'Bad Hombres' Line*, TIME (Oct. 19, 2016, 10:02 PM), https://time.com/4537847/donald-trump-bad-hombres/.

[16] The President's News Conference, DAILY COMP. PRES. DOC. 125 (Feb. 16, 2017).

[17] Donald J. Trump (@realDonaldTrump), TWITTER (Jun. 18, 2018, 7:46 AM), https://twitter.com/realdonaldtrump/status/1008692333771132929.

[18] Donald J. Trump (@realDonaldTrump), TWITTER (Jun. 24, 2018, 10:02 AM), https://twitter.com/realDonaldTrump/status/1010900865602019329.

[19] Donald J. Trump (@realDonaldTrump), TWITTER (Jul. 1, 2018, 7:11 AM), https://twitter.com/realDonaldTrump/status/1013394559429169152.

[20] Donald J. Trump (@realDonaldTrump), TWITTER (Jul. 5. 2018, 7:44 PM), https://twitter.com/realDonaldTrump/status/1015033658548207616.

not supposed to use that word. You know what I am? I'm a nationalist, okay? I'm a nationalist. Nationalist. Nothing wrong. Use that word. Use that word."[21]

n)  On or about February 15, 2019, President Trump said: "But one of the things I said I have to do, and I want to do is border security, because we have tremendous amount of drugs flowing into our country, much of it coming from the southern border."

Further, he said: "The probably easiest one to win is on declaring a national emergency, because we're declaring it for virtual invasion purposes: drugs, traffickers, and gangs. And one of the things, just to finish: We have removed thousands of MS-13 gang monsters. Thousands. They're out of this country. We take them out by the thousands. And they are monsters."[22]

o)  On or about March 13, 2019, President Trump said: "The massive, surging flow of illegal immigration, trafficking, drugs, and crime threaten the safety and security of all Americans."[23]

p)  On or about July 14, 2019, President Trump tweeted: "So interesting to see 'Progressive' Democrat Congresswomen, who originally came from countries whose governments are a complete and total catastrophe, the worst, most corrupt and inept anywhere in the world (if they even have a functioning government at all), no loudly and viciously telling the people of the United States, the greatest and most powerful Nation on earth, how our government is to be run. Why don't they go back and help fix the totally broken and crime infested places from which they came…"[24]

q)  When asked about the tweets above, he responded: "It doesn't concern me because many people agree with me."[25]

r)  On or about July 15, 2019, President Trump tweeted: "Radical Left Democrats want Open Borders, which means drugs, crime, human trafficking, and much more…"[26]

s)  On or about August 19, 2019, President Trump tweeted: "Democrats want Open Borders and Crime. So dangerous for our Country. But we are building a big, beautiful, NEW Wall!"[27]

---

[21] Quint Forgey, *Trump: 'I'm a nationalist'*, POLITICO (Oct. 22, 2018, 8:50 PM), https://www.politico.com/story/2018/10/22/trump-nationalist-926745.
[22] Remarks on Declaring a National Emergency Concerning the Southern Border of the United States and an Exchange With Reporters, DAILY COMP. PRES. DOC. 79 (Feb. 15, 2019).
[23] Remarks in a Briefing on Drug Trafficking at the Mexico-U.S. Border and an Exchange With Reporters, DAILY PRES. COMP. DOC. 145 (Mar. 13, 2019).
[24] Donald J. Trump (@realDonaldTrump), TWITTER (Jul. 14, 2019, 7:27 AM), https://twitter.com/realDonaldTrump/status/1150381394234941448.
[25] John Haltiwanger, *Trump says that his tweets being called racist 'doesn't concern' him because 'many people agree' with him*, BUSINESS INSIDER (Jul. 15, 2019 2:14 PM), https://www.businessinsider.com/trump-not-concerned-about-racist-tweets-because-many-people-agree-2019-7.
[26] Donald J. Trump (@realDonaldTrump), TWITTER (Jul. 15, 2018, 4:08 PM), https://twitter.com/realDonaldTrump/status/1150874781744607232.
[27] Donald J. Trump (@realDonaldTrump), TWITTER (Aug. 19, 2019, 8:44 AM), https://twitter.com/realDonaldTrump/status/1163446760406171649.

t)  On or about December 6, 2019, President Trump tweeted: "Without the horror show that is the Radical Left, Do Nothing Democrats, the Stock Market and Economy would be even better, if that is possible, and the Border would be closed to the evil of Drugs, Gangs and all other problems! #2020"[28]

u)  On or about December 30, 2019, President Trump said: "We believe our country should be a sanctuary for law abiding Americans, not for criminal aliens. The open borders agenda of the radical left causes profound harm to poor working-class Americans, their extreme policies overcrowd schools and hospitals, they drain vital public resources, deplete health care dollars, and place enormous burdens on taxpayers of every background."[29]

## C.  Commissioner Morgan's Comment on Children.

55.  Similar to comments made by President Trump, acting Commissioner of CPB Mark Morgan said: "I've been to the detention facilities where I've walked up to these individuals that are, so called, minors, 17 or under, and I've looked at them and I've looked at their eyes, Tucker, and I said, that is a soon to be MS-13 gang member, its unequivocal."[30]

## D.  "I'm 10-15."

56.  On or about July 1, 2019, ProPublica, an online journal, reported on the "I'm 10-15" secret Facebook group that had approximately 9,500 subscribers to said group.[31] According to the article, 10-15 is a code used by border patrol agents, which means "aliens in custody." The article states:

> Members of a secret Facebook group for current and former Border Patrol agents joked about the deaths of migrants, discussed throwing burritos at Latino members of Congress visiting a detention facility in Texas on Monday and posted a vulgar illustration depicting Rep. Alexandria Ocasio-Cortez engaged in oral sex with a detained migrant, according to screenshots of their postings. In one exchange, group members responded with indifference and

---

[28] Donald J. Trump (@realDonaldTrump), TWITTER (Dec. 6, 2019, 10:00 AM), https://twitter.com/realdonaldtrump/status/1202981139155210241.
[29] Remarks at the Turning Point U.S.A Student Action Summit in West Palm Beach, Florida, DAILY PRES. COMP. DOC. 886 (Dec. 21, 2019).
[30] *The Lead with Jake Tapper: Expected CBP Chief Made Racist Comments About Migrant Kids*, CNN (June 25, 2019), https://www.cnn.com/videos/politics/2019/06/25/ice-chief-mark-morgan-fox-news-look-in-eyes-and-see-ms-13-gang-member-begala-sot-lead-vpx.cnn.
[31] Thompson A.C., *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica, https://www.propublica.org/article/secret-border-patrol-facebook-group-agents-joke-about-migrant-deaths-post-sexist-memes (posted July 1, 2019). A true and correct copy of the article is attached as **Exhibit 2** because it contains screen shots taken from the 10-15 Facebook group.

wisecracks to the post of a news story about a 16-year-old Guatemalan migrant who died in May while in custody at a Border Patrol station in Weslaco, Texas. One member posted a GIF of Elmo with the quote, "Oh well." Another responded with an image and the words "If he dies, he dies."

57.    On or about July 12, 2019, The Intercept, an online journal, reported that former United States Border Patrol Chief, Carla Provost, was a member of I'm 10-15 and even commented on various posts.[32] The article states:

> Provost is one of several Border Patrol supervisors The Intercept has identified as current or former participants in the secret Facebook group, including chief patrol agents overseeing whole Border Patrol sectors; multiple patrol agents in charge of individual stations; and ranking officials in the Border Patrol's union, who have enjoyed direct access to President Donald Trump. (It is technically possible that someone else posted in the group using the individuals' accounts.) The group's existence has already generated at least two investigations from lawmakers and internal Department of Homeland Security oversight bodies.

58.    On or about July 15, 2019, the New York Times published an article regarding "I'm 10-15", and provided the following information[33]:

> At least 62 current federal border agents have joined private Facebook groups and other social media pages that included obscene images of Hispanic lawmakers and threats to members of Congress, internal investigators said on Monday. In all, 70 current or former Customs and Border Protection employees were identified as members of the groups, officials from the agency's Office of Professional Responsibility said.
>
> Representative Jerrold Nadler, Democrat of New York and the chairman of the House Judiciary Committee, described the Facebook posts as "racist and misogynist" during a Monday hearing on overcrowded Border Patrol facilities.

---

[32] Devereaux Ryan, *Border Patrol Chief Carla Provost was a Member of Secret Facebook Group*, The Intercept, https://theintercept.com/2019/07/12/border-patrol-chief-carla-provost-was-a-member-of-secret-facebook-group/ (posted July 12, 2019). A true and correct copy of the article is attached as **Exhibit 3**.
[33] Kanno-Youngs Zolan, *62 Border Agents Belonged to Offensive Facebook Group, Investigation Finds*, The New York Times, https://www.nytimes.com/2019/07/15/us/politics/border-patrol-facebook-group.html (Posted July 15, 2019).

59.     On or about January 27, 2020, Bennie G. Thompson, Chairman of the Committee on Homeland Security in the U.S. House of Representatives, sent a letter to Mark A. Morgan, the acting Commissioner of CBP[34] ("Thompson Letter"), which states:

> On Friday, I received notification that Mr. Rodney S. Scott has been selected as the new Chief of the U.S. Border Patrol. According to media reports, Mr. Scott engaged with at least one social media site—the Facebook group "I'm 10-15"—in which CBP personnel communicated vulgar and discriminatory comments.

60.     On or about February 2, 2020, Chief Rodney S. Scott assumed command of the United States Border Patrol becoming the 24th Chief since its establishment in May 28, 1924.[35]

**E.      Border Wall is About Re-election, Not a Compelling Government Interest.**

61.     On or about May 9, 2018, John Bolton, then the United States National Security Advisor to President Trump, heard the following remarks from President Trump: "I got elected on this issue [border wall], and now I'm going to get unelected."[36] President Trump further stated: "We're doing the worst job on the border of any Administration. I ran and won on the border. We have a national emergency. . ."[37]

<u>FROM ANIMUS TO UNCONSTITUTIONAL GOVERNMENTAL ACTION</u>

**A.      President Donald Trump's Action.**

62.     On or about January 24, 2017, President Trump tweeted: "Big day planned on NATIONAL SECURITY tomorrow. Among many other things, we will build the wall!"

---

[34] Ltr. From Bennie G. Thompson, Chairman, U.S. House of Representatives Comm. On Homeland Sec. (Jan. 27, 2020). A true and correct copy of the Thompson Letter is attached as **Exhibit 4**.
[35] DHS, *Chief United States Border Patrol Rodney S. Scott*, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices/chief-united-states-border-patrol (last modified April 16, 2020).
[36] Bolton John, *The Room Where it Happened*, 228 (2020).
[37] *Id.*

63.    On or about January 25, 2017, President Trump initiated Executive Order 13767: Border

Security and Immigration Enforcement Improvements. The Executive Order provides, in relevant

part, as follows:

- Border security is critically important to the national security of the United States. Aliens who illegally enter the United States without inspection or admission present a significant threat to national security and public safety. Such aliens have not been identified or inspected by Federal immigration officers to determine their admissibility to the United States. The recent surge of illegal immigration at the southern border with Mexico has placed a significant strain on Federal resources and overwhelmed agencies charged with border security and immigration enforcement, as well as the local communities into which many of the aliens are placed.

- It is the policy of the executive branch to: (a) secure the southern border of the United States through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism;

- "Southern border" shall mean the contiguous land border between the United States and Mexico, including all points of entry.

- "Border States" shall mean the States of the United States immediately adjacent to the contiguous land border between the United States and Mexico.

64.    On or about January 25, 2017, President Trump tweeted: "Beginning today, the United States

of America gets back control of its borders. Full speech from today @DHSgov:

https://t.co/CXn2u87Vv6?amp=1"[38]

65.    During the full speech linked above, President Trump, in his remarks at the Department of

Homeland Security, stated:

> Here is a brief summary of the what actions are contained in my Executive Orders. The Secretary of Homeland Security, working with myself and my staff, will begin immediate construction of a border wall. So badly needed. You folks know how badly needed it is, as a help, but very badly needed. This will also help Mexico by deterring illegal immigration from Central America and by disrupting violent cartel networks. As I've said repeatedly to the country, we're going to get the bad ones out. The criminals and the drug deals and gangs

---

[38] Donald J. Trump (@realDonaldTrump), TWITTER (Jan. 25, 2017, 6:03 PM), https://twitter.com/realdonaldtrump/status/824407390674157568.

and gang members and cartel leaders. The day is over when they can stay in
our country and wreak havoc. We are going to get them out and were going to
get them out fast and John Kelly is going to lead that way.

66.    On or about January 24, 2020, U.S. Customs and Border Protection released a status update

noting the allocation of funding for the border wall: "FY 2020 funding includes $1.375 billion for

approximately 69 miles of new border wall system in the Laredo Sector in locations where no barriers

currently exist."

67.    On or about February 24, 2020, U.S. Customs and Border Protection released a document

which stated:

U.S. Customs and Border Protection (CBP) is constructing new border wall
system in Zapata and Webb counties, Texas, within the U.S. Border Patrol
Laredo Sector. CBP is constructing approximately 51 miles of new border
system in Webb County, Texas and approximately 18 miles of new border
system in Zapata County, Texas.

68.    On or about February 24, 2020, Zapata County Commissioners voted unanimously to deny

rights of entry to U.S. Customs and Border Protection.

**B.    DHS Waivers.**

69.    On or about May 15, 2020, DHS published in the Federal Register, Vol. 85, No. 95, notice of

the determination to waive "certain laws, regulations and other legal requirements in order to ensure

the expeditious construction of barriers and roads in the vicinity of the international land border in

Webb County and Zapata County, Texas ("May 15th Notice").[39]

70.    The May 15th Notice purports to waive the following laws:

- The National Environmental Policy Act (Pub. L. 91–190, 83 Stat. 852
  (Jan. 1, 1970) 42 U.S.C. 4321 et seq.));
- the Endangered Species Act (Pub. L. 93– 205, 87 Stat. 884 (Dec. 28,
  1973) (16 U.S.C. 1531 et seq.));
- the Federal Water Pollution Control Act (commonly referred to as the
  Clean Water Act (33 U.S.C. 1251 et seq.));

---

[39] A true and correct copy of the May 15th Notice is attached as **Exhibit 5**.

- the National Historic Preservation Act (Pub. L. 89– 665, 80 Stat. 915 (Oct. 15, 1966), as amended, repealed, or replaced by Public Law 113–287, 128 Stat. 3094 (Dec. 19, 2014) (formerly codified at 16 U.S.C. 470 et seq., now codified at 54 U.S.C. 100101 note and 54 U.S.C. 300101 et seq.));
- the Migratory Bird Treaty Act (16 U.S.C. 703 et seq.);
- the Migratory Bird Conservation Act (16 U.S.C. 715 et seq.);
- the Clean Air Act (42 U.S.C. 7401 et seq.);
- the Archeological Resources Protection Act (Pub. L. 96–95, 93 Stat. 721 (Oct. 31, 1979) (16 U.S.C. 470aa et seq.));
- the Paleontological Resources Preservation Act (16 U.S.C. 470aaa et seq.);
- the Federal Cave Resources Protection Act of 1988 (16 U.S.C. 4301 et seq.);
- the Safe Drinking Water Act (42 U.S.C. 300f et seq.);
- the Noise Control Act (42 U.S.C. 4901 et seq.);
- the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. 6901 et seq.);
- the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601 et seq.);
- the Archaeological and Historic Preservation Act (Pub. L. 86–523, 74 Stat. 220 (June 27, 1960) as amended, repealed, or replaced by Pub. L. 113–287, 128 Stat. 3094 (Dec. 19, 2014) (formerly codified at 16 U.S.C. 469 et seq., now codified at 54 U.S.C. 312502 et seq.));
- the Antiquities Act (formerly codified at 16 U.S.C. 431 et seq., now codified at 54 U.S.C. 320301 et seq.);
- the Historic Sites, Buildings, and Antiquities Act (formerly codified at 16 U.S.C. 461 et seq., now codified at 54 U.S.C. 3201–320303 & 320101–320106);
- the Farmland Protection Policy Act (7 U.S.C. 4201 et seq.);
- National Fish and Wildlife Act of 1956 (Pub. L. 84–1024 (16 U.S.C. 742a, et seq.));
- the Fish and Wildlife Coordination Act (Pub. L. 73–121, 48 Stat. 401 (March 10, 1934) (16 U.S.C. 661 et seq.));
- the National Trails System Act (16 U.S.C. 1241 et seq.);
- the Administrative Procedure Act (5 U.S.C. 551 et seq.);
- the Rivers and Harbors Act of 1899 (33 U.S.C. 403);
- the Wild and Scenic Rivers Act (Pub. L. 90–542 (16 U.S.C. 1281 et seq.));
- the Eagle Protection Act (16 U.S.C. 668 et seq.);
- the Native American Graves Protection and Repatriation Act (25 U.S.C. 3001 et seq.); and
- the American Indian Religious Freedom Act (42 U.S.C. 1996). (collectively, May 15th Waivers")

71.    The May 15th Notice states, "[i]n the vicinity of the international land border in Webb County, Texas, and Zapata County, Texas," but it remains silent regarding how far north the waivers extend. Not all portions of Zapata County and/or Webb County, Texas, are in the vicinity of the international land border, and the purported waivers do not apply to said locations and/or citizens outside the vicinity of the international land border. The May 15th Notice simply states: "[s]tarting at the Columbia Solidarity International Bridge and generally following the Rio Grande River south and east to approximately one-half (0.5) of a mile south of the southern boundary of the city limits [sic] of San Ignacio [sic], Texas."[40]

72.    The May 15th Waivers also contain a catchall statement regarding waiver of state and local laws without identification of a specific law:

> Accordingly, pursuant to section 102(c) of IIRIRA, I hereby waive in their entirety, with respect to the construction of physical barriers and roads (including, but not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors) in the project area, all of the following statutes, including **all** federal, **state, or other laws, regulations, and legal requirements of**, deriving from, or related to the subject of, the following statutes, as amended. . . (emphasis added).

## C.    A Brief Summary of DHS and CBP Communication with Zapata County.

73.    Zapata County received a general letter addressed to "To Whom it May Concern" dated Febuary 21, 2020, seeking comments from Zapata County regarding input on potential impact as a result of border wall construction. No other request for consultation was sought by CBP.

74.    Zapata County received a second correspondence from CBP dated February 24, 2020, seeking the execution of a Right of Entry for Survey and Site Assement ("ROE"). An ROE purportedly allows

---

[40] San Ygnacio is not incorporated and is thus not a city. Additionally, the name is misspelled in the waiver.

DHS and/or CBP engineers and other personnel from the United States Army Corp of Engineers to survey and test property in order to plan for and construct border wall fencing.

75.     On or about May 18, 2018, Zapata County received correspondence from the United States Department of Justice advising that it was providing Notice of Condemnation. On or about June 8, 2020, Zapata County filed its Original Answer & Objections to the Notice of Condemnation.

**D.    No Consultation to Minimize the Impact.**

76.     DHS and/or CBP have not engaged in any meaningful consultation with Zapata County, or the other plaintiffs, as required by IIRIRA Sec. 102(b)(1)(C), which states:

> **[i]n carrying out this section**, the Secretary of Homeland Security, shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, **local governments**, Indian tribes, and **property owners** in the United States to **minimize the impact** on the environment, culture, commerce, and quality of life for the communities and residents **located near the sites** at which such fencing is to be constructed. (emphasis added).

77.     The Consolidated Appropriations Act of 2008[41] creates a consultation mandate with which DHS must comply. The Appropriations Act amended the note to 8 U.S.C. § 1103 by adding, among other provisions, the consultation clause. *United States v. 1.04 Acres of Land*, 538 F. Supp. 2d 995, 1012-15 (S.D. Tex. 2008). The consultation provision was introduced by United States Senator Kay Bailey Hutchinson of Texas as Senate Amendment 2466 to House Resolution 2638. *See* H.R. Res. 2638, 110th Cong. (2007). The report states:

> [The Committee] is aware that the Department [of Homeland Security] has recently begun to consult with States and local government in some affected border communities, and directs the Secretary to continue such consultation or initiate it immediately. The Committee directs that border security fencing and tactical infrastructure installations be implemented in ways that take full advantage of natural terrain and barriers and minimize adverse impacts on the environment and local communities.

*Id* at 34, 37.

---

[41] Pub. L. 110-161, 121 Stat. 2090 (2007)

78.     The only meetings held by CBP related to the condemnation process involved in the border wall construction. The meetings did not focus on the issues relevant to minimizing the impact of the border wall construction on the environment, culture, commerce, and quality of life for the residents of Zapata County and Webb County, Texas, located in the Waiver Zone or near the sites of the border wall construction.

79.     As of the filing of this Complaint, neither DHS nor CBP have engaged or attempted any consultation with Zapata County regarding San Ygnacio's historic designation, the historic buildings, the bird sanctuary, the SYWW, or the community in Ramireño and how or in what manner to preserve, protect and account for the impact posed by the Waivers and border wall construction. Upon information and belief, DHS and/or CBP have not conducted or produced any studies regarding the impact the Waivers or the border wall will have on Zapata County. If such studies have been conducted, the studies have been conducted without consultation or notice to Zapata County.

**E.      2nd Class Citizens.**

80.     Zapata County and Webb County are the target of a racist policy in violation of the Fifth Amendment to the United States Constitution.

81.     Citizens in Zapata County and Webb County, Texas, are treated differently from United States citizens who do not live along the United States/Mexico border.

82.     The IIRIRA Waivers violate the Fifth Amendment in the following ways: (1) the Waivers can only be applied in the vicinity of the United States/Mexico border creating a 2nd Class United States citizen with no due process rights as it relates to the Waivers; (2) the Waivers as applied in Zapata County, Texas violate the Fifth Amendment because DHS has failed to consult with Zapata County and its citizens in the same manner and with the same deference as DHS has in other communities such as the San Diego Sector (a predominately white and affluent community); (3) the notice of waivers issued in the Zapata County and Webb County, Texas fail to identify the limits of where the

waivers apply ("Waiver Zone") in order to provide citizens within the Waiver Zone the opportunity to challenge the Waivers within the 60 day statute of limitations; (4) the waiver notice also fails to identify what areas fall outside the Waiver Zone to allow those citizens and community members to protect themselves from the negative impacts of the Waivers; and (5) DHS is not competent to determine what laws to waive or not waive that impact the environment, cultural monuments, and/or any laws pertaining to Zapata County's duty to care for the safety and welfare of its citizens to accurately determine which laws to waive. For these reasons, the authority delegated to DHS does not contain an intelligible principle as it relates to the issues outlined herein. As such, the May 15th Waivers violate the non-delegation doctrine.

83.    The Waivers and border wall construction proposed in the Laredo Sector issue from by an animus towards Mexicans, Mexican Americans and/or border communities perpetuated by President Trump. The pejorative comments regarding immigrants, Mexico, the border region in South Texas and statements regarding Mexican Americans create a negative and racist stigma in the Zapata County and Webb County regions as a dangerous place with dangerous people. Thus, this inflammatory rhetoric generates the perception that the United States/Mexico border is lawless and that people of Mexican descent are endangering United States citizens through pervasive criminal behavior. This racist rhetoric has made border wall construction a divisive issue in the political life of the United States, and this racist and nationalist rhetoric now drives unconstitutional governmental action against United States citizens living in Zapata County and Webb County in violation of the Fifth Amendment.

84.    The Plaintiffs assert their right to contest the constitutionality of the Waivers at issue in Zapata County and/or Webb County and the constitutionality of the border wall.

85.    The Plaintiffs further assert that the issuance of President Donald Trump's Executive Order Number 13767 also violates the Fifth Amendment because it's a result of President Trump's animus against Mexicans, Mexican-Americans, communities of color who live in Zapata County and/or Webb

County, Texas. The reliance of DHS/CBP on said executive order to use eminent domain to seize land in Zapata County and/or Webb County in order to construct a border wall in said communities violates the principles of fairness, due process and equal protection that exist in the Fifth Amendment to the United States Constitution.

86.      Like IIRIRA, Executive Order Number 13767 creates a 2nd Class United States citizen at the southern border who can have their land seized wholesale based on racist and white nationalist motives. The Plaintiffs have standing to contest this Executive Order and IIRIRA because they have land targeted for seizure for the unconstitutional border wall. Plaintiffs will further show that the issues raised by the condemnation proceedings against Zapata County in the Condemnation Matter and potential condemnation proceedings against Mrs. Cigarroa and CCMD violate the Fifth Amendment because said governmental action is an assault on the cultural and historical connection of communities of Zapata County and Webb County, Texas to the Rio Grande River. This assault on the Plaintiffs cannot be justly compensated because said connections are priceless and integral to the very essence of said communities. As such the condemnation proceedings and/or border wall construction violates the Fifth Amendment.

## UNITED STATES CITIZENS AT THE BORDER

**A.      Melissa Renteria Cigarroa.**

87.      Mrs. Cigarroa, a Mexican American, is a resident of Laredo, Texas situated in Webb County, Texas. She owns approximately 173 acres in Zapata County through CCMD. Mrs. Cigarroa files her claims as a landowner in Zapata County, whose land has been targeted by DHS/CBP for condemnation, but also as a landowner in Zapata County and citizen of Webb County affected by the May 15th Notice.

88.     While it is clear that Mrs. Cigarroa's land located in Zapata County is within the Waiver Zone, it is not clear if her home located in the Heights Neighborhood, which is situated approximately two miles from the Rio Grande River in Laredo, Texas, is in the Waiver Zone.

89.     On or about February 7, 2020, Mrs. Cigarroa attended meetings with CBP and Assistant United States Attorney Paxton Meyer Warner in what was dubbed a landowners meeting. During the meeting, the CBP representatives and Mr. Meyer Warner discussed the condemnation process and explained that landowners did not have grounds to prevent the border wall construction or the waivers of laws pursuant to IIRIRA Sec. 102. While the tone of the meeting was cordial, CBP and Mr. Meyer Warner attempted to prevent opposition to the border wall construction by the landowners present.

90.     On or about March 11, 2020, Mrs. Cigarroa, and her husband, Carlos Cigarroa, M.D., attended a subsequent meeting where Karen Guillot, a representative of U.S. Army Corp. of Engineers, and two CBP agents again discussed the condemnation process and took comments and questions from landowners. At that meeting, Ms. Guillot expressed that she would check if any studies regarding the impact to wildlife had been undertaken and stated that this question had not been previously discussed. However, Ms. Cigarroa reminded her that the question had been raised and discussed at the February 7th meeting, at which Ms. Guillot was present, thus indicating to landowners that their environmental concerns were being ignored.

91.     Mrs. Cigarroa left the meetings understanding landowners had no option but to sign the ROE. More important, the meetings focused on the condemnation process and not on how to minimize the impact to the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed or within the Waiver Zone.

92.     Mrs. Cigarroa had the impression that CBP would listen to landowner concerns if the ROE was signed, but if the landowner constested signing of the ROE, then the opportunity to consult was waived or lost. Indeed, government representatives made clear that the only avenue to discuss how to

minimize the impact to the environment, culture, commerce, and quality of life for the communities and landowners could only occur once the ROE was signed and surveyors could access the property, thus initiating the condemnation process before the requisite consultation process.

93.     From 2018 through 2020, Mrs. Cigarroa served as the president of the board of directors for the Rio Grande International Studies Center ("RGISC"). RGISC is the largest and most important environmental non-profit organization in Webb County and Zapata County, Texas, focused on protecting the Rio Grande River and minimizing water pollution for the region's sole source of drinking water. In her role with RGISC, Mrs. Cigarroa has followed the developments regarding DHS/CBP's proposed border wall construction and the waivers pursuant to IIRIRA Sec. 102. Mrs. Cigarroa is not aware of any meeting where there was any significant discussion or request for information from DHS/CBP regarding how to minimize the impact to the environment, culture, commerce, and quality of life for the communities and residents located near the proposed fencing construction sites or within the Waiver Zone.

94.     As a landowner with property in Zapata County identified as land that may be condemned for border wall construction, and as a citizen of the City of Laredo impacted by the May 15th Notice, and as the president of Laredo's most significant environmental non-profit organization tasked with protecting the Rio Grande River and water in the communities of Zapata County and Webb County, Texas, Mrs. Cigarroa has not had the opportunity to attend any meeting with DHS/CBP where there was any conversation regarding how to minimize the impact to the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed or within the Waiver Zone. If Mrs. Cigarroa has not attended any such meeting, there is a strong chance that no such meeting has occurred in Zapata County and Webb County, Texas.

**B.      George Rincon.**

95.      Mr. Rincon, a Mexican American, is a resident of Zapata County. He has resided in San Ygnacio, Texas for approximately 25 years. Mr. Rincon is an active member of the community and is the Executive Director of the River Pierce Foundation, which works to identify, conserve and make known the built vernacular and cultural heritage of the rural village of San Ygnacio, Texas, including the San Ygnacio Historic District (National Register of Historic Places 1973). Mr. Rincon is concerned that the historic buildings owned by the River Pierce Foundation and the historic buildings near the river will be destroyed because of flooding as a result of the border wall.

96.      Mr. Rincon is also a member of the No Border Wall Coalition in Zapata County, Texas, and has attended multiple meetings with landowners potentially impacted by the border wall construction and/or the May 15th Notice. To his knowledge, Mr. Rincon is not aware of any meetings between landowners and DHS/CBP where any conversation occurred regarding how to minimize the impact to the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed or within the Waiver Zone.

97.      As a citizen of San Ygnacio, Mr. Rincon is further impacted by the May 15th Notice because of the potential for pollution of the Rio Grande River, interruption in his water supply, and the destruction of the bird sanctuary in San Ygnacio, an environmental asset of his community.

98.      Mr. Rincon is concerned by the total failure of the Defendants to study the region, and especially the cultural and historical legacy of San Ygnacio. He stated:

> This is not the first time that outside agencies make policy decisions which have had adverse effects on this sector of the US/Mexico Border: Treaty of Guadalupe Hidalgo, which made Spanish/Mexican settlements subject to the laws of the USA; or the planning and construction of the Falcon Dam which destroyed many other historic settlements like Revilla, old Zapata, etc. This is what makes San Ygnacio a nationally significant historic site. Additionally, the Treviño-Uribe Rancho, San Ygnacio's oldest structure is a National Historic Landmark, one of 6 between El Paso and Brownsville. It holds the same historic status as the Golden Gate Bridge, the Statue of Liberty, the Alamo, and Mount Rushmore.

**C.    Meaningless Meetings.**

99.    In the Laredo Sector, which includes Zapata County, CBP conducted online webinars where predetermined questions with answers were made public. Those who participated in the webinars did not have the opportunity to provide feedback other than to submit comments online. To date, the public has not been made aware of what feedback was offered and no information has been provided by DHS/CBP regarding impact and mitigation plans regarding environment, culture, commerce, and quality of life for the residents of Zapata County and Webb County located in the Waiver Zone or near the sites of the border wall construction.

100.    DHS and/or CBP have failed to conduct meetings or discuss the impact of the border wall construction and the waiver of laws included in the May 15th Notice on the environment, culture, commerce, and quality of life for the residents of Zapata County and Webb County located outside the Waiver Zone and/or sites of the border wall construction.

101.    Therefore, the May 15th Notice fails to provide sufficient information to residents in Zapata County and Webb County, Texas, that allows said residents to determine if they live outside the Waiver Zone. The May 15th Notice was not published in Spanish, so any Zapata County and/or Webb County citizen who does not read English has received no notice whatsover. With the exception of a few, most citizens in Zapata County and Webb County have no idea that the deadline to challenge the waivers is July 14, 2020.

102.     As such, DHS and/or CBP have failed to carry out their obligations under IIRIRA and have further treated the landowners and citizens of Zapata County and Webb County in a discriminatory manner prohibited by the United States Constitution.

103.    As of the filing of this Complaint, DHS and/or CBP have not engaged in or attempted any consultation with landowners or residents of Zapata County and Webb County, Texas regarding the environment, culture, commerce, and quality of life for the residents of Zapata County and Webb

County, Texas, concerning the proposed construction of a border wall and the waivers issued by DHS on or about May 15, 2020. If such studies have been conducted, the studies have been conducted without consultation with or notice to Zapata County and other plaintiffs.

**D.    Consult First to Minimize Impact.**

104.    Dr. Thomas Vaughn, retired environmental scientist and professor at Texas A&M International University, and Eduardo Garza P.E., an engineer and expert on environmental studies relating to flooding and construction, explain that in order to minimize the impact to the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed or within the Waiver Zone, DHS and/or CBP must consult first and assess the potential impact before issuing waivers, seizing land and commencing construction. Therefore, DHS and/or CBP have failed to provide the protections required by IIRIRA Sec. 102(b)(1)(C).

105.    Despite the statutory requirement to consult, DHS and CBP failed to do so, and instead offered meaningless reassurances to the communities targeted for border wall construction with hollow words:

> DHS/CBP remains committed to protection of the nation's important natural and cultural resources. DHS/CBP has been, and will continue coordinating and consulting with other federal, state, and local resource agencies and other interested stakeholders to **ensure** that potential impacts to the environment, wildlife, and cultural and historical resources are analyzed and minimized, **to the greatest extent possible**. (emphasis added).[42]

---

[42] DHS's May 15, 2020, press release regarding the waivers in Zapata County and Webb County, Texas.

WHO YOU ARE/WHERE YOU LIVE MATTERS TO DHS

**A.     DHS Consultation in Southern California.**

106.     On or about February 27, 2018, the *In re Border Infrastructure Envtl. Litig.* opinion was issued by

the United States District Court for the Southern District of California. *In re Border Infrastructure Envtl.*

*Litig.*, No. CV 17-1215 GPC (WVG), 284 F. Supp. 3d 1092, 2018 U.S. Dist. LEXIS 31847, 2018 WL

1071702, at *1 (S.D. Cal. Feb. 27, 2018).

107.     The case involved three consolidated cases challenging waiver determinations made by former

Secretaries of the Department of Homeland Security on August 2, 2017, and September 12, 2017,

pursuant to section 102 of IIRIRA waiving the legal requirements of National Environmental

Protection Act , the Endangered Species Act, the Coastal Zone Management Act and more than 30

additional laws not at issue in these cases.

108.     The *In re Border Infrastructure* waivers concerned two types of border wall construction projects

in San Diego County: (1) a border wall prototype project; and (2) the replacement of fifteen miles of

existing border fence in the San Diego Sector and three miles of existing border fence in the El Centro

Sector.

109.     According to the *In re Border Infrastructure* order issued on February 27, 2018 by U.S. District

Court Judge Gonzalo P. Curiel, DHS had extensive consultations with stakeholders in the San Diego

Sector and conducted various studies and reports as part of both the condemnation and construction

process. *Id* at 18.

110.     The prototype project[43] occurred entirely on federal property that is "used as an enforcement

zone for border security purposes and is heavily disturbed. CBP [Customs and Border Patrol] did not

---

[43] The temporary border wall prototypes were for research purposes and were torn down after construction. *See* John Burnett, *Border Wall Prototypes Destroyed, Making Way for New Fencing*, National Public Radio, Feb 27, 2019 [Accessed on June 28, 2020 at https://www.npr.org/2019/02/27/698620276/watch-border-wall-prototypes-destroyed-making-way-for-new-fencing]

meet with USDA, the State of California, local government, or Indian Tribes as it determined they were not stakeholders. However, CBP met with one adjacent landowner and in response to the landowner's concerns, installed temporary fencing to prevent unauthorized construction access across the landowner's property." *Id.* CBP met with U.S Department of the Interior, U.S. Fish and Wildlife Service, and Bureau of Land Management's staff, toured the project area and discussed potential environmental impacts. CBP also met with the General Service Administration to discuss potential environmental impacts and routing of construction traffic. CBP also conducted a field survey considering natural and biological resources and published a report. It also conducted a field survey to identify any cultural or historical resources and published a report. After the surveys were completed, CBP conducted additional consultations with federal agencies to review the results. Ultimately, CBP found that the prototype project "would have no impact on cultural or historic resources and would not have a significant impact on any endangered species as there are no threatened or endangered species in the project area, and no vernal pools, wetlands or other surface water located within the project area." *Id.* Despite this, CBP mandated its contractors follow certain best management practices and adjusted the prototype project based on the surveys and consultations. *Id.*

111.    The replacement of three miles of existing border fence in the El Centro Sector was done primarily on federal land that is used primarily for border enforcement or port operations. CBP met with representatives from the U.S. Department of the Interior, consulted with the California State Historic Preservation Officer and Native American Tribes to make sure the geo-technical testing did not impact historic or cultural resources. CBP conducted filed surveys to identify natural and historical resources, natural and biological resources, and documented and delineated potential wetlands and waters in the project area. All the surveys were summarized in report detailing those findings. After the surveys were completed, CBP conducted additional outreach and sent letters to U.S. Fish and

Wildlife Service, the California Department of Fish and Wildlife, the California State Historic Preservation Officer and Native American Tribes, the Colorado River Basin Regional Water Quality Control Board, the U.S. Army Corps of Engineers, the Imperial Irrigation District, Imperial County Air Pollution Control District, and the City of Calexico. *Id.*

### WHAT WE NOW KNOW ABOUT ENVIRONMENTAL DAMAGE

112.    Existing border walls have done significant damage to the environment. In the Otay Mountain Wilderness Area, explosives were used to carve out a switch-back road so CBP could access the border wall, generating 530,000 cubic yards of stone waste. More than 100 of the rare Tecate cypresses were reportedly cut down for the road and wall. Debris from construction ended up in the Tijuana River and the channels that feed into it. Prior to construction, the U.S. Environmental Protection Agency found that this would likely violate the Clean Water Act. The U.S. Department of the Interior stated that construction, maintenance and Border Patrol activities would likely harm threatened and endangered species for years to come.[44]

113.    In southern Arizona, the endangered Sonoran Pronghorn has been badly affected by wall construction and the roads and activity associated with increased patrols. US and Mexican populations of Sonoran Pronghorn were increasingly cut off from one another, preventing the genetic exchange necessary to avoid inbreeding and ensure healthy populations. U.S. Fish and Wildlife Service observed that the traffic, diesel generator noise, and 24-hour floodlights caused Sonoran pronghorn to abandon critical habitat. In 2009, due to heavy Border Patrol traffic on a nearby patrol road, biologists saw the pronghorn abandon land that had been managed to maximize forage for pronghorns. After moving into less suitable terrain, three does lost their fawns.[45]

---

[44] Stefanie Herweck and Scott Nicol, *Death, Damage and Failure, Past, Present and Future Impacts of Walls on the U.S.-Mexico Border*, 23 (ACLU Border Rights Center, September 12, 2018).
[45] *Id* at 28-29.

114.    Jaguars, which were thought to have been wiped out in the US, had begun to return to the Arizona/New Mexico border from Northern Mexico. The walls and noise associated with increased patrols are likely to affect the jaguars in ways similar to the Sonoran pronghorn.[46]

115.    In South Texas, wildlife habitat fragmentation is a serious concern and the federal government had been acquiring land to preserve habitat for the endangered ocelot and jaguarundi. However, portions of the federal land that was previously set aside as wildlife habitat has now been cleared and used for border wall construction. The wall has further fragmented and hurt the already endangered population of ocelots and jaguarundi. Remedial measures taken by CBP appear to be ineffective.[47]

116.    Flooding is another major environmental problem that has been caused by border walls. In Nogales, the urban border walls served as a dam that caused major flooding during a 2008 storm. A wall and gate built by the Border Patrol in an underground storm drain connecting the Nogales sister cities flooded, causing water to break through the ceiling of the underground storm drain and flow south into Nogales, Mexico. Two people were killed in the flooding, that was estimated to have caused $8 million of damage in Mexico.[48]

117.    The Organ Pipe Cactus National Monument in Arizona also saw flooding after border walls were built across creeks, gullies and washes. When walls were initially proposed, the National Park Service expressed concerns that the fence would impede the conveyance of floodwaters across the international boundary; Debris carried by flash floods would be trapped by the fence, resulting in impeded flow and clean up issues."[49] That is exactly what happened. Despite assurances by CBP that the sections of the wall across gullies and washes were designed to convey water, the border wall has

---

[46] *Id* at 34.
[47] *Id* at 40-42.
[48] *Id* at 31-32.
[49] *Id* at 29.

acted as a dam and caused flooding which has washed out different sections of the wall various times since it was built.

118.    In South Texas along the Rio Grande, CBP constructed vertical concrete levees topped with bollards to serve as border walls and replace sloped, earthen levees. The sheer concrete walls completely fragment habitat for even the smallest animals, in ways that even bollard walls do not. Even worse, flood waters will drown almost all animals trapped on the river side of the levee wall, as they cannot cross the river or climb the sheer concrete levee. After a 2010 hurricane, the U.S. Fish and Wildlife Service reported that the "floodwall blocked almost all egress for terrestrial wildlife species." The flooding killed hundreds of threatened Texas Tortoises and likely killed any endangered ocelots or jaguarundis that were in the area. [50]

119.    Border wall construction in Zapata County will cause flooding, fragmentation and destruction of wildlife habitat, and pollution of the Rio Grande with silt and debris. A border wall will also make it virtually impossible for the people of Zapata County to enjoy their river, to fish, hike, canoe and sightsee. The bird sanctuary in San Ygnacio will likely be destroyed by wall construction.

## Unlawful Appointment of Chad Wolf as DHS Acting Secretary

120.    On April 10, 2019, Kristjen Nielsen, who had previously been appointed with the advice and consent of the Senate, resigned as DHS Secretary.

121.    Kevin McAleenan was appointed as Acting Secretary under circumstances which may have violated the FVRA, the Homeland Security Act, and Executive Order 13753.[51]

---

[50] *Id* at 42.

[51] *See* Letter from Bennie G. Thompson, Chair, House Comm. On Homeland Security, et. al to Comptroller of the United States Gene Dodaro (Nov. 15, 2019). https://oversight.house.gov/sites/democrats.oversight.house.gov/files/191115%20T%20Dodaro%20re%20Letter%20to%20GAO%20on%20Wolf-Cuccinelli%20Appointment.pdf

122.     Even assuming a lawful appointment, the 210-day expiration of McAleenan's authority under 8 U.S.C. § 3346(a) expired on November 6, 2019. On November 8, 2019, however, McAleenan amended the order of succession for the Secretary of Homeland Security with the express purpose of appointing Chad Wolf. *Id.*

123.     As of today's date, Chad Wolf has not been confirmed to the position of DHS Secretary with the advice and consent of the Senate. Furthermore, President Trump has not nominated Chad Wolf, or anyone else, to fill the vacancy left by Secretary Nielsen.

VI.     CLAIMS (CONSTITUTIONAL)

**A.     Equal Protection Under the Fifth Amendment of the U.S. Constitution**

124.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

125.     The Fifth Amendment to the US Constitution provides a right to due process, which guarantees equal protection to any person in the United States. *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954). Racial discrimination can be violative of due process. *Id* at 499. Mexicans Americans are a protected class under the Equal Protection Clause. *Hernandez v. Texas*, 347 U.S. 475 (1954). Statutes or government policies that infringe fundamental rights, or that make distinctions based upon suspect classifications, such as race or national origin, are subject to strict scrutiny, which requires that the statute be narrowly tailored to achieve a compelling government interest. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985). The Equal Protection Clause restricts government action inconsistent with elemental constitutional premises. *Plyler v. Doe*, 457 U.S. 202, 216 (1982).

126.     The communities targeted for wall construction by DHS in its May 15, 2020 waiver and President Trump's Executive Order 13767 are overwhelmingly Mexican American. These are communities that have historically been discriminated against and marginalized. Despite the statutory requirement for consultation, no consultation has taken place and no efforts have been made to "minimize the impact on the environment, culture, commerce, and quality of life for the communities

and residents located near the sites at which such fencing is to be constructed." 8 U.S.C. § 1103(b)(1)(c).

127.    The wall construction would completely and totally cut off the Laredo/San Ygnacio border from its only river and water source. The wall will take the property of hundreds of mostly Mexican American landowners along the border, cause great damage to the environment, and deny hundreds of thousands of people access to their river for fishing, swimming, hiking, and enjoying. The deprivation of liberty involved in sealing off the Rio Grande from the majority Mexican American people of the region infringes on their fundamental rights.

128.    Immigration and border control are a legitimate governmental interest. President Trump, DHS and/or CBP have failed to articulate a legitimate governmental interest as it relates to border wall construction in the Laredo Sector. Instead, the animus articulated by President Trump, endorsed by CBP, and displayed by the total failure to consult, makes clear that in the Laredo Sector the proposed border wall construction violates the Fifth Amendment. The majority Mexican American population along the Texas/Mexico border is a protected class under the Fifth Amendment. Because the construction of the wall targets a protected class under the Fifth Amendment and affects their fundamental rights, the construction of the wall must be narrowly tailored to achieve its goal in order to pass constitutional muster. President Trump made clear why he seeks to build a border wall in the Laredo Sector: "I got elected on this issue [border wall], and now I'm going to get unelected." Therefore, the Real ID Act, the May 15th Waivers, Executive Order 13767 and the use of eminent domain based on IIRIRA violate the Fifth Amendment equal protection clause. Based on the foregoing, Plaintiffs seek a declaration of their rights.

**B.    Due Process Under the Fifth Amendment to the U.S. Constitution**

129.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

130. The Secretary's May 15th Notice regarding the waivers was not proper and sufficient notice to alert the residents of the affected areas that their land, rights, culture and environment were endangered. The vast majority of the affected population are Mexican American, many of whom speak only Spanish. The notice was published in the Federal Register in English and to the best of our knowledge, there was not a Spanish version. No effort was made to communicate the importance of the notice or its impact to the affected communities.

131. In addition to specific federal statutes listed previously in the Complaint, DHS waived the following unknown laws in violation of the Fifth and Tenth Amendments of the United States Constitution:

> Accordingly, pursuant to section 102(c) of IIRIRA, I hereby waive in their entirety, with respect to the construction of physical barriers and roads (including, but not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors) in the project area, all of the following statutes, including **all** federal, **state, or other laws, regulations, and legal requirements of**, deriving from, or related to the subject of, the following statutes, as amended. . . (emphasis added).

132. The broad and vague waiver of all state and local laws is a violation of the Fifth Amendment guarantee of due process because Zapata County was not informed on which laws were being waived. Since the Waiver Zone could conceivably include the entire county, Zapata County has no idea which local laws are active and can continue to be enforced and which ones have been waived and can no longer be enforced. Based on the foregoing, Plaintiffs seek a declaration of their rights.

**C.     Violation of the Tenth Amendment**

133. Plaintiffs incorporates by reference the allegations in all preceding paragraphs.

134. IIRIRA Sec. 102(c)(1) authorizes the Secretary to "waive all legal requirements" that he, in his sole discretion, determines necessary to ensure expeditious construction of barriers and roads along the border.

135.    The Secretary's May 15th Waivers pursuant to Section 102(c)(1) purport to waive "all federal, state, or local laws, regulations and legal requirements of, deriving from or related to the subject of" the named federal statutes.

136.    The Secretary's waivers of state and local laws, regulations and legal requirements violate the Tenth Amendment to the U.S. Constitution and basic constitutional principles of federalism.

137.    By issuing the waivers and constructing the border wall between San Ygnacio and the Rio Grande, DHS/CBP will impose tremendous costs on Zapata County. Drainage into the river will be affected and could cause flooding that damages San Ygnacio, particularly the historic structures close to the river. The water intake for SYWW will be affected and will likely have to be moved. The bird sanctuary, which also serves as a local park, will likely be destroyed as part of the wall construction. Fishing, hiking and recreation will all be affected. Zapata County's fire, police and ambulance services will also be affected, as they may not be able to respond to emergencies on the river side of the wall. DHS/CBP is effectively commandeering these local resources as part of their wall construction. This undermines political accountability, as Zapata County and its residents will bear the financial and political costs of decisions and policies made at the federal level. *New York v. U.S.*, 505 U.S. 144, 168-169 (1992).

138.    Additionally, the problems that the waivers and the border wall will cause regarding drainage, police, emergency services, and recreation, are issues left by the Tenth Amendment to the sovereignty of the states. The construction of the border wall thus infringes on these sovereign areas of state and local governance. The waivers and wall construction thus uniquely affect Texas without that disparate treatment being "sufficiently related to the problem that it targets." *Shelby County v. Holder*, 570 U.S. 529, 542 (2013). Despite the lack of any walls or border barriers in the Webb County/Zapata County

area, detentions of undocumented immigrants are at historic lows and continue to fall.[52] Thus, the infringement by the federal government into the sovereignty of the state in a disparate way is not sufficiently related to the problem that it targets. Based on the foregoing, Plaintiffs seek a declaration of their rights.

### D.      Separation of Powers and the Nondelegation Doctrine

139.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

140.    Article I, Section 1 of the United States Constitution directs that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."

141.    Article II, Section 1 of the United States Constitution directs that "[t]he executive Power shall be vested in a President of the United States of America."

142.    Under these constitutional provisions, Congress may not delegate legislative authority to an executive branch agency, or in the case of IIRIRA section 102(c), may not delegate legislative authority to an individual executive branch official.

143.    IIRIRA section 102(c) unconstitutionally delegates legislative powers to the DHS Secretary, an executive branch official, and unconstitutionally purports to exempt the Executive Branch from complying with its constitutional obligation to faithfully execute the laws. In particular, the lack of any accountability or judicial review of the scope of the waiver or of its compliance with the limitations set out by the Congress present serious constitutional concerns.

144.    The purported acting DHS Secretary Chad Wolf's waiver of laws in the "project area" is an unconstitutional exercise of legislative power by an executive branch official, and consequently violates the U.S. Constitution's separation of powers and nondelegation doctrines.

---

[52] Attached as **Exhbit 6** is a chart from the US Border Patrol listing total illegal alien aprehensions by fiscal year 1960-2019 for the Southwest Border Sectors. The document is available on the CBP website at: https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Fiscal%20Year%20Southwest%20Border%20Sector%20Apprehensions%20%28FY%201960%20-%20FY%202019%29_0.pdf

145.    The notice of waivers issued in the Zapata County and Webb County, Texas fail to identify the limits of the Waiver Zone in order to provide citizens within the Waiver Zone the opportunity to challenge the Waivers within the 60 day statute of limitations. The waiver notice also fails to identify what areas fall outside the Waiver Zone to allow those citizens and community members to protect themselves from the negative impacts of the Waivers. Additionally, DHS is not competent to determine what laws to waive or not waive that impact the environment, cultural monuments, and/or any laws pertaining to Zapata County's duty to care for the safety and welfare of its citizens, which also violates the Tenth Amendment. For said reasons, the authority delegated to DHS does not contain an intelligible principle as it relates to the issues outlined herein. As such, the May 15th Waivers violate the non-delegation doctrine. Based on the foregoing, Plaintiffs seek a declaration of their rights.

**E.    Violation of the Appointments Clause of the U.S. Constitution**

146.    Plaintiffs incorporate by reference all of the preceding paragraphs.

147.    The Appointments Clause of the U.S. Constitution requires that officers of the United States are appointed by the President and with the advice and consent of the Senate. U.S. Const. art. II, § 2, cl. 2.

148.    The duties performed by Mr. Wolf in his purported role as Acting Director of DHS qualify the role as an officer of the United States for the purposes of the Appointment Clause.

149.    Although he continues to serve as an officer, Mr. Wolf has not been confirmed by the Senate to the vacant office. Based on the foregoing, Plaintiffs seek a declaration of their rights.

VII.    CLAIMS (STATUTORY)

**A.    *Ultra Vires* Violations**

150.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

151.    The purported waiver of laws under the May 15, 2020 IIRIRA section 102(c) Notice of Determination is an unlawful ultra vires act subject to review by this court. The U.S. Supreme Court has identified a narrow exception to an express statutory bar on judicial review when there is a claim that an agency acted beyond its statutory authority. *See Leedom v. Kyne*, 358 U.S. 184 (1958); *Bd. Of Governors of Fed. Reserve Sys. V. MCorp. Fin., Inc.*, 502 U.S. 32 (1991).  For the exception to apply, the agency must have acted in excess of its delegated powers contrary to clear and mandatory statutory language and the party seeking review must be wholly deprived of a meaningful and adequate means of vindicating its statutory rights. *American Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5ᵗʰ Cir. 1999); *Pac. Mar. Ass'n v. NLRB*, 827 F.3d 1203, 1208 (9ᵗʰ Cir. 2016). *In re Border Infrastructure Envtl. Litig.*, No. CV 17-1215 GPC (WVG), 284 F. Supp. 3d 1092, 2018 U.S. Dist. LEXIS 31847, 2018 WL 1071702, at *1 (S.D. Cal. Feb. 27, 2018).

152.    The IIRIRA Sec. 102(b)(1)(C) provides that the DHS Secretary shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

153.    When DHS attempted to condemn the property of Texas Southmost College in Brownsville, Texas, the U.S. District Court ordered DHS to consider the College's unique status as an institution of higher education and consult with them regarding alternatives to a physical barrier.[53]

154.    When DHS attempted to construct a wall in the San Diego, California area, they: (1) met with numerous federal and state government agencies to discuss potential environmental impacts, (2) conducted field surveys concerning the natural and biological resources on the sites, (3) conducted a

---

[53] Attached as **Exhibit 7** is a true and correct copy of the order of dismissal in Civil Action No. B-08-56; *The United States of America v. 37.52 Acres of Land, more or less, situate in Cameron County, State of Texas; and Texas Southmost College District, et al.*; pending in the United States District Court, Southern District of Texas, Brownsville Division.

field survey and records search to identify any cultural and historical resources in the project area, (4) reviewed the results of the surveys with stakeholders, (5) prepared a Memorandum for the Record analyzing the environmental impacts, (6) prepared a Cultural Resources Survey Report, and (6) mandated its contractors follow certain Best Management Practices.

155.     Consultation as contemplated by the statute and as practiced in Brownsville and San Diego has not occurred. The consultation requirement is clear and mandatory statutory language. If this Court does not intervene, Plaintiffs will be wholly deprived of a meaningful and adequate means of vindicating their statutory rights. Based on the foregoing, Plaintiffs seek a declaration of their rights.

**B.     Violation of the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.***

156.     Plaintiffs incorporate by reference all of the preceding paragraphs.

157.     Mr. McAleenan's appointment as Acting DHS Director violated the Federal Vacancies Reform Act, the Homeland Security Act, and Executive Order 13753. Assuming for argument's sake that Mr. McAleenan's appointment was lawful, Mr. Wolf's appointment as Acting DHS Director violated the Federal Vacancies Reform Act.

158.     Mr. Wolf's appointment was facilitated solely by an order issued by Mr. McAleenan on November 8, 2019, after the statutory expiration of his authority on November 6, 2020. Mr. McAleenan purportedly became Acting DHS Director after the resignation of Secretary Nielsen on April 10, 2019. Mr. Aleenan's order of November 8 2019 was beyond the 210 day limitation of his authority, and thus had no force or effect under 8 U.S.C. § 3348(d)(1).

159.     The purported waiver of laws under the May 15, 2020 IIRIRA Section 102(c) Notice of Determination is an unlawful act made by purported Acting DHS Director Wolf that is invalidated by 8 U.S.C. § 3348. Based on the foregoing, Plaintiffs seek a declaration of their rights.

VIII.     PRAYER

160.     Wherefore, Presmises Considered, Plaintiffs respectfully request that the Court:

a.      Declare that Executive Order 13767 violates the Fifth Amendment of the United States Constitution as outlined above;

b.      Declare that  authority to waive laws conferred upon the Secretary by Section 102(c) of IIRIRA, as amended, is unconstitutional as outlined above;

c.      Declare that the purported Secretary's May 15, 2020, waiver of at least 27 laws (and any subsequent waivers issued after May 15, 2020) in connection with the construction of physical barriers and roads in the vicinity of the United States border, located in the State of Texas, within the Laredo sector (starting at the Columbia Solidarity International Bridge and generally following the Rio Grande River south and east to approximately one-half (0.5) of a mile of the southern boundary of the city limits of San Ygnacio, Texas), is unconstitutional as outlined above;

d.      Declare that the use of eminent domain in the Laredo Sector for border wall construction is unconstitutional as outlined above;

e.      Enjoin the Defendants and their agents or employees from constructing or commencing any wall, fence, road, or other barrier, or related infrastructure, in the vicinity of the United States border, located in the State of Texas, within the Laredo sector (starting at the Columbia Solidarity International Bridge and generally following the Rio Grande River south and east to approximately one-half (0.5) of a mile of the southern boundary of the city limits of San Ygnacio, Texas);

f.      Declare that the purported Acting Secretary's May 15, 2020 waiver of at least 27 laws in connection with the construction of physical barriers and roads in the vicinity of the United States border, located in the State of Texas, within the Laredo sector (starting at the Columbia Solidarity International Bridge and generally following the Rio Grande River south and east to approximately one-half (0.5) of a mile of the southern boundary of the city limits of San Ygnacio, Texas), is unlawful and vacated, and declare that Mr. Wolf is unlawfully serving as DHS Acting Secretary;

g.      In the alternative, Plaintiffs pray that this Court declare Plaintiffs' rights or remedies under IIRIRA, as amended;

h.      In the alternative, Plaintiffs pray that this Court declare Plaintiffs' rights or remedies in conjunction with or relating to the Constitutional provisions set out hereinabove;

i.      Award Plaintiffs their costs and reasonable attorneys' fees in this action; and

j.      Grant such other relief as the Court deems just and proper.

Dated: July 6, 2020                    Respectfully submitted,

                                   By: /s/ Carlos Evaristo Flores
                                   Carlos Evaristo Flores
                                   Southern District of Texas No. 940935
                                   Texas Bar No. 24050606
                                   WHITWORTH CIGARROA, PLLC
                                   602 East Calton, Suite 201
                                   Laredo, Texas 78041
                                   Telephone:  (956) 727-4441
                                   Facsimile: 956.727.2696
                                   E-mail: cflores@wctexlaw.com

                                   ATTORNEY COUNTY OF ZAPATA, TEXAS. MELISSA RENTERIA CIGARROA, CCMD, LLC, AND GEORGE C. RINCON