**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| ZAPATA COUNTY, TEXAS, | § | |
| MELISSA CIGARROA, | § | |
| CCMD, LLC & GEORGE C. | § | |
| RINCON, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CASE NO.    5:20-CV-106 |
| | § | |
| DONALD J. TRUMP, PRESIDENT OF | § | |
| THE UNITED STATES; CHAD WOLF, as | § | |
| the purported acting secretary of THE | § | |
| UNITED STATES OF AMERICA'S | § | |
| DEPARTMENT OF HOMELAND | § | |
| SECURITY and MARK A. MORGAN, as | § | |
| the Acting Commissioner of THE UNITED | § | |
| STATES CUSTOMS AND BORDER | § | |
| PROTECTION, | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

**<u>DEFENDANTS' MOTION TO DISMISS COMPLAINT</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................ii

TABLE OF AUTHORITIES .................................................................................................... iv

TABLE OF EXHIBITS ............................................................................................................. x

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 1

I.       STATUTORY FRAMEWORK ................................................................................. 1

II.      SECRETARY'S EXERCISE OF WAIVER AUTHORITY.................................... 5

III.     LEGAL STANDARD ................................................................................................ 7

     **A.**    Rule 12(b)(1) Motion................................................................................ 7

     **B.**    Rule 12(b)(6) Motion................................................................................ 7

ARGUMENT ............................................................................................................................. 9

I.       PLAINTIFFS' *ULTRA VIRES* CHALLENGE TO THE IIRIRA WAIVER MUST
       BE DISMISSED .......................................................................................................... 9

     **A.**    The Court Lacks Jurisdiction to Consider Plaintiffs' Non-Constitutional
          Claims Regarding the Waiver Decisions ................................................ 9

     **B.**    To the Extent the Court Conducts *Ultra Vires* Review, It Must Conclude
          that the Secretary Did Not Exceed His Statutory Authority ................ 18

II.      PLAINTIFFS' CONSTITUTIONAL CLAIMS FAIL...................................... 23

     **A.**    The Waiver Provision Does Not Violate Article I § 1 .......................... 23

     **B.**    The Waiver Provision Does Not Violate the Tenth Amendment ........ 27

     **C.**    Executive Order 13767 and Waiver of May 15, 2020 Does Not Violate
          Equal Protection under the Fifth Amendment ...................................... 30

     **D.**    May 15, 2020 Waiver Does Not Violate Due Process under the Fifth
          Amendment............................................................................................ 32

     **E.**    Acting Secretary Wolf's Service Does Not Violate the Appointments
          Clause..................................................................................................... 33

III.   PLAINTIFFS' CLAIMS UNDER THE FVRA AND HSA MUST BE
       DISMISSED ............................................................................................ 36

       **A.**   The HSA Authorizes Acting Service .................................................... 37

       **B.**   Mr. McAleenan Lawfully Served Under the HSA ................................ 38

       **C.**   The FVRA's Limit on Acting Service Does Not Apply to Designations
                Under  the HSA.................................................................................... 40

CONCLUSION.................................................................................................... 42

# TABLE OF AUTHORITIES

*Cases*

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*,
   291 F.3d 336 (5th Cir. 2002) ................................................................................ 8

*Am. Airlines, Inc. v. Herman*,
   176 F.3d 283 (5th Cir. 1999) ................................................................ 17, 18, 19

*Am. Fed. Of Gov't Emps., Local 1617 v. FLRA*,
   103 F. App'x 802 (5th Cir. 2004) ...................................................................... 16

*Am. Soc'y of Anesthesiologists v. Shalala*,
   90 F. Supp. 2d 973 (N.D. Ill. 2000) .................................................................. 18

*Amacker v. Renaissance Asset Mgmt. LLC*,
   657 F.3d 252 (5th Cir. 2011) ........................................................................... 7-8

*Animal Legal Def. Fund v. Department of Homeland Sec.*,
   139 S. Ct. 594 (2018) .......................................................................................... 5

*Arizona v. United States*,
   567 U.S 387 (2012) .............................................................................. 27-28, 28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................... 8, 9

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin. Inc.*,
   502 U.S. 32 (1991) ............................................................................... 10, 16, 17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................ 8

*Big Time Vapes, Inc. v. Food & Drug Admin.*,
   963 F.3d 436 (5th Cir. 2020) ............................................................................ 24

*Block v. Community Nutrition Inst.*,
   467 U.S. 340 (1984) .......................................................................................... 11

*Bowen v. Michigan Acad. of Family Physicians*,
   476 U.S. 667 (1986) ................................................................................... 10, 16

*Casa de Maryland, Inc. v. Wolf*,
   No. 8:20-cv-02118, ECF No. 69 (D. Md. Sept. 11, 2020) ........................... 40, 41

*Center for Biological Diversity v. McAleenan*,
   404 F. Supp. 3d 218 (D.D.C. Sept. 4, 2019) ........................................ 5, 12, 24

*Choice Inc. of Texas v. Greenstein*,
   691 F.3d 710 (5th Cir. 2012) .............................................................................. 7

*Cinel v. Connick*,
   15 F.3d 1338 (5th Cir. 1994) .............................................................................. 8

iv

*Clearwater v. Indep. Sch. Dist. No. 166,*
    231 F.3d 1122 (8th Cir. 2000) ................................................................. 32

*Congress." Califano v. Sanders,*
    430 U.S. 99 (1977) ................................................................................ 10

*Connecticut Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ......................................................................... 13, 14

*County of El Paso v. Chertoff,*
    No. 08-196, 2008 WL 4372693 (W.D. Tex. 2008) ....................... 5, 24, 29, 30

*Deer Park Indep. Sch. Dist. v. Harris Cty. Appraisal Dist.,*
    132 F.3d 1095 (5th Cir. 1998) ............................................................... 28

*Defenders of Wildlife v. Chertoff,*
    527 F. Supp. 2d 119 (D.D.C. 2007) ............................................. 5, 12, 24, 25

*Designating an Acting Attorney General,*
    2018 WL 6131923 ................................................................................ 35

*Doe v. Robertson,*
    751 F.3d 383 (5th Cir. 2014) ............................................................... 8, 9

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) ................................................................................. 13

*Estep v. United States,*
    327 U.S. 114 (1946) ......................................................................... 10, 16

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
    545 U.S. 546 (2005) .............................................................................. 9

*Green v. Forney Eng'g Co.,*
    589 F.2d 243 (5th Cir. 1979) ................................................................. 7

*Griffith v. FLRA,*
    842 F.2d 487 (D.C. Cir. 1988) ......................................................... 18, 23

*Guedes v. ATF,*
    356 F. Supp. 3d 109 (D.D.C. 2019) ................................................. 34, 42

*Gunn v. Minton,*
    568 U.S. 251 (2013) .............................................................................. 9

*Heckler v. Chaney,*
    470 U.S. 821 (1985) .............................................................................. 10

*Hooks v. Kitsap Tenant Support Servs.,*
    816 F.3d 550 (9th Cir. 2016) ................................................................ 38

*In re Border Infrastructure Envtl. Litig.,*
    284 F. Supp. 3d 1092 (S.D. Cal. Feb. 27, 2018) ................................. 22, 24

v

*In re Katrina Canal Breaches Litig.*,
   495 F.3d 191 (5th Cir. 2007) ............................................................................ 8

*J.W. Hampton, Jr. Co. v. United States*,
   276 U.S. 394 (1928) ...................................................................................... 24

*Kirby Corp. v. Pena*,
   109 F.3d 258 (5th Cir. 1997) ........................................................................ 16

*Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) ...................................................................................... 26

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ........................................................................................ 7

*Kucana v. Holder*,
   558 U.S. 233 (2010) ................................................................................ 16, 18

*La Posta Band of Diegueno Mission Indians of the La Posta Reservation v. Trump*,
   2020 WL (S.D. Cal. Sept. 9, 2020) ...........................................................21-22

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ................................................................................ 10, 16

*Loving v. United States*,
   517 U.S. 748 (1996) ...................................................................................... 26

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................ 7

*McGirt v. Oklahoma*,
   140 S. Ct. 2452 (2020) ............................................................................ 11, 12

*Mistretta v. United States*,
   488 U.S. 361 (1989) ...................................................................................... 24

*Moosa v. I.N.S.*,
   171 F.3d 994 (5th Cir. 1999) ........................................................................ 12

*New York v. United States*,
   505 U.S. 144 (1992) ................................................................................ 27, 29

*NLRB v. United Food & Commercial Workers Union*,
   484 U.S. 112 (1988) ...................................................................................... 15

*Nyunt v. Broad. Bd. of Gover.*
   589 F.3d 445 (D.C. Cir. 2009) ..................................................................18-19

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983) ................................................................................................ 28

*Paladin Community Mental Health Ctr. v. Sebelius*,
    684 F.3d 527 (5th Cir. 2012) ........................................................................... 18, 19

*Pers. Adm'r of Massachusetts v. Feeney*,
    442 U.S. 256 (1979) ..................................................................................... 30, 31, 32

*Printz v. United States*,
    521 U.S. 898 (1997) ................................................................................................ 30

*Ralpho v. Bell*,
    569 F.2d 607 & n.101 (D.C. Cir. 1977) ................................................................ 10

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) .................................................................................. 7

*Save Our Heritage v. Gonzalez*,
    533 F. Supp. 2d 58 (D.D.C. 2008) ............................................................... 5, 12, 24

*Shelby Cnty., Ala. v. Holder*,
    133 S. Ct. 2612 (2013) ..................................................................................... 28, 29

*Sierra Club v. Ashcroft*,
    2005 WL 8153059 (S.D. Cal. Dec. 13, 2005) ................................... 5, 24, 24-25

*Sullivan v. Leor Energy, LLC*,
    600 F.3d 542 (5th Cir. 2010) .................................................................................. 8

*Switchmen's Union v. Nat'l Mediation Bd.*,
    320 U.S. 297 (1946) ............................................................... 10, 10-11, 16

*Texas Border Coal. v. Napolitano*,
    614 F. Supp. 2d 54 (D.D.C. 2009) ....................................................................... 19

*Touby v. United States*,
    500 U.S. 160 (1991) .......................................................................................... 25-26

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) .......................................................................................... 31

*United States v. Bozarov*,
    974 F.2d 1037 (9th Cir. 1992) ......................................................................... 26, 27

*United States v. DeCay*,
    620 F.3d 534 (5th Cir. 2010) ................................................................................ 27

*United States v. Eaton*,
    169 U.S. 331 (1898) ................................................................................................ 34

*United States v. Lucido*,
    373 F. Supp. 1142 (E.D. Mich. 1974) .................................................................. 42

*United States v. Smith,*
   962 F.3d 755 (4th Cir. 2020) ........................................................................ 34, 38

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) .................................................................................... 30, 32

*Washington v. Davis,*
   426 U.S. 229 (1976) ......................................................................................... 31

*Weiss v. United States,*
   510 U.S. 163 (1994) ......................................................................................... 35

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ......................................................................................... 25

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990) ........................................................................................... 7

*Wilkinson v. Austin,*
   545 U.S. 209 (2005) ......................................................................................... 33

### *Constitutional Provisions*

Art. I § 1 ........................................................................................................... 23

Art. II § 2 .......................................................................................................... 34

5th Amend ..................................................................................... 12, 19, 30, 32

10th Amend .................................................................................................27-28

### *Statues*

5 U.S.C. § 701 ............................................................................................ 10, 27

5 U.S.C. § 3345 ..................................................................................... 35, 41, 42

5 U.S.C. § 3346 .............................................................................................41, 42

5 U.S.C. § 3347 ............................................................................. 36, 38, 40, 41

6 U.S.C. § 113 ........................................... 35, 36, 37, 38, 38-39, 41, 42

6 U.S.C. § 202 .................................................................................................. 1, 2

8 U.S.C § 1103 .................................................................................................... 2

8 U.S.C. § 1226a .............................................................................................. 13

8 U.S.C. § 1701 .................................................................................................... 1

10 U.S.C. § 2667 ............................................................................................... 22

12 U.S.C. § 1818 ............................................................................................... 17

16 U.S.C. §§ 1531 ............................................................................................... 6

22 U.S.C. § 6450 ............................................................................................... 13

28 U.S.C. § 1331 ................................................................................................. 9

28 U.S.C. § 1359 ............................................................................................... 13

42 U.S.C. § 4332 ........................................................................................................ 22

42 U.S.C. § 4321 .......................................................................................................... 6

70 Fed. Reg. 55622 (Sept. 22, 2005) ........................................................................... 5

72 Fed. Reg. 2535 (Jan. 19, 2007) ............................................................................... 5

72 Fed. Reg. 60870 (Oct. 26, 2007) ............................................................................. 5

73 Fed. Reg. 19077 (Apr. 8, 2008) ............................................................................... 5

73 Fed. Reg. 19078 (Apr. 8, 2008) ............................................................................... 5

82 Fed. Reg. 8793 (Jan. 25, 2017) ............................................................................... 2

82 Fed. Reg. 35984 (Aug. 2, 2017) .............................................................................. 5

85 Fed. Reg. 29472 (May 15, 2020) ............................................................... 5, 6, 32, 33

Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009-554 (Sept. 30, 1996) ........ 1, 2, 3, 12, 19, 20, 26

Pub. L. No. 105-292, § 410, 112 Stat. 2787 (Oct. 27, 1998) ................................... 13

Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) .................................................. 2

Pub. L. No. 109-13, Div. B, Title I §102, 119 Stat. 231 (May 11, 2005) .................... 2

Pub. L. No. 109-367, § 3, 120 Stat. 2638 (Oct. 26, 2006) ................................... 1, 2, 3

Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 2090 (Dec. 26, 2007) ...................... 2, 3, 19, 21, 22

Fed. R. Civ. P. 12 ..................................................................................................... 7, 8

## TABLE OF EXHIBITS

Exhibit 1        H.R. Rep. 104-828 (Sept. 24, 1996) (Conf. Rep.) (excerpt)

Exhibit 2        H.R. Rep. 109-72 (May 3, 2005) (Conf. Rep.) (excerpt)

Exhibit 3        109th Cong., H.R. 1268, Div. B § 102 (engrossed in House, Mar. 16, 2005)

Exhibit 4        151 Cong. Rec. H471 (Feb. 9, 2005)

Exhibit 5        151 Cong. Rec. H553-59 (Feb. 10, 2005)

**DHS Succession Documents**

Exhibit 6        Designation of an Order of Succession for the Secretary (Apr. 9, 2019)

Exhibit 7        Amendment to the Order of Succession for the Secretary (Nov. 8, 2019)

Exhibit 8        Order Designating the Order of Succession for the Secretary of Homeland
                 Security (Sept. 10, 2020)

Exhibit 9        DHS Delegation No. 106, Revision 8.5 (Apr. 10, 2019)

Exhibit 10       Letter from Neal J. Swartz, Associate General Counsel for General Law, DHS, to
                 Hon. Michael R. Pence, President of the Senate (Apr. 16, 2018)

Exhibit 11       Letter from Neal J. Swartz, Associate General Counsel for General Law, DHS, to
                 Hon. Michael R. Pence, President of the Senate (Apr. 11, 2019)

Exhibit 12       165 Cong. Rec. S6515-S6520 (Nov. 13, 2019) (excerpt)

**Declaration**

Exhibit 13       Declaration of Paul Enriquez (Sept. 14, 2020)

**Unpublished Court Decisions**

Exhibit 14       Order, *La Posta Band of Diegueno Mission Indians of the La Posta Reservation v.
                 Trump*, No. 3:20-cv-1552, ECF No. 26 (S.D. Cal. Sept. 9, 2020)

Exhibit 15       Memorandum Opinion, *Casa de Maryland, Inc. v. Wolf*, No. 8:20-cv-02118, ECF
                 No. 69 (D. Md. Sept. 11, 2020)

## INTRODUCTION

Congress has repeatedly identified the construction of border infrastructure to prevent illegal entry of people and contraband as a significant priority. In addition to the Executive Branch's inherent authority over immigration policy, foreign affairs, and national security, Congress has called on the U.S. Department of Homeland Security ("DHS") to construct physical barriers and roads along the border to deter illegal crossings in areas of high illegal entry. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA" or "Act"), Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009-554 (Sept. 30, 1996), as amended. In order to speed construction of these border infrastructure projects, Congress gave the Secretary of Homeland Security specific authority to waive any legal requirement necessary to ensure expeditious construction, and strictly limit judicial review of such determinations – only constitutional challenges are permitted and the only appellate review is a petition of certiorari to the Supreme Court. The Act has been repeatedly upheld in the face of legal challenges.

In this suit, Plaintiffs challenge § 102 of the IIRIRA, a waiver issued under its authority, and the appointment of the DHS Secretary who issued the waiver. Plaintiffs raise five constitutional and two statutory theories. For the reasons discussed herein, Defendants respectfully move the Court to dismiss Plaintiffs' Complaint in full.

## BACKGROUND

## I.    STATUTORY FRAMEWORK

Among its responsibilities, DHS is responsible for border security and the detection and prevention of illegal entry into the United States.  *See, e.g.*, 6 U.S.C. § 202(a)(1)-(2).  Congress has ordered DHS to achieve and maintain operational control of the international land border. *See* Secure Fence Act of 2006, Public Law 109-367, § 2(a), 120 Stat. 2638 (Oct. 26, 2006) (8

U.S.C. § 1701 note).  "Operational control" means "prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband."  *Id.* § 2(b).  Consistent with that mandate, the President has directed DHS to take immediate steps to prevent all unlawful entries into the United States, including the immediate construction of physical infrastructure to prevent illegal entry.  *See* Exec. Order 13767 §§ 2(a), 4(a), 82 Fed. Reg. 8793 (Jan. 25, 2017).

Among the statutory authorities provided to DHS to carry out its border security mission is the IIRIRA.  *See* Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009-554 (Sept. 30, 1996).  Codified at 8 U.S.C § 1103 note (and included as an appendix at the end of this memorandum), IIRIRA § 102 has been amended several times.  *See* Dep't of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 2090 (Dec. 26, 2007); Secure Fence Act of 2006, Pub. L. No. 109-367, § 3, 120 Stat. 2638 (Oct. 26, 2006); REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I §102, 119 Stat. 231, 302, 306 (May 11, 2005).  The IIRIRA directs the Secretary of Homeland Security to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  Pub. L. No. 104-208, Div. C., Title I § 102(a), as amended.[1]

In § 102(b), Congress provided certain requirements for implementing the broad mandate laid out in § 102(a).  These requirements have varied over the years.  For example, in 1996,

---

[1] In 1996, responsibility for border enforcement lay with the Attorney General.  The Homeland Security Act of 2002, Pub. L. No. 107-296, created DHS and transferred border enforcement authority to it.  In 2005, IIRIRA § 102 was amended to refer to the DHS Secretary.  *See* H.R. Rep. 109-72 at 171 (May 3, 2005) (Conf. Rep.).

Congress specified that, in "carrying out subsection (a), the [agency] shall provide for the construction . . . of second and third fences, in addition to the existing reinforced fence, and for roads between the fences" in a 14-mile section near San Diego.  Pub. L. No. 104-208, Div. C., Title I § 102(b)(1).  In 2006, Congress struck the reference to San Diego and required construction of "at least 2 layers of reinforced fencing, [and] the installation of additional physical barriers, roads, lights, cameras, and sensors" in five specified locations along the southern border, with deadlines for certain of the projects.  Pub. L. No. 109-367, § 3.  In the most recent amendment, Congress removed the specifications set out in 2006 and instead required "construct[ion of] reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective" and directed DHS to "provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border."  Pub. L. No. 110-161, Div. E, Title V § 564; *see also* IIRIRA § 102(b)(1)(D) (as amended) (stating that the Secretary is free to determine that the use or placement of "fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location" is not "the most appropriate means to achieve and maintain operational control over the international border" at that location).

Section 102(c) seeks to ensure expeditious construction pursuant to the mandate laid out in § 102(a) in two ways.  First, it permits waiver of legal impediments:

> Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section.   Any such decision by the Secretary shall be effective upon being published in the Federal Register.

*Id.* § 102(c)(1).  This provision had originally been limited to the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA"), *see* Pub. L. No. 104-208, Div.

3

C, Title I § 102(c), but the REAL ID Act expanded it to its current breadth. *See* Ex. 2, H.R. Rep. 109-72, at 171-72 (May 3, 2005) (Conf. Rep.) (explaining "Congress' intent that the Secretary's discretionary waiver authority extends to any local, state or federal statute, regulation, or administrative order that could impede expeditious construction of border security infrastructure"); *see also* Ex. 1, H.R. Rep. 104-828, at 200 (Sept. 24, 1996) (Conf. Rep.) (explaining that the original waiver of two environmental laws was intended "to facilitate a uniform construction of necessary fences and roads").

Second, § 102(c) provides for limited and streamlined judicial review of the Secretary's exercise of this waiver authority. Federal district courts have "exclusive jurisdiction" to hear such claims, and the only "cause of action or claim" that may be brought is one "alleging a violation of the Constitution of the United States" that is filed within sixty days of the Secretary's action. *Id.* § 102(c)(2)(A)-(B). The only appellate review is a certiorari petition to the U.S. Supreme Court. *Id.* § 102(c)(2)(C). This provision was adopted by the conference committee for the appropriations bill of which the REAL ID Act was a part. The House bill would have entirely barred judicial review, *see* Ex. 3, 109th Cong., H.R. 1268, Div. B § 102 (engrossed in House, Mar. 16, 2005), but some had expressed concern about the constitutionality of such a total bar on review. *See, e.g.*, Ex. 5, 151 Cong. Rec. H553, 556-57 (Feb. 10, 2005) (statement of Cong. Farr) (introducing Congressional Research Service letter observing that Congress does not clearly have "authority to prevent courts . . . from addressing and remedying issues arising under the United States Constitution"). Ultimately, the conference report explained that Congress was providing "federal judicial review for claims alleging that the actions or decisions of the Secretary violate the United States Constitution," and that the strict limits on judicial review reflected the "Conferees' intent [] to ensure that judicial review of

4

actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver."  H.R. Rep. 109-72 at 172.

## II.   SECRETARY'S EXERCISE OF WAIVER AUTHORITY

Pursuant to the IIRIRA, the Secretary has repeatedly issued waiver determinations as necessary to ensure expeditious construction of barriers and roads along the border.  *See, e.g.*, 70 Fed. Reg. 55622 (Sept. 22, 2005); 72 Fed. Reg. 2535 (Jan. 19, 2007); 72 Fed. Reg. 60870 (Oct. 26, 2007); 73 Fed. Reg. 19077 (Apr. 8, 2008); 73 Fed. Reg. 19078 (Apr. 8, 2008); 82 Fed. Reg. 35984 (Aug. 2, 2017).  Every judicial challenge to these determinations has been dismissed.  *See Center for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218 (D.D.C. Sept. 4, 2019), *cert denied*, 2020 WL 3492658 (June 29, 2020); *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092 (S.D. Cal. 2018), *cert. denied sub nom. Animal Legal Def. Fund v. Department of Homeland Sec.*, 139 S. Ct. 594 (2018); *County of El Paso v. Chertoff*, No. 08-196, 2008 WL 4372693 (W.D. Tex. 2008), *cert. denied*, 557 U.S. 915 (2009); *Save Our Heritage v. Gonzalez*, 533 F. Supp. 2d 58 (D.D.C. 2008); *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007), *cert. denied*, 554 U.S. 918 (2008); *Sierra Club v. Ashcroft*, No. 04-272, 2005 WL 8153059 (S.D. Cal. Dec. 13, 2005).

On May 15, 2020, DHS published another waiver determination under the IIRIRA.  *See* 85 Fed. Reg. 29472 (May 15, 2020) ("Laredo Waiver") (see Pls.' Compl. Ex. 5).  This waiver determination concerned an area in the vicinity of the United States border starting at the Columbia Solidarity International Bridge and generally following the Rio Grande River south and east to approximately one-half of a mile south of the southern boundary of the city limits of San Ignacio, Texas.  *See id.*   In support of his determination, the Acting Secretary made three factual determinations:

- that the project area "is an area of high illegal entry,"
- that there is "an acute and immediate need to construct physical barriers and roads in the vicinity of the border of the United States in order to prevent unlawful entries into the United States in the project area," and
- that exercise of waiver authority under the IIRIRA was necessary "to ensure the expeditious construction of the barriers and roads in the project area."

*Id.* Accordingly, the Secretary announced the waiver of certain laws "with respect to the construction of roads and physical barriers . . . in the project area," including the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.* 85 Fed. Reg. at 29472. The Secretary also waived "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of, the [specified federal] statutes." *Id.*

Even where the Secretary has waived environmental and other laws, U.S. Customs and Border Protection ("CBP") still seeks to avoid, minimize, or mitigate impacts on environmental and cultural concerns. In furtherance of these mitigation efforts, CBP consults with relevant stakeholders pursuant to § 102(b)(1)(C). Here, CBP has already met with landowners, representatives from the Department of the Interior, U.S. Fish & Wildlife Service, the U.S. Environmental Protection Agency, the Texas Commission on Environmental Quality and the Texas Historic Commission, among others. Ex. 13, Enriquez Decl. ¶¶ 16-29. CBP will conduct a variety of surveys, of the project area, which will be used by CBP to inform project planning and execution. Enriquez Decl. ¶¶ 13-15. Based on the information and feedback it compiles, CBP will identify measures to minimize potential impacts. Enriquez Decl. ¶¶ 31-32. CBP will publish an Environmental Stewardship Plan for the project and will continue to engage with stakeholders and solicit input as the project moves forward. Enriquez Decl. ¶¶ 31-34.

### III.   LEGAL STANDARD

#### A.   Rule 12(b)(1) Motion

If a plaintiff lacks standing to bring a claim, the Court lacks subject matter jurisdiction over the claim and dismissal under Fed. R. Civ. P. 12(b)(1) is appropriate. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990).  Once the defendant objects to a lack of subject matter jurisdiction, plaintiff bears the burden of establishing the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To survive a motion to dismiss under Rule 12(b)(1), plaintiff must prove the Court has jurisdiction to hear the case.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction . . . . It is to be presumed that a cause lies outside their limited jurisdiction . . . and the burden of establishing the contrary rests on the party asserting jurisdiction."). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *see also Choice Inc. of Texas v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012).  A district court may consider materials attached to a motion to dismiss pursuant to Rule 12(b)(1) "if the material is pertinent to the question of the District Court's jurisdiction since it is always the obligation of a federal court to determine if it has jurisdiction." *Green v. Forney Eng'g Co.*, 589 F.2d 243, 246 (5th Cir. 1979) (quoting *State of Ala. ex rel. Baxley v. Woody*, 473 F.2d 10, 12 (5th Cir. 1973)).

#### B.   Rule 12(b)(6) Motion

"Under Rule 12(b)(6), a claim may be dismissed when a plaintiff fails to allege sufficient facts that, taken as true, state a claim that is plausible on its face." *Amacker v. Renaissance Asset Mgmt. LLC*, 657 F.3d 252, 254 (5th Cir. 2011).  To withstand dismissal, a complaint must

7

contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Fed. R. Civ. P. 12(b)(6) motion, a "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and citations omitted). A court may also "consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.'" *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)). Likewise, "[i]n deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record." *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) (citation omitted).

On the other hand, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent dismissal under Rule 12(b)(6)." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 348 (5th Cir. 2002). "While a complaint attacked by a Fed. R. Civ. P. 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusion, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Fed. P. 8(a)(2)) (citations omitted) (alteration in original).

Thus, the Court must first identify the pleadings that are not entitled to the assumption of truth because they are nothing more than mere conclusions. *Doe v. Robertson*, 751 F.3d 383, 387 (5th Cir. 2014) (citing *Iqbal*, 556 U.S. at 679)). Second, the Court must assume the truth of well-pleaded allegations and determine whether they plausibly give rise to entitlement to relief. *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## ARGUMENT

## I.   PLAINTIFFS' *ULTRA VIRES* CHALLENGE TO THE IIRIRA WAIVER MUST BE DISMISSED

In the face of the IIRIRA's "express statutory bar on judicial review" of waiver determinations, Pls.' Compl. ¶¶ 18, 151, Plaintiffs allege that the *ultra vires* doctrine allows them to challenge DHS's compliance with IIRIRA's consultation requirement.  In 2007, Congress added the requirement that "[i]n carrying out" § 102, DHS "shall consult with" two cabinet departments, along with "States, local governments, Indian tribes, and property owners" regarding "minimiz[ing] the impact" of construction "on the environment, culture, commerce, and quality of life for the communities and residents located near the sites."  § 102(b)(1)(C). Congress sought to ensure that relevant stakeholders had an opportunity to discuss mitigation efforts for construction that had already been determined to be necessary, while making the provision exclusively enforceable by Congress, not private litigants.  Plaintiffs' *ultra vires* claim fails both because the Court lacks jurisdiction to hear the claim and because DHS has not violated any clear and mandatory statutory requirements.

### A.   The Court Lacks Jurisdiction to Consider Plaintiffs' Non-Constitutional Claims Regarding the Waiver Decisions

It is axiomatic that federal courts "are courts of limited jurisdiction possessing only that power authorized by Constitution and statute."  *Gunn v. Minton*, 568 U.S. 251, 256 (2013). Accordingly, "district courts may not exercise jurisdiction absent a statutory basis."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).  Plaintiffs assert that the Court has jurisdiction under 28 U.S.C. § 1331, *see* Compl. ¶ 10, but such general grants of jurisdiction over claims arising under federal law and claims against the United States are "subject . . . to

9

preclusion-of-review statutes created or retained by Congress." *Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see also Estep v. United States*, 327 U.S. 114, 120 (1946) ("[E]xcept when the Constitution requires it, judicial review of administrative action may be granted or withheld as Congress chooses."); *see also Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 672-73 (1986) ("Subject to constitutional constraints, Congress can, of course, make exceptions to the historic practice whereby courts review agency action.").[2]  Indeed, Congress noted as much in the APA itself by providing an exemption from judicial review "to the extent that—(1) statutes precluding judicial review." 5 U.S.C. § 701(a)(1); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (stating that § 701(a)(1) "applies where Congress has expressed an intent to preclude judicial review").

*Ultra vires* review is no exception.  It is simply an application of "the familiar proposition that 'only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.'" *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin. Inc.*, 502 U.S. 32, 44 (1991) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967).  It depends on the observation that courts "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." *Leedom v. Kyne*, 358 U.S. 184, 190 (1958).  Thus, courts lack jurisdiction to conduct *ultra vires* review when Congress clearly intends to preclude it.  *See, e.g., Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 305 (1943) (holding that the Railway Labor Act—by

---

[2] *See also Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1946) ("All constitutional questions aside, it is for Congress to determine how the rights which it creates will be enforced."); *Ralpho v. Bell*, 569 F.2d 607, 622 & n.101 (D.C. Cir. 1977) (observing that nothing "prevent[s] [Congress] from shielding even the most patent deviation from the statutory scheme from judicial redress where the Constitution is in no wise implicated." (citing *Switchmen's Union*, 320 U.S. at 301)).

providing judicial review for certain other matters but only administrative review of an agency's

certification of a collective bargaining representative—impliedly precluded *ultra vires* review

because congressional "intent seems plain" that "[t]here was to be no dragging of the controversy

into other tribunals of law"). Accordingly, this Court's jurisdiction over Plaintiffs' *ultra vires*

claim depends on congressional intent expressed through IIRIRA's limitation on judicial review.

### 1. Congress plainly intended to bar all judicial review of non-constitutional claims

Congressional intent to withhold jurisdiction to review agency action can be shown by

"specific language or specific legislative history that is a reliable indicator of congressional

intent," or "inferences of intent drawn from the statutory scheme as a whole." *Block v.

Community Nutrition Inst.*, 467 U.S. 340, 349 (1984). "There is no need to consult extratextual

sources when the meaning of a statute's terms is clear." *McGirt v. Oklahoma*, 140 S. Ct. 2452,

2469 (2020). Here, the statutory text is plain enough to dispose of the question.

Congress has expressly withdrawn district court jurisdiction to review non-constitutional

challenges to the Secretary's exercise of waiver authority:

> The district courts of the United States shall have exclusive jurisdiction to hear all
> causes or claims arising from any action undertaken, or any decision made, by the
> Secretary of Homeland Security pursuant to paragraph (1). A cause of action or
> claim may only be brought alleging a violation of the Constitution of the United
> States. The court *shall not have jurisdiction* to hear any claim not specified in this
> subparagraph.

IIRIRA § 102(c)(2)(A) (emphasis added). This statutory language is emphatic and

comprehensive in several respects. First, it expansively encompasses "*all* causes or claims

arising from *any* action undertaken, or *any* decision made" pursuant to § 102(c)(1)'s waiver

authority. *Id.* Second, it expressly identifies the sort of suits that may be brought: "only . . .

alleging a violation of the Constitution." *Id.* Third, it expressly removes district court

jurisdiction over "any claim not specified in this subparagraph." *Id.*

There is no reason to doubt the import of this plain language.  The most recent court to consider this question held that "Congress has drafted section 102(c)(2)(A) to lead inexorably to the conclusion that there is neither a viable cause of action in federal court concerning section 102(c)(1) waiver determinations, nor federal court jurisdiction to review any such challenge, unless the claim alleges a violation of the United States Constitution."  *Center for Biological Diversity*, 404 F. Supp. 3d at 242; *see also id.* ("[S]ection 102(c)(2)(A) plainly and unequivocally expresses Congress's intent with respect to restricting judicial review of legal challenges to section 102(c)(1) waiver determinations, in a manner that overcomes even the strong presumption that Congress ordinarily intends for agency actions to be subject to review by the federal courts.").  Most other courts have reached the same conclusion.  *See, e.g.*, *Defenders of Wildlife*, 527 F. Supp. 2d at 122 (declaring that § 102(c) "allows the district courts to consider only those claims that allege a violation of the Constitution").[3]

Moreover, the Fifth Circuit has observed that it lacks the jurisdiction to review claims under other provisions of IIRIRA.  *See, e.g.*, *Moosa v. I.N.S.*, 171 F.3d 994, 1013 (5th Cir. 1999) (holding that the court "lack[ed] jurisdiction to review the decision" coming under IIRIRA § 309(c)(4)(E)'s statement that "there shall be no appeal of any discretionary decision under section . . . 244 . . . of the [INA]").  There are many other examples of Congress using similarly unambiguous "shall not have jurisdiction" formulations to partially or completely bar judicial review.  *See, e.g.*, 28 U.S.C. § 1359 ("A district court shall not have jurisdiction of a civil action

---

[3] *See also Save Our Heritage Org. v. Gonzales*, 533 F. Supp. 2d 58, 60 (D.D.C. 2008) ("The only claims permitted under the REAL ID Act's waiver provision are those 'alleging a violation of the Constitution.'" (quoting § 102(c)(2)(A)); *Sierra Club*, 2005 WL 8153059, *7 (holding that § 102(c) "restricted judicial review of any claims to constitutional challenges"); *id.* at *10 ("The only justiciable controversies Congress left for the courts to decide in this connection are constitutional claims.").

in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court.").[4]  In sum, Congress could not have been clearer in stating that all non-constitutional claims are barred.  Accordingly, Plaintiffs' attempts to challenge the Secretary's action on non-constitutional grounds must be rejected for lack of jurisdiction.  *See, e.g.*, *Elgin v. Dep't of Treasury,* 567 U.S. 1, 12 (2012) (upholding dismissal for lack of jurisdiction because it was "fairly discernible that Congress intended to deny such employees an additional avenue of review in district court").

### 2. The legislative history and statutory context support the plain meaning of the jurisdictional bar

The plain meaning of the Act should be the end of the matter.  *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992) ("[Courts] must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."  But if the Court were to find any ambiguity in the text, the legislative history and statutory context also support the government's reading.

The limitation on judicial review was adopted as part of the REAL ID Act of 2005.  The underlying bill passed by the House of Representatives would have gone farther and entirely barred judicial review, *see* 109th Cong., H.R. 1268, Div. B § 102 (engrossed in House, Mar. 16,

---

[4]  *See also*, *e.g.*, 8 U.S.C. § 1226a(b)(1) (providing for "mandatory detention of suspected terrorist" but strictly limiting judicial review: "Judicial review of any action or decision relating to this section . . . is available exclusively in habeas corpus proceedings consistent with this subsection. Except as provided in the preceding sentence, no court shall have jurisdiction to review, by habeas corpus petition or otherwise, any such action or decision."); 22 U.S.C. § 6450 ("No court shall have jurisdiction to review any Presidential determination or agency action under this chapter or any amendment made by this chapter." (adopted by the Int'l Religious Freedom Act of 1998, Pub. L. No. 105-292, § 410, 112 Stat. 2787 (Oct. 27, 1998))).

2005),[5] which was a significant concern to opponents of the bill.[6]  Because the Senate passed a substitute version of the bill that differed substantially from the House version (and did not include any provision regarding IIRIRA § 102), the bill was finalized by a conference committee.  *See* H.R. Rep. No. 109-72 (May 3, 2005) (Conf. Rep.).  The conference committee noted that the House bill "would prohibit judicial review" and explained that the committee had "revised the House provision in the following respects," including "provid[ing] federal judicial review for claims alleging that the actions or decisions of the Secretary violate the United States Constitution."  *See* H.R. Rep. No. 109-72 at 171-72.  The report further explained that "[t]he Conferees' intent is to ensure that judicial review of actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver."  *Id.* at 172.  Thus, the conference report supports the plain text in two respects.  First, it makes clear that the House's complete bar on judicial review was modified only to permit judicial review of constitutional claims.  Standing alone, this express provision for constitutional review but no other review indicates that *ultra vires* review was intentionally excluded.  Second, the conference report establishes that strictly limited judicial review was fundamental to the statutory scheme.  The purpose of the waiver authority is the "expeditious completion" of necessary construction, § 102(C)(2)(A), and Congress was expressly concerned with litigation delays.  *See, e.g.*, Ex. 2, H.R. Rep. 109-72 at 171 (May 3,

---

[5] "[N]o court, administrative agency, or other entity shall have jurisdiction—(A) to hear any cause or claim arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1); or (B) to order compensatory, declaratory, injunctive, equitable, or any other relief for damage alleged to arise from any such action or decision."

[6] *See, e.g.*, Ex. 5, 151 Cong. Rec. H557 (Feb. 10, 2005) (statement of Congresswoman Davis) (objecting to provision because it "bars judicial review of any claim arising from the construction of barriers and roads at borders"); *id.* at5 H559 (statement of Congressman Mark Udall) ("The bill also removes any judicial review of the waiving of these laws.").

2005) (Conf. Rep.) ("Continued delays caused by litigation have demonstrated the need for additional waiver authority with respect to other laws that might impede the expeditious construction of security infrastructure along the border, such as the Coastal Zone Management Act.").[7]  Accordingly, the text cannot be interpreted to permit non-constitutional review that would frustrate the congressional goal to prevent litigation delays.  *Cf. NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 130-133 (1988) (holding that "prosecutorial" decisions of the General Counsel of the NLRB are not subject to judicial review, in part because review "would involve lengthy judicial proceedings in precisely the area where Congress was convinced that speed of resolution is most necessary").

### 3.  Plaintiffs cannot evade the jurisdictional bar by framing their claims as *ultra vires* challenges

Plaintiffs cannot evade Congress' clear jurisdictional limitation by citing cases reviewing whether an agency acted *ultra vires* even when other sorts of judicial review were impliedly or expressly prohibited.  *See* Pls.' Compl. ¶ 13.  While these cases show that courts are less inclined to find that Congress intended to prohibit *ultra vires* review (and review of constitutional claims) than merits review, they cannot overturn plainly expressed congressional intent to prohibit all review other than constitutional claims.  After all, the presumption of judicial review is merely an "interpretive guide" that is "dislodge[d]" when Congress provides "clear and convincing evidence" that it intends to preclude judicial review.  *Kucana v. Holder*, 558 U.S. 233, 251 (2010).  In 1943, for example, the Supreme Court held that the Railway Labor Act—by

---

[7]  *See also* Ex. 4, 151 Cong. Rec. H471 (Feb. 9, 2005) (statement of Cong. Hoekstra) ("Authorized by Congress in 1996, [the San Diego barrier] has yet to be completed because of on-going environmental litigation."); Ex. 5, 151 Cong. Rec. H554 (Feb. 10, 2005) (statement of Cong. Sensenbrenner) (referencing "endless litigation against plugging the hole in the fence south of San Diego" and noting that "[w]e were able to win World War II quicker than we were able to complete this fence").

providing judicial review for certain other matters but only administrative review of an agency's certification of a collective bargaining representative—impliedly precluded judicial review because congressional "intent seems plain" that "[t]here was to be no dragging of the controversy into other tribunals of law." *See Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 305 (1943). A few year later, in what became the seminal *ultra vires* review decision, the Supreme Court reaffirmed *Switchmen's Union*'s focus on congressional intent and applied it to *ultra vires* review. *See Leedom v. Kyne*, 358 U.S. 184, 188 (1958). *Kyne* held that courts "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." *Id.* at 190. Because the agency action was "contrary to a specific [statutory] prohibition" that was "clear and mandatory" and "deprived the professional employees of a 'right' assured to them by Congress," the Court concluded that Congress intended to permit *ultra vires* review. *Id.* at 188-90.

The Supreme Court has clarified *Kyne*'s limited scope. *Kyne* and its progeny do not "authoriz[e] judicial review of *any* agency action that is alleged to have exceeded the agency's statutory authority." *MCorp Fin.*, 502 U.S. at 43 (emphasis added). Instead, *Kyne* does not apply where "Congress has spoken clearly and directly" to preclude review. *Id.* at 44.[8]

---

[8] In light of the Supreme Court's clarification, some Fifth Circuit decisions appear to overstate the availability of *ultra vires* review under *Kyne*. While *Kyne* addresses a situation where "the agency's challenged action is so contrary to the terms of the relevant statute that it necessitates judicial review independent of the review provisions of the relevant statute," *Kirby Corp. v. Pena*, 109 F.3d 258, 269 (5th Cir. 1997), it is imprecise to say that courts may exercise judicial review "despite there being a statutory provision prohibiting such review." *Id.* As the Supreme Court has repeatedly noted, the presumption of judicial review is overcome whenever Congress clearly prohibits review. *See MCorp Fin.*, 502 U.S. at 44; *Kucana*, 558 U.S. at 251; *Bowen*, 476 U.S. at 672-73; *Estep*, 327 U.S. at 120; *cf. Am. Fed. Of Gov't Emps., Local 1617 v. FLRA*, 103 F. App'x 802, 805 (5th Cir. 2004) (characterizing *MCorp* as holding that "there was no jurisdiction where the agency's authorizing statute indicated a congressional intent to deny district court review, and the statute provided a meaningful and adequate opportunity for judicial review."). Instead, such Fifth Circuit language is best understood to address circumstances where Congress

16

Congressional intent to prohibit *ultra vires* review is at least as clear here as it was in *MCorp Financial*.  Here, just as in *MCorp Financial*, Congress "has spoken clearly and directly" to preclude all judicial review (except for constitutional claims).  In *MCorp Financial*, the relevant statute stated that "except as otherwise provided in this section or under [two other sections] of this title no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any [Board] notice or order under this section."  12 U.S.C. § 1818(i)(1); *see* 502 U.S. at 44.  The Supreme Court held that *ultra vires* review under *Kyne* was unavailable because "the clarity of the congressional preclusion of review" in this statute stood in marked contrast to the statute at issue in *Kyne*, in which it had only been argued that a judicial review statute "implied, by its silence, a preclusion of review of the contested determination."  502 U.S. at 44.  Section 102 of the IIRIRA, like 12 U.S.C. § 1818(i)(1), is an express preclusion provision rather than an implied one.  The only avenue for challenging agency action here is a constitutional claim.  Indeed, it is difficult to imagine how Congress could have been any more comprehensive or what Plaintiffs would accept as sufficient evidence of intent to bar *ultra vires* claims.

As another court has noted, the presumption in favor of judicial review cannot shift the balance "where, as here, Congress has been so *explicit* in stating a prohibition against judicial review—federal courts are not, after all, superlegislatures entitled to invoke a generalized presumption to trump an express 'hands off' direction from Congress."  *Am. Soc'y of*

---

did not permit review under a specific statute, such as the APA, *see Am. Airlines, Inc.  v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999) (applying *Kyne* as exception to "final agency action" requirement under the APA), but still intended *ultra vires* review to be available separate from the statute.  *See Kirby Corp.*, 109 F.3d at 261-62 (addressing government's "heavy burden when arguing that Congress meant to prohibit all judicial review").  It is another matter entirely when, as here, Congress clearly intends to prohibit all judicial review.  *See, e.g.*, *Kirby Corp.*, 109 F.3d at 262 (noting that "the presumption favoring judicial review 'like all presumptions used in interpreting statutes, may be overcome by specific language or specific legislative history that is a reliable indicator of congressional intent'" (quoting *Block*, 467 U.S. at 349)).

*Anesthesiologists v. Shalala*, 90 F. Supp. 2d 973, 975 (N.D. Ill. 2000), *aff'd*, 279 F.3d 447 (7th Cir. 2002) (addressing 42 U.S.C. § 1395w–4).

In sum, the Act is not "reasonably susceptible to divergent interpretation," and the presumption of judicial review is "dislodged." *Kucana*, 558 U.S. at 251. Plaintiffs' non-constitutional challenges to the waiver determination must be dismissed for lack of jurisdiction.

**B. To the Extent the Court Conducts *Ultra Vires* Review, It Must Conclude that the Secretary Did Not Exceed His Statutory Authority**

In the alternative, to the extent the Court determines that—despite the plain meaning of the statute and Congress' clear intent—courts retain jurisdiction to determine whether a waiver determination is *ultra vires*, the Secretary's decision here must be upheld. Under the extraordinarily deferential *ultra vires* review standard, the Court must conclude that the Secretary did not exceed his statutory authority.

*Kyne* allows jurisdiction "only in a very narrow situation in which there is a plain violation of an unambiguous and mandatory provision of the statute." *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999); *cf. Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) ("[R]eview may only be had when the agency's error is patently a misconstruction of the Act, or when the agency has disregarded a specific and unambiguous statutory directive, or when the agency has violated some specific command of a statute."). A dispute over an agency's interpretation of a statutory phrase "is not the 'extraordinary' situation that falls within the very limited *Kyne* exception." *Paladin Community Mental Health Ctr. v. Sebelius*, 684 F.3d 527, 532 (5th Cir. 2012) (quoting *Kirby Corp.*, 109 F.3d at 293); *see also Nyunt v. Broad. Bd. of Gover*, 589 F.3d 445 at 449 (holding that "extreme error" is required to rely on the *Kyne* exception, and that this is a "very stringent standard" under which a claim "rarely succeeds"); *Am. Airlines*, 176 F.3d at 294 (concluding that "the narrow *Kyne* exception" is a "rarely invocable precedent").

Plaintiffs cannot carry their burden to show that DHS violated "an unambiguous and mandatory provision of the statute." *Am. Airlines*, 176 F.3d at 293. *Ultra vires* review permits only "a cursory review of the merits of the case to determine whether the Secretary violated a clear statutory mandate." *Paladin Community Mental Health Ctr.*, 684 F.3d at 532 (quoting *Hanauer v. Reich*, 82 F.3d 1304, 1309 (4th Cir. 1996)). Plaintiffs argue that DHS has violated "clear and mandatory language" in the consultation requirement in IIRIRA § 102(b)(1)(C). *See* Compl. ¶ 155. This argument fails for several reasons.

### 1.    This Requirement is Not Privately Enforceable, Including by *Ultra Vires* Review

As an initial matter, § 102(c)(2)(A)'s jurisdictional bar applies with even greater force where a plaintiff alleges that a waiver determination failed to comply with the consultation requirement. In two ways, Congress emphasized that it intended no judicial review of this provision, regardless of whether a waiver was employed. First, Congress expressly provided that "[n]othing in this subparagraph may be construed to—(I) create . . . any right of action for a State, local government, or other person or entity affected by this subsection." *See* IIRIRA § 102(b)(1)(C)(ii); *Texas Border Coal. v. Napolitano*, 614 F. Supp. 2d 54, 63 (D.D.C. 2009) (concluding that "no private right of action or private remedy has been created" to enforce the consultation provision). Second, Congress demonstrated that it would enforce the provision through its appropriations power. In the same law that adopted the provision, Congress made access to the appropriated funds contingent on compliance with the provision. *See* Pub. L. No. 110-161, Div. E, Title V § 564(b), 121 Stat. 1844, 2091 (Dec. 26, 2007) (providing that "[n]o funds appropriated" for border infrastructure "may be obligated unless the Secretary of Homeland Security has complied with" § 102(b)(1)(C)(i)). Together with the jurisdictional bar, these provisions leave no doubt that Congress intended no private enforcement of this provision,

regardless of the cause of action.

### 2.      This Requirement Does Not Apply to the Determination to Waive Legal Requirements

Moreover, nothing in the waiver provision is expressly or implicitly dependent on completion of the consultation requirement.  Instead, § 102(c)(1) permits the Secretary to waive legal provisions in her "sole discretion" upon determining that a waiver is necessary to expedite construction.  Nor would consultation with the listed entities be likely to inform the decision whether waiver of a given legal requirement is necessary.[9]  Thus, failure to satisfy the consultation requirement cannot be treated as a condition precedent that can be the basis for overturning a waiver on *ultra vires* review.

In addition, the consultation provision does not make the waiver determination itself a subject of the intended consultation.  Instead, the provision most naturally refers to mitigation efforts after projects have been selected.  Congress takes it as a given that the "sites at which such fencing is to be constructed" are already known, and directs consultation on the subject of "minimiz[ing] the impact" of the construction.  IIRIRA § 102(b)(1)(C)(ii).  *See also* 153 Cong. Rec. S9881 (Sen. Cornyn) ("recognizing that result is nonnegotiable").  Thus, Plaintiffs cannot show that the statute requires DHS to consult specifically regarding the need for infrastructure construction in a given area, or regarding the Secretary's discretionary exercise of her waiver authority.  After all, DHS is the entity with expertise regarding what locations are "areas of high illegal entry" and what sort of infrastructure is "necessary" to "deter illegal crossings."  IIRIRA §

---

[9] Consultation about the waiver of legal requirements would also be unlikely to be informative. Presumably, most states and local governments would oppose waiver of any of their own statutes; and even if the entities were not uniformly opposed, they would be unlikely to be in position to assess the likelihood that a given statute would cause excessive delay.  After all, delaying litigation could be initiated by other entities, such as national environmental organizations like most of the Plaintiffs here.

102(a).  Additional evidence of the lack of a connection between the consultation requirement and the Secretary's waiver authority is found in Congress's adoption of two different appropriations restrictions for the 2007 funds—one specific to the waiver authority, *see* Pub. L. No. 110-161, 121 Stat. at 2049 (prohibiting obligation of funds for waiver projects "until 15 days have elapsed" after the notice was published in the Federal Register); and one specific to the consultation requirement, *see* Pub. L. No. 110-161, 121 Stat. at 2091 (prohibited DHS from obligating funds until it had "complied with" that requirement).  If Congress intended consultation to be a prerequisite to a waiver determination, this approach would be unnecessarily redundant.  Instead, Congress presumed that consultation and the finalization of construction contracts might occur after "the Secretary has exercised [§ 102(c)] waiver authority."  Pub. L. No. 110-161, 121 Stat. at 2049.  In sum, the consultation requirement thus cannot be considered a "clear and mandatory" prerequisite to the Secretary's waiver determinations.

### 3.    DHS Has Complied With the Consultation Requirement

Plaintiffs cannot show that the Secretary's application of the requirement here contravenes clear statutory prohibition.  DHS has reasonably initiated consultation before construction to allow its mitigation efforts to be informed by these entities' concerns and information in their possession.  *See* Ex. 13, Enriquez Decl. ¶¶ 16-28.  Even if it were assumed that "shall consult" gives rise to a mandatory obligation, plaintiffs have not shown that DHS's approach violated the statute because it does not clearly establish (1) *when* such consultation must occur, (2) with *whom* it must necessarily occur, or (3) the *degree* of interaction required to satisfy the requirement.  *See, e.g.*, Ex. 14, *La Posta Band of Diegueno Mission Indians of the La Posta Reservation v. Trump*, No. 3:20-cv-1552, 2020 WL (S.D. Cal. Sept. 9, 2020) (finding no clear and mandatory requirements to enforce on ultra vires review); *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1125-26 (S.D. Cal. Feb. 27, 2018) (same).

21

First, unlike many other statutory provisions, Congress did not require that consultation be completed "before" any specific action.[10]  Instead, the statute simply requires DHS to consult "[i]n carrying out this section," leaving to DHS to determine the appropriate timing in light of the myriad considerations implicated by a particular project.  For example, Congress's use of appropriations limitations for the 2007 funds to require consultation before contracts were finalized demonstrates that the statute did not inherently include such a timing requirement.  *See* Pub. L. No. 110-161, 121 Stat. at 2091; *see also* GAO Decision B-300480.2 (June 26, 2003) (link) (explaining that "obligation" of funds occurs when contract is signed).  Even if "to be constructed" assumes consultation before construction, CBP has complied by initiating consultation in October of 2019 and sending hundreds of consultation letters in February of 2020.  *See* Enriquez Decl. ¶¶ 17, 19.

Second, this provision does not unambiguously require anyone to be contacted in every instance.  Instead, it is reasonably understood to call for DHS to assess which entities are "located near the sites at which such fencing is to be constructed" and thus should be consulted. IIRIRA § 102(b)(1)(C)(i).  For example, it calls for DHS to consult "States" and "Indian tribes," but a given project might implicate only one state, or there might be no tribes with interests in the project area.  Thus, it is reasonable for DHS to determine for each project what entities are stakeholders who may be affected, as it did here.

Third, Congress did not specify the depth of consultation required.  Accordingly, it would be improper on *ultra vires* review to reject CBP's good faith efforts.  To date, those good faith

---

[10] *See, e.g.*, 10 U.S.C. § 2667(g)(3) ("Before entering into any lease under this subsection, the Secretary shall consult with the [EPA] Administrator[.]"); 42 U.S.C. § 4332(C) ("Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of [certain] Federal agenc[ies].").

consultation efforts have included, among other things, soliciting comment and input from interested stakeholders and the public, meetings and discussions with federal and State resource agencies, engagement with landowners, and on-going consultation with the United States Section of the International Boundary and Water Commission.  *See* Enriquez Decl. ¶¶ 17-29.  Moreover, those good faith efforts have already resulted in the identification of construction best management practices that will be implemented during project execution, and DHS is continuing to examine other measures that can be taken to minimize potential impacts. *See* Enriquez Decl. ¶¶ 31-32.

For all of these reasons, the Court cannot conclude that DHS's consultation efforts fall below a clear and mandatory standard provided by the statute.  To the contrary, DHS has reasonably complied with the consultation requirement.  Even if plaintiffs could show that it is *plausible* to interpret the provision to require more—and they have not—DHS's decision to adopt one plausible interpretation over the other cannot constitute a violation of a clear statutory mandate.  *See Griffith*, 842 F.2d at 494 (upholding "colorable" but not "only possible interpretation of the statutory language").

## II.     PLAINTIFFS' CONSTITUTIONAL CLAIMS FAIL

### A.     The Waiver Provision Does Not Violate Article I § 1

Plaintiffs claim that § 102(c) unconstitutionally delegates legislative power to the DHS Secretary.  *See* Pls.' Compl. ¶ 143.  The nondelegation doctrine is rooted in "the principle of separation of powers," but few laws violate it:

> Even though Congress has delegated power to the President from the beginning of the government, the Court did not find a delegation of legislative power to be unlawful until 1935, when the Court declared two to be unconstitutional.  *See Pan. Ref. Co. v. Ryan*, 293 U.S. 388, 433 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 542 (1935). But the Court has not done so in the nearly nine decades since and, instead, has long defended Congress's ability to delegate power under broad standards. In fact, the Court has almost never felt

> qualified to second-guess Congress regarding the permissible degree of policy
> judgment that can be left to those executing or applying the law.

*Big Time Vapes, Inc. v. Food & Drug Admin.*, 963 F.3d 436, 442 (5th Cir. 2020) (citations and

alterations omitted).  Every court to consider a nondelegation challenge to § 102(c) has rejected

it.  *See Center for Biological Diversity*, 404 F. Supp. 3d at 244-49; *In re Border Infrastructure

Envtl. Litig.*, 284 F. Supp. 3d at 1130-37; *County of El Paso*, 2008 WL 4372693, at \*2-4; *Save

Our Heritage*, 533 F. Supp. 2d at 63-64; *Defenders of Wildlife*, 527 F. Supp. 2d at 126-29; *Sierra

Club*, 2005 2005 WL 8153059, at \*16-25.  Plaintiffs' claims must likewise fail.

It is well established that, because Congress could not function without the ability to

delegate, Congress may authorize another branch of government to carry out its law-making

authority so long as it provides "an intelligible principle to which the person or body authorized

to [act] is directed to conform."  *J.W. Hampton, Jr. Co. v. United States*, 276 U.S. 394, 409

(1928).  To provide a constitutionally permissible "intelligible principle," Congress need only

"clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries

of this delegated authority."  *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989).

Congress has provided ample guidance about the policy the Secretary is to be guided by

in exercising the waiver authority.  Section 102(a) delineates a "general policy" of installing

infrastructure to "deter illegal crossings in areas of high illegal entry into the United States,"

which § 102(c) incorporates by tying the waiver authority to "expeditious construction of

barriers and roads under this section."  This establishes a policy to guide the Secretary:  that

improving border protection by expediting the construction of necessary barriers and roads is a

high Congressional priority.  *See, e.g.*, *Sierra Club*, 2005 WL 8153059, at \*20 (concluding that §

102's clearly delineated general policy is "improvement of U.S. border protection" which is "a

high congressional priority"); *Defenders of Wildlife*, 527 F. Supp. 2d at 127 (finding a clearly

24

delineated general policy "to expeditiously 'install additional physical barriers and roads . . . to deter illegal crossings in areas of high illegal entry'").

Congress has also provided specific boundaries for its delegated authority.  The authority may only be exercised to "waive all legal requirements [the] Secretary . . . determines necessary to ensure expeditious construction of the barriers and roads under this section."  IIRIRA § 102(c)(1) (emphasis added).  The first boundary is geographic.  Waivers may only be issued in connection with construction "in the vicinity of the United States border."  Id. § 102(a) (incorporated by the "under this section" cross-reference).  The second boundary is temporal necessity.  Waivers may only be issued where "necessary to ensure expeditious construction" at those locations.  Id. § 102(c)(2).  See Defenders of Wildlife, 527 F. Supp. 2d at 127 (concluding that Congress provided a sufficient boundary by instructing that "the Secretary may waive only those laws that he determine necessary to ensure expeditious construction").

Plaintiffs nevertheless claim that the Waiver has failed to "identify the limits of the Waiver Zone."  Pls.' Compl. ¶ 145.  Their theory is strikingly similar to one rejected by the Supreme Court.  Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 475 (2001) (rejecting lower court's approach, noting that "even in sweeping regulatory schemes we have never demanded … that statutes provide a determinate criterion for saying how much of the regulated harm is too much").  Nor does the "intelligible principle" caselaw support their efforts to cabin the flexibility available to Congress.  The geographic boundary and necessity requirement together amply suffice.  See, e.g., Whitman, 531 U.S. at 475-76 (holding that "necessity" standard "fits comfortably within the scope of discretion permitted by our precedent"); Touby v. United States, 500 U.S. 160, 163 (1991) (approving delegation to the Attorney General of the authority to designate a drug as a controlled substance for purposes of criminal drug enforcement if doing so

was "necessary to avoid an imminent hazard to the public safety"). What Congress has crafted is targeted flexibility. While Congress initially anticipated that NEPA and the ESA could be the source of undue construction delay and thus made them expressly waivable, *see* Pub. L. No. 104-208, Div. C, Title I § 102(c), in 2005, Congress shifted to the current waiver approach after plaintiffs in other cases unexpectedly used the Coastal Zone Management Act ("CZMA") to shut down construction. *See* Ex. 2, H.R. Rep. 109-72 at 171 (May 3, 2005) (Conf. Rep.) ("Continued delays caused by litigation have demonstrated the need for additional waiver authority with respect to other laws . . . such as the Coastal Zone Management Act."). Section 102 reflects Congress' discovery that it could not sufficiently anticipate the ways that existing laws would be wielded to frustrate Congress' priorities.

Additionally, it is well-established that Congress may delegate in even broader terms in such areas. *See Loving v. United States*, 517 U.S. 748, 772 (1996) (finding that delegations may be broader "where the entity exercising the delegated authority itself possesses independent authority over the subject matter"); *Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950) ("The exclusion of aliens is a fundamental act of sovereignty . . . [and] is inherent in the executive power to control the foreign affairs of the nation."). Because the Executive Branch's actions here are "congressionally authorized" Plaintiffs cannot evade this settled conclusion.

Finally, Plaintiffs argue that judicial review is essential for a delegation to be upheld. *See* Pls.' Compl. ¶ 143. Plaintiffs cannot prevail because courts have expressly rejected the argument that statutory limitations on judicial review create a nondelegation problem. *See United States v. Bozarov*, 974 F.2d 1037, 1041-45 (9th Cir. 1992). The Ninth Circuit agreed with the government that "the purpose of the intelligible principle is simply to channel the discretion of the executive and to permit Congress to determine whether its will is being

obeyed." *Id.* at 1041 ("[T]he government has the better of the argument.").  In that case, the

Ninth Circuit rejected arguments parallel to those of Plaintiffs here and concluded, "[i]n sum, we

believe that the Supreme Court cases upholding judicial preclusion of agency decisions, the

language of the APA, and the fact that the EAA involves foreign policy issues support our

conclusion that the EAA's preclusion of judicial review is constitutional." *Id.* at 1044.  Because

that same reasoning applies here, the limitation of judicial review to constitutional claims should

not create a nondelegation problem.[11]

        In sum, the Act contains a sufficiently intelligible principle to survive constitutional

scrutiny and Plaintiff's claims to the contrary should be dismissed.

### B.       The Waiver Provision Does Not Violate the Tenth Amendment

        The Tenth Amendment "reserve[s] to the States respectively, or to the people" the powers

the Constitution has not "delegated to the United States" or "prohibited . . . to the States."  U.S.

Const., 10th Amend.  In general, "[w]hen Congress properly exercises its authority under an

enumerated constitutional power, the Tenth Amendment is not implicated."  *United States v.*

*DeCay*, 620 F.3d 534, 542 (5th Cir. 2010); *see also New York v. United States*, 505 U.S. 144,

156-57 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment

expressly disclaims any reservation of that power to the States.").  This includes the power to

preempt state laws that conflict with or serve as an obstacle to the purposes of federal law.  *See,*

*e.g., Arizona v. United States*, 567 U.S 387, 399 (2012) ("State laws are preempted when they

---

[11] In *Bozarov*, the Ninth Circuit also "noted in closing" that its conclusion was "bolstered" by the availability of judicial review for constitutional claims and *ultra vires* claims.  *Id.* at 1044-45. While the availability of such review under that statute made the case easier, nothing in the Ninth Circuit reasoning suggests that the removal of *ultra vires* review would alter the outcome. Indeed, it relied in part on the fact that "the language of the APA itself [in 5 U.S.C. § 701(a)(1)] . . . suggests that Congress intended that certain agency actions be immune from judicial review." *Id.* at 1042.

conflict with federal law."); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 203 (1983) ("It is well-established that within Constitutional limits Congress may preempt state authority by so stating in express terms"). And waiver of state law—whether by statute or by regulation—is simply a limited form of federal preemption. Here, Congress legislated to regulate the international border of the United States and to reduce illegal entry into the United States of persons and contraband—violations of federal law. These are quintessentially within Congress' inherent and enumerated powers. *See, e.g.*, *Arizona*, 567 U.S. at 395 ("The federal power to determine immigration policy is well settled."); *id.* at 422 (2012) (Scalia, J., concurring in part and dissenting in part) (arguing that immigration legislation "is an inherent attribute of sovereignty" which was why "there was no need to set forth control of immigration as one of the enumerated powers of Congress"). Indeed, Plaintiffs do not suggest that Congress lacked authority to enact § 102 generally, i.e., to direct DHS to construct barriers and roads in the vicinity of the international border. Plaintiffs' only challenges Section 102(c)'s waiver provision for its interference in state policy powers and state sovereignty. Pls.' Comp at ¶ 138. But this is not enough to raise a viable Tenth Amendment claim. "[T]he Tenth Amendment's reservation to the states of power not conferred on the federal government in no way inhibits the activities of the federal government in situations in which a power has been so conferred." *Deer Park Indep. Sch. Dist. v. Harris Cty. Appraisal Dist.*, 132 F.3d 1095, 1099 (5th Cir. 1998).

Plaintiffs make two attempts to avoid the straightforward Tenth Amendment jurisprudence. First, they attempts to appropriate *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612, 2622 (2013), which concluded that the "extraordinary measures" taken in 1965 "to address [the] extraordinary problem" of "entrenched race discrimination in voting" were no longer justified

"[n]early 50 years later." 133 S. Ct. at 2618. In Shelby County, the Supreme Court was primarily concerned that "equal sovereignty" among the states was impaired by expressly singling out certain states, and that those states "must beseech the Federal Government for permission to implement [election] laws that they would otherwise have the right to enact and execute on their own." *Id.* at 2623-24. By contrast, there is no impairment of "equal sovereignty" for Congress to pass laws regarding the international border of the United States, and thus impacting the states in which that border lies. And there is no comparison between the limited waiver of state laws that might impair expeditious construction of border infrastructure and a comprehensive preclearance requirement for "all changes to state election law—however innocuous." *Id.* at 2624. In *Shelby County*, the concerns previously discussed were exacerbated by the fact that statute continued to single out states "based on decades old data and eradicated practices." 133 S. Ct. at 2627. Here, by contrast, the "historic lows," Pls.' Compl. ¶ 138, of undocumented immigrant detentions do not undermine either the legitimacy of Congress's goal of operation control of the border or DHS's exercise of the authority Congress delegated to pursue that goal. The border situation need not be the crisis that it was in the 1990s to justify the actions Congress has adopted. *Cf. County of El Paso*, No. 08-196, 2008 WL 4372693, at *8 ("The Secretary, pursuant to the Supremacy Clause, has only waived state and local laws which interfere with Congress's purpose to construct the border barrier.").

Second, Plaintiffs argue that *New York v. United States*, 505 U.S. 144 (1992) and the Waiver "undermines political accountability" leaving "Zapata County and its residents [bearing] the financial and political costs of decision and policies made at the federal level." Pls.' Compl ¶ 138. But the caselaw stands for an entirely different principle. *New York*, along with a companion case, *Printz v. United States*, 521 U.S. 898 (1997), addressed the limits on Congress's

29

power under the Anti-Commandeering Doctrine.  That analysis has no application here, where Congress has not forced state legislative action but instead simply preempted certain state laws for one narrow activity.  *See County of El Paso*, No. 08-196, 2008 WL 4372693, at *8 (concluding that a § 102(c) waiver "do[es] not affect the validity of the state and local laws" but "merely suspend[s] the effects of the state and local laws").

### C.   Executive Order 13767 and Waiver of May 15, 2020 Does Not Violate Equal Protection under the Fifth Amendment

Plaintiffs allege that the Waiver and Executive Order violate the Equal Protection component of the Fifth Amendment to the Constitution. Plaintiffs fail to state an equal protection claim because their complaint includes no well-pled allegation that DHS issued the Waiver or the President issued the order based on any improper discriminatory motive. Plaintiffs do not argue that the Waiver and Order are facially neutral, but claim that the Waiver and Order violate the equal protection clause because its alleged purpose is to disproportionately affect a particular racial subset of immigrants. Pls.' Compl. ¶ 126. In support, Plaintiffs rely primarily on a handful of stray comments by the President and certain government officials concerning border fence and immigration in general, rather than the Waiver or Order in particular. Plaintiffs' allegations are insufficient to establish a plausible equal protection claim.

"[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id.* at 265. "Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). "It implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an

30

identifiable group." *Id.* Additionally, strict scrutiny does not apply simply because a plaintiff alleges a disproportionate impact on a particular racial or ethnic group; rational basis applies unless Plaintiffs establish discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 242 (1976) ("Disproportionate impact . . . [s]tanding alone . . . does not trigger the rule . . . that racial classifications are to be subjected to the strictest scrutiny.").

A narrow standard of review here is particularly appropriate because this case implicates the Executive Branch's authority over the admission and exclusion of foreign nationals, "a matter within the core of executive responsibility." *Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018); *id.* at 2419 (highly deferential standard is appropriate "[g]iven the authority of the political branches over admission"). Indeed, this "deferential standard of review" applies "across different contexts and constitutional claims" because "'it is not the judicial role in cases of this sort to probe and test the justifications of immigration policies." *Id.* "A conventional application of" this standard, "asking only whether the policy is facially legitimate and bona fide," would plainly require dismissal of Plaintiffs' equal protection claims because Plaintiffs do not contend there is anything facially discriminatory about the Rule. *Id.* at 2420. But dismissal is also appropriate if the Court were to apply rational basis review to Plaintiffs' claim. Under that standard, the Court considers only whether the policy is "plausibly related to the Government's stated objective" and must "uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.* The Complaint contains no allegations suggesting that the Waiver is not at least plausibly related to DHS's stated objectives.

Under any potentially-applicable standard, however, this claim fails because Plaintiffs' allegations do not suggest that DHS issued the Waiver or the President issued the Executive Order "because of" any alleged "adverse effects upon an identifiable" racial or ethnic group.

31

First, "the [stated] purposes of the" Waiver "provide the surest explanation for its" design and implementation. *Feeney*, 442 U.S. at 279.  Here, DHS explains that the Waiver was issued to combat "high levels of illegal entry within the Laredo Sector" as illustrated by the apprehension of over 38,000 illegal aliens attempting to enter the United States between border crossings in that sector last year and the seizure of large volumes of illegal drugs.  *See* 85 Fed. Reg. at 29472.

Second, to show that DHS issued the Waiver due to improper motives, Plaintiffs rely almost exclusively on alleged public statements by non-DHS officials and former DHS employees. The alleged public statements in the Complaint reflect general views on immigration and the Border Wall project, and say nothing of why any particular official supported the Waiver. Regardless, "contemporary statements" may be relevant to the question of whether an "invidious discriminatory purpose was a motivating factor," if made "by members of the decisionmaking body." *Arlington Heights*, 429 U.S. at 268; *see also Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir. 2000) ("Evidence demonstrating discriminatory animus in the decisional process needs to be distinguished from stray remarks . . . statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process."). Here, Plaintiffs rely almost exclusively on statements made by former or non-DHS personnel, and Plaintiffs provide no explanation for how these statements reveal that *Acting Secretary Chad Wolf* harbored an improper motive in issuing the Waiver. Accordingly, Plaintiffs have failed to state a plausible equal protection claim.

### D.     May 15, 2020 Waiver Does Not Violate Due Process under the Fifth Amendment

Plaintiffs claim that § 102(c)'s "broad and vague waiver of all state and local laws is a violation of the Fifth Amendment guarantee of due process because Zapata County was not informed on which laws were being waived." Pls.' Compl. ¶ 132.  This claim fails at the

threshold.  It is Plaintiffs' burden to establish a life, liberty, or property interest for which due

process is required.  *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("[T]hose who seek to

invoke [Due Process Clause] protection must establish that one of these interests is at stake.").

Here, Plaintiffs make no attempt to carry that burden.  And there is no reason to believe that they

have in fact been deprived of any cognizable interest.

But even if they had identified a protected interest, Plaintiffs cannot show that the statute

or the waiver determinations fail to provide sufficient notice.  Plaintiffs claim that the waiver

determinations leave "Zapata County [having] no idea which local laws are active and can

continue to be enforced and which ones have been waived and no longer be enforced." Pls.'

Compl. ¶ 132.  But they provide nothing to suggest that there is any actual ambiguity in a

determination that specifies which federal laws are waived and includes all "state, or other laws

regulations and legal requirements of, deriving from, or related to the subject of" those federal

laws.  85 Fed. Reg. at 29472.  Indeed, because state law that can bind federal action is

vanishingly rare, Plaintiffs would be hard pressed to identify any laws that might or might not be

affected.

### E.      Acting Secretary Wolf's Service Does Not Violate the Appointments Clause

Mr. Wolf is the Senate-confirmed Under Secretary for Strategy, Policy, and Plans.[12] In

addition, he serves as the Acting Secretary of Homeland Security. Plaintiffs allege that he cannot

perform the duties of the Secretary even in an acting capacity unless the President nominates him

and the Senate confirms him as Secretary of Homeland Security. Pls.' Compl. ¶¶ 148–49. This

claim fails because an acting agency head is not a principal officer and thus does not require

Senate confirmation. And, regardless, Mr. Wolf's prior confirmation as Under Secretary satisfies

---

[12] Ex. 12, 165 Cong. Rec. S6519 (Nov. 13, 2019).

any confirmation requirement because the duties of the Secretary are germane to his position as Under Secretary.

*First*, Mr. Wolf may temporarily perform the duties of the Secretary without Senate confirmation because his service as Acting Secretary does not transform him into a principal officer. The Appointments Clause specifies the process for selecting all "Officers" whose positions are "established by Law." U.S. Const. art. II, § 2, cl. 2. The Secretary of Homeland Security is a principal officer and must be Senate-confirmed. But that does not mean that an individual who *temporarily* performs the functions of a principal office in an *acting* capacity must also be appointed as a principal officer.

Although the Appointments Clause is silent on the issue, the Supreme Court and lower courts have repeatedly held that a person performing the duties of a vacant principal office is not a principal officer. *See United States v. Eaton*, 169 U.S. 331, 343 (1898). Indeed, "the Supreme Court has repeatedly embraced the government's view that it is the temporary nature of acting duties that permits an individual to perform them without becoming a principal officer under the Appointments Clause." *Guedes v. ATF*, 356 F. Supp. 3d 109, 146 (D.D.C. 2019); *see also id.* ("[T]he Supreme Court has held and subsequently reaffirmed that an official designated to perform the duties of a principal office temporarily, on an acting basis, need not undergo Senate confirmation."); *United States v. Smith*, 962 F.3d 755, 764 (4th Cir. 2020) ("Someone who temporarily performs the duties of a principal officer . . . may occupy that post without having been confirmed with the advice and consent of the Senate.").

These holdings are confirmed by consistent legislative practice. Acts of Congress passed in three different centuries have authorized the designation of non-Senate-confirmed acting principal officers. *See, e.g.*, 5 U.S.C. § 3345(a)(1), (3); Act of July 23, 1868, ch. 227, § 1, 15

34

Stat. 168; Act of Feb. 13, 1795, 1 Stat. 415; Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281.[13]

And the Executive Branch has repeatedly designated non-Senate-confirmed persons to serve as acting agency heads under these statutes. *See Designating an Acting Attorney General*, 2018 WL 6131923, at *8 (OLC Nov. 14, 2018) (identifying over 160 occasions).

In sum, Plaintiffs' claim that Mr. Wolf's temporary service as Acting Secretary violates the Appointments Clause (1) finds no support in the Appointments Clause's text, (2) conflicts with Supreme Court and lower court precedent, and (3) is inconsistent with the historical practice of the Legislative and Executive Branches.

*Second*, Mr. Wolf's prior confirmation as Under Secretary satisfies any confirmation requirement because the duties of the Secretary are germane to his position as Under Secretary. The Supreme Court has held that officers confirmed by the Senate for one office may serve in a second office that requires Senate confirmation—without a second confirmation—so long as the role of the second office is "germane" to the first office. *Weiss v. United States*, 510 U.S. 163, 176 (1994). Here, the duties of the Secretary are "germane" to Mr. Wolf's position as Under Secretary.[14]

Because Mr. Wolf's service is valid under the Appointments Clause, Plaintiffs fail to state a claim upon which relief can be granted.

---

[13] In fact, Congress has specifically authorized the designation of a non-Senate-confirmed Acting Secretary of Homeland Security. 6 U.S.C. § 113(g)(2).

[14] If the Court finds that Mr. Wolf may serve as Acting Secretary without a second confirmation because the duties of the Secretary are germane to Mr. Wolf's position as Under Secretary, the Court need not decide whether Mr. Wolf is a principal officer based on his service as Acting Secretary. And the Court need not decide whether an acting officer is an officer or employee because that question "does not arise for anyone who is already an 'Officer of the United States' . . ., as any duties arising [from the acting service] can be regarded as part and parcel of the office to which he was appointed." Office of Legal Counsel, *Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121, 122 n.3 (2003) (citing *Weiss*, 510 U.S. at 174).

35

III.    **PLAINTIFFS' CLAIMS UNDER THE FVRA AND HSA MUST BE DISMISSED**

Mr. Wolf currently serves as Acting Secretary under an order of succession that former Acting Secretary McAleenan designated. *See* Pls.' Compl. ¶ 122. Plaintiffs allege Mr. McAleenan's service "as Acting DHS [Secretary] violated the Federal Vacancies Reform Act, the Homeland Security Act, and Executive Order 13753." *Id.* ¶ 157. Presumably, Plaintiffs' theory is that, if Mr. McAleenan's service was unlawful, Mr. Wolf's service is necessarily unlawful because he serves under an order of succession that Mr. McAleenan designated. Plaintiffs also argue that, even if Mr. McAleenan's service was lawful, Mr. Wolf's service is still unlawful because Mr. McAleenan designated the order of succession that Mr. Wolf serves under after the FVRA's 210-day limit on acting service had expired. *Id.* ¶ 157–58.

Both theories fail. *First*, the FVRA is not the exclusive scheme for acting service if there is an express office-specific statutory provision for acting service. 5 U.S.C. § 3347(a)(1). The HSA is one such office specific vacancy statute. *See* 6 U.S.C. § 113(g)(1)–(2). *Second*, Mr. McAleenan lawfully served under the HSA. *Third*, because Mr. McAleenan and Mr. Wolf served under the HSA—not the FVRA—they are not subject to the FVRA's time limit on acting service.

While this litigation turns on Mr. Wolf's status at the time the Waiver was issued in May 2020, *see* Pls.' Compl. ¶¶ 157-159, there were two additional developments last week regarding Mr. Wolf's service at DHS.  First, the President submitted to the Senate Mr. Wolf's nomination to serve as the Secretary of Homeland Security.  *See Two Nominations Sent to the Senate* (Sept. 10, 2020), available at https://www.whitehouse.gov/presidential-actions/two-nominations-sent-senate-091020/.  Second, DHS issued an additional order regarding the order of succession for Secretary of Homeland Security.  Ex. 8, Order Designating the Order of Succession for the Secretary of Homeland Security (Sept. 10, 2020).  As discussed below, DHS has consistently

36

explained that Acting Secretary Wolf is serving lawfully under the HSA, and under valid orders altering the DHS order of succession issued by Ms. Nielsen and Mr. McAleenan.  But DHS recognizes that ongoing challenges to Acting Secretary Wolf's service risk an unnecessary "distraction to the mission of the Department of Homeland Security."  *Id.*  Thus, "out of an abundance of caution," the Senate-confirmed Administrator of the Federal Emergency Management Agency (FEMA), Peter T. Gaynor[15]—who, upon the submission of Mr. Wolf's nomination and under the terms of Executive Order 13753, would be the officer next in line to serve as Acting Secretary—issued a new order of succession on September 10, 2020, relying on "any authority vested in [him] as Acting Secretary of Homeland Security."  *Id.*  And as a result of that order approved by Mr. Gaynor—through which the FEMA Administrator and the Under Secretary for Strategy, Policy, and Plans would become sixth and fourth in line, respectively— Mr. Wolf would then become Acting Secretary, as the most senior official now serving in the line of succession.  Neither of these actions have any immediate effect on this litigation.[16]

### A.  The HSA Authorizes Acting Service

The FVRA is generally the "exclusive means for temporarily authorizing an acting officer to perform the functions and duties" of a Senate-confirmed office. 5 U.S.C. § 3347(a). It recognizes exceptions to this general rule of exclusivity, including for statutes that "expressly designate" an acting officer, *id.* § 3347(a)(1)(B), and statutes that "authorize[] the President, a

---

[15] Gaynor was nominated by the President to serve as FEMA Administrator on October 15, 2019, confirmed by the Senate on January 14, 2020, and sworn into office on January 16, 2020.

[16] Although DHS disagrees with the legal theory advanced by plaintiffs in these and other cases, if that theory is correct, the result would be that Mr. Gaynor (not Mr. Wolf) would be the proper Acting Secretary under the Executive Order's order of succession—and thus would be authorized under 6 U.S.C. § 113(g)(2) to alter the order of succession.  If the Acting Secretary ultimately takes any further curative steps to address legal challenges to past agency actions in reliance on that September 10 order, then the parties can address the significance of any such ratification (and of the September 10 order generally) at that time.

court, or the head of an Executive department, to designate" an acting officer, *id.* § 3347(a)(1)(A). When a vacancy arises in an office with an office-specific vacancy statute, that statute provides an alternate means of designating an acting officer. *See Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550, 556 (9th Cir. 2016) (FVRA and office-specific statute coexist as "statutory alternatives to designate" acting officer); *see also Smith*, 962 F.3d at 763 n.1 (same).

The HSA is one such office-specific statute. There, Congress gave the Secretary of Homeland Security the power to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2). Congress made clear that the Secretary's power applies "[n]otwithstanding" the FVRA. *Id.* As explained below, Mr. McAleenan served under the HSA, not the FVRA. Thus, Plaintiffs' claim that his service violated the FVRA must fail.

### B.    Mr. McAleenan Lawfully Served Under the HSA

Kirstjen Nielsen served as Secretary of Homeland Security between December 5, 2017 and April 10, 2019. On April 9, 2019, Ms. Nielsen exercised her authority under the HSA, 6 U.S.C. § 113(g)(2), to designate a new order of succession for the office of Secretary. *See* Ex. 6, Designation of an Order of Succession for the Secretary (Apr. 9, 2019). This order applied to all vacancies in the office, regardless of reason. Under Ms. Nielsen's order of succession, the CBP Commissioner was third in line to serve as Acting Secretary. *Id.*; *see also* 6 U.S.C. § 113(g)(1) (recognizing that the Deputy Secretary is first-in-line and the Under Secretary for Management is second-in-line). When Ms. Nielsen resigned, her order of succession was triggered, and then-CBP Commissioner Kevin McAleenan became the Acting Secretary because the first two positions in the order of succession were vacant. *See* Ex. 10, Letter from Neal J. Swartz, Associate General Counsel for General Law, DHS, to Hon. Michael R. Pence, President of the Senate (Apr. 16, 2018); Ex. 11, Letter from Neal J. Swartz, Associate General Counsel for

38

General Law, DHS, to Hon. Michael R. Pence, President of the Senate (Apr. 11, 2019).

Plaintiffs may argue that Executive Order 13753 ("EO 13753")—not Ms. Nielsen's April 9 order of succession—controlled when Ms. Nielsen resigned. *See* Pls.' Compl. ¶ 157. This argument fails.

To begin with, Ms. Nielsen's signed order controlled when she resigned. The order says five times that Ms. Nielsen is designating an order of succession for the Secretary. The order's unqualified language shows that it would apply to all vacancies. Plus, it expressly relied on her authority under § 113(g)(2), which empowers only the Secretary to designate an "order of succession" for officers to serve as Acting Secretary in the event of a vacancy.

Moreover, this argument assumes that Revision 8.5 to DHS Delegation No. 00106, an administrative document that DHS uses to consolidate the orders of succession for many senior positions in DHS, controlled when Ms. Nielsen resigned. *See* Ex. 9, DHS Order of Succession and Delegations of Authorities for Named Positions, DHS Delegation No. 00106 Rev. 08.5 (Apr. 10, 2019). This assumption is wrong because an administrative document cannot override the Secretary's signed order.

Beyond relying on the wrong document, this argument assumes that the April 2019 order altered Section II.B (a delegation of authority that governs during disaster or emergency) but not Section II.A (an order of succession that governs when the office of Secretary is vacant) of Revision 8.5 to DHS Delegation No. 00106. This argument misses critical context: EO 13753 sets out the President's order of succession under the FVRA, and it was issued before Congress authorized the Secretary to set an order of succession in § 113(g)(2). When Congress gave the Secretary this power, it made clear that the Secretary's authority to designate an order of succession applies "[n]otwithstanding" the FVRA. 6 U.S.C. § 113(g)(2). Thus, Ms. Nielsen's §

39

113(g)(2) order of succession superseded the order of succession under EO 13753. Finally, by assuming that Ms. Nielsen only amended Section II.B, this argument relies on a cramped reading of the order: it concludes that—by signing an order to "amend the order of succession" under § 113(g)(2)—Ms. Nielsen only amended the order for delegation of authority under § 112(b)(1). But the order shows that Ms. Nielsen employed both her § 112(b)(1) and § 113(g)(2) powers and provided that Annex A would serve both succession and delegation purposes.

Ms. Nielsen's order shows that Mr. McAleenan lawfully served under the HSA. *But see* Ex. 15, Mem. Opinion at 39-45, *Casa de Maryland, Inc. v. Wolf*, No. 8:20-cv-02118, ECF No. 69 (D. Md. Sept. 11, 2020) (finding that Mr. McAleenan was not the proper Acting Secretary when Ms. Nielsen resigned).[17] Mr. McAleenan thus had the authority under § 113(g)(2) to amend the order of succession for the office of the Secretary. When he exercised that authority, Mr. McAleenan put the Under Secretary for Strategy, Policy, and Plans third in line to serve as Acting Secretary. *See* Ex. 7, Amendment to the Order of Succession for the Secretary (Nov. 8, 2019). When Mr. McAleenan resigned from the Department on November 13, 2019, Mr. Wolf, as the Senate-confirmed Under Secretary for Strategy, Policy, and Plans, lawfully became Acting Secretary under the operative order of succession.

Because Mr. McAleenan lawfully served under the HSA, Mr. Wolf also lawfully serves under the HSA.

### C.     The FVRA's Limit on Acting Service Does Not Apply to Designations Under the HSA

Plaintiffs claim that even if Mr. McAleenan's service were lawful, Mr. Wolf's service is still unlawful because Mr. McAleenan amended the order of succession that Mr. Wolf serves

---

[17] DHS respectfully disagrees with this finding for the reasons just explained.

under after the FVRA's 210-day limit on acting service had expired. Pls.' Compl. ¶ 158. This argument fails because the FVRA's time limit does not apply to designations under the HSA. *See Casa de Maryland*, slip op. at 37 (holding that the FVRA did not "authorize[] th[e] Court to extend the FVRA's timing provision to selections made pursuant to the 'further order of succession' in section 113(g)(2)").

The FVRA's initial 210-day limit only applies to a "person serving as an acting officer *as described under section 3345*." 5 U.S.C. § 3346(a)(1) (emphasis added); *see also id.* § 3345(a)(1)-(3) (explaining that service under § 3345 is "subject to the time limitations of section 3346"). When enacting the FVRA, Congress was aware that "[m]ost office-specific vacancy statutes "do not place time restrictions on the length of an acting officer." S. Rep. No. 105-250, at 17 (1998). But it still retained these statutes as alternatives to the FVRA. 5 U.S.C. § 3347(a)(1)(A)–(B). And it imposed the 210-day limit only on persons serving under the FVRA. *Id.* § 3346(a)(1). That is, Congress placed no time limit on service under *office-specific vacancy statutes*. *See Guedes*, 356 F. Supp. 3d at 142 (unlike Attorney General vacancy statute, service under FVRA was subject to "specific time limits"); *see also United States v. Lucido*, 373 F. Supp. 1142, 1150-51 (E.D. Mich. 1974) (Deputy Attorney General could serve as Acting Attorney General under office-specific statute after time limit in pre-FVRA Vacancies Act expired); Office of Legal Counsel, *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 66-67 & n.3 (Mar. 22, 1999) (FVRA's time limits "do not apply" to office-specific vacancy statutes).

As explained, the HSA is one such office-specific vacancy statute. *See* 6 U.S.C. § 113(g)(1)–(2). By § 3346's unambiguous text, the 210-day limit does not apply to designations under the HSA. The HSA contains no express time limit and provides that the Secretary's

41

authority to designate an officer under § 113(g)(2) applies "[n]othwithstanding" the FVRA. The "notwithstanding" phrase makes clear that § 113(g)(2)—consistent with § 3347(a)(1)(A)—authorizes the Secretary to designate a line of succession for service under the HSA, which is distinct from the FVRA and thus not subject to the FVRA's 210-day limit.

Because neither Mr. McAleenan's nor Mr. Wolf's service violates the HSA or the FVRA, Plaintiffs fail to state a claim upon which relief can be granted.

## CONCLUSION

Defendants, through the undersigned counsel, respectfully move to dismiss Plaintiffs' Complaint. As set forth in motion above, this case should be dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), or, in the alternative, for failure to state a claim upon relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,

**RYAN K. PATRICK**
United States Attorney
Southern District of Texas

By: *s/P. Conner Kirtley*
     **P. CONNER KIRTLEY**
Assistant United States Attorney
Southern District of Texas No. 3563689
Oklahoma Bar No. 32440
11204 McPherson Road, Suite 100A
Laredo, Texas 78045
Telephone: (956) 723-6523
E-mail: Philip.Kirtley@usdoj.gov
Attorney in charge for Defendants

**JOHN A. SMITH III**
Assistant United States Attorney
Southern District of Texas No. 8638
Texas Bar No. 18627450

42

One Shoreline Plaza
800 North Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401
Telephone: (361) 888-3111
Facsimile: (361) 888-3234
E-mail: john.a.smith@usdoj.gov
Attorney for Defendants

**E. PAXTON WARNER**
Assistant United States Attorney
Southern District of Texas No. 555957
Texas Bar No. 24003139
1701 W. Bus. Highway 83, Suite 600
McAllen, TX 78501
Telephone: (956) 618-8010
Facsimile: (956) 618-8016
E-mail: Paxton.Warner@usdoj.gov
Attorney for Defendants

## CERTIFICATE OF SERVICE

I, P. Conner Kirtley, Assistant United States Attorney for the Southern District of Texas, hereby certify that on September 14, 2020, I served the foregoing using the Court's ECF notification system on all parties receiving ECF notice in this case.

By:   *s/P. Conner Kirtley*
**P. CONNER KIRTLEY**
Assistant United States Attorney

43