104TH CONGRESS  } HOUSE OF REPRESENTATIVES {  REPORT
2d Session                                                      104–828

## ILLEGAL IMMIGRATION REFORM AND IMMIGRANT RESPONSIBILITY ACT OF 1996

SEPTEMBER 24, 1996.—Ordered to be printed

Mr. HYDE, from the committee of conference,
submitted the following

## CONFERENCE REPORT

[To accompany H.R. 2202]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 2202) to amend the Immigration and Nationality Act to improve deterrence of illegal immigration to the United States by increasing border patrol and investigative personnel, by increasing penalties for alien smuggling and for document fraud, by reforming exclusion and deportation law and procedures, by improving the verification system for the eligibility for employment, and through other measures, to reform the legal immigration system and facilitate legal entries into the United States, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment, insert the following:

**SECTION 1. SHORT TITLE; AMENDMENTS TO IMMIGRATION AND NA-TIONALITY ACT; APPLICATION OF DEFINITIONS OF SUCH ACT; TABLE OF CONTENTS; SEVERABILITY.**

*(a) SHORT TITLE.—This Act may be cited as the "Illegal Immigration Reform and Immigrant Responsibility Act of 1996".*

*(b) AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.—Except as otherwise specifically provided—*

*(1) whenever in this Act an amendment or repeal is expressed as the amendment or repeal of a section or other provision, the reference shall be considered to be made to that section or provision in the Immigration and Nationality Act; and*

27–298

GOVERNMENT EXHIBIT
1

2

(2) amendments to a section or other provision are to such section or other provision before any amendment made to such section or other provision elsewhere in this Act.

(c) APPLICATION OF CERTAIN DEFINITIONS.—Except as otherwise specifically provided in this Act, for purposes of titles I and VI of this Act, the terms "alien", "Attorney General", "border crossing identification card", "entry", "immigrant", "immigrant visa", "lawfully admitted for permanent residence", "national", "naturalization", "refugee", "State", and "United States" shall have the meaning given such terms in section 101(a) of the Immigration and Nationality Act.

(d) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; amendments to Immigration and Nationality Act; application of definitions of such Act; table of contents.

TITLE I—IMPROVEMENTS TO BORDER CONTROL, FACILITATION OF LEGAL ENTRY, AND INTERIOR ENFORCEMENT

Subtitle A—Improved Enforcement at the Border

Sec. 101. Border patrol agents and support personnel.
Sec. 102. Improvement of barriers at border.
Sec. 103. Improved border equipment and technology.
Sec. 104. Improvement in border crossing identification card.
Sec. 105. Civil penalties for illegal entry.
Sec. 106. Hiring and training standards.
Sec. 107. Report on border strategy.
Sec. 108. Criminal penalties for high speed flights from immigration checkpoints.
Sec. 109. Joint study of automated data collection.
Sec. 110. Automated entry-exit control system.
Sec. 111. Submission of final plan on realignment of border patrol positions from interior stations.
Sec. 112. Nationwide fingerprinting of apprehended aliens.

Subtitle B—Facilitation of Legal Entry

Sec. 121. Land border inspectors.
Sec. 122. Land border inspection and automated permit pilot projects.
Sec. 123. Preinspection at foreign airports.
Sec. 124. Training of airline personnel in detection of fraudulent documents.
Sec. 125. Preclearance authority.

Subtitle C—Interior Enforcement

Sec. 131. Authorization of appropriations for increase in number of certain investigators.
Sec. 132. Authorization of appropriations for increase in number of investigators of visa overstayers.
Sec. 133. Acceptance of State services to carry out immigration enforcement.
Sec. 134. Minimum State INS presence.

TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling

Sec. 201. Wiretap authority for investigations of alien smuggling or document fraud.
Sec. 202. Racketeering offenses relating to alien smuggling.
Sec. 203. Increased criminal penalties for alien smuggling.
Sec. 204. Increased number of assistant United States Attorneys.
Sec. 205. Undercover investigation authority.

Subtitle B—Deterrence of Document Fraud

Sec. 211. Increased criminal penalties for fraudulent use of government-issued documents.
Sec. 212. New document fraud offenses; new civil penalties for document fraud.

3

Sec. 213. New criminal penalty for failure to disclose role as preparer of false application for immigration benefits.
Sec. 214. Criminal penalty for knowingly presenting document which fails to contain reasonable basis in law or fact.
Sec. 215. Criminal penalty for false claim to citizenship.
Sec. 216. Criminal penalty for voting by aliens in Federal election.
Sec. 217. Criminal forfeiture for passport and visa related offenses.
Sec. 218. Penalties for involuntary servitude.
Sec. 219. Admissibility of videotaped witness testimony.
Sec. 220. Subpoena authority in document fraud enforcement.

### TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION, AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

#### Subtitle A—Revision of Procedures for Removal of Aliens

Sec. 301. Treating persons present in the United States without authorization as not admitted.
Sec. 302. Inspection of aliens; expedited removal of inadmissible arriving aliens; referral for hearing (revised section 235).
Sec. 303. Apprehension and detention of aliens not lawfully in the United States (revised section 236).
Sec. 304. Removal proceedings; cancellation of removal and adjustment of status; voluntary and new sections 239 to 240C).
Sec. 305. Detention and removal of aliens ordered removed (new section 241).
Sec. 306. Appeals from orders of removal (new section 242).
Sec. 307. Penalties relating to removal (revised section 243).
Sec. 308. Redesignation and reorganization of other provisions; additional conforming amendments.
Sec. 309. Effective dates; transition.

#### Subtitle B—Criminal Alien Provisions

Sec. 321. Amended definition of aggravated felony.
Sec. 322. Definition of conviction and term of imprisonment.
Sec. 323. Authorizing registration of aliens on criminal probation or criminal parole.
Sec. 324. Penalty for reentry of deported aliens.
Sec. 325. Change in filing requirement.
Sec. 326. Criminal alien identification system.
Sec. 327. Appropriations for criminal alien tracking center.
Sec. 328. Provisions relating to State criminal alien assistance program.
Sec. 329. Demonstration project for identification of illegal aliens in incarceration facility of Anaheim, California.
Sec. 330. Prisoner transfer treaties.
Sec. 331. Prisoner transfer treaties study.
Sec. 332. Annual report on criminal aliens.
Sec. 333. Penalties for conspiring with or assisting an alien to commit an offense under the Controlled Substances Import and Export Act.
Sec. 334. Enhanced penalties for failure to depart, illegal reentry, and passport and visa fraud.

#### Subtitle C—Revision of Grounds for Exclusion and Deportation

Sec. 341. Proof of vaccination requirement for immigrants.
Sec. 342. Incitement of terrorist activity and provision of false documentation to terrorists as a basis for exclusion from the United States.
Sec. 343. Certification requirements for foreign health-care workers.
Sec. 344. Removal of aliens falsely claiming United States citizenship.
Sec. 345. Waiver of exclusion and deportation ground for certain section 274C violators.
Sec. 346. Inadmissibility of certain student visa abusers.
Sec. 347. Removal of aliens who have unlawfully voted.
Sec. 348. Waivers for immigrants convicted of crimes.
Sec. 349. Waiver of misrepresentation ground of inadmissibility for certain alien.
Sec. 350. Offenses of domestic violence and stalking as ground for deportation.
Sec. 351. Clarification of date as of which relationship required for waiver from exclusion or deportation for smuggling.

Sec. 352. *Exclusion of former citizens who renounced citizenship to avoid United States taxation.*
Sec. 353. *References to changes elsewhere in Act.*

*Subtitle D—Changes in Removal of Alien Terrorist Provisions*

Sec. 354. *Treatment of classified information.*
Sec. 355. *Exclusion of representatives of terrorists organizations.*
Sec. 356. *Standard for judicial review of terrorist organization designations.*
Sec. 357. *Removal of ancillary relief for voluntary departure.*
Sec. 358. *Effective date.*

*Subtitle E—Transportation of Aliens*

Sec. 361. *Definition of stowaway.*
Sec. 362. *Transportation contracts.*

*Subtitle F—Additional Provisions*

Sec. 371. *Immigration judges and compensation.*
Sec. 372. *Delegation of immigration enforcement authority.*
Sec. 373. *Powers and duties of the Attorney General and the Commissioner.*
Sec. 374. *Judicial deportation.*
Sec. 375. *Limitation on adjustment of status.*
Sec. 376. *Treatment of certain fees.*
Sec. 377. *Limitation on legalization litigation.*
Sec. 378. *Rescission of lawful permanent resident status.*
Sec. 379. *Administrative review of orders.*
Sec. 380. *Civil penalties for failure to depart.*
Sec. 381. *Clarification of district court jurisdiction.*
Sec. 382. *Application of additional civil penalties to enforcement.*
Sec. 383. *Exclusion of certain aliens from family unity program.*
Sec. 384. *Penalties for disclosure of information.*
Sec. 385. *Authorization of additional funds for removal of aliens.*
Sec. 386. *Increase in INS detention facilities; report on detention space.*
Sec. 387. *Pilot program on use of closed military bases for the detention of inadmissible or deportable aliens.*
Sec. 388. *Report on interior repatriation program.*

TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

*Subtitle A—Pilot Programs for Employment Eligibility Confirmation*

Sec. 401. *Establishment of programs.*
Sec. 402. *Voluntary election to participate in a pilot program.*
Sec. 403. *Procedures for participants in pilot programs.*
Sec. 404. *Employment eligibility confirmation system.*
Sec. 405. *Reports.*

*Subtitle B—Other Provisions Relating to Employer Sanctions*

Sec. 411. *Limiting liability for certain technical violations of paperwork requirements.*
Sec. 412. *Paperwork and other changes in the employer sanctions program.*
Sec. 413. *Report on additional authority or resources needed for enforcement of employer sanctions provisions.*
Sec. 414. *Reports on earnings of aliens not authorized to work.*
Sec. 415. *Authorizing maintenance of certain information on aliens.*
Sec. 416. *Subpoena authority.*

*Subtitle C—Unfair Immigration-Related Employment Practices*

Sec. 421. *Treatment of certain documentary practices as unfair immigration-related employment practices.*

TITLE V—RESTRICTIONS ON BENEFITS FOR ALIENS

Sec. 500. *Statements of national policy concerning public benefits and immigration.*

*Subtitle A—Ineligibility of Excludable, Deportable, and Nonimmigrant Aliens From Public Assistance and Benefits*

Sec. 501. *Means-tested public benefits.*
Sec. 502. *Grants, contracts, and licenses.*

Sec. 503. Unemployment benefits.
Sec. 504. Social security benefits.
Sec. 505. Requiring proof of identity for certain public assistance.
Sec. 506. Authorization for States to require proof of eligibility for State programs.
Sec. 507. Limitation on eligibility for preferential treatment of aliens not lawfully
        present on basis of residence for higher education benefits.
Sec. 508. Verification of student eligibility for postsecondary Federal student finan-
        cial assistance.
Sec. 509. Verification of immigration status for purposes of social security and high-
        er educational assistance.
Sec. 510. No verification requirement for nonprofit charitable organizations.
Sec. 511. GAO study of provision of means-tested public benefits to ineligible aliens
        on behalf of eligible individuals.

### Subtitle B—Expansion of Disqualification From Immigration Benefits on the Basis of Public Charge

Sec. 531. Ground for exclusion.
Sec. 532. Ground for deportation.

### Subtitle C—Affidavits of Support and Attribution of Income

Sec. 551. Requirements for sponsor's affidavit of support.
Sec. 552. Attribution of sponsor's income and resources to sponsored immigrants.
Sec. 553. Attribution of sponsor's income and resources authority for State and local
        governments.
Sec. 554. Authority of States and political subdivisions of States to limit assistance
        to aliens and to distinguish among classes of aliens in providing general
        cash public assistance.

### Subtitle D—Miscellaneous Provisions

Sec. 561. Increased maximum criminal penalties for forging or counterfeiting seal of
        a Federal department or agency to facilitate benefit fraud by an unlaw-
        ful alien.
Sec. 562. Computation of targeted assistance.
Sec. 563. Treatment of expenses subject to emergency medical services exception.
Sec. 564. Reimbursement of States and localities for emergency ambulance services.
Sec. 565. Pilot programs to require bonding.
Sec. 566. Reports.

### Subtitle E—Housing Assistance

Sec. 571. Short title.
Sec. 572. Prorating of financial assistance.
Sec. 573. Actions in cases of termination of financial assistance.
Sec. 574. Verification of immigration status and eligibility for financial assistance.
Sec. 575. Prohibition of sanctions against entities making financial assistance eligi-
        bility determinations.
Sec. 576. Regulations.
Sec. 577. Report on housing assistance programs.

### Subtitle F—General Provisions

Sec. 591. Effective dates.
Sec. 592. Statutory construction.
Sec. 593. Not applicable to foreign assistance.
Sec. 594. Notification.
Sec. 595. Definitions.

## TITLE VI—MISCELLANEOUS PROVISIONS

### Subtitle A—Refugees, Parole, and Asylum

Sec. 601. Persecution for resistance to coercive population control methods.
Sec. 602. Limitation on use of parole.
Sec. 603. Treatment of long-term parolees in applying worldwide numerical limita-
        tions.
Sec. 604. Asylum reform.
Sec. 605. Increase in asylum officers.
Sec. 606. Conditional repeal of Cuban Adjustment Act.

*Subtitle B—Miscellaneous Amendments to the Immigration and Nationality Act*

Sec. 621. *Alien witness cooperation.*
Sec. 622. *Waiver of foreign country residence requirement with respect to inter-national medical graduates.*
Sec. 623. *Use of legalization and special agricultural worker information.*
Sec. 624. *Continued validity of labor certifications and classification petitions for professional athletes.*
Sec. 625. *Foreign students.*
Sec. 626. *Services to family members of certain officers and agents killed in the line of duty.*

*Subtitle C—Provisions Relating to Visa Processing and Consular Efficiency*

Sec. 631. *Validity of period of visas.*
Sec. 632. *Elimination of consulate shopping for visa overstays.*
Sec. 633. *Authority to determine visa processing procedures.*
Sec. 634. *Changes regarding visa application process.*
Sec. 635. *Visa waiver program.*
Sec. 636. *Fee for diversity immigrant lottery.*
Sec. 637. *Eligibility for visas for certain Polish applicants for the 1995 diversity immigrant program.*

*Subtitle D—Other Provisions*

Sec. 641. *Program to collect information relating to nonimmigrant foreign students.*
Sec. 642. *Communication between government agencies and the Immigration and Naturalization Service.*
Sec. 643. *Regulations regarding habitual residence.*
Sec. 644. *Information regarding female genital mutilation.*
Sec. 645. *Criminalization of female genital mutilation.*
Sec. 646. *Adjustment of status for certain Polish and Hungarian parolees.*
Sec. 647. *Support of demonstration projects.*
Sec. 648. *Sense of Congress regarding American-made products; requirements regarding notice.*
Sec. 649. *Vessel movement controls during immigration emergency.*
Sec. 650. *Review of practices of testing entities.*
Sec. 651. *Designation of a United States customs administrative building.*
Sec. 652. *Mail-order bride business.*
Sec. 653. *Review and report on H–2A nonimmigrant workers program.*
Sec. 654. *Report on allegations of harassment by Canadian customs agents.*
Sec. 655. *Sense of Congress on discriminatory application of New Brunswick provincial sales tax.*
Sec. 656. *Improvements in identification-related documents.*
Sec. 657. *Development of prototype of counterfeit-resistant Social Security card.*
Sec. 658. *Border Patrol Museum.*
Sec. 659. *Sense of the Congress regarding the mission of the Immigration and Naturalization Service.*
Sec. 660. *Authority for National Guard to assist in transportation of certain aliens.*

*Subtitle E—Technical Corrections*

Sec. 671. *Miscellaneous technical corrections.*

(e) SEVERABILITY.—If any provision of this Act or the application of such provision to any person or circumstances is held to be unconstitutional, the remainder of this Act and the application of the provisions of this Act to any person or circumstance shall not be affected thereby.

# TITLE I—IMPROVEMENTS TO BORDER CONTROL, FACILITATION OF LEGAL ENTRY, AND INTERIOR ENFORCEMENT

## Subtitle A—Improved Enforcement at the Border

### SEC. 101. BORDER PATROL AGENTS AND SUPPORT PERSONNEL.

(a) INCREASED NUMBER OF BORDER PATROL AGENTS.—The Attorney General in each of fiscal years 1997, 1998, 1999, 2000, and 2001 shall increase by not less than 1,000 the number of positions for full-time, active-duty border patrol agents within the Immigration and Naturalization Service above the number of such positions for which funds were allotted for the preceding fiscal year.

(b) INCREASE IN BORDER PATROL SUPPORT PERSONNEL.—The Attorney General, in each of fiscal years 1997, 1998, 1999, 2000, and 2001, may increase by 300 the number of positions for personnel in support of border patrol agents above the number of such positions for which funds were allotted for the preceding fiscal year.

(c) DEPLOYMENT OF BORDER PATROL AGENTS.—The Attorney General shall, to the maximum extent practicable, ensure that additional border patrol agents shall be deployed among Immigration and Naturalization Service sectors along the border in proportion to the level of illegal crossing of the borders of the United States measured in each sector during the preceding fiscal year and reasonably anticipated in the next fiscal year.

(d) FORWARD DEPLOYMENT.—

(1) IN GENERAL.—The Attorney General shall forward deploy existing border patrol agents in those areas of the border identified as areas of high illegal entry into the United States in order to provide a uniform and visible deterrent to illegal entry on a continuing basis. The previous sentence shall not apply to border patrol agents located at checkpoints.

(2) PRESERVATION OF LAW ENFORCEMENT FUNCTIONS AND CAPABILITIES IN INTERIOR STATES.—The Attorney General shall, when deploying border patrol personnel from interior stations to border stations, coordinate with, and act in conjunction with, State and local law enforcement agencies to ensure that such deployment does not degrade or compromise the law enforcement capabilities and functions currently performed at interior border patrol stations.

(3) REPORT.—Not later than 6 months after the date of the enactment of this Act, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report on—

(A) the progress and effectiveness of the forward deployment under paragraph (1); and

(B) the measures taken to comply with paragraph (2).

### SEC. 102. IMPROVEMENT OF BARRIERS AT BORDER.

(a) IN GENERAL.—The Attorney General, in consultation with the Commissioner of Immigration and Naturalization, shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

(b) CONSTRUCTION OF FENCING AND ROAD IMPROVEMENTS IN THE BORDER AREA NEAR SAN DIEGO, CALIFORNIA.—

(1) IN GENERAL.—In carrying out subsection (a), the Attorney General shall provide for the construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences.

(2) PROMPT ACQUISITION OF NECESSARY EASEMENTS.—The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act (as inserted by subsection (d)), shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

(3) SAFETY FEATURES.—The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features into the design of the fence system as are necessary to ensure the well-being of border patrol agents deployed within or in near proximity to the system.

(4) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this subsection not to exceed $12,000,000. Amounts appropriated under this paragraph are authorized to remain available until expended.

(c) WAIVER.—The provisions of the Endangered Species Act of 1973 and the National Environmental Policy Act of 1969 are waived to the extent the Attorney General determines necessary to ensure expeditious construction of the barriers and roads under this section.

(d) LAND ACQUISITION AUTHORITY.—

(1) IN GENERAL.—Section 103 (8 U.S.C. 1103) is amended—

(A) by redesignating subsections (b), (c), and (d) as subsections (c), (d), and (e), respectively; and

(B) by inserting after subsection (a) the following:

"(b)(1) The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this Act.

"(2) The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.

"(3) When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemna-

tion proceedings pursuant to the Act of August 1, 1888 (Chapter 728; 25 Stat. 357).

"(4) The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).".

(2) CONFORMING AMENDMENT.—Section 103(e) (as so redesignated by paragraph (1)(A)) is amended by striking "subsection (c)" and inserting "subsection (d)".

### SEC. 103. IMPROVED BORDER EQUIPMENT AND TECHNOLOGY.

The Attorney General is authorized to acquire and use, for the purpose of detection, interdiction, and reduction of illegal immigration into the United States, any Federal equipment (including fixed wing aircraft, helicopters, four-wheel drive vehicles, sedans, night vision goggles, night vision scopes, and sensor units) determined available for transfer by any other agency of the Federal Government upon request of the Attorney General.

### SEC. 104. IMPROVEMENT IN BORDER CROSSING IDENTIFICATION CARD.

(a) IN GENERAL.—Section 101(a)(6) (8 U.S.C. 1101(a)(6)) is amended by adding at the end the following: "Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.".

(b) EFFECTIVE DATES.—

(1) CLAUSE A.—Clause (A) of the sentence added by the amendment made by subsection (a) shall apply to documents issued on or after 18 months after the date of the enactment of this Act.

(2) CLAUSE B.—Clause (B) of such sentence shall apply to cards presented on or after 3 years after the date of the enactment of this Act.

### SEC. 105. CIVIL PENALTIES FOR ILLEGAL ENTRY.

(a) IN GENERAL.—Section 275 (8 U.S.C. 1325) is amended—

(1) by redesignating subsections (b) and (c) as subsections (c) and (d), respectively; and

(2) by inserting after subsection (a) the following:

"(b) Any alien who is apprehended while entering (or attempting to enter) the United States at a time or place other than as designated by immigration officers shall be subject to a civil penalty of—

"(1) at least $50 and not more than $250 for each such entry (or attempted entry); or

"(2) twice the amount specified in paragraph (1) in the case of an alien who has been previously subject to a civil penalty under this subsection.

Civil penalties under this subsection are in addition to, and not in lieu of, any criminal or other civil penalties that may be imposed.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to illegal entries or attempts to enter occurring on or after the first day of the sixth month beginning after the date of the enactment of this Act.

### SEC. 106. HIRING AND TRAINING STANDARDS.

(a) REVIEW OF HIRING STANDARDS.—Not later than 60 days after the date of the enactment of this Act, the Attorney General shall complete a review of all prescreening and hiring standards used by the Commissioner of Immigration and Naturalization, and, where necessary, revise such standards to ensure that they are consistent with relevant standards of professionalism.

(b) CERTIFICATION.—At the conclusion of each of fiscal years 1997, 1998, 1999, 2000, and 2001, the Attorney General shall certify in writing to the Committees on the Judiciary of the House of Representatives and of the Senate that all personnel hired by the Commissioner of Immigration and Naturalization for such fiscal year were hired pursuant to the appropriate standards, as revised under subsection (a).

(c) REVIEW OF TRAINING STANDARDS.—

(1) REVIEW.—Not later than 180 days after the date of the enactment of this Act, the Attorney General shall complete a review of the sufficiency of all training standards used by the Commissioner of Immigration and Naturalization.

(2) REPORT.—

(A) IN GENERAL.—Not later than 90 days after the completion of the review under paragraph (1), the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the results of the review, including—

(i) a description of the status of efforts to update and improve training throughout the Immigration and Naturalization Service; and

(ii) an estimate of when such efforts are expected to be completed.

(B) AREAS REQUIRING FUTURE REVIEW.—The report shall disclose those areas of training that the Attorney General determines require further review in the future.

### SEC. 107. REPORT ON BORDER STRATEGY.

(a) EVALUATION OF STRATEGY.—The Comptroller General of the United States shall track, monitor, and evaluate the Attorney General's strategy to deter illegal entry in the United States to determine the efficacy of such strategy.

(b) COOPERATION.—The Attorney General, the Secretary of State, and the Secretary of Defense shall cooperate with the Comptroller General of the United States in carrying out subsection (a).

(c) REPORT.—Not later than one year after the date of the enactment of this Act, and every year thereafter for the succeeding 5 years, the Comptroller General of the United States shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the results of the activities undertaken under subsection (a) during the previous year. Each such report shall include an analysis of the degree to which the Attorney General's strategy has been effective in reducing illegal entry. Each such report shall include a collection and systematic analysis of data, including workload indicators, related to activities to deter illegal entry and recommendations to improve and increase border security at the border and ports of entry.

**SEC. 108. CRIMINAL PENALTIES FOR HIGH SPEED FLIGHTS FROM IMMIGRATION CHECKPOINTS.**

(a) FINDINGS.—The Congress finds as follows:

(1) Immigration checkpoints are an important component of the national strategy to prevent illegal immigration.

(2) Individuals fleeing immigration checkpoints and leading law enforcement officials on high speed vehicle chases endanger law enforcement officers, innocent bystanders, and the fleeing individuals themselves.

(3) The pursuit of suspects fleeing immigration checkpoints is complicated by overlapping jurisdiction among Federal, State, and local law enforcement officers.

(b) HIGH SPEED FLIGHT FROM IMMIGRATION CHECKPOINTS.—

(1) IN GENERAL.—Chapter 35 of title 18, United States Code, is amended by adding at the end the following:

**"§ 758. High speed flight from immigration checkpoint**

"Whoever flees or evades a checkpoint operated by the Immigration and Naturalization Service, or any other Federal law enforcement agency, in a motor vehicle and flees Federal, State, or local law enforcement agents in excess of the legal speed limit shall be fined under this title, imprisoned not more than five years, or both.".

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of such chapter is amended by inserting after the item relating to section 757 the following:

"758. High speed flight from immigration checkpoint.".

(c) GROUNDS FOR DEPORTATION.—Section 241(a)(2)(A) (8 U.S.C. 1251(a)(2)(A)) is amended—

(1) by redesignating clause (iv) as clause (v);

(2) by inserting after clause (iii) the following:

"(iv) HIGH SPEED FLIGHT.—Any alien who is convicted of a violation of section 758 of title 18, United States Code, (relating to high speed flight from an immigration checkpoint) is deportable."; and

(3) in clause (v) (as so redesignated by paragraph (1)), by striking "and (iii)" and inserting "(iii), and (iv)".

**SEC. 109. JOINT STUDY OF AUTOMATED DATA COLLECTION.**

(a) STUDY.—The Attorney General, together with the Secretary of State, the Secretary of Agriculture, the Secretary of the Treasury, and appropriate representatives of the air transport industry, shall jointly undertake a study to develop a plan for making the transition to automated data collection at ports of entry.

(b) REPORT.—Nine months after the date of the enactment of this Act, the Attorney General shall submit a report to the Committees on the Judiciary of the Senate and the House of Representatives on the outcome of the joint initiative under subsection (a), noting specific areas of agreement and disagreement, and recommending further steps to be taken, including any suggestions for legislation.

**SEC. 110. AUTOMATED ENTRY-EXIT CONTROL SYSTEM.**

(a) SYSTEM.—Not later than 2 years after the date of the enactment of this Act, the Attorney General shall develop an automated entry and exit control system that will—

*(1) collect a record of departure for every alien departing the United States and match the records of departure with the record of the alien's arrival in the United States; and*

*(2) enable the Attorney General to identify, through on-line searching procedures, lawfully admitted nonimmigrants who remain in the United States beyond the period authorized by the Attorney General.*

*(b) REPORT.—*

*(1) DEADLINE.—Not later than December 31 of each year following the development of the system under subsection (a), the Attorney General shall submit an annual report to the Committees on the Judiciary of the House of Representatives and of the Senate on such system.*

*(2) INFORMATION.—The report shall include the following information:*

*(A) The number of departure records collected, with an accounting by country of nationality of the departing alien.*

*(B) The number of departure records that were successfully matched to records of the alien's prior arrival in the United States, with an accounting by the alien's country of nationality and by the alien's classification as an immigrant or nonimmigrant.*

*(C) The number of aliens who arrived as nonimmigrants, or as a visitor under the visa waiver program under section 217 of the Immigration and Nationality Act, for whom no matching departure record has been obtained through the system or through other means as of the end of the alien's authorized period of stay, with an accounting by the alien's country of nationality and date of arrival in the United States.*

*(c) USE OF INFORMATION ON OVERSTAYS.—Information regarding aliens who have remained in the United States beyond their authorized period of stay identified through the system shall be integrated into appropriate data bases of the Immigration and Naturalization Service and the Department of State, including those used at ports of entry and at consular offices.*

### SEC. 111. SUBMISSION OF FINAL PLAN ON REALIGNMENT OF BORDER PATROL POSITIONS FROM INTERIOR STATIONS.

*Not later than November 30, 1996, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a final plan regarding the redeployment of border patrol personnel from interior locations to the front lines of the border. The final plan shall be consistent with the following:*

*(1) The preliminary plan regarding such redeployment submitted by the Attorney General on May 17, 1996, to the Committee on Appropriations of the House of Representatives and the Committee on Appropriations of the Senate.*

*(2) The direction regarding such redeployment provided in the joint explanatory statement of the committee of conference in the conference report to accompany the Omnibus Consolidated Rescissions and Appropriations Act of 1996 (Public Law 104–134).*

### SEC. 112. NATIONWIDE FINGERPRINTING OF APPREHENDED ALIENS.

There are authorized to be appropriated such additional sums as may be necessary to ensure that the "IDENT" program (operated by the Immigration and Naturalization Service) is expanded to apply to illegal or criminal aliens apprehended nationwide.

## Subtitle B—Facilitation of Legal Entry

### SEC. 121. LAND BORDER INSPECTORS.

In order to eliminate undue delay in the thorough inspection of persons and vehicles lawfully attempting to enter the United States, the Attorney General and the Secretary of the Treasury each shall increase, by approximately equal numbers in each of fiscal years 1997 and 1998, the number of full-time land border inspectors assigned to active duty by the Immigration and Naturalization Service and the United States Customs Service to a level adequate to assure full staffing during peak crossing hours of all border crossing lanes currently in use, under construction, or whose construction has been authorized by the Congress, except such low-use lanes as the Attorney General may designate.

### SEC. 122. LAND BORDER INSPECTION AND AUTOMATED PERMIT PILOT PROJECTS.

(a) EXTENSION OF LAND BORDER INSPECTION PROJECT AUTHORITY; ESTABLISHMENT OF AUTOMATED PERMIT PILOT PROJECTS.— Section 286(q) is amended—

(1) by striking the matter preceding paragraph (2) and inserting the following:

"(q) LAND BORDER INSPECTION FEE ACCOUNT.—(1)(A)(i) Notwithstanding any other provision of law, the Attorney General is authorized to establish, by regulation, not more than 6 projects under which a fee may be charged and collected for inspection services provided at one or more land border points of entry. Such projects may include the establishment of commuter lanes to be made available to qualified United States citizens and aliens, as determined by the Attorney General.

"(ii) The program authorized in this subparagraph shall terminate on September 30, 2000, unless further authorized by an Act of Congress.

"(iii) This subparagraph shall take effect, with respect to any project described in clause (1) that was not authorized to be commenced before the date of the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 30 days after submission of a written plan by the Attorney General detailing the proposed implementation of such project.

"(iv) The Attorney General shall prepare and submit on a quarterly basis, until September 30, 2000, a status report on each land border inspection project implemented under this subparagraph.

"(B) The Attorney General, in consultation with the Secretary of the Treasury, may conduct pilot projects to demonstrate the use of designated ports of entry after working hours through the use of card reading machines or other appropriate technology."; and

(2) by striking paragraph (5).

(1) Section 506(a) of the Intelligence Authorization Act, Fiscal Year 1990 (Public Law 101–193) is amended by striking "this section" and inserting "such section".

(2) Section 140 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, as amended by section 505(2) of Public Law 103–317, is amended—

(A) by moving the indentation of subsections (f) and (g) 2 ems to the left; and

(B) in subsection (g), by striking "(g)" and all that follows through "shall" and inserting "(g) Subsections (d) and (e) shall".

And the Senate agree to the same.

HENRY HYDE,
LAMAR SMITH,
ELTON GALLEGLY,
BILL MCCOLLUM,
BOB GOODLATTE,
ED BRYANT,
SONNY BONO,
BILL GOODLING,
RANDY "DUKE" CUNNINGHAM,
HOWARD P. "BUCK" MCKEON,
E. CLAY SHAW, JR.,
*Managers on the Part of the House.*

ORRIN HATCH,
AL SIMPSON,
CHUCK GRASSLEY,
JON KYL,
ARLEN SPECTER,
STROM THURMOND,
DIANNE FEINSTEIN,
*Managers on the Part of the Senate.*

JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF
CONFERENCE

The managers on the part of the House and the Senate at the
conference on the disagreeing votes of the two Houses on the
amendment of the Senate to the bill (H.R. 2202) to amend the Im-
migration and Nationality Act to improve deterrence of illegal im-
migration to the United States by increasing border patrol and in-
vestigative personnel, by increasing penalties for alien smuggling
and for document fraud, by reforming exclusion and deportation
law and procedures, by improving the verification system for eligi-
bility for employment, and through other measures, to reform the
legal immigration system and facilitate legal entries into the Unit-
ed States, and for other purposes, submit the following joint state-
ment to the House and the Senate in explanation of the effect of
the action agreed upon by the managers and recommended in the
accompanying conference report:

The Senate amendment struck all of the House bill after the
enacting clause and inserted a substitute text.

The House recedes from its disagreement to the amendment of
the Senate with an amendment that is a substitute for the House
bill and the Senate amendment. The differences between the House
bill, the Senate amendment, and the substitute agreed to in con-
ference are noted below, except for clerical corrections, conforming
changes made necessary by agreements reached by the conferees,
and minor drafting and clerical changes.

TITLE I—IMPROVEMENTS TO BORDER CONTROL, FACILITATION OF
LEGAL ENTRY, AND INTERIOR ENFORCEMENT

SUBTITLE A—IMPROVED ENFORCEMENT AT THE BORDER

Section 101—House recedes to sections 101 (a) and (b) of the
Senate amendment, with modifications, and the Senate recedes to
House section 101(c) with modifications. This section increases the
number of Border Patrol agents by 1000 per year from FY 1997
through 2001. It further provides that the Attorney General, in
each fiscal year from 1997 through 2001, may increase by 300 the
number of support personnel for the Border Patrol. The additional
border patrol agents are to be deployed in sectors along the border
in proportion to the level of illegal crossings of the border in such
sectors. Border Patrol resources should be used primarily at the
border to deter illegal crossings and to apprehend at the earliest
possible juncture those who have made such crossings. This section
also requires the forward deployment of Border Patrol agents to
provide a visible deterrent to illegal immigration, and includes the
requirement in Senate amendment section 109 regarding the pres-
ervation of immigration enforcement functions in interior areas.
The managers intend that for purposes of this section, border sec-

tors shall include coastal areas of the United States. The managers also intend, as a further deterrent to repeat illegal crossings, that available resources be made used to detain and prosecute aliens who repeatedly violate section 275(a) of the Immigration and Nationality Act.

Section 102—Senate amendment section 108 recedes to House section 102, with modifications, including the substantive provisions of sections 109 and 327 of the Senate amendment. This section requires the Attorney General to install additional fences and roads to deter illegal immigration. In the San Diego sector, it calls for extension of the new fencing to a point 14 miles east of the Pacific Ocean, and the construction of second and third fences, with roads between the fences, to provide an additional deterrent. This section includes a proviso (from Senate amendment section 108) that the design of such fencing incorporate features necessary to ensure the safety of Border Patrol agents. This section also includes provisions based on Senate amendment section 327 to enhance the Attorney General's ability to acquire property along the border for purposes of improving border controls. This section also provides for a limited waiver of the Endangered Species Act of 1973 and the National Environmental Policy Act of 1969 in order to facilitate a uniform construction of necessary fences and roads.

Section 103—Senate amendment section 179 recedes to House section 103. This section authorizes the acquisition by the Attorney General of improved equipment and technology to deter illegal immigration on the border.

Section 104—Senate recedes to House sections 104(a) and 104(b). This section requires improvement in the Border Crossing Identification Card, a document issued in lieu of a visa to aliens from Canada and Mexico for short-term visits within a designated distance from the border. Such cards are frequently counterfeited and used by impostors. The new cards issued under this section will be machine-readable and contain security features to prevent use by impostors.

Section 105—Senate recedes to House section 105. This section provides for civil money penalties for aliens apprehended while entering or attempting to enter the United States other than at a lawful port of entry.

Section 106—House section 107 recedes to Senate amendment section 107. This section requires the Attorney General to review within 60 days of enactment all hiring standards of the INS, and within 180 days of enactment all training standards of the INS. The Attorney General shall submit a certification in each of fiscal years 1997 through 2000 that all personnel hired in that year were hired in accordance with appropriate standards. The Attorney General also shall submit a report based on the review of training standards describing the status of efforts to improve such standards.

Section 107—Senate recedes to House section 108, with modification. This section requires the Comptroller General, with the cooperation of the Attorney General and in consultation with the Secretary of State and the Secretary of Defense, to track, monitor, and evaluate efforts to deter illegal entry into the United States. The Comptroller General shall report his findings to the Committees on

the Judiciary of the Senate and the House of Representatives within 1 year from the date of enactment and every year thereafter through FY 2000. The report shall include recommendations to increase border security at the land border and at ports of entry.

Section 108—House recedes to Senate amendment section 304. This section amends chapter 35 of title 18 to add a new section 758, making high-speed flight from an INS checkpoint a felony punishable by up to 5 years in prison. This section also amends INA section 241(a)(2)(A) to make an alien convicted of this offense deportable.

Section 109—House recedes to Senate amendment section 173. This section requires the Attorney General, together with the Secretary of State, the Secretary of the Treasury, and representatives of the air transport industry, to develop a plan for automated data collection at ports of entry. The Attorney General shall report to the Committees on the Judiciary of the House of Representatives and the Senate within 9 months of the date of enactment regarding the outcome of this joint initiative, including recommendations for legislation.

Section 110—House recedes to Senate amendment section 174, with modifications to include most of the substantive requirements from House section 113. This section will require the Attorney General within 2 years of enactment to establish an automated entry and exit control system that will (1) collect a record of departure for every alien departing the United States and match the record of departure with the record of the alien's arrival in the United States, and (2) enable the identification of lawfully admitted nonimmigrants who remain in the United States beyond the period authorized by the Attorney General. The Commissioner of the INS must submit an annual report to the Committees on the Judiciary of the Senate and the House of Representatives on the operation of the system, including information on the number of departure records collected, the number of records successfully matched to records of arrival, and the number of nonimmigrants and other visitors for whom no matching departure record was obtained. All of this information shall include accounting by country of nationality of the arriving and departing aliens. Information on visa overstays identified through the entry and exit control system shall be integrated into appropriate data bases of the INS and the Department of State, including those used at ports of entry and consular offices.

Section 111—House recedes to Senate amendment section 322, with modifications. This section requires the Attorney General to submit a report by September 30, 1996, to the Committees on the Judiciary of the House of Representatives and of the Senate regarding the redeployment of border patrol agents.

Section 112—House recedes to Senate amendment section 120C. This section authorizes the appropriation of funds to ensure that the "IDENT" program operated by the Immigration and Naturalization Service (INS) is expanded to apply to all apprehended illegal and criminal aliens.

Section 113—Senate recedes to House section 106, with modification.

nadian Customs officials of a New Brunswick Provincial Sales Tax on goods purchased in the United States by residents of New Brunswick, but not on goods purchased by New Brunswick residents in other Canadian provinces, may violate the North American Free Trade Agreement (NAFTA) and that the United States Trade Representative should move without delay in seeking redress under the dispute resolution process in chapter 20 of NAFTA.

Section 656—House sections 831 and 832 recede to Senate amendment section 118, with modifications. Without placing mandates on states, this section establishes grant programs to encourage states to develop more counterfeit-resistant birth certificates and driver's licenses. After October 1, 2000, Federal agencies may only accept as proof of identity driver's licenses that conform to standards developed by the Secretary of the Treasury after consultation with state motor vehicle officials through the American Association of Motor Vehicle Administrators. Beginning 4 years after the date of enactment, Federal agencies may only accept birth certificates issued after such date that conform to standards developed by the Secretary of Health and Human Services after consultation with appropriate State officials. The managers intend that the new standards developed in consultation with state officials apply only to licenses issued or renewed after October 1, 2000, and only to birth certificates issued more than 4 years after the date of enactment.

Section 657—House recedes to Senate amendment section 332, with modifications. This section requires the Commissioner of Social Security to develop a prototype of a counterfeit-resistant social security card, and requires the Comptroller General to conduct a study and issue a report to Congress that examines different methods of improving the social security card application process.

Section 658—House recedes to Senate amendment section 314. This section will authorize the transfer of INA artifacts to the Border Patrol Museum and Memorial Library Foundation.

Section 659—Senate recedes to House section 840. This section states the sense of Congress regarding enforcement priorities of the INS.

SUBTITLE E—TECHNICAL CORRECTIONS.

Section 671—Senate recedes to House section 851, with modifications. This section makes a number of entirely technical corrections to the Immigration Reform and Control Act of 1986, the Immigration and Nationality Technical Corrections Act of 1994, the Immigration and Nationality Act, and other legislation.

OTHER PROVISIONS

The House recedes to the Senate on the following provisions: House sections 222, 300, 801.

The Senate recedes to the House on the following provisions: Senate amendment sections 120B, 120D, 120E, 305, 318.

HENRY HYDE,
LAMAR SMITH,
ELTON GALLEGLY,
BILL McCOLLUM,

252

BOB GOODLATTE,
ED BRYANT,
SONNY BONO,
BILL GOODLING,
RANDY "DUKE" CUNNINGHAM,
HOWARD P. "BUCK" MCKEON,
E. CLAY SHAW, JR.,
*Managers on the Part of the House.*

ORRIN HATCH,
AL SIMPSON,
CHUCK GRASSLEY,
JON KYL,
ARLEN SPECTER,
STROM THURMOND,
DIANNE FEINSTEIN,
*Managers on the Part of the Senate.*

○

| 109TH CONGRESS<br>*1st Session* | } HOUSE OF REPRESENTATIVES { | REPORT<br>109–72 |

---

## MAKING EMERGENCY SUPPLEMENTAL APPROPRIATIONS FOR THE FISCAL YEAR ENDING SEPTEMBER 30, 2005, AND FOR OTHER PURPOSES

———

MAY 3, 2005.—Ordered to be printed

———

Mr. LEWIS of California, from the committee of conference, submitted the following

## CONFERENCE REPORT

[To accompany H.R. 1268]

The committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R. 1268), "making emergency supplemental appropriations for the fiscal year ending September 30, 2005, to establish and rapidly implement regulations for State driver's license and identification document security standards, to prevent terrorists from abusing the asylum laws of the United States, to unify terrorism-related grounds for inadmissibility and removal, to ensure expeditious construction of the San Diego border fence, and for other purposes", having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate and agree to the same with amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment, insert the following:

### *SECTION 1. SHORT TITLE.*

*This Act may be cited as the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief Act, 2005".*

### *SEC. 2. TABLE OF CONTENTS.*

*The table of contents for this Act is as follows:*

Sec. 1. Short title.
Sec. 2. Table of contents.
Sec. 3. References.

20–930



GOVERNMENT EXHIBIT

2

2

*DIVISION A—EMERGENCY SUPPLEMENTAL APPROPRIATIONS FOR DEFENSE, THE GLOBAL WAR ON TERROR, AND TSUNAMI RELIEF, 2005*

*Title I—Defense Related Appropriations*
*Title II—International Programs and Assistance for Reconstruction and the War on Terror*
*Title III—Domestic Appropriations for the War on Terror*
*Title IV—Indian Ocean Tsunami Relief*
*Title V—Other Emergency Appropriations*
*Title VI—General Provisions and Technical Corrections*

*DIVISION B—REAL ID ACT OF 2005*

**SEC. 3. REFERENCES.**

*Except as expressly provided otherwise, any reference to "this Act" contained in any division of this Act shall be treated as referring only to the provisions of that division.*

# DIVISION A—EMERGENCY SUPPLEMENTAL APPROPRIATIONS ACT FOR DEFENSE, THE GLOBAL WAR ON TERROR, AND TSUNAMI RELIEF, 2005

*That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2005, and for other purposes, namely:*

## TITLE I—DEFENSE-RELATED APPROPRIATIONS

### DEPARTMENT OF DEFENSE—MILITARY

#### MILITARY PERSONNEL

##### MILITARY PERSONNEL, ARMY

*For an additional amount for "Military Personnel, Army", $13,609,208,000, of which not to exceed $508,374,000 shall remain available until September 30, 2006: Provided, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).*

##### MILITARY PERSONNEL, NAVY

*For an additional amount for "Military Personnel, Navy", $535,108,000, of which not to exceed $19,928,000 shall remain available until September 30, 2006: Provided, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).*

##### MILITARY PERSONNEL, MARINE CORPS

*For an additional amount for "Military Personnel, Marine Corps", $1,358,053,000, of which not to exceed $220,227,000 shall remain available until September 30, 2006: Provided, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).*

73

# DIVISION B—REAL ID ACT OF 2005

**SECTION 1. SHORT TITLE.**

This division may be cited as the "REAL ID Act of 2005".

# TITLE I—AMENDMENTS TO FEDERAL LAWS TO PROTECT AGAINST TERRORIST ENTRY

**SEC. 101. PREVENTING TERRORISTS FROM OBTAINING RELIEF FROM REMOVAL.**

(a) CONDITIONS FOR GRANTING ASYLUM.—Section 208(b)(1) of the Immigration and Nationality Act (8 U.S.C. 1158(b)(1)) is amended—

(1) by striking "The Attorney General" the first place such term appears and inserting the following:

"(A) ELIGIBILITY.—The Secretary of Homeland Security or the Attorney General";

(2) by striking "the Attorney General" the second and third places such term appears and inserting "the Secretary of Homeland Security or the Attorney General"; and

(3) by adding at the end the following:

"(B) BURDEN OF PROOF.—

"(i) IN GENERAL.—The burden of proof is on the applicant to establish that the applicant is a refugee, within the meaning of section 101(a)(42)(A). To establish that the applicant is a refugee within the meaning of such section, the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant.

"(ii) SUSTAINING BURDEN.—The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.

"(iii) CREDIBILITY DETERMINATION.—Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under

74

*oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.".*

(b) EXCEPTIONS TO ELIGIBILITY FOR ASYLUM.—Section 208(b)(2)(A)(v) of the Immigration and Nationality Act (8 U.S.C. 1158(b)(2)(A)(v)) is amended—

(1) by striking "inadmissible under" each place such term appears and inserting "described in"; and

(2) by striking "removable under".

(c) WITHHOLDING OF REMOVAL.—Section 241(b)(3) of the Immigration and Nationality Act (8 U.S.C. 1231(b)(3)) is amended by adding at the end the following:

"(C) SUSTAINING BURDEN OF PROOF; CREDIBILITY DETERMINATIONS.—In determining whether an alien has demonstrated that the alien's life or freedom would be threatened for a reason described in subparagraph (A), the trier of fact shall determine whether the alien has sustained the alien's burden of proof, and shall make credibility determinations, in the manner described in clauses (ii) and (iii) of section 208(b)(1)(B).".

(d) OTHER REQUESTS FOR RELIEF FROM REMOVAL.—Section 240(c) of the Immigration and Nationality Act (8 U.S.C. 1230(c)) is amended—

(1) by redesignating paragraphs (4), (5), and (6) as paragraphs (5), (6), and (7), respectively; and

(2) by inserting after paragraph (3) the following:

"(4) APPLICATIONS FOR RELIEF FROM REMOVAL.—

"(A) IN GENERAL.—An alien applying for relief or protection from removal has the burden of proof to establish that the alien—

"(i) satisfies the applicable eligibility requirements; and

"(ii) with respect to any form of relief that is granted in the exercise of discretion, that the alien merits a favorable exercise of discretion.

"(B) SUSTAINING BURDEN.—The applicant must comply with the applicable requirements to submit information or documentation in support of the applicant's application for relief or protection as provided by law or by regulation or in the instructions for the application form. In evaluating the testimony of the applicant or other witness in support of the application, the immigration judge will determine whether or not the testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant has satisfied the applicant's burden of proof. In de-

75

*termining whether the applicant has met such burden, the immigration judge shall weigh the credible testimony along with other evidence of record. Where the immigration judge determines that the applicant should provide evidence which corroborates otherwise credible testimony, such evidence must be provided unless the applicant demonstrates that the applicant does not have the evidence and cannot reasonably obtain the evidence.*

*"(C) CREDIBILITY DETERMINATION.—Considering the totality of the circumstances, and all relevant factors, the immigration judge may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.".*

*(e) STANDARD OF REVIEW FOR ORDERS OF REMOVAL.—Section 242(b)(4) of the Immigration and Nationality Act (8 U.S.C. 1252(b)(4)) is amended by adding at the end, after subparagraph (D), the following: "No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, as described in section 208(b)(1)(B), 240(c)(4)(B), or 241(b)(3)(C), unless the court finds, pursuant to section 242(b)(4)(B), that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.".*

*(f) CLARIFICATION OF DISCRETION.—Section 242(a)(2)(B) of the Immigration and Nationality Act (8 U.S.C. 1252(a)(2)(B)) is amended—*

*(1) by inserting "or the Secretary of Homeland Security" after "Attorney General" each place such term appears; and*

*(2) in the matter preceding clause (i), by inserting "and regardless of whether the judgment, decision, or action is made in removal proceedings," after "other provision of law,".*

*(g) REMOVAL OF CAPS.—*

*(1) ASYLEES.—Section 209 of the Immigration and Nationality Act (8 U.S.C. 1159) is amended—*

*(A) in subsection (a)(1)—*

*(i) by striking "Service" and inserting "Department of Homeland Security"; and*

*(ii) by striking "Attorney General" each place such term appears and inserting "Secretary of Homeland Security or the Attorney General";*

*(B) in subsection (b)—*

76

*(i) by striking "Not more" and all that follows through "asylum who—" and inserting "The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who—"; and*

*(ii) in the matter following paragraph (5), by striking "Attorney General" and inserting "Secretary of Homeland Security or the Attorney General"; and*

*(C) in subsection (c), by striking "Attorney General" and inserting "Secretary of Homeland Security or the Attorney General".*

*(2) PERSONS RESISTING COERCIVE POPULATION CONTROL METHODS.—Section 207(a) of the Immigration and Nationality Act (8 U.S.C. 1157(a)) is amended by striking paragraph (5).*

*(h) EFFECTIVE DATES.—*

*(1) The amendments made by paragraphs (1) and (2) of subsection (a) shall take effect as if enacted on March 1, 2003.*

*(2) The amendments made by subsections (a)(3), (b), (c), and (d) shall take effect on the date of the enactment of this division and shall apply to applications for asylum, withholding, or other relief from removal made on or after such date.*

*(3) The amendment made by subsection (e) shall take effect on the date of the enactment of this division and shall apply to all cases in which the final administrative removal order is or was issued before, on, or after such date.*

*(4) The amendments made by subsection (f) shall take effect on the date of the enactment of this division and shall apply to all cases pending before any court on or after such date.*

*(5) The amendments made by subsection (g) shall take effect on the date of the enactment of this division.*

*(i) REPEAL.—Section 5403 of the Intelligence Reform and Terrorism Prevention Act of 2004 (Public Law 108–458) is repealed.*

**SEC. 102. WAIVER OF LEGAL REQUIREMENTS NECESSARY FOR IMPROVEMENT OF BARRIERS AT BORDERS; FEDERAL COURT REVIEW.**

*Section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) is amended to read as follows:*

*"(c) WAIVER.—*

*"(1) IN GENERAL.—Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.*

*"(2) FEDERAL COURT REVIEW.—*

*"(A) IN GENERAL.—The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be*

brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

"(B) TIME FOR FILING OF COMPLAINT.—Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

"(C) ABILITY TO SEEK APPELLATE REVIEW.—An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.".

## SEC. 103. INADMISSIBILITY DUE TO TERRORIST AND TERRORIST-RELATED ACTIVITIES.

(a) IN GENERAL.—So much of section 212(a)(3)(B)(i) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(i)) as precedes the final sentence is amended to read as follows:

"(i) IN GENERAL.—Any alien who—

"(I) has engaged in a terrorist activity;

"(II) a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv));

"(III) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

"(IV) is a representative (as defined in clause (v)) of—

"(aa) a terrorist organization (as defined in clause (vi)); or

"(bb) a political, social, or other group that endorses or espouses terrorist activity;

"(V) is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);

"(VI) is a member of a terrorist organization described in clause (vi)(III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;

"(VII) endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

"(VIII) has received military-type training (as defined in section 2339D(c)(1) of title 18, United States Code) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

"(IX) is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years, is inadmissible.".

93

*U.S.C. 1153(d))) whose immigrant worker petitions were approved based on schedule A, as defined in section 656.5 of title 20, Code of Federal Regulations, as promulgated by the Secretary of Labor";*

*(2) in paragraph (2)(A), by striking "and 2000" and inserting "through 2004"; and*

*(3) in paragraph (2), by amending subparagraph (B) read as follows:*

*"(B)(i) REDUCTION.—The number described in subparagraph (A) shall be reduced, for each fiscal year after fiscal year 2001, by the cumulative number of immigrant visas actually used under paragraph (1) for previous fiscal years.*

*"(ii) MAXIMUM.—The total number of visas actually used under paragraph (1) may not exceed 50,000.".*

And the Senate agree to the same.

That the House recede from its disagreement to the amendment of the Senate to the title of the bill and concur in the same.

> JERRY LEWIS,
> C. W. BILL YOUNG,
> RALPH REGULA,
> HAROLD ROGERS,
> FRANK R. WOLF,
> JIM KOLBE,
> JAMES T. WALSH,
> CHARLES H. TAYLOR,
> DAVID L. HOBSON,
> HENRY BONILLA,
> JOE KNOLLENBERG,
> JOHN P. MURTHA,
> NORMAN D. DICKS,
> ALAN B. MOLLOHAN,
> PETER J. VISCLOSKY,
> CHET EDWARDS,
> *Managers on the Part of the House.*

> THAD COCHRAN,
> TED STEVENS,
> PETE V. DOMENICI,
> CHRISTOPHER S. BOND,
> MITCH MCCONNELL,
> RICHARD C. SHELBY,
> JUDD GREGG,
> ROBERT F. BENNETT,
> LARRY CRAIG,
> KAY BAILEY HUTCHISON,
> MIKE DEWINE,
> SAM BROWNBACK,
> WAYNE ALLARD,
> ROBERT C. BYRD,
> DANIEL K. INOUYE,
> PATRICK LEAHY
>   (with exception for REAL ID),
> TOM HARKIN

94

(with exception for REAL
ID),
BARBARA MIKULSKI
(with exception for REAL
ID),
HARRY REID
(with exception for REAL
ID),
BYRON L. DORGAN
(with res.—conference did
not reconvene),
DIANNE FEINSTEIN
(with exception for REAL
ID),
TIM JOHNSON,
MARY LANDRIEU,
*Managers on the Part of the Senate.*

### JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R. 1268) making emergency supplemental appropriations for the fiscal year ending September 30, 2005, and for other purposes, submit the following joint statement to the House and the Senate in explanation of the effects of the action agreed upon by the managers and recommended in the accompanying conference report.

Report language included in the reports of the House (H. Rept. 109–16) and of the Senate (S. Rept. 109–52) accompanying H.R. 1268 should be complied with unless specifically addressed in this statement of the managers. The statement of the managers, while repeating some report language for emphasis, is not intended to negate the language referred to above unless expressly provided herein.

This conference agreement is organized by subject matter. Due to certain jurisdictional differences between the subcommittees of the House and the Senate Committees on Appropriations, the accounts and programs of certain subcommittees are, in some cases, displayed within titles or chapters with the accounts and programs of other subcommittees. The organizational structure of this conference agreement does not predetermine the organization of conference agreements on the fiscal year 2006 appropriations bills.

### TITLE I—DEFENSE-RELATED APPROPRIATIONS

The conference agreement recommends $75,888,262,000 for the Department of Defense, instead of $76,923,910,000, as proposed by the House, and $74,800,257,000, as proposed by the Senate.

The following table provides details of the supplemental appropriations for the Department of Defense—Military.

170

Clarification of Discretionary Relief Provision: Subsection 101(f) would amend subparagraph 242(a)(2)(B) of the INA by clarifying that the provision barring judicial review of denials of discretionary relief applies regardless of whether the discretionary judgment, decision, or action is made in removal proceedings. It also amends subparagraph 242(a)(2)(B) of the INA by adding reference to the Secretary of Homeland Security, to clarify the text and make it consistent with the aims of the Reorganization Plan for the Department of Homeland Security.

Subsection 101(g)(4) of Division B would provide that the amendments in subsection 101(f) shall take effect on the date of enactment and apply to all cases pending before, on, or after such date.

Removal of Caps. Section 209 of the INA currently provides that the Attorney General may adjust the status of aliens granted asylum to lawful permanent residence if they satisfy certain conditions, subject to a cap of 10,000 persons per fiscal year (aside from certain groups of asylees who are or have been exempt from the cap or subject to limits set in other legislation). Paragraph 101(g)(1) of Division B would eliminate the cap for adjustment of status for asylees. It would also replace references to the "Immigration and Naturalization Service" with references to the "Department of Homeland Security" and replace references to the "Attorney General" with references to the "Secretary of Homeland Security or the Attorney General."

Similarly, under section 207(a)(5) of the INA, not more than 1,000 aliens may be admitted as refugees or granted asylum under the provision of section 101(a)(42) therein relating to persecution for resistance to coercive population control methods. Paragraph 101(g)(2) would strike the limitation on grants under this provision.

Subsection 101(f), lifting these caps, shall take effect on the date of enactment of Division B, pursuant to paragraph 101(g)(5).

Repeal of the Study and Report on Terrorists and Asylum. Section 5403 of the Intelligence Reform and Terrorism Prevention Act of 2004 provides that "the Comptroller General of the United States shall conduct a study to evaluate the extent to which weaknesses in the United States asylum system and withholding of removal system have been or could be exploited by aliens connected to, charged in connection with, or tied to terrorist activity," including the extent to which precedential court decisions may have affected the ability of the Federal Government to prove that an alien is a terrorist who should be denied asylum and/or removed.

Subsection 101(h) of Division B would repeal the requirement for the study and report, because the other provisions in section 101 of Division B would resolve the vulnerability of the asylum and withholding of removal systems to terrorist exploitation.

Section 102 of the conference agreement includes language modified from language proposed in section 102 of division B of the House bill. The Senate did not include similar language.

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 provides for construction and strengthening of barriers along U.S. land borders and specifically provides for 14 miles of barriers and roads along the border near San Diego, beginning at the Pacific Ocean and extending eastward. It provides

171

for a waiver of the Endangered Species Act of 1973 (ESA) and the National Environmental Policy Act of 1969 (NEPA) to the extent the Attorney General determines is necessary to ensure expeditious construction of barriers and roads. Despite the existing waiver provision, construction of the San Diego area barriers has been delayed due to a dispute involving other laws. The California Coastal Commission has prevented completion of the San Diego border security infrastructure because it alleges that plans to complete it are inconsistent with the California Coastal Management Program, a state program approved pursuant to the federal Coastal Zone Management Act (CZMA)—notwithstanding the fact that the San Diego border security infrastructure was designed to avoid and/or minimize adverse environmental impacts, and the Bureau of Customs and Border Protection (CBP) of the Department of Homeland Security testified before the California Coastal Commission that the plans for completion were consistent with the Coastal Management Program to the maximum extent practicable without sacrificing the effectiveness of the border security infrastructure. Continued delays caused by litigation have demonstrated the need for additional waiver authority with respect to other laws that might impede the expeditious construction of security infrastructure along the border, such as the Coastal Zone Management Act.

Current Law. Section 102(c) of IIRIRA provided for a waiver of the ESA and NEPA to the extent the Attorney General determines is necessary to ensure expeditious construction of barriers and roads.

Section 102 of the conference report would amend the current provision to require the Secretary of Homeland Security to waive all laws that he or she determines, in his or her sole discretion, are necessary to ensure the expeditious construction of the border barriers.

Additionally, it would prohibit judicial review of a waiver decision or action by the Secretary and bar judicially ordered compensatory, declaratory, or injunctive, equitable, or any other relief or other remedy for damage alleged to result from any such decision or action. As discussed above, current statutes and the Reorganization Plan for the Department of Homeland Security have not amended and clarified references to executive authority throughout the INA. Accordingly, the provision would have replaced the reference in current law to the Attorney General by a reference to the Secretary of Homeland Security.

The Conferees have revised the House provision in the following respects. First, the revised provision authorizes but does not require the Secretary of DHS to waive any legal requirements that he or she, in his or her sole discretion, determines are necessary to ensure expeditious construction of border security infrastructure. Second, the provision clarifies the intent of the conference report by substituting a reference to waiver of "all legal requirements" for the prior reference to waiver of "all laws", clarifying Congress' intent that the Secretary's discretionary waiver authority extends to any local, state or federal statute, regulation, or administrative order that could impede expeditious construction of border security infrastructure. Third, the conferees provided that any such waiver would become effective upon publication in the Federal Register, thereby ensuring appropriate public notice of such determinations.

172

Finally, the Conferees have provided federal judicial review for claims alleging that the actions or decisions of the Secretary violate the United States Constitution. The Conferees have further provided that such claims must be filed within sixty days of the Secretary's action or decision, and that interlocutory or final judgments, decrees, or orders of federal district courts on such claims may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States. The Conferees' intent is to ensure that judicial review of actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver.

Section 106 of the conference agreement includes language modified from language proposed in section 105 of division B of the House bill. The Senate did not include similar language.

Section 106 of Division B addresses a number of judicial review anomalies improperly favoring criminal aliens that were created by court decisions interpreting changes to the INA in 1996. Since 1961, Congress has consistently provided that only the courts of appeals may review removal orders. From 1961 through 1996, the INA provided that review in the courts of appeals "shall be the sole and exclusive procedure" for judicial review of deportation orders. See INA subsection 106(a) (1995) (entitled "Exclusiveness of procedure"). As the legislative history behind this provision reveals, Congress aimed to "create a single, separate, statutory form of judicial review of administrative orders for the deportation and exclusion of aliens from the United States." H.R. Rep. No. 1086, 87th Cong., 1st Sess., reprinted in 1961 U.S.C.C.A.N. 2950, 2966 (1961). Congress's "fundamental purpose" was "to abbreviate the process of judicial review of deportation orders" and to "eliminat[e] the previous initial step in obtaining judicial review—a suit in a District Court." *Foti* v. *INS*, 375 U.S. 217, 224 (1963); accord *Agosto* v. *INS*, 436 U.S. 748, 752–53 (1978); *Giova* v. *Rosenberg*, 379 U.S. 18 (1964) (per curiam). Thus, a final order of deportation could be challenged only in the appropriate court of appeals upon a timely filed petition for review.

Such order could not have been challenged in district court by way of habeas corpus. Although the INA contained another provision permitting habeas review, see INA § 106(a)(10) (1995), several circuits interpreted that provision as not providing habeas review over deportation orders, but only review over collateral issues, such as whether the alien should be released from custody or granted a stay of deportation pending a petition for review.

Moreover, to the extent that habeas review of deportation orders had been available before 1996, Congress attempted to eliminate it in enacting the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104–132, 110 Stat. 1214 (April 24, 1996). One of the statute's provisions, entitled "Elimination of Custody Review by Habeas Corpus," expressly repealed the former habeas provision. See subsection 401(e), 110 Stat. 1268, repealing INA paragraph 106(a)(10) (1995). This was part of Congress's broad efforts to streamline immigration proceedings. Indeed, to expedite removal, section 440(a) of AEDPA precluded all judicial review of deportation orders for certain classes of criminal aliens. 110 Stat. 1276–77 (providing that such orders "shall not be subject to review by any court").

187

The conferees agree to the Senate amendment relating to the title of the Act. The Senate amended the title to read "An Act Making Emergency Supplemental Appropriations for Defense, the Global War on Terror, and Tsunami Relief, for the fiscal year ending September 30, 2005, and for other purposes.".

JERRY LEWIS,
C. W. BILL YOUNG,
RALPH REGULA,
HAROLD ROGERS,
FRANK R. WOLF,
JIM KOLBE,
JAMES T. WALSH,
CHARLES H. TAYLOR,
DAVID L. HOBSON,
HENRY BONILLA,
JOE KNOLLENBERG,
JOHN P. MURTHA,
NORMAN D. DICKS,
ALAN B. MOLLOHAN,
PETER J. VISCLOSKY,
CHET EDWARDS,
*Managers on the Part of the House.*

THAD COCHRAN,
TED STEVENS,
PETE V. DOMENICI,
CHRISTOPHER S. BOND,
MITCH MCCONNELL,
RICHARD C. SHELBY,
JUDD GREGG,
ROBERT F. BENNETT,
LARRY CRAIG,
KAY BAILEY HUTCHISON,
MIKE DEWINE,
SAM BROWNBACK,
WAYNE ALLARD,
ROBERT C. BYRD,
DANIEL K. INOUYE,
PATRICK LEAHY
    (with exception for REAL
    ID),
TOM HARKIN
    (with exception for REAL
    ID),
BARBARA MIKULSKI
    (with exception for REAL
    ID),
HARRY REID
    (with exception for REAL
    ID),
BYRON L. DORGAN
    (with res.—conference did
    not reconvene),
DIANNE FEINSTEIN

188

(with exception for REAL
ID),
TIM JOHNSON,
MARY LANDRIEU,
*Managers on the Part of the Senate.*

○

109TH CONGRESS
1ST SESSION

# H. R. 1268

---

# AN ACT

Making emergency supplemental appropriations for the fiscal
year ending September 30, 2005, to establish and rapidly
implement regulations for State driver's license and iden-
tification document security standards, to prevent terror-
ists from abusing the asylum laws of the United States,
to unify terrorism-related grounds for inadmissibility and
removal, to ensure expeditious construction of the San
Diego border fence, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*



GOVERNMENT
EXHIBIT
3

2

1   That the following sums are appropriated, out of any

2   money in the Treasury not otherwise appropriated, for the

3   fiscal year ending September 30, 2005, and for other pur-

4   poses, namely:

# DIVISION A—EMERGENCY SUP-
5   
6   PLEMENTAL APPROPRIA-
7   TIONS ACT FOR DEFENSE,
8   THE GLOBAL WAR ON TER-
9   ROR, AND TSUNAMI RELIEF,
10  2005

11  TITLE I—DEFENSE-RELATED APPROPRIATIONS

12  CHAPTER 1

13  DEPARTMENT OF DEFENSE

14  DEPARTMENT OF DEFENSE—MILITARY

15  MILITARY PERSONNEL

16  MILITARY PERSONNEL, ARMY

17  For an additional amount for ''Military Personnel,

18  Army'', $11,779,642,000: *Provided*, That the amounts

19  provided under this heading are designated as an emer-

20  gency requirement pursuant to section 402 of the con-

21  ference report to accompany S. Con. Res. 95 (108th Con-

22  gress).

23  MILITARY PERSONNEL, NAVY

24  For an additional amount for ''Military Personnel,

25  Navy'', $534,080,000: *Provided*, That the amounts pro-

74

1    Federal Regulations, and part 95 of title 22, Code

2    of Federal Regulations.

3    This division may be cited as the "Emergency Sup-

4    plemental Appropriations Act for Defense, the Global War

5    on Terror, and Tsunami Relief, 2005".

# DIVISION B—REAL ID ACT OF 2005

**SECTION 1. SHORT TITLE.**

9    This division may be cited as the "REAL ID Act of

10   2005".

# TITLE I—AMENDMENTS TO FEDERAL LAWS TO PROTECT AGAINST TERRORIST ENTRY

**SEC. 101. PREVENTING TERRORISTS FROM OBTAINING RELIEF FROM REMOVAL.**

16   (a) CONDITIONS FOR GRANTING ASYLUM.—Section

17   208(b)(1) of the Immigration and Nationality Act (8

18   U.S.C. 1158(b)(1)) is amended—

19        (1) by striking "The Attorney General" the

20        first place such term appears and inserting the fol-

21        lowing:

22             "(A)   ELIGIBILITY.—The   Secretary   of

23        Homeland Security or the Attorney General";

24        (2) by striking "the Attorney General" the sec-

25        ond and third places such term appears and insert-

1    ing "the Secretary of Homeland Security or the At-

2    torney General"; and

3        (3) by adding at the end the following:

4            "(B) BURDEN OF PROOF.—

5                "(i) IN GENERAL.—The burden of

6            proof is on the applicant to establish that

7            the applicant is a refugee, within the

8            meaning of section 101(a)(42)(A). To es-

9            tablish that the applicant is a refugee with-

10           in the meaning of such section, the appli-

11           cant must establish that race, religion, na-

12           tionality, membership in a particular social

13           group, or political opinion was or will be a

14           central reason for persecuting the appli-

15           cant.

16               "(ii) SUSTAINING BURDEN.—The tes-

17           timony of the applicant may be sufficient

18           to sustain the applicant's burden without

19           corroboration, but only if the applicant sat-

20           isfies the trier of fact that the applicant's

21           testimony is credible, is persuasive, and re-

22           fers to specific facts sufficient to dem-

23           onstrate that the applicant is a refugee. In

24           determining whether the applicant has met

25           the applicant's burden, the trier of fact

76

1 may weigh the credible testimony along
2 with other evidence of record. Where the
3 trier of fact determines, in the trier of
4 fact's discretion, that the applicant should
5 provide evidence which corroborates other-
6 wise credible testimony, such evidence
7 must be provided unless the applicant does
8 not have the evidence and cannot reason-
9 ably obtain the evidence without departing
10 the United States. The inability to obtain
11 corroborating evidence does not excuse the
12 applicant from meeting the applicant's
13 burden of proof.

14  ''(iii) CREDIBILITY DETERMINA-
15 TION.—The trier of fact should consider all
16 relevant factors and may, in the trier of
17 fact's discretion, base the trier of fact's
18 credibility determination on any such fac-
19 tor, including the demeanor, candor, or re-
20 sponsiveness of the applicant or witness,
21 the inherent plausibility of the applicant's
22 or witness's account, the consistency be-
23 tween the applicant's or witness's written
24 and oral statements (whenever made and
25 whether or not made under oath), the in-

77

1          ternal consistency of each such statement,

2          the consistency of such statements with

3          other evidence of record (including the re-

4          ports of the Department of State on coun-

5          try conditions), and any inaccuracies or

6          falsehoods in such statements, without re-

7          gard to whether an inconsistency, inaccu-

8          racy, or falsehood goes to the heart of the

9          applicant's claim. There is no presumption

10          of credibility.''.

11      (b) WITHHOLDING OF REMOVAL.—Section 241(b)(3)

12  of the Immigration and Nationality Act (8 U.S.C.

13  1231(b)(3)) is amended by adding at the end the fol-

14  lowing:

15          ''(C) SUSTAINING BURDEN OF PROOF;

16          CREDIBILITY DETERMINATIONS.—In deter-

17          mining whether an alien has demonstrated that

18          the alien's life or freedom would be threatened

19          for a reason described in subparagraph (A), the

20          trier of fact shall determine whether the alien

21          has sustained the alien's burden of proof, and

22          shall make credibility determinations, in the

23          manner described in clauses (ii) and (iii) of sec-

24          tion 208(b)(1)(B).''.

78

1    (c) OTHER REQUESTS FOR RELIEF FROM RE-
2  MOVAL.—Section 240(c) of the Immigration and Nation-
3  ality Act (8 U.S.C. 1230(c)) is amended—

4        (1) by redesignating paragraphs (4), (5), and
5    (6) as paragraphs (5), (6), and (7), respectively; and

6        (2) by inserting after paragraph (3) the fol-
7    lowing:

8        "(4) APPLICATIONS FOR RELIEF FROM RE-
9    MOVAL.—

10            "(A) IN GENERAL.—An alien applying for
11        relief or protection from removal has the bur-
12        den of proof to establish that the alien—

13                "(i) satisfies the applicable eligibility
14            requirements; and

15                "(ii) with respect to any form of relief
16            that is granted in the exercise of discre-
17            tion, that the alien merits a favorable exer-
18            cise of discretion.

19            "(B) SUSTAINING BURDEN.—The appli-
20        cant must comply with the applicable require-
21        ments to submit information or documentation
22        in support of the applicant's application for re-
23        lief or protection as provided by law or by regu-
24        lation or in the instructions for the application
25        form. In evaluating the testimony of the appli-

79

1      cant or other witness in support of the applica-

2      tion, the immigration judge will determine

3      whether or not the testimony is credible, is per-

4      suasive, and refers to specific facts sufficient to

5      demonstrate that the applicant has satisfied the

6      applicant's burden of proof. In determining

7      whether the applicant has met such burden, the

8      immigration judge shall weigh the credible testi-

9      mony along with other evidence of record.

10     Where the immigration judge determines in the

11     judge's discretion that the applicant should pro-

12     vide evidence which corroborates otherwise cred-

13     ible testimony, such evidence must be provided

14     unless the applicant demonstrates that the ap-

15     plicant does not have the evidence and cannot

16     reasonably obtain the evidence without depart-

17     ing from the United States. The inability to ob-

18     tain corroborating evidence does not excuse the

19     applicant from meeting the burden of proof.

20        "(C) CREDIBILITY DETERMINATION.—The

21     immigration judge should consider all relevant

22     factors and may, in the judge's discretion, base

23     the judge's credibility determination on any

24     such factor, including the demeanor, candor, or

25     responsiveness of the applicant or witness, the

80

1          inherent plausibility of the applicant's or
2          witness's account, the consistency between the
3          applicant's or witness's written and oral state-
4          ments (whenever made and whether or not
5          made under oath), the internal consistency of
6          each such statement, the consistency of such
7          statements with other evidence of record (in-
8          cluding the reports of the Department of State
9          on country conditions), and any inaccuracies or
10         falsehoods in such statements, without regard
11         to whether an inconsistency, inaccuracy, or
12         falsehood goes to the heart of the applicant's
13         claim. There is no presumption of credibility.''.

14     (d) STANDARD OF REVIEW FOR ORDERS OF RE-

15  MOVAL.—Section 242(b)(4) of the Immigration and Na-

16  tionality Act (8 U.S.C. 1252(b)(4)) is amended by adding

17  at the end, after subparagraph (D), the following: ''No

18  court shall reverse a determination made by a trier of fact

19  with respect to the availability of corroborating evidence,

20  as described in section 208(b)(1)(B), 240(c)(4)(B), or

21  241(b)(3)(C), unless the court finds that a reasonable

22  trier of fact is compelled to conclude that such corrobo-

23  rating evidence is unavailable.''.

81

1    (e) CLARIFICATION OF DISCRETION.—Section
2 242(a)(2)(B) of the Immigration and Nationality Act (8
3 U.S.C. 1252(a)(2)(B)) is amended—

4        (1) by inserting ''or the Secretary of Homeland
5      Security'' after ''Attorney General'' each place such
6      term appears; and

7        (2) in the matter preceding clause (i), by insert-
8      ing ''and regardless of whether the judgment, deci-
9      sion, or action is made in removal proceedings,''
10     after ''other provision of law,''.

11   (f) REMOVAL OF CAPS.—Section 209 of the Immigra-
12 tion and Nationality Act (8 U.S.C. 1159) is amended—

13       (1) in subsection (a)(1)—

14          (A) by striking ''Service'' and inserting
15        ''Department of Homeland Security''; and

16          (B) by striking ''Attorney General'' each
17        place such term appears and inserting ''Sec-
18        retary of Homeland Security or the Attorney
19        General'';

20       (2) in subsection (b)—

21          (A) by striking ''Not more'' and all that
22        follows through ''asylum who—'' and inserting
23        ''The Secretary of Homeland Security or the
24        Attorney General, in the Secretary's or the At-
25        torney General's discretion and under such reg-

82

1    ulations as the Secretary or the Attorney Gen-

2    eral may prescribe, may adjust to the status of

3    an alien lawfully admitted for permanent resi-

4    dence the status of any alien granted asylum

5    who—''; and

6     (B) in the matter following paragraph (5),

7    by striking ''Attorney General'' and inserting

8    ''Secretary of Homeland Security or the Attor-

9    ney General''; and

10   (3) in subsection (c), by striking ''Attorney

11  General'' and inserting ''Secretary of Homeland Se-

12  curity or the Attorney General''.

13  (g) EFFECTIVE DATES.—

14   (1) The amendments made by paragraphs (1)

15  and (2) of subsection (a) shall take effect as if en-

16  acted on March 1, 2003.

17   (2) The amendments made by subsections

18  (a)(3), (b), and (c) shall take effect on the date of

19  the enactment of this division and shall apply to ap-

20  plications for asylum, withholding, or other removal

21  made on or after such date.

22   (3) The amendment made by subsection (d)

23  shall take effect on the date of the enactment of this

24  division and shall apply to all cases in which the

83

1  final administrative removal order is or was issued

2  before, on, or after such date.

3      (4) The amendments made by subsection (e)

4  shall take effect on the date of the enactment of this

5  division and shall apply to all cases pending before

6  any court on or after such date.

7      (5) The amendments made by subsection (f)

8  shall take effect on the date of the enactment of this

9  division.

10  (h) REPEAL.—Section 5403 of the Intelligence Re-

11  form and Terrorism Prevention Act of 2004 (Public Law

12  108–458) is repealed.

**13  SEC. 102. WAIVER OF LAWS NECESSARY FOR IMPROVE-**

**14              MENT OF BARRIERS AT BORDERS.**

15  Section 102(c) of the Illegal Immigration Reform and

16  Immigrant Responsibility Act of 1996 (8 U.S.C. 1103

17  note) is amended to read as follows:

18  ''(c) WAIVER.—

19      ''(1) IN GENERAL.—Notwithstanding any other

20      provision of law, the Secretary of Homeland Security

21      shall have the authority to waive, and shall waive, all

22      laws such Secretary, in such Secretary's sole discre-

23      tion, determines necessary to ensure expeditious con-

24      struction of the barriers and roads under this sec-

25      tion.

84

1    "(2) NO JUDICIAL REVIEW.—Notwithstanding

2  any other provision of law (statutory or nonstatu-

3  tory), no court, administrative agency, or other enti-

4  ty shall have jurisdiction—

5      "(A) to hear any cause or claim arising

6     from any action undertaken, or any decision

7     made, by the Secretary of Homeland Security

8     pursuant to paragraph (1); or

9      "(B) to order compensatory, declaratory,

10     injunctive, equitable, or any other relief for

11     damage alleged to arise from any such action or

12     decision.".

13 **SEC. 103. INADMISSIBILITY DUE TO TERRORIST AND TER-**

14      **RORIST-RELATED ACTIVITIES.**

15  (a) IN GENERAL.—So much of section

16 212(a)(3)(B)(i) of the Immigration and Nationality Act

17 (8 U.S.C. 1182(a)(3)(B)(i)) as precedes the final sentence

18 is amended to read as follows:

19      "(i) IN GENERAL.—Any alien who—

20      "(I) has engaged in a terrorist

21     activity;

22      "(II) a consular officer, the At-

23     torney General, or the Secretary of

24     Homeland Security knows, or has rea-

25     sonable ground to believe, is engaged

130

1    ernment in order to facilitate the integration of com-

2    munications among the departments and agencies of

3    the Federal Government and State, local government

4    agencies, and Indian tribal agencies on matters re-

5    lating to border security; and

6       (2) to enhance information sharing among the

7    departments and agencies of the Federal Govern-

8    ment, State and local government agencies, and In-

9    dian tribal agencies on such matters.

10   (b) REPORT.—Not later than 1 year after imple-

11  menting the plan under subsection (a), the Secretary shall

12  submit a copy of the plan and a report on the plan, includ-

13  ing any recommendations the Secretary finds appropriate,

14  to the Senate Committee on Commerce, Science, and

15  Transportation, the House of Representatives Committee

16  on Science, the House of Representatives Committee on

17  Homeland Security, and the House of Representatives

18  Committee on the Judiciary.

     Passed the House of Representatives March 16, 2005.

     Attest:

*Clerk.*

109TH CONGRESS
1ST SESSION

# H. R. 1268

# AN ACT

Making emergency supplemental appropriations for
the fiscal year ending September 30, 2005, to es-
tablish and rapidly implement regulations for
State driver's license and identification document
security standards, to prevent terrorists from
abusing the asylum laws of the United States, to
unify terrorism-related grounds for inadmis-
sibility and removal, to ensure expeditious con-
struction of the San Diego border fence, and for
other purposes.

favor of rational proposals that bolster U.S. security and global competitiveness.

Ms. HART. Mr. Speaker, the REAL ID Act completes the mission of the 9/11 Commission recommendations by implementing common sense reforms to strengthen our borders security and better protect our homeland.

IMPLEMENTING MUCH NEEDED DRIVER'S LICENSE REFORMS

Driver's licenses have become the primary identification document in the United States, enabling individuals to get other identity documents, transfer funds to a U.S. bank account, obtain access to federal buildings and other vulnerable facilities, purchase a firearm, rent a car and board a plane.

Lax standards and loopholes in the current issuance processes allow terrorists to obtain driver's licenses—often multiple licenses from different states—and abuse the license for identification purposes.

The Sept 11th hijackers had, within their possession, at least 15 valid drivers licenses and numerous State issued identity cards with a large variety of addresses.

Identification documents are the last opportunity to ensure that people are who they say they are and to check whether they are terrorists.

The REAL ID Act would require applicants to provide proof they are in the country legally. Currently, eleven states do not have such a requirement, meaning a majority of states have already recognized the need for tighter standards, but unnecessary and dangerous gaps in the system still exist.

The REAL ID Act would require identity documents to expire at the same time as the expiration of lawful entry status, preventing those who have illegally entered or are unlawfully present in the U.S. from having valid identification documents.

States would still issue driver's licenses and identification cards and would control their own driver database.

CLOSING ASYLUM LOOPHOLES

The 9–11 Commission's staff report on "9–11 and Terrorist Travel" found that "a number of terrorists . . . abused the asylum system".

Examples of Terrorists Abusing Our Asylum Laws:

The "Blind Sheik", Sheik Omar Abdel Rahman, led a plot to bomb New York City landmarks. Rahman used an asylum application to avoid deportation to Egypt after all other means of remaining in the U.S. failed.

The 9/11 Commission staff report noted than an immigration judge held a hearing on Rahman's asylum claim weeks before his followers bombed the World Trade Center.

During the Republican Convention last August, an illegal alien from Pakistan was picked up and arrested for attempting to bomb the Herald Square subway station and plotting to bomb the Verrazano Narrows bridge. He was quoted as saying that "I want at least 1,000 to 2,000 to die in one day." The alien had applied for asylum.

A number of courts, specifically the 9th Circuit Court has severely undermined current authorities by limiting the factors that judges can consider when assessing the credibility of an alien seeking asylum. This impairment encourages asylum fraud.

The REAL ID Act would strengthen judges' ability to determine whether the asylum seeker is truthful. This provision codifies the factors immigration judges use to assess credibility

and prevents the 9th Circuit from further undermining our national security.

DEFENDING BORDERS

In 1996 Congress approved building the 14 mile long San Diego Border Fence on the Mexico-U.S. border, right next to a major U.S. Navy base.

The San Diego Sector covers an area of more than 7,000 square miles and contains 66 linear miles of international border with Mexico. Directly to the south of the San Diego Sector area of responsibility lie the Mexican cities of Tijuana and Tecate, which have a combined population of more than two million.

For decades, this area had been the preferred corridor for entry into the United States by unknown or undocumented persons due to the highly populated cities north and south of the border, as well as relatively quick access to national transportation hubs such as LAX.

Construction of the fence was halted when radical environmentalists claimed that the area was a habitat of a rare bird. As a result, eight years later, the fence remains incomplete and is an opportunity for aliens to cross the border illegally.

This incomplete fence allows border security gaps to remain open. We must close these gaps because they remain a threat to our national security.

The REAL ID Act will require the completion of this important security fence.

STRENGTHENING DEPORTATION LAWS

Under current immigration laws, prohibitions on some terrorist-related activities only apply to aliens who are trying to enter the U.S., but not to those who already reside within our borders. Therefore, if an alien seeking a visa has been found to participate in certain terrorist-related activity, he/she is prohibited from entering the U.S. But if an alien is found to have participated in the same terrorist activity in the U.S., he/she may not be deportable.

The REAL ID Act would finally make the laws consistent by providing that all terrorist-related offenses and making aliens inadmissible which would also be grounds for deportation.

The REAL ID Act provides that any alien contributing funds to a terrorist organization would be deportable.

Mr. SESSIONS. Mr. Speaker, I yield back the balance of my time, and I move the previous question on the resolution.

The previous question was ordered.

The resolution was agreed to.

A motion to reconsider was laid on the table.

───────

MESSAGE FROM THE PRESIDENT

A message in writing from the President of the United States was communicated to the House by Ms. Wanda Evans, one of his secretaries.

───────

PLAN FOR SECURING THE NUCLEAR WEAPONS, MATERIAL, AND EXPERTISE OF THE STATES OF THE FORMER SOVIET UNION—MESSAGE FROM THE PRESIDENT OF THE UNITED STATES

The SPEAKER pro tempore laid before the House the following message

from the President of the United States; which was read and, together with the accompanying papers, without objection, referred to the Committee on International Relations:

*To the Congress of the United States:*

Consistent with section 1205 of the National Defense Authorization Act for Fiscal Year 2003 (Public Law 107–314), I am providing a report prepared by my Administration on implementation during 2003 of the plan for securing nuclear weapons, material, and expertise of the states of the former Soviet Union.

GEORGE W. BUSH.

THE WHITE HOUSE, *February 8, 2005.*

───────

GENERAL LEAVE

Mr. SENSENBRENNER. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days within which to revise and extend their remarks and include extraneous material on H.R. 418, soon to be considered.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Wisconsin?

There was no objection.

───────

REAL ID ACT OF 2005

The SPEAKER pro tempore. Pursuant to House Resolution 71 and rule XVIII, the Chair declares the House in the Committee of the Whole House on the State of the Union for the consideration of the bill, H.R. 418.

□ 1359

IN THE COMMITTEE OF THE WHOLE

Accordingly, the House resolved itself into the Committee of the Whole House on the State of the Union for the consideration of the bill (H.R. 418) to establish and rapidly implement regulations for State driver's license and identification document security standards, to prevent terrorists from abusing the asylum laws of the United States, to unify terrorism-related grounds for inadmissibility and removal, and to ensure expeditious construction of the San Diego border fence, with Mr. CULBERSON in the chair.

The Clerk read the title of the bill.

The CHAIRMAN. Pursuant to the rule, the bill is considered as having been read the first time.

General debate shall not exceed 1 hour and 40 minutes, with 40 minutes equally divided and controlled by the chairman and ranking minority member of the Committee on the Judiciary; 40 minutes equally divided and controlled by the chairman and ranking minority member of the Committee on Government Reform; and 20 minutes equally divided and controlled by the chairman and ranking minority member of the Committee on Homeland Security.

The gentleman from Wisconsin (Mr. SENSENBRENNER) and the gentleman from Michigan (Mr. CONYERS) each will control 20 minutes of debate from the Committee on the Judiciary.

GOVERNMENT EXHIBIT 4

The Chair recognizes the gentleman from Wisconsin (Mr. SENSENBRENNER).

Mr. SENSENBRENNER. Mr. Chairman, I yield myself such time as I may consume.

□ 1400

Mr. Chairman, in December, the President signed into law legislation intended to respond to the recommendations of the 9/11 Commission. Unfortunately, the legislation that was enacted failed to include several key provisions critical to addressing vulnerabilities found in both the 9/11 Commission Report and the 9/11 staff report on terrorist travel. To that end, on January 26th of this year, I introduced H.R. 418, the REAL ID Act. The bill, which now has 139 cosponsors, encompasses four of the most important border and document security provisions that the House overwhelmingly approved as a part of H.R. 10 last year.

The goal of the REAL ID Act is straightforward. It seeks to prevent another 9/11-type terrorist attack by disrupting terrorist travel. The 9/11 Commission terrorist travel report stated that ''Abuse of the immigration system and the lack of interior enforcement were unwittingly working together to support terrorist activities.''

The report further states that ''Members of al Qaeda clearly valued freedom of movement as critical to their ability to plan and carry out the attacks prior to September 11th.''

Finally, the report observed, ''If terrorist travel options are reduced, they may be forced to rely on means of interaction which can be more easily monitored and to resort to travel documents that are more easily detectable.''

The REAL ID Act contains four provisions aimed at disrupting terrorist travel. First, the legislation does not, does not, try to set States' policy for those who may or may not drive a car, but it does address the use of a driver's license as a form of identification to a Federal official such as an airport screener at a domestic airport.

American citizens have the right to know who is in their country, that the people are who they say they are, and that the name on the driver's license is the real holder's name, not some alias.

Second, this legislation will tighten our asylum system, which has been abused by terrorists. The 9/11 Commission staff report on terrorist travel states that ''Once the terrorists had entered the United States, their next challenge was to find a way to remain here.'' Their primary method was immigration fraud.

Irresponsible judges have made asylum laws vulnerable to fraud and abuse. We will end judge-imposed presumptions that benefit suspected terrorists in order to stop providing a safe haven to some of the worst people on Earth. The REAL ID Act will reduce the opportunity for immigration fraud so that we can protect honest asylum seekers and stop rewarding the terror-

ists and criminals who falsely claim persecution.

Liberal activist judges in the Ninth Circuit have been overturning clearly established precedent and are preventing immigration judges from denying bogus asylum applications by aliens who are clearly lying. If criminal juries can sentence a defendant to life imprisonment or execution based on adverse credibility determinations, certainly an immigration judge can deny an alien asylum on this basis. It is one of the foundations of our system of jurisprudence that juries and trial judges should be able to decide cases on the basis of credibility or lack of credibility of witnesses. This bill will again allow immigration judges to deny asylum claims based on the lack of credibility.

The bill also overturns an even more disturbing Ninth Circuit precedent that has made it easier for terrorists to receive asylum. The circuit has actually held that an alien can receive asylum on the basis that his or her government believes that the alien is a terrorist.

Third, the REAL ID Act will waive Federal laws to the extent necessary to complete gaps in the San Diego border security fence which is still stymied 8 years after congressional authorization. Neither the public safety nor the environment are benefiting from the current stalemate.

Finally, the REAL ID Act contains a common-sense provision that helps protect Americans from terrorists who have infiltrated the United States. Currently, certain terrorism-related grounds of inadmissibility to our country are not also grounds for deportation of aliens already here. The REAL ID Act makes aliens deportable from the United States for terrorism-related offenses to the same extent they would be inadmissible to the United States to begin with. The act provides that any alien who knowingly provides funds or other material support to a terrorist organization will be subject to immigration consequences.

The REAL ID Act will make America a safer place. It is even endorsed by the 9/11 Families for a Secure America, an association of family members of 9/11 victims.

I urge my colleagues to support this bill.

HOUSE OF REPRESENTATIVES,
COMMITTEE ON THE JUDICIARY,
*Washington, DC, February 9, 2005.*

Hon. JOE BARTON,
*Chairman, House Committee on Energy and Commerce, Washington, DC.*

DEAR CHAIRMAN BARTON: Thank you for your letter, dated February 8, 2005, regarding H.R. 418, the ''REAL ID Act.'' As you noted, some of the provisions of the bill contained in section 102 fall within the Rule X jurisdiction of the Committee on Energy and Commerce. I appreciate your willingness to forgo consideration of the bill, and I acknowledge that by agreeing to waive its consideration of the bill, the Committee on Energy and Commerce does not waive its jurisdiction over these provisions.

Pursuant to your request, I will include a copy of your letter and this response in the

Congressional Record during consideration of H.R. 418 on the House floor.

Sincerely,

F. JAMES SENSENBRENNER, Jr.,
*Chairman.*

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ENERGY AND COMMERCE,
*Washington, DC, February 8, 2005.*

Hon. F. JAMES SENSENBRENNER, Jr.,
*Chairman, Committee on the Judiciary, Washington, DC.*

DEAR CHAIRMAN SENSENBRENNER: I understand that you will shortly bring H.R. 418, the REAL ID Act of 2005, to the House floor. This legislation contains provisions that fall within the jurisdiction of the Committee on Energy and Commerce.

Section 102 of the bill provides the Secretary of Homeland Security with the authority to waive applicable environmental law, such as the Resource Conservation and Recovery Act (RCRA) and the Comprehensive Environmental Response, Compensation, and Liability Act CERCLA, for the purpose of building roads and barriers. As you know, Rule X of the Rules of the House of Representatives gives the Committee on Energy and Commerce jurisdiction over these statutes.

I recognize your desire to bring this legislation before the House in an expeditious manner. Accordingly, I will not exercise my Committee's right to a referral. By agreeing to waive its consideration of the bill, however, the Energy and Commerce Committee does not waive its jurisdiction over H.R. 418. In addition, the Energy and Commerce Committee reserves its right to seek conferees on any provisions of the bill that are within its jurisdiction during any House-Senate conference that may be convened on this or similar legislation. I ask for your commitment to support any request by the Energy and Commerce Committee for conferees on H.R. 418 or similar legislation.

I request that you include this letter in the Congressional Record during consideration of H.R. 418. Thank you for your attention to these matters.

Sincerely,

JOE BARTON,
*Chairman.*

Mr. Chairman, I reserve the balance of my time.

Mr. CONYERS. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, I rise, regrettably in opposition to this anti-immigrant legislation.

Mr. Chairman, if we truly believe in all we have heard about the importance of freedom and liberty from our President and others, then we have no other choice but to vote down this bill which denies so much freedom and liberty to the immigrants in our own country.

H.R. 418 includes provision after provision limiting the rights of refugees, imposing onerous new driver's license requirements on the States, unfunded mandates, making it easier to deport legal immigrants, waiving all Federal laws concerning construction of barriers and fences anywhere within the United States and denying immigrants long-standing habeas corpus rights. This is a work of art that has to be examined very, very carefully and very critically.

If this measure becomes law, this will close America's doors to Cubans fleeing

from their country, religious minorities attempting to escape religious persecution, women fleeing from sex trafficking, rape or forced abortions.

Unfortunately, in our history, there have been a number of examples of this overreaction in the past. For example, during the Civil War, General Ulysses Grant, no less, sought to expel the Jews from the South. The aftermath of World War I brought the notorious Red scare, and the very long remembered anti-immigrant Palmer raids from the attorney general of that era. Of course, World War II gave us the searing memory of the unconscionable internment of Japanese Americans.

In the wake of the 9/11 tragedy, and even after the PATRIOT Act, which did its share of violating the rights of those who were in this country, this legislation would even further target immigrants for crimes they have not committed and for which they are not responsible.

At some point we have to treat terrorism as a problem that requires intelligent response, as opposed to an excuse to scapegoat immigrants.

For all these reasons, there are so many groups lined up behind the American Civil Liberties Union to oppose the bill: immigration rights groups, civil rights groups, civil liberty organizations, private rights groups, labor organizations, environmental groups, Native American rights, States' rights and international human rights groups.

So, I urge us in good conscience and serious concern over the direct and the subtle import of this legislation, please, we cannot and should not close ourselves off to the most vulnerable members of our society.

Mr. Chairman, I ask unanimous consent that the gentlewoman from Texas (Ms. JACKSON-LEE) be permitted to manage the bill on this side of the floor.

The CHAIRMAN. Is there objection to the request of the gentleman from Michigan?

There was no objection.

Mr. SENSENBRENNER. Mr. Chairman, I yield 2½ minutes to the distinguished gentleman from Texas (Mr. SMITH).

Mr. SMITH of Texas. Mr. Chairman, I thank the gentleman from Wisconsin (Chairman SENSENBRENNER) for yielding me time.

Mr. Chairman, this bill is the first step back on the long road to real homeland security. First, this bill prevents terrorists and others from getting driver's licenses by requiring applicants to prove that they are in the country legally. Driver's licenses can be used to board an aircraft, open a bank account and get a job. To preserve our security, we must deny terrorists the ability to obtain this form of identification.

In addition, this legislation makes it harder for terrorists to exploit our asylum system. It also requires the completion of the 14-mile San Diego border fence, which Congress approved in 1996.

Finally, Mr. Chairman, this legislation strengthens our ability to deport terrorists. Current law makes terrorists inadmissible for certain offenses but not deportable for those same offenses.

Congress can improve homeland security by passing this legislation. But if the administration wants to continue to protect the lives of Americans, it can also take immediate steps to change policies that have encouraged illegal immigration. It should start by requesting funding for all of the border enforcement positions that Congress authorized last year. The President's budget only requests enough funds for 210 new border patrol agents, even though Congress authorized 2,000 new agents.

Further, the administration must start fining employers for hiring illegal immigrants. Last year it did not fine a single employer. The administration also should change its policy of recognizing consular identification cards issued by other countries. These cards are simply not secure or reliable. They give terrorists and illegal aliens another way to remain undetected in the United States.

Mr. Chairman, the REAL ID Act marks the beginning of an effort to make America safer. I hope the administration will fully support us in this effort.

Ms. JACKSON-LEE of Texas. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, I believe that what we do today is a matter that could have been approached in a bipartisan manner. As I look at the Members on the floor of the House, each and every one is sincere in their commitment to the war on terrorism. And let me applaud them for that. I applaud the chairman of the full Committee on the Judiciary. Let me applaud the ranking member. A number of Members who are here on the floor are Committee on the Judiciary members. I want to applaud them for the work that has been done on this issue.

That is why I believe that the REAL ID Act could have been addressed in regular order, the regular order of committee hearings, the regular order of taking testimony from governors and legislators and local government officials. But now the REAL ID Act is an attempt to breathe life into immigration provisions that were stripped from the Terrorism Reform and Prevention Act. These provisions were viewed as controversial then and they are no less controversial now.

Opposition to this legislation at this time is by no means a reflection on anyone's commitment to the war on terrorism, but the REAL ID Act should have been subjected to hearings and markups before being brought to this floor.

□ 1415

First of all, it is an unfunded mandate of almost $500 million.

Supporters of H.R. 418 are afraid that terrorists are using our asylum laws as a means of entering and remaining in the United States. This fear has to be put into perspective. Terrorists are statutorily barred from asylum eligibility, and it is not apparent why they should choose such a complicated, time-consuming method for entering and remaining in the United States, in any event. In addition, large numbers of advocates, religious organizations and others who understand asylum laws and realize that there are still religious and political persecution today, realize that this bill is misdirected.

As we stand here on the floor, the Committee on Rules is determining whether the Nadler amendment will be admitted that responds to the crisis we face in the asylum laws if this bill is to be passed in its present form.

We know that the 9/11 hijackers entered and remained in the United States as nonimmigrant visitors. Visitor visas only require a 2-minute interview with an American Consulate office. The applicant just has to establish that he will return to his country at the end of the authorized period of stay. This is much easier than the steps required for obtaining asylum.

I too want to have a kind of organized system that bars terrorists, but putting into effect a national ID card is not what the 9/11 Commission said. In fact, they made it very clear. This legislation will force the United States in its national database and in its requirement standardizing ID driver's licenses and birth certificates which puts us on that road without hearings, without oversight, and without question of America's civil liberties.

I know that the polls and all the phone calls in Members' offices have said we do not want illegal aliens driving cars. Well, do you want individuals on our highways and byways that are not licensed? Are you taking away the 10th amendment of the United States to allow them to be able to standardize those documents? I do believe that we can standardize them by a biometric system, but we have intruded on the rights of States when they too can work with the Federal Government making the system work.

I think there are valuable aspects of this bill; not using certain ID for certain Federal purposes, which may in fact include travel. But the overbroadness of this particular legislation, barring any laws to be utilized in the building of a fence, eliminating environmental laws, work laws, criminal laws is overbroad.

Lastly, I would say, we are the land of the free and the brave. We have always welcomed those fleeing from persecution. This legislation bars that opportunity, and I would ask my colleagues to oppose it and for us to go back to the drawing board and work for freedom and the war against terrorism in a bipartisan way.

Mr. Chairman, I reserve the balance of my time.

Case 5:20-cv-00106   Document 11-1   Filed on 09/14/20 in TXSD   Page 53 of 120

Mr. SENSENBRENNER. Mr. Chairman, I yield 1 minute to the gentleman from Ohio (Mr. CHABOT), the chairman of the Subcommittee on the Constitution.

Mr. CHABOT. Mr. Chairman, I rise in strong support of the REAL ID Act, and I want to thank the distinguished chairman of the Committee on the Judiciary, the gentleman from Wisconsin (Mr. SENSENBRENNER) for his efforts in this matter. It is very important.

This bill is about common sense. It is about protecting our borders and making our country safer. The 9/11 Commission report revealed many disconcerting facts, none more unnerving than the fact that all but one of the 9/11 hijackers who were here temporarily obtained valid driver's licenses, enabling them to travel freely about the country. That is absurd, and the American people know it. This bill finally does something about that absurdity. We cannot continue to let our laws be exploited and circumvented by future terrorists to further their plans of violence, destruction, and murder. With the REAL ID Act in place, we can better prevent future tragic events from occurring.

Mr. Chairman, I urge my colleagues to pass this critical piece of legislation.

Ms. JACKSON-LEE of Texas. Mr. Chairman, I am very pleased to yield 3 minutes to the gentlewoman from California (Ms. LINDA T. SÁNCHEZ), a distinguished member of the House Committee on the Judiciary.

(Ms. LINDA T. SANCHEZ of California asked and was given permission to revise and extend her remarks.)

Ms. LINDA T. SANCHEZ of California. Mr. Chairman, I am a proud daughter of immigrants who is honored to serve my country. I consider it a privilege to be able to give something back to this country that has given so much opportunity to generations of immigrants over the years.

Like millions of immigrants here today, my family came to this country in search of the American Dream: a better life for their children so that their children could receive a quality education, some day own a home, and earn a fair wage.

I stand before my colleagues today angered and outraged that under the guise of national security, the Republican Party is trying to punish those seeking the same dreams that my parents sought. If the Republicans and this administration really want to strengthen national security, they should start, I would think, by providing full funding for the Department of Homeland Security. Instead, the administration's budget slashes funding for the COPS program by $480 million and guts funding for local firefighters by $215 million. This leaves our first responders without the critical resources they need.

The administration's budget also breaks the promise of putting an additional 2,000 border patrol agents on the job in 2006 as promised in landmark intelligence reforms passed last year and endorsed by the 9/11 Commission. Instead, the President's budget provides funding for a mere 210 agents, a 90 percent cut over the 9/11 Commission recommendations.

The truth of the matter is that Republicans are using national security as a facade to alienate law-abiding, hard-working, and tax-paying immigrants. There are 8 million undocumented immigrants in this country who are cleaning our offices, caring for our children and elderly, and picking the fruits and vegetables that we consume. Most of these jobs most Americans do not want. Without these immigrants, our economy would falter.

What we should be doing is allowing immigrants a path to citizenship and access to driver's licenses so they become a part of our American system. This will make our country safer, and it will strengthen our national security.

We need comprehensive reform that supports our economy and values our immigrants. If the REAL ID Act is passed today, it will deny driver's licenses to those immigrants and slam the door shut on refugees seeking asylum from blood-thirsty regimes.

America is a country built by immigrants, and we should remain a country that is opening and welcoming to those who seek freedom. It is a sad day when Republicans use the pretext of national security to attack immigrants who pose no real threat to our security. Americans deserve better, and I urge my colleagues to vote "no" on H.R. 418.

Mr. SENSENBRENNER. Mr. Chairman, I yield 2 minutes to the gentleman from Indiana (Mr. HOSTETTLER), the distinguished chairman of the Subcommittee on Immigration.

Mr. HOSTETTLER. Mr. Chairman, I rise in support of H.R. 418, the Real ID Act.

The REAL ID Act incorporates four of the 9/11 Commission recommendations that are necessary to effectively protect our constituents from terrorists seeking to exploit loopholes in our immigration system. This bill will close several of those dangerous loopholes.

In addition to providing important Federal security guidelines for driver's licenses, the REAL ID Act also includes other important homeland security measures, including the deportability of terrorists, preventing terrorists from gaming the asylum system, and implementing border security measures in San Diego.

Currently, the terrorists and their supporters can be kept out of the United States; but as soon as they set foot into the U.S. on tourist visas, we cannot deport them for many of the very same offenses. This hinders our ability to protect Americans from those alien terrorists who have infiltrated the United States. H.R. 418 makes aliens deportable for the same terrorist-related offenses as those that would prevent them from being admitted to the United States in the first place.

Another deficiency in current law is based on a flawed understanding of how terrorist organizations operate.

The Immigration and Nationality Act now reads that if an alien provides funding or other material support to a terrorist organization, the alien can escape deportation if they can show that he did not know that the funds or support would further the organization's terrorist activity; i.e., his donation did not immediately go to buying explosives.

As Kenneth McKune, former associate coordinator for Counterterrorism at the State Department, explained, "Given the purposes, organizational structure, and clandestine nature of foreign terrorist organizations, it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions, regardless of whether such support was ostensibly intended to support nonviolent, nonterrorist activities."

Money given to terrorist organizations is fungible. Senator DIANE FEINSTEIN has rightly stated that "I simply do not accept that so-called humanitarian works by terrorist groups can be kept separate from their other operations. I think the money will ultimately go to bombs and bullets rather than babies, or, because money is fungible, it will free up other funds to be used on terrorist activities."

The REAL ID Act is written so that an alien who provides funds or other material support to a terrorist organization would be deportable unless he did not know and should not reasonably have known that the organization was a terrorist organization.

Mr. Chairman, I urge the support and passage of H.R. 418.

Ms. JACKSON-LEE of Texas. Mr. Chairman, it is my pleasure to yield 3 minutes to the distinguished gentleman from New York (Mr. NADLER), a strong advocate for preserving the Constitution.

Mr. NADLER. Mr. Chairman, the supporters of this legislation are completely correct that obviously real terrorist threats exist and we must act forcefully to safeguard our national security. But this bill is really three or four or five separate bills entirely, some of them unexceptional, some of them very questionable.

Under the excuse of national security, for example, the asylum provisions in this bill completely gut the possibility of many legitimate victims of persecution to be granted asylum. Asylum law is supposed to be about protecting individuals, including women and children, from serious human rights abuses; it is not supposed to be about seizing on any possible basis to deny a claim or return people to persecution.

Proponents of this bill have been making dramatic claims about terrorists abusing the asylum system to get into this country to perform acts of terrorism. But since 9/11, in fact, since the 1996 act, most asylum-seekers are in jail while resolution of their cases are pending so they cannot pose a threat. What this bill does is to change the standards by which the judgment is made as to whether they should get asylum; but while it is being judged, they are in jail. So this has nothing to do with alleviating a threat to this country.

For example, one provision would change current law to require that the applicant prove that his or her race, religion, et cetera is a central reason instead of merely a major reason for the legitimate fear of persecution in order to get asylum. This would force asylum applicants to prove the state of mind of their persecutors. What is the central reason of several different reasons? It makes it almost impossible to grant asylum.

Now, this was not, and some of the points in the manager's amendment were not in the bill before us last year. No one has ever seen some of these provisions until yesterday. This provision, at least, and I am gratified that the Committee on Rules made the amendment to be in order by me and the gentleman from Florida (Mr. MEEK) and the gentlewoman from Texas (Ms. JACKSON-LEE) to strike this section of the bill, and in order for it to be passed tomorrow so that the Committee on the Judiciary can properly vet this bill or the asylum provisions can be properly looked at and we can deal with it adequately.

This section, in my judgment, would subject hundreds, maybe thousands, of people to being tortured or abused or shot because of their race, color, religion, creed, or opposition to a dictatorial regime back home, because it would make it impossible for them to get asylum. I think when this House examines this carefully, and when the committee examines this carefully, it will come to that conclusion. Maybe we out to change the asylum provisions, but we ought to do it after careful consideration.

So I hope that this bill will not be passed in its current form, and that my amendment will be passed so that we can give proper consideration to some of these provisions that do not really aid the national security, but do get protection for people who need these protections.

Mr. SENSENBRENNER. Mr. Chairman, I yield 2 minutes to the gentleman from California (Mr. DANIEL E. LUNGREN), our recently returned prodigal son.

(Mr. DANIEL E. LUNGREN of California asked and was given permission to revise and extend his remarks.)

Mr. DANIEL E. LUNGREN of California. Mr. Chairman, I rise in support of H.R. 418.

Twenty-six years ago, when I first came to this Chamber, we were speaking about border security. Sixteen years ago, when I left this Chamber, we were speaking about border security; and here we are again.

A fundamental aspect of national sovereignty is that a nation is able to control its own borders. The nature of this requirement is of particular importance in the post-9/11 environment in which we must all live. In years past, when those of us on the Subcommittee on Immigration confronted this challenge, there were traffickers and human cargo and narcotics and the increasing problem of criminal gangs who profit from such enterprises. Today, however, we must deal with the additional worry that these channels of illicit commerce may also include those who enter our country to kill innocent Americans and the related concerns of weapons of mass destruction.

The Real ID Act, introduced by the gentleman from Wisconsin (Chairman SENSENBRENNER), is an important step in meeting this challenge. In conjunction with the additional border patrol positions authorized by this body at the close of the last Congress, H.R. 418 will remove the impediments to completing the fence along the San Diego corridor of our southern border.

□ 1430

I want to commend my predecessor in the Third Congressional District in California, Mr. Doug Ose, who worked hard to remove the regulatory obstacles to completion of the fence.

In today's post-9/11 environment, it is one component in an integrated U.S. border security system. There is simply no excuse for the failure to complete the remaining 3½ miles of the security fence. The language offered by our colleague from Wisconsin would allow us to do so.

In our system of governance, the United States Government and specifically the Congress have given us what is tantamount to plenary jurisdiction over immigration law. As a former attorney general in my State, I can make the observation that in most areas of the law enforcement, the States and local governments have primary jurisdiction. That is not the case with immigration enforcement. As a former President of the other party put it in a different context, "The buck stops here."

Although I am a committed believer in federalism, the nature of the task and the language of Article I, section 8, are clear. While this bill in no way preempts State law with respect to the issuance of driver's licenses, it does entail a modest notion that the immigration laws enacted by this body ought to mean something.

Ms. JACKSON-LEE of Texas. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, I am delighted that the gentleman from New York (Mr. NADLER) has indicated that the amendment has been made in order, and I do want to acknowledge that he is the ranking minority member of the Subcommittee on the Constitution of the Committee on the Judiciary.

Mr. Chairman, how much time remains?

The Acting CHAIRMAN (Mr. SIMPSON). The gentlewoman from Texas (Ms. JACKSON-LEE) has 5½ minutes remaining. The gentleman from Wisconsin (Mr. SENSENBRENNER) has 8 minutes remaining.

Ms. JACKSON-LEE of Texas. Mr. Chairman, I yield 1½ minutes to the distinguished new member from the great State of Florida (Ms. WASSERMAN SCHULTZ).

Ms. WASSERMAN SCHULTZ. Mr. Chairman, the most troubling aspect of this bill is that related to asylum.

Today's laws for seeking asylum are the result of lessons learned after World War II. After the war, America reflected with shame on how this shining beacon of democracy and freedom turned its back on 1,000 Jews who fled for their lives on the ship called the St. Louis. We turned the St. Louis away, not even allowing it to dock in America. It is estimated that over half of those refugees eventually died.

Today, in Haiti, Cuba and other countries, thousands face death, religious persecution, torture and property confiscation. This bill virtually closes the door to those who might seek asylum in America.

Let us not forget the lessons of history. I urge my colleagues to keep the doors open to those seeking justifiable refuge.

Regarding driver's licenses, the 9/11 tragedy has been referred to here on this floor referencing the terrorists who obtained driver's licenses. Let me remind my colleagues that this bill would not affect that situation at all, as all of the terrorists were in this country legally and could have obtained driver's licenses regardless of this law.

We should heed what Florida Governor Jeb Bush said last year when he was talking about driver's licenses for illegal immigrants. He said, "We shouldn't allow them to come into the country to begin with, but once they're here, what do you do? Do you basically say that they are lepers to society, that they do not exist?"

He concluded by saying, "A policy that ignores them is a policy of denial." I agree and I urge my colleagues to vote against this bill.

Mr. SENSENBRENNER. Mr. Chairman, I yield 1 minute to the gentleman from Indiana (Mr. PENCE).

(Mr. PENCE asked and was given permission to revise and extend his remarks.)

Mr. PENCE. Mr. Chairman, I rise in strong support of the REAL ID Act and with a particular sense of gratitude toward the gentleman from Wisconsin (Mr. SENSENBRENNER), who has doggedly brought this legislation to the Hill for one reason and one reason only.

9/11 is not theoretical for me. I was here. I was on the Capitol grounds, and

my family during the school year lives in the Washington D.C., area, and like millions of other families in New York and Washington, D.C., was imperiled.

As the 9/11 Commission Report stated, "For terrorists, travel documents are as important as weapons." On page 390 of the report they point out that "All but one of the 9/11 hijackers acquired some form of U.S. identification by fraud and that acquisition of these forms of identification assisted them in boarding commercial flights."

By bringing this legislation today, the gentleman from Wisconsin (Mr. SENSENBRENNER) is making my family safer in this post-9/11 America, and also closing asylum loopholes, strengthening our deportation laws. It is time for Congress to get real and pass the REAL ID Act and make our families and our Nation safer.

Ms. JACKSON-LEE of Texas. Mr. Chairman, I yield 2 minutes to the distinguished gentleman from California (Mr. FILNER), who has been able to determine the difference between immigration laws and laws to fight terrorism; and also his district contains the discussed fence.

Mr. FILNER. Mr. Chairman, I thank the gentleman from Wisconsin (Mr. SENSENBRENNER) and all of those on the Republican side who are so concerned about my district. I represent the California border between Mexico and the United States.

This so-called fence that you want to put in my district is really a giant public works project that does enormous harm. I wish you were equally concerned about the 50 million gallons of sewage that flows into my district that we should be treating. I wish you were concerned about the legal border crossings, that take four or five hours some days. I wish you would be concerned about my local health facilities who treat the undocumented and refund those dollars.

But, no, you want to put a public works project in that waives all existing environmental laws necessary to ensure the construction of roads, barriers, cut and fills, taking down mountains. This would result in an enormous waste of millions of Federal and State dollars that have already been contributed to restore and protect this area in San Diego, its historical, its cultural, its environmental resources.

Ironically, the United Nations Ramsar Convention recently bestowed the prestigious label of "Wetlands of International Importance" on this 2,500-acre national wildlife refuge and state park that you are going to destroy.

Now, we know we have to have border security. We live right there. You think we want to be overrun with terrorists? We know what it takes. We know what a smart border is. And what you are suggesting is not a smart border. For a minimal security benefit and maximum dollars spent, you will do irreparable damage to areas along the western portion of the U.S.-Mexico border.

This multitiered fence, road building, cut and fill, shaving down of mountains will destroy, as I said, an environmentally sensitive area, violate several sections of the Coastal Act and destroy acres of sensitive habitat and wetlands and coastline.

This sensitive habitat plays a vital role in the sustainability of the binational ecosystem. Vote down this bill.

Mr. SENSENBRENNER. Mr. Chairman, I yield 2 minutes to the gentleman from Virginia (Mr. FORBES).

Mr. FORBES. Mr. Chairman, I rise today in support of the REAL ID Act, and I thank the chairman for his courage and hard work on this vital measure.

Over a decade ago, the ability of Ramzi Yousef, the mastermind behind the 1993 World Trade Center bombing to be granted asylum and to move freely in the country should have signaled that something was terribly wrong with our system. It did not, and 8 years later, 19 terrorists collectively carrying a total of 63 valid U.S. driver's licenses, boarded planes to finish Yousef's work.

It is now over 3 years since that tragic September 11th. Today, we are considering a vital piece of legislation to address three key failures of current security policy. First, the REAL ID Act mandates standards to obtain driver's licenses; second, it tightens our Nation's asylum laws, which easily allow suspected terrorists into our Nation; and finally, it addresses the need to secure our borders.

These concepts are not rocket science. The need for these reforms has been reiterated over and over, and in expert testimony, in anecdotal evidence from security professionals, in scholarly research and in evidence presented from our Nation's justice and military personnel. But the fact of the matter is, the most compelling reason to pass this bill is just plain old common sense.

We can not repeat enough what the 9/11 Commission said: "For terrorists, travel documents are as important as weapons." They are right. They also said, "It is elemental to border security to know who is coming into the country."

Today, more than 9 million people have entered the United States outside the legal immigration system. The security chain protecting America is only as good as its weakest link. It does not take a congressman or a national security expert to tell you this. Most Americans know that despite the rhetoric we hear against this bill, as long as we ignore the need for border security, we place them and their families at risk.

I strongly urge my colleagues to vote in favor of the REAL ID Act.

Ms. JACKSON-LEE of Texas. Mr. Chairman, I yield myself the balance of my time.

Mr. Chairman, we are on the floor today because the representation has been made to the American people and to our colleagues that this legislation is legislation that relates and responds to the crisis in the war on terror. We all are united in that war, but this is an immigration bill, and I do believe we should do immigration in a bipartisan manner.

Let me make it very clear, the 9/11 terrorists would not have been thwarted by this legislation. In fact, all 19 of the 9/11 hijackers had documents to enter the country legally. And under this particular legislation, the terrorists would not have been prevented from using these documents to obtain driver's licenses.

I think the real crux is as was quoted in the words of Governor Jeb Bush, "What do you do with them?" illegal aliens who are working in our hotels and factories, who are working every day in our States and our cities and our counties?

The last thing, Mr. Chairman: Do we remember Bosnia and Kosovo? These were people seeking asylum. I think we have to judge ourselves by reason and reasonable policy. I join my colleagues in working together to secure the homeland, but in this instance, this does not follow the 9/11 recommendations. This commission did, in fact, say that they wanted secure documents, and identification should begin in the United States. It did not document or indicate in which manner we should be able to do that.

I would have hoped that H.R. 620, the Security Measures Feasibility Act, which would ask the hard questions of how and what is the best vehicle in order to be able to establish these secure documents, would have been the better approach. Now we undermine the States' ability for safety and security in their own States, and we undermine the very principles of this Nation, which are to open the doors for those fleeing persecution both in terms of religious and political persecution.

What about the Cubans? What about the Haitians, the Liberians, the Sudanese, the Bosnians? What about those fleeing, as my colleague has indicated, our Jewish individuals who were fleeing persecution? I simply say that we have a better way of doing this. I wish we could do it together.

I hope my colleagues will oppose this bill so we might do this effort in a bipartisan manner.

Mr. Chairman, I rise in opposition to H.R. 418, the REAL ID Act. The REAL ID Act is an attempt to breathe life into immigration provisions that were stripped from the Intelligence Reform and Terrorism Prevention Act. These provisions were viewed as controversial then, and they are no less controversial now. The REAL ID Act should have been subjected to hearings and markups before the legislation before the floor.

The supporters of the H.R. 418 are afraid that terrorists are using our asylum laws as a means of entering and remaining in the United States. This fear has to be put into perspective. Terrorists are statutorily barred from asylum eligibility, and it is not apparent why they

would choose such a complicated, time consuming method for entering and remaining in the United States in any event.

The 9/11 hijackers entered and remained in the United States as nonimmigrant visitors. Visitors' visas only require a two-minute interview with an American Consulate Officer. The applicant just has to establish that he will return to his country at the end of the authorized period of stay. This is much easier than the steps required for obtaining asylum, which, among other things, require the applicant to establish a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

The Intelligence Reform and Terrorism Prevention Act established a study to find out the extent to which terrorists are attempting to use our asylum laws to enter and remain in the United States and what weaknesses they are exploiting. We need to wait for that information before we consider any bills on revising our asylum laws. Changes should be designed to deal specifically with weaknesses that we know are being exploited.

The approach in the REAL ID Act is to raise the bar on the burden of proof, which would result in a denial of relief to bona fide asylum seekers without any assurance that the changes would discourage terrorists from seeking asylum. For instance, in addition to showing that the alleged persecution would be "on account of" one of the enumerated grounds, the applicant would have to establish that the persecution was or will be "a central reason for persecuting the applicant." In effect, the asylum applicant would have to establish what was in the mind of the persecutor. It is not apparent how this would discourage terrorists from fabricating asylum claims. The only certainty is that it would make it more difficult for bona fide asylum seekers to meet their burden of proof. The unfairness of this approach is illustrated by a comment that the Honorable Sandra Day O'Connor made recently about the asylum laws of our country. She said:

The United States offers protection in the form of asylum to individuals fleeing persecution in other nations. In most cases, however, asylum seekers find themselves alone, destitute and facing deportation. Asylum law is governed by a labyrinth of statutes, regulations, and case law, but, unlike criminal defendants, only those asylum seekers who can afford to hire an attorney or who are fortunate enough to secure pro bono counsel are represented.

The REAL ID Act would codify the standards that adjudicators use in making credibility findings in asylum proceedings. The codification would encourage adverse credibility findings against asylum applicants who cannot produce corroborating evidence of their account, or whose demeanor is inconsistent with an immigration judge's preconceived expectations. This can be very unfair. People fleeing persecution often lack the opportunity and the ability to secure the legal evidence needed to corroborate their claims, and demeanor is a function in some cases of cultural background rather than credibility. For instance, it is considered rude in some cultures to stare into another person's eyes during a conversation, but the failure to look someone in the eyes indicates deception in this country.

The REAL ID Act also would expand the categories of people who can be excluded or deported as a terrorist. The broad net this would create would ensnare innocent people who have made donations or been involved in some other way with organizations they did not know were terrorist organizations. The defense to removal on that basis would be to demonstrate by clear and convincing evidence that you did not know, and should not reasonably have known, that the organization was a terrorist organization. This can be an impossible burden to meet. For instance, how would you prove by clear and convincing evidence that you did not notice a person who entered this room 5 minutes ago?

The REAL ID Act also includes sections on security measures for drivers' licenses and identification cards. We have already enacted legislation to improve security measures for drivers' licenses and identification cards. The Intelligence Reform and Terrorism Prevention Act we just enacted requires the Secretary of Transportation, in consultation with the Secretary of Homeland Security, to promulgate regulations establishing minimum standards for driver's licenses or personal identification cards issued by a State for use by Federal agencies for identification purposes. Before being published as proposed regulations, the standards would be subjected to a negotiated rule making committee that would include the affected stakeholders such as State elected officials and State motor vehicle departments. The recommendations of this committee are required to include an assessment of the benefits and the costs of the measures in the proposed regulations.

In contrast, the REAL ID Act would impose specific requirements on the States now, without giving the States and the other stakeholders an opportunity to provide input on what these requirements should be, and without an assessment of the benefits and costs of the measures. If the security measures were to prove to be impossible or too costly to implement, it would require an act of Congress to change them.

Before we can address the merits of the security measures that would be required by the REAL ID Act, we need answers to the following questions. (1) Are the States capable of establishing and implementing the security measures Mr. SENSENBRENNER is proposing? For instance, his bill calls for two categories of drivers' licenses, one for citizens and permanent residents and another for aliens who have nonimmigrant status. The licenses for nonimmigrants would be tied to periods of lawful status and extensions of the status. Can the State motor vehicle departments handle this increased work load? Will the States be able to provide the training needed to evaluate the many immigration documents that reflect lawful nonimmigrant status? (2) How much would it cost to establish, implement, and maintain these security measures? We do not have unlimited resources. We cannot evaluate whether these safety measures are worth what they would cost unless we know what they would cost. (3) How long would it take to establish and implement these security measures? I have introduced a bill that would establish a study to find the answers to these questions, "The Security Measures Feasibility Act."

The REAL ID Act also would restrict the privilege of obtaining a driver's license to aliens who have lawful status. My Security Measures Feasibility Act would establish a study of the consequences that would result from forcing millions of undocumented aliens to drive without drivers' licenses.

Sheriff Timothy Bukowski of Kankakee, Illinois, has made an important observation on this matter. According to Sheriff Bukowski, the issuance of drivers' licenses is a safety issue, not an immigration issue. I agree with Sheriff Bukowski, a driver's license is more than just a privilege to the driver, it also is a device that the States use to make our highways safer.

Austin Assistant Chief of Police Rudy Landerso explains it this way. "[W]e strongly believe it would be in the public interest to make available to these communities the ability to obtain a driver's license. In allowing this community the opportunity to obtain driver's licenses, they will have to study our laws and pass a driver's test that will make them not only informed drivers but safe drivers." I would just add that it also requires them to have insurance.

The REAL ID Act contains a provision that would provide the Secretary of Homeland Security with authority to waive all laws he deems necessary for the expeditious construction of the barriers authorized to be constructed by section 102 of the Illegal Immigration Reform and Immigration Responsibility Act of 1996, IIRIRA. To my knowledge, a waiver this broad is unprecedented. It would waive all laws, including laws protecting civil rights; laws protecting the health and safety of workers; laws, such as the Davis-Bacon Act, which are intended to ensure that construction workers on federally-funded projects are paid the prevailing wage; environmental laws; and laws respecting sacred burial grounds. It so broad that it would not just apply to the San Diego border fence that is the underlying reason for this provision. It would apply any other barrier or fence that may come about in the future. At the very least, we should have a hearing to consider the consequences of such a drastic waiver.

I am concerned also by the piecemeal approach that the REAL ID Act is taking to immigration reform. We need comprehensive immigration reform, not fixes for a few specific problems. This view is shared by our colleagues on the Senate side. Senator JOHN McCAIN has expressed the need to have comprehensive immigration reform. I have heard that he will be working on comprehensive immigration legislation with Senator EDWARD KENNEDY. We can do the same thing in the House of Representatives. I invite my colleagues who are supporting the REAL ID Act to work with me on comprehensive immigration reform. In the meantime, however, passage of this piece-meal, ill-advised bill would be a step backwards. I urge you to vote against it.

The Acting CHAIRMAN. The time of the gentlewoman from Texas (Ms. JACKSON-LEE) has expired.

Mr. SENSENBRENNER. Mr. Chairman, I yield 2 minutes to the gentleman from Iowa (Mr. KING).

Mr. KING of Iowa. Mr. Chairman, I thank the chairman for yielding me time. I thank the chairman for leading on this most important issue.

On September 11, our Nation suffered the most horrible attack ever on American soil at the hands of those with a deep-seated, enduring hatred for freedom. Since that day, we have made

great strides in improving our Nation's security, but several gaps leave our Nation vulnerable to attacks, just like those we suffered that day.

The REAL ID bill would close loopholes and make Americans more secure. The situation in California where a State environmental commission is blocking a national security barrier from being finished must be remedied. A 3-mile gap remains in a fence which would prevent people from crossing over our southern border in an area that is home to a military base. Half a million people are caught there each year trying to get across, and that does not include those who get on through. They are their own environmental problem as well.

The REAL ID bill would give the Secretary of Homeland Security the authority he needs to ensure that our national security is not compromised for dubious environmental concerns.

Our asylum system presently welcomes fraud by those who seek to do our Nation harm. The REAL ID bill would allow our immigration judges to use common sense to protect Americans while still providing a safe harbor for those who truly need refuge in our country.

It is outrageous that we can keep people out of this country based upon terrorist links, but the minute they are in this country, we cannot deport them. The REAL ID bill would fix this problem, which poses a great danger to our citizens.

Perhaps most importantly, our Nation's security will remain at risk so long as we give validity to those who are in our Nation illegally in the form of State driver's licenses and other ID's. Driver's licenses in our country are de facto ID cards. They allow people to blend in, move freely, rent apartments, go to work, board airplanes. If States do not require some valid form of U.S. Government-issued ID to get a driver's license, any person could walk in off the street and claim to be a legal alien in search of a license, and be granted one.

To say that this is not an issue of national security is beyond the limits of reasonability. The REAL ID bill would ensure those to whom we issue government IDs and driver's licenses are in the U.S. legally and make it more likely that those to whom we issue ID's do not intend to harm Americans. We must close these loopholes.

I thank the chairman and I ask the Congress to act.

□ 1445

Mr. SENSENBRENNER. Mr. Chairman, I yield myself the balance of the time.

Mr. Chairman, several speakers on the other side said that if this bill was law at the time of 9/11, it would not have made any difference on what ID the terrorists used to get on the planes. That is flat out wrong.

What the bill say is that anyone who is admitted to this country on a tem-

porary visa will have their driver's license expire as to the date of their visa.

Now, Mohammed Atta, who is the ring leader of 9/11 murderers, entered the United States on a 6-month visa. That visa expired on July 9, 2001. He got a driver's license from the State of Florida on May 5, 2001. That was a 6-year driver's license. Had this bill been in effect at the time, that driver's license would have expired on July 9, and he would not have been able to use that driver's license to get on a plane because it was an expired ID. Read the bill.

Secondly, relative to the asylum issue, what this bill does is two things. First of all, it says the burden of proof is on the applicant for asylum to prove that they qualify. What is wrong with that? The burden of proof is on anybody who is the plaintiff or an applicant in any type of proceeding. They have got to prove that they are entitled to the relief that they are requesting, and I will just read from page 3 of the bill.

In General. The burden of proof is on the applicant to establish that the applicant is a refugee, within the meaning of the law. To establish that the applicant is a refugee, the applicant must establish that race, religion, nationality or membership in a particular social group or political opinion was or will be the central reason for persecuting the applicant.

So nobody, nobody who falls under that definition will be denied asylum under this bill.

Secondly, it says that in sustaining the burden, it allows the trier of fact, the immigration judge in this case, to determine the credibility of the witnesses. Now, the trier of the fact, whether it is a judge or a jury in any other legal proceeding, bases determinations on the credibility of the witnesses as to what verdict is reached. Without this bill, a person can come before an immigration judge, be determined by that judge that they are lying through their teeth, and still get asylum. That is just flat out wrong, and it is a distortion of the type of jurisprudence that we have had where court proceedings are supposed to determine exactly what the truth is.

There is no one who is lying through their teeth that should be able to get relief from the courts, and I would just point out that this bill would give immigration judges the tool to get at the Blind Sheik who wanted to blow up landmarks in New York, the man who plotted and executed the bombing of the World Trade Center in New York, the man who shot up the entrance to the CIA headquarters in northern Virginia, and the man who shot up the El Al counter at Los Angeles International Airport. Every one of these non-9/11 terrorists who tried to kill or did kill honest, law-abiding Americans was an asylum applicant. We ought to give our judges the opportunity to tell these people no and to pass the bill.

The Acting CHAIRMAN. All time for debate by this committee has expired. For what purpose does the gentlewoman from Texas rise?

Ms. JACKSON-LEE of Texas. Mr. Chairman, do I have time for a unanimous consent request?

The Acting CHAIRMAN. The gentlewoman may make a unanimous consent request.

Ms. JACKSON-LEE of Texas. Mr. Chairman, I yield to the gentlewoman from California (Ms. SOLIS) for a unanimous consent request.

(Ms. SOLIS asked and was given permission to revise and extend her remarks.)

Ms. SOLIS. Mr. Chairman, I would simply like to submit my statement for the RECORD on this particular issue in opposition to the REAL ID Act.

Mr. Chairman, I rise today in strong opposition of the REAL ID Act. H.R. 418 is mean-spirited legislation that threatens our national security by depriving law enforcement officials of critical information on many adults who are physically present in the United States. The driver's license REAL ID Act will also impose additional requirements on states, without providing funding, and interfere with what is inherently a state responsibility. The REAL ID Act will also raise insurmountable hurdles for refugees seeking asylum.

This bill will negatively affect women refugees seeking asylum from honor killings, rape and sex trafficking, since most women cannot provide direct proof of torture. I do not understand how supporters of this bill can turn their backs on victims of sex trafficking in the name of protecting homeland security.

Finally, I am particularly disappointed that the authors of this bill have ignored real security threats. Like the need to upgrade the safety of our chemical and nuclear plants. Instead they have introduced a sweeping new law that allows the Department of Homeland Security to unilaterally strip away civil rights, labor, health and environmental laws to build a border fence. This will be done without any recourse for the average American citizen impacted by the construction. This doesn't make our country safer, it just takes away the liberties that make America a model for the world.

I strongly urge all Members to vote "no" on H.R. 418.

The Acting CHAIRMAN. The gentleman from Virginia (Mr. TOM DAVIS) and the gentlewoman from the District of Columbia (Ms. NORTON) each will control 20 minutes of debate from the Committee on Government Reform.

The Chair recognizes the gentleman from Virginia (Mr. TOM DAVIS).

Mr. TOM DAVIS of Virginia. Mr. Chairman, I yield myself such time as I may consume.

I rise today in support of H.R. 418. I want to thank my colleague from Wisconsin for his leadership and tireless efforts to secure our Nation's borders.

Last year, the Congress passed the Intelligence Reform and Terrorism Prevention Act, enacting into law many of the recommendations made by the 9/11 Commission.

Unfortunately, not all of the recommendations were included in the

first round of legislation, which is why we are here today. The gentleman from Wisconsin (Chairman SENSENBRENNER) and I committed to working together to make sure that one of the first orders of business considered by the House in the 109th Congress would be to address some of the recommendations in our jurisdiction that the Congress failed to address last year.

I want to use my time today to discuss the provisions contained in H.R. 418 that fall within the jurisdiction of the Committee on Government Reform which I chair: security measures for Federal acceptance of state-issued driver's licenses and personal identification cards, commonly referred to as identity security.

Last year's 9/11 Commission report identified a number of gaps and weaknesses in our Nation's intelligence and homeland security systems, providing recommendations for Congress to consider in fixing these problems. One of the most pressing recommendations proposed by the commission and one that fell within the jurisdiction of the Committee on Government Reform appears on page 390 of the 9/11 Commission report. It is the following:

Secure identification should begin in the United States. The Federal Government should set standards for the issuance of birth certificates and sources of identification, such as driver's licenses. Fraud in identity documents is no longer just a problem of theft. At many entry points to vulnerable facilities, including gates for boarding aircraft, sources of identification are the last opportunity to ensure that people are who they say they are and to check whether they are terrorists.

For terrorists, travel documents are as important as weapons. The 9/11 hijackers relied on a wide variety of fraudulent documents. We know that the 19 hijackers held 63 driver's licenses or ID cards.

Based upon guidelines proposed by State motor vehicle administrators and adopted by a number of States throughout the country, our committee worked with other interested stakeholders to craft legislation that would establish minimum standards to be accepted of state-issued identification that could be used for Federal purposes. These important provisions were overwhelmingly passed by the House as part of H.R. 10 and heralded by the 9/11 victims' families.

Unfortunately, the House-passed provisions critical to strengthening identity security were dropped from the bill in conference. Instead, language was included that would set up a general framework for a Federal role in this area, but the language was filled with so many loopholes and opt-out clauses for States that it really only made matters worse.

We find ourselves here today to correct these mistakes and to again enact meaningful reform. H.R. 418 provides the Congress with this opportunity.

Our approach is very straightforward. Our legislation would set forth minimum document and issuance standards for Federal acceptance of driver's licenses and state-issued personal identification cards. The legislation would provide 3 years for States to come into compliance with these standards if their driver's licenses are to be recognized for Federal Government purposes and their documents as proof of an individual's identity.

As the 9/11 Commission concluded, fraud in identity documents is no longer just a problem of theft. As we continue to strengthen our intelligence function to better identify and track terrorists, those individuals will be forced to find ways to conceal their identity in order to avoid detection.

We know that the 9/11 hijackers used the United States as their staging area for training and preparation in the year prior to the attacks, traveling into and out of and around the country with little fear of capture. In fact, several of the hijackers lived less than 15 miles away from this building while making final preparations for their attack. We are dedicated to making sure we do not provide such a hospitable environment in the future.

As chairman of the committee that oversees federalism issues, I am mindful of concerns about the Federal Government imposing burdens on States, so-called unfunded mandates. My response is threefold. One is that this is a national security issue that requires a unified national response rather than 50 separate responses. Secondly, the legislation authorizes grants to States to conform to the minimum standards set forth in the act. Third, I am confident that these minimum standards will not be a heavy lift for a majority of the States in our Nation. It is the handful of States that continue to have lax security standards more than 3 years after 9/11 that may have the most work to do.

It is crucial that we do everything we can to enhance the security of the American people, and this important legislation takes a significant step in frustrating terrorists' attempts to integrate into our society. I urge my colleagues to support H.R. 418 and strengthen identity security.

Mr. Chairman, I reserve the balance of my time.

Ms. NORTON. Mr. Chairman, I will be managing this bill; but before my opening remarks, I yield such time as he may consume to the gentleman from California (Mr. WAXMAN), and we are fortunate that the ranking member of the full committee has come on to the floor.

Mr. WAXMAN. Mr. Chairman, I thank my colleague for yielding time to me.

I rise today to raise serious concerns with some of the provisions in H.R. 418 that have not been thoroughly considered, in large part because the bill was not considered by our committee.

No matter what our views are on immigration, States' rights or a national ID, my colleagues should carefully review the driver's license requirements of H.R. 418. Simply stated, the bill imposes costly new requirements on States that simply cannot be achieved in 3 years allotted by the bill; and while States may attempt to comply, the bill's unreasonable deadlines and inadequate funding will create confusion and frustrate the public.

Congress previously recognized that States should play an integral role in implementing new driver's license standards. That is why the 9/11 legislation that we passed just 2 months ago directed the Department of Homeland Security to consult with the States first and then issue appropriate regulations. H.R. 418 repeals this sound regulatory approach and leaves the States without a voice.

One of the biggest problem areas is that the bill requires State departments of motor vehicles to verify the issuance, validity, and completeness of birth certificates with issuing agencies. Currently, birth certificates are not issued or maintained in a uniform manner. States, counties, cities and localities all across the country issue birth certificates. In fact, experts estimate that up to 14,000 jurisdictions within the United States currently issue birth certificates. Many of these jurisdictions do not have automated records but keep paper copies at the local courthouse. Even if they were to begin automated records of new births, they would still need to automate millions of preexisting birth certificates.

H.R. 418 also requires States to verify the issuance, validity and completeness of various other documents with various Federal agencies that do not yet have fully automated systems in place.

These requirements will be expensive and time-consuming. Ultimately the databases will be built that will allow States to conduct rapid verification of these birth certificates and other documents; but in most States and localities, they do not currently exist, and the experts say it will take a whole lot longer than 3 years to create them.

That is why the bill is opposed by the States. It is opposed by the National Governors Association, the National Conference of State Legislatures and even the DMV trade association, the American Association of Motor Vehicle Administrators.

The best timeline estimate from State DMVs is that will take 10 to 12 years for all of the required automation to occur. Yet H.R. 418 requires verification within just 3 years.

In the meantime, what will happen? States will not be able to issue same-day driver's licenses, the public will be frustrated, and homeland security will not be advanced.

In addition to the unworkable nature of the driver's license provisions in this bill, I want to raise my deep concern about section 102 of this legislation. This section provides the Secretary of Homeland Security the authority to waive any law for the purposes of building immigration barriers along

Case 5:20-cv-00106   Document 11-1   Filed on 09/14/20 in TXSD   Page 59 of 120 CONGRESSIONAL RECORD — HOUSE *February 9, 2005*

the border. I do not understand why we need to provide the administration with unilateral authority to waive labor laws, State and local laws, environmental laws, tax codes and criminal laws.

□ 1500

This does not apply just in San Diego. It applies throughout the Nation.

I am sad to say this bill presents a dangerous new precedent. The Federal Government has never before had unilateral authority to waive child labor laws, civil rights laws, and environmental laws. For Republican Members who want to rein in the unchecked authority of the Federal Government, they might want to carefully examine this provision, which expands it enormously. I urge my colleagues to oppose the legislation.

Mr. TOM DAVIS of Virginia. Mr. Chairman, I yield 2 minutes to the distinguished gentlewoman from Michigan (Mrs. MILLER), a former Secretary of State of the State of Michigan, which issues driver's licenses in Michigan, and someone who has been very helpful in crafting this bill.

Mrs. MILLER of Michigan. Mr. Chairman, I thank the gentleman from Virginia for yielding me this time, and I rise today in very, very strong support of the identification reforms that are in this legislation. These reforms, in my opinion, are extremely necessary to help us better protect our identity documents and to secure our borders.

This legislation will help America to better protect our Nation from those who wish to do us harm. No longer will we allow terrorists free access to state-issued identity documents as a way to use the tools of our freedom against us. No longer will we stand idly by and watch terrorists harm our homeland.

State-issued driver's licenses and State identification cards are the most widely used form of identification in the Nation. It is the backbone, quite frankly, of our identity. It provides legitimacy to any person who holds this form of identification. Driver's licenses are used in everyday instances, such as boarding an airplane or enrolling in a flight school.

Does that sound familiar? Well, it should. Because according to the 9/11 Commission Report, all but one of the 9/11 hijackers acquired some form of U.S. identification documents, some by fraud. All but one of the hijackers used a state-issued driver's license on that horrific day.

Even more frightening is the fact that a regular driver's license is your passport to obtain a commercial driver's license, from which then, of course, you can then try to obtain a hazardous materials license, an endorsement on your commercial driver's license. It is bad enough to think about giving terrorists access to our roadways and our aircraft, but it is unthinkable to give them access to 40,000 gallons of liquid propane, as an example.

This legislation also closes a loophole which has allowed illegal aliens to get access to our driver's licenses. Our message on this issue is clear: if you are not in this country legally, then you will not be given legal sanctions on our roads. If you are in America on a visa, you will be issued a driver's license; but it will expire on the same day as your visa.

Muhammed Atta, as has been said, came to America on a 6-month visa, but he was issued a 6-year Florida driver's license. I struggled with this issue, as the chairman has said. In my former role as the Secretary of State in Michigan, where I served as the chief motor vehicle administrator, I was forced to issue drivers' licenses to illegal aliens. Unfortunately, Michigan is one of the States that continues this practice. It has become a State of choice for illegals to obtain a license. We must stop this practice.

I urge my colleagues to support the bill.

Ms. NORTON. Mr. Chairman, I yield myself such time as I may consume, and I sympathize with the gentlewoman from Michigan that she cannot get her State to do what she believes is the right thing for her State to do. I caution those from the States that the Federal Government is not the place to get the States to take appropriate action. Watch out when you open up that can of worms.

Mr. Chairman, the ink is not just damp; it is wet on perhaps the most important legislation we passed in the last half century, the bipartisan national security or 9/11 law; and H.R. 418, H.R. 368 come along right after to overturn the law.

Why is this bill here? To hear some who have preceded me, you would think the 9/11 Commission just left this out. What were they thinking?

What they were thinking is that this is a Federal Republic, and they tried to deal with the fact that we were dealing with a State function and that the Federal Government was moving in on a State function that we have had nothing to do with before. That is difficult to do.

So what did they say we should do? The 9/11 bill required just the kind of thoughtful rulemaking process that this issue needs to keep us from stepping all over each other and getting into needless controversy so that your bring people to the table and get a workable compromise. Under the process in the bill, the States must be at the table.

Remember, those are the entities that are mandated to carry out these procedures. This is an unfunded mandate, so they must pay for these procedures. So you say, let us bring you in. You are in disagreement, some of you are like Michigan, some are like other States, but let us sit down and figure it out. If you cannot, then we will have to work out a compromise in the Department of Homeland Security.

I thought that is the way we did things in this country, Mr. Chairman. I

thought that the other side of the aisle extols federalism all the time; yes, even in hard times; and, yes, even when you are dealing with hard issues like terrorism.

So what is happening now? The Select Committee on Homeland Security, and I am on the committee, is establishing a committee that includes State officials, representatives of State driver's license agencies, and of course officials from the Department of Homeland Security so that the Federal Government is at the table big foot, big time, not to worry, we are covered, we are final here. So why shut the States out all together? Why not listen to the 9/11 Commission and say let us try to reconcile as much as this before we fly off the handle?

The issue is not about what to do. Let us concede, Mr. Chairman, straight up that something must be done. That is the procedure provided for in the 9/11 bill passed just 2 months ago. We must do something. What to do; how to do it. The bill lays out how to do it. By September 2005, this committee, under the aegis of the Department of Homeland Security, will provide recommendations, a detailed assessment of the costs and the benefits of its proposals.

By June 2006, a proposed regulation based on the committee's recommendations, with such changes as should occur by December 2006, the Federal agencies will accept only new licenses that conform with these minimum standards.

What is wrong with that procedure? What is wrong with that procedure? It is difficult to find fault with that kind of careful procedure in a Federal republic, especially when you consider the supremacy clause and that the Congress of the United States can overturn regulations. So what are you afraid of, since in fact the ball stops when it comes to a matter of national security with the Federal Government?

Why are we trying to shut the States out? Why are those who speak up for the States whenever it suits their fancy putting down the States now? I do not agree with everything that is happening in the States; I just do not believe we should pass a piece of regulation that says you are not in this, except you better pay for it and you better do what it takes to enforce it within 3 years, although experts tell us it will take a dozen years for them to even begin to get through competently what it is we are asking them to do.

What is mandated is a negotiated rulemaking process that incorporates the practical issues that nobody in this Congress knows anything about, the issues that the States pass. It is a reckless bill. It would literally undo the 9/11 legislation and mandate on this issue.

I am asking that we come to an agreement before we vote down our own States on how to proceed, regardless of where you stand. Experts are telling us that it will be a dozen years before the States begin to even come

into mild conformance with this bill, and yet there will be hearings by the Members who are on this very floor criticizing the States and calling them before them to explain why illegals are still getting licenses in their States. How dare they do what we knew they could do in the first place.

So I hope you will keep the States at the negotiating table and join the National Governors Association, the National Conference of State Legislatures in rejecting these bills and retaining the far more thoughtful rulemaking process Congress has just passed as part of the historic 9/11 Intelligence Reform legislation.

Mr. Chairman, I reserve the balance of my time.

Mr. TOM DAVIS of Virginia. Mr. Chairman, may I inquire of the time on each side.

The Acting CHAIRMAN (Mr. SIMPSON). The gentleman from Virginia (Mr. TOM DAVIS) has 13 minutes remaining, and the gentlewoman from the District of Columbia (Ms. NORTON) has 8½ minutes remaining.

Mr. TOM DAVIS of Virginia. Mr. Chairman, I yield myself such time as I may consume.

Before I recognize the next chairman, I wish to respond to the gentlewoman's question of why are we doing this. We are doing this because the 9/11 Commission Report asked that we do it. They made it a priority. We are doing it because our committee, the committee the gentlewoman sits on, the one I chair, authorized this last year and the House overwhelmingly passed this last year.

The 9/11 victims' families have a letter that also requests this. And we are doing it because when I get on an airplane and somebody makes an ID to get on the airplane, I would like to know they are who they say they are. I think every other American would like to have that assurance in safety as well.

And by the way, we do not tell the States what to do. They can issue a license to whoever they want to issue a license to. But if they want to use that State license for Federal purposes, like getting on an airplane, they are going to have to be able to show that the people are who they said they were.

Also, Mr. Chairman, we worked with the American Association of Motor Vehicle Administrators in crafting this legislation, and 3 years is ample time.

Mr. Chairman, I submit for the RECORD, the letter of the victims' families, which I just referred to:

9/11 FAMILIES FOR A
SECURE AMERICA,
*New York, NY, October 19, 2004.*

Hon. TOM DAVIS,
*Chairman, Committee on Government Reform,*
*House of Representatives, Washington, DC.*

DEAR CHAIRMAN DAVIS: 9/11 Families for a Secure America, comprised of the families of hundreds of the victims of the September 11 terrorist attacks, are writing to express the support of our members for the provisions in H.R. 10, the 9/11 Recommendations Implementation Act, to establish minimum document and issuance standards for federal ac-

ceptance of state-issued driver's licenses and birth certificates. As the Conference Committee on the intelligence reform bills begins to consider the identity management security provisions contained in S. 2845 and H.R. 10, we plead with the conferees to remember our murdered loved ones and adopt the language of the House-passed bill.

These provisions would go a long way toward closing the loopholes that allowed 19 terrorists—all of whom had violated our immigration laws in one way or another—to obtain sixty-three authentic state driver's licenses, which allowed them to live here unnoticed while they honed their plot to murder our loved ones. To us, who have suffered horrific grief, loss and rage, it is beyond belief that even one Member of Congress would oppose a law that will stop the next Mohammed Atta from obtaining the "valid ID" that will allow him to board an airplane.

The state-issued driver's license has become the preferred identification document in America. It allows the holder to cash a check, rent a car or truck, board an airplane, purchase a firearm, enter a federal or state building, register to vote, and obtain other federally-issued documents. Despite the vast benefits simple possession of a driver's license now confers on its holder, it is one of the easiest documents to obtain, whether by citizen or illegal alien, friend or enemy.

Recognizing this fact, the 9/11 Commission recommended that, "The federal government should set standards for the issuance of birth certificates and sources of identification, such as drivers licenses." We commend the House for taking the necessary and appropriate action on this important issue.

Supporters of the Senate position have argued that a negotiated rulemaking process is the appropriate action to take in order to establish minimum standards. We could not disagree more strongly, knowing that inevitably the final rules will lack any teeth. The standards included in H.R. 10 come directly from the State Administrators of these programs and from law enforcement, developed since the terrorist attacks on our nation and founded on long-standing principles and best practices.

We believe it is perfectly appropriate for Congress to establish baseline standards and give authority to the Secretary of Homeland Security and the Secretary of Transportation to work with the States and issue regulations on how individual States can come into compliance. This is particularly true because experience in many States has shown that implementation of these standards involve minuscule financial costs. Also, states' rights issues are in no way infringed since H.R. 10 only affects federal non-recognition for federal purposes of licenses from nonconforming states.

Congress has promised us repeatedly that they would honor our loved ones who were murdered three years ago by enacting reforms to ensure that Americans will never again face the same horror. The House provisions on identity management security are vital in this effort, and we urge you to oppose the Senate language, which will protect a status quo that aided the murderers who tore apart our families on September 11, 2001.

In the names of our dead and ourselves we ask you: how much longer will you permit terrorists to obtain drivers' licenses? For what reasons can you possibly oppose such an essential law?

And to those of you who are opposed: are you prepared to accept the responsibility for the next 9/11 terrorists who utilize US-issued drivers licenses?

Sincerely,
Peter Gadiel & Jan Gadiel, Parents of James, age 23, WTC, North Tower 103rd Floor.

Al Regenhard, Det. Sgt. (retired) NYPD, Parents of firefighter Christian Regenhard.

Joan Molinaro, Mother of Firefighter Carl Molinaro, age 32.

Grace Godshalk, Mother of William R. Godshalk, age 35, WTC, South Tower, 89th Floor.

Colette Lafuente, Wife of Juan Lafuente, WTC visitor.

Wil Sekzer, Detective Sergeant (Retired) NYPD, Father of Jason, age 31, WTC, North Tower, 105th floor.

Bruce DeCell (NYPD, Retired), Father in law of Mark Petrocelli, age 29, WTC, North Tower, 105th floor.

Lynn Faulkner, Husband of Wendy Faulkner, South Tower.

Bill Doyle, Father of Joseph, age 24, WTC, North Tower.

April Gallop, Pentagon Survivor.

Diana Stewart, Only wife of Michael Stewart.

Mr. Chairman, I yield 2 minutes to the gentleman from Virginia (Mr. CANTOR), the deputy whip, who has been so active on this issue, and introduced the first legislation in this House that would have tied visa expiration to a driver's license date.

Mr. CANTOR. Mr. Chairman, I congratulate the chairman and the Committee on Government Reform for reporting out this bill that is so important that this Congress take action on and take action on now.

Of course we need to do this. Of course we need to pass the REAL ID Act. Because as the chairman just said, certainly all of us who board planes want to know that there is some integrity to our ID system in this country and that terrorists are not boarding planes by the use of a state-issued identification card. This is not conjecture. This is what happened on 9/11. This is what the 9/11 Commission suggested that we take action on, and this is what we are here doing today.

As the chairman suggested, I am proud to say that in 2003 Virginia, under the leadership of former Attorney General Jerry Kilgore, acted to close this dangerous loophole. The General Assembly passed and the Governor signed into law a provision which requires the minimum standard, which says that anyone applying for a license in Virginia must have legal status in this country; that they must have a visa; and that the license that would be issued would coterminate with the termination or expiration of that visa.

This is just common sense. Why do we want terrorists to have a license issued by a State to go and board our airplanes and commandeer those airplanes into a building? It is time for Congress to act, to provide and mandate a minimum standard for States when they issue State IDs, including driver's licenses, to require that individuals who have that privilege be here in this country legally.

Mr. Chairman, I thank the gentleman from Virginia (Mr. TOM DAVIS) for his leadership on this, and I urge passage of the REAL ID Act.

Ms. NORTON. Mr. Chairman, I yield myself such time as I may consume to make a point of correction. What we

Case 5:20-cv-00106    Document 11-1    Filed on 09/14/20 in TXSD    Page 61 of 120

are doing today is not mandated by the 9/11 Commission, nor is it mandated by the law we passed. It is contrary to the law we passed. It is mandated by the fact that we held up the law we passed and it was promised to two chairmen.

Mr. Chairman, I yield 2½ minutes to the gentleman from Massachusetts (Mr. LYNCH).

Mr. LYNCH. Mr. Chairman, I thank the gentlewoman for yielding me this time, and I rise in opposition to the so-called REAL ID Act of 2005.

Mr. Chairman, while I have enormous respect for the gentleman from Virginia, the chairman of the full committee, I must take exception to the assertions that have been made by a lot of speakers here today that somehow this bill will prevent or would have prevented the 9/11 attacks from occurring. I just want to point out that regardless of the number of licenses that the terrorists held on September 11, they were all obtained because those individuals were in the country legally on student visas. And student visa holders in the future, even after this act is passed, will still have the opportunity to get licenses. So that argument is indeed bogus.

But I want to talk about the most egregious parts of this bill. Under this bill, it would allow the Secretary of the Department of Homeland Security to nullify all of our laws while fulfilling his responsibilities under the scope of this act. And putting aside the schizophrenic immigration policy we have heard from the Republican Party, you have a President that wants to have open borders and basically amnesty to allow open borders for low-wage workers to come in, and then you have a Republican House that is saying that all those coming in must not have licenses. They must be pedestrians.

□ 1515

Mr. Chairman, under this act, what this means for American citizens is, our civil rights laws will be set aside under this bill. Our nondiscrimination laws will be set aside under this bill. Our health and safety laws will be set aside under this bill. Our environmental laws will not apply under this bill. And child labor laws will not apply under this bill. Most troubling of all, the public holding laws of this country will not apply under this bill for this project.

Right now on the committee that I serve with the esteemed chairman, we are investing no-bid contracts that were given to Halliburton. We have millions of dollars in overcharges to the United States taxpayer, we have bribery charges, and we are doing all kinds of investigation on that no-bid.

There is no reason that the civil rights laws and the public bidding laws should be set aside. If that were not the most extreme example, they have removed any opportunity for judicial review under this act. There will be no review of the Secretary's action in setting aside all of those laws, no recourse.

It is ironic, Mr. Chairman, that while we have our soldiers in uniform protecting democracy, we are giving it away under this bill.

Mr. TOM DAVIS of Virginia. Mr. Chairman, I yield myself such time as I may consume.

I note on page 390 of the 9/11 Commission Report, it recommends secure identification should begin in the United States. The Federal Government should set standards for the issuance of birth certificates and sources of identification such as driver's licenses.

Mr. Chairman, I yield 1½ minutes to the gentlewoman from Tennessee (Mrs. BLACKBURN).

Mrs. BLACKBURN. Mr. Chairman, our committee chairman is exactly right; we can go to page 384 in the 9/11 Commission Report. And I encourage all of my constituents to do this, look at this: "For terrorists, travel documents are as important as weapons." And what is the number one travel document? It is a driver's license. It is a huge gaping hole that we have. That is why it is imperative that we pass the REAL ID Act today and we set a national standard.

Maybe that is just too much common sense for some of my friends that do not want us to do that, but if someone is going to use a travel document as a driver's license and use it as a way to circumvent our laws and harm our citizens, then it is imperative that we close that loophole. Having standards that all the States would follow is a great way to close that loophole.

I would encourage my colleagues to support the REAL ID Act.

I thank the gentleman from Virginia (Chairman TOM DAVIS) for his good work on this issue, and I encourage our constituents to read this report and see the importance of the actions that we are taking today.

Ms. NORTON. Mr. Chairman, I yield myself such time as I may consume.

I just want to say to the chairman that I could not agree more that the 9/11 Commission mandated secure identification standards by the Federal Government, and that is exactly what the 9/11 bill provides after rulemaking with the States at the table. What is being proposed is a unilateral process.

Mr. Chairman, I yield 1½ minutes to the gentleman from Arizona (Mr. GRIJALVA).

Mr. GRIJALVA. Mr. Chairman, I rise today in strong opposition to H.R. 418. I am deeply concerned about several aspects of this proposed legislation. This legislation, if passed, would be a terrible setback with regards to three critical areas: defending the people of the United States from terrorism, due process for immigrants, and environmental protection. The bill would undo security provisions that were passed just last year under the Intelligence Reform Act.

Families of September 11th victims stated the impact of this legislation will not make us safer from terrorism.

Instead, it would prevent people from fleeing persecution, from obtaining relief, making our highways more dangerous and undermine our security.

Section 102 of this bill would eliminate Homeland Security and border patrol's responsibility to inform and involve communities in proposed construction projects along the entire U.S. border and the requirement to consider less harmful alternatives to proposed actions.

This would allow Homeland Security to operate in secrecy in critically important areas such as Cabeza Prieta and Buenos Aires National Wildlife Refuge and Organ Pipe National Monument that are all in my district. Many of our most precious wildlife depend upon protected public lands along U.S. borderlands for migration corridors between countries.

In addition, this section would waive laws requiring consultations with Native nations regarding activities on tribal lands, grave sites or archaeological and sacred lands.

Finally, in a rush to deport anyone, H.R. 418 would deny due process for immigrants and asylum seekers. This is un-American. It is against what we stand for, and it is against what we are asking the world to replicate in democracy across this Earth.

Mr. TOM DAVIS of Virginia. Mr. Chairman, I yield 2 minutes to the gentlewoman from North Carolina (Ms. FOXX).

Ms. FOXX. Mr. Chairman, I rise today to voice my strong support for the REAL ID Act, particularly its provisions calling for stronger standards for obtaining driver's licenses. Page 47 of the 9/11 Commission Report, "Without freedom of movement, terrorists cannot plan, conduct surveillance, hold meetings, train for their mission or execute an attack."

Others have argued that the proposal involves an unprecedented preemption of State authority regarding the issuance and production of driver's licenses. This is untrue. Let me be clear: We are not preempting State authority in this area. What we are doing is establishing minimum standards for Federal acceptance of such documents. This is consistent with actions taken by individual States. Today, Nevada and New Mexico do not accept as proof of identity a State-issued driver's license or identification card from States that do not meet their standards.

The federalism issue is one of extreme importance, and that is exactly why the language has been crafted as it has. Driver's licenses have become the primary form of identification in the United States. They permit people to apply for other forms of identification, transfer funds to bank accounts, obtain access to Federal buildings, purchase firearms and board airplanes.

The majority of the States have recognized the privilege that a license brings and have set high standards for obtaining them. However, 10 States, including my State of North Carolina,

issue valid driver's licenses and identification cards without requiring proof of legal status. That is scary.

According to the 9/11 Commission Report, these travel documents are just as important as weapons are to terrorists.

The REAL ID Act would require that Federal agencies accept only driver's licenses and State-issued identification cards from States that prove the legal status of applicants. The bill would also require States to review the legality of existing license holders upon renewal or replacement. The bill does not seek to set State policy for who may or who may not drive a car. It aims to set rigorous standards for what may be used as a form of ID to a Federal official.

As I have stated before, I am a strong advocate of States' rights. However, if certain States act irresponsibly and place the national security of the rest of the country at risk, then Congress must get involved. We must do what it takes to make America safe.

Ms. NORTON. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, my good friend alluded to the support of the American Association of Motor Vehicle Administrators, and I include for the RECORD their letter indicating that they oppose both bills that are before us.

NATIONAL GOVERNORS ASSOCIATION,
AND AMERICAN ASSOCIATION OF
MOTOR VEHICLE ADMINISTRATORS,
*February 8, 2005.*

Hon. J. DENNIS HASTERT,
*Speaker, House of Representatives,
Washington, DC.*
Hon. THOMAS DELAY,
*Majority Leader, House of Representatives,
Washington, DC.*
Hon. NANCY PELOSI,
*Minority Leader, House of Representatives,
Washington, DC.*

DEAR MR. SPEAKER, REPRESENTATIVE DELAY AND REPRESENTATIVE PELOSI: We write to express our opposition to Title II of H.R. 418, the "Improved Security For Driver's Licenses and Personal Identification Cards" provision, and H.R. 368, the "Driver's License Security and Modernization Act". While Governors and motor vehicle administrators share your concern for increasing the security and integrity of the driver's license and State identification processes, we firmly believe that the driver's license and ID card provisions of the Intelligence Reform and Terrorism Prevention Act of 2004 offer the best course for meeting those goals.

The "Driver's Licenses and Personal Identification Cards" provision in the Intelligence Reform Act of 2004 provides a workable framework for developing meaningful standards to increase reliability and security of driver's licenses and ID cards. This framework calls for input from State elected officials and motor vehicle administrators in the regulatory process, protects State eligibility criteria, and retains the flexibility necessary to incorporate best practices from around the States. We have begun to work with the U.S. Department of Transportation to develop the minimum standards, which must be completed in 18 months pursuant to the Intelligence Reform Act.

We commend Chairman Sensenbrenner and Chairman Davis for their commitment to driver's license integrity; however, both H.R. 418 and H.R. 368 would impose technological standards and verification procedures on States, many of which are beyond the current capacity of even the Federal government. Moreover, the cost of implementing such standards and verification procedures for the 220 million driver's licenses issued by States represents a massive unfunded Federal mandate.

Our States have made great strides since the September 11, 2001 terrorists attacks to enhance the security processes and requirements for receiving a valid driver's license and ID card. The framework in the Intelligence Reform Act of 2004 will allow us to work cooperatively with the Federal government to develop and implement achievable standards to prevent document fraud and other illegal activity related to the issuance of driver's licenses and ID cards.

We urge you to allow the provisions in the Intelligence Reform Act of 2004 to work. Governors and motor vehicle administrators are committed to this process because it will allow us to develop mutually agreed-upon standards that can truly help create a more secure America.

Sincerely,

RAYMOND C. SCHEPPACH,
*Executive Director, National Governors Association.*
LINDA R. LEWIS,
*President and CEO, American Association of Motor Vehicle Administrators.*

Ms. NORTON. Mr. Chairman, I yield 1 minute to the gentleman from Virginia (Mr. MORAN).

Mr. MORAN of Virginia. Mr. Chairman, the problem with this bill is that it is an immigration bill posing as an identification bill. Instead of listening to what the States told us needed to be done to make driver's licenses more secure, what we have done is to basically make State motor vehicle employees unwitting immigration agents. It does little to improve homeland security, and it is certain to prove overwhelming and ineffective.

Now, I support what the gentleman from Virginia (Chairman TOM DAVIS) is trying to do to improve the integrity of driver's licenses, but I find it curious that the leadership of the House has chosen to largely ignore the multiple references in the 9/11 Commission Report to the value of on-card biometric technology in improving the integrity of identification cards. The problem is that these digital images are not sufficient. Matching the image with the face is more prone to error than the technology that would use biometric data. Two fingerprints transformed into numeric algorithm, that works.

What we have here does not work. I think we are going to find the States letting us know that. Unfortunately, it will be too late. We will miss an opportunity.

Mr. TOM DAVIS of Virginia. Mr. Chairman, I look forward to working with the gentleman from Virginia (Mr. MORAN) on this issue as we move forward.

Mr. Chairman, I yield 3 minutes to the gentleman from Connecticut (Mr. SHAYS), the chairman of the Subcommittee on National Security.

Mr. SHAYS. Mr. Chairman, welcome to the world of Mohammed Atta: Legal visa to come in, 6 months; driver's license from Florida, 6 years.

Like many in this Chamber, I was a strong supporter of the intelligence reform legislation passed last year, but when I voted for it, I believed we needed to go further in several areas, including strengthening driver's license guidelines.

In my home State of Connecticut, we take strong steps to ensure the integrity of our identification cards, but we are not perfect. To receive a driver's license in Connecticut, you must prove you are a legal resident of the State, and you are not a legal resident of the State if you are not legally present in the United States, period.

This is common sense to me. Driver's licenses are verifiable forms of identification in the United States. Providing such identification cards to people who are illegally present in our country presents serious concerns.

The problem, however, is that not all States maintain this high standard. That means that someone who is illegally present in the United States and takes advantage of a weak law in another State can obtain a driver's license and use the document to identify him or herself in the State of Connecticut. They can also use that document to access Federal buildings, rent a vehicle or get on a plane.

Tightening access to State-issued identification cards is an important and necessary improvement for our homeland security. Many Members have raised concerns about the impact of driver's license provisions in H.R. 418 in our home States. Connecticut Governor Jodi Rell stated, "In my view, if a noncitizen is lawfully in this country, he or she should be able to obtain a driver's license for the time frame in which he is lawfully allowed to be here. Conversely, if someone is in this country illegally, he or she should not be able to obtain a driver's license in Connecticut or any other State."

I could not agree more with her. Frankly, most of our constituents could not agree more with her.

Let me raise one other point about this legislation and commend the chairman for including this provision. A legally present visitor to the United States can obtain a driver's license in Connecticut, as he can in other States. However, in Connecticut we issue licenses for 6 years at a time. In that time, visitors can leave and come back, whether legally or illegally, an untold number of times. During subsequent visits, this person can continue to use the license for whatever purpose he or she wants. This is wrong. Frankly, it is stupid.

Requiring a temporary ID for persons temporarily in our country is a no-brainer. I do not think Mohammed Atta would like it, but, I do not care what he wants.

□ 1530

Ms. NORTON. Mr. Chairman, I yield myself such time as I may consume. I

do want everybody to know what we are voting on here. We oppose this bill. We favor the 9/11 intelligence bill passed 2 months ago. That requires that driver's licenses be issued under Federal standards; that is Federal law. After the States have had an opportunity to have some input, the final would be a Federal bill. The only difference between us and those on the other side is they want to keep the States out of the process all together.

Mr. Chairman, I yield 1 minute to the gentleman from Texas (Mr. GONZALEZ).

Mr. GONZALEZ. Mr. Chairman, I rise in opposition to H.R. 418. The first thing is America will not sleep any more securely with the passage of this piece of legislation, as well intended as it may be, because I am not going to question the motives of my colleagues on the other side of the aisle. But why do a useless thing? Why would the State legislatures, why would the State Governors, why would every Latino advocacy group come against this? Why would the National Council of Bishops here in the States come out against this? It is for various reasons. But they all acknowledge that there is not a conspiracy going on here to thwart the efforts at security by these groups. No one would accuse these individuals of that, because this does not do anything. It only burdens the State and does not get us anywhere.

But more importantly, and I really believe this, this is an anti-immigrant bill in the guise of some sort of security consideration, which it does not further.

And so we ask, who are these immigrants? I have a simple answer for all of us. Look in the mirror. That is who we are talking about. We all got here one way or another, some earlier than others. We are all immigrants. What this bill is really about is not bad people coming into this country to do bad things to this country. It is about preventing good people coming into this country to do good things.

Mr. TOM DAVIS of Virginia. Mr. Chairman, I am happy to yield 2 minutes to the gentleman from Ohio (Mr. TURNER), the former mayor of Dayton and chairman of our Subcommittee on Technology, Information Policy, Intergovernmental Relations and the Census.

Mr. TURNER. Mr. Chairman, I thank the gentleman for his leadership on this most important issue affecting our country. I am a cosponsor of the REAL ID Act that calls for necessary reforms in our driver's license processes to make it harder for terrorists to obtain driver's license to use them for acts of violence in our country.

Driver's licenses can be used by terrorists to enter buildings, obtain other forms of identification, and board flights. The loopholes that currently exist in issuing driver's licenses have to be closed to stop those who would use driver's licenses as a tool in committing terrorist acts on our own soil.

In fact, as we have heard, we know that many of the hijackers who at-

tacked our Nation on September 11 possessed valid driver's licenses and many other state-issued identity cards.

The REAL ID Act would require applicants to prove that they are in this country legally. The debate here somewhat surprises me because I bet if you asked the American people if in order to get a driver's license, if you have to prove that you are in this country legally, overwhelmingly I believe the people in this country would believe that not only is it the right thing to do but they would be surprised to find out that it is not already a requirement.

The 9/11 commission stated that all but one of the 9/11 hijackers acquired some form of U.S. identification, and that for terrorists travel documents are as important as weapons. And their recommendation stated secure identification should begin in the United States. The Federal Government should set standards for the issuance of birth certificates and sources of identification such as driver's licenses.

Last year as we heard the steady beat to implement the 9/11 Commission recommendations, certainly, their recommendation that the Federal Government have standards for driver's licenses is something that we ought to enact, and I support this bill.

Ms. NORTON. Mr. Chairman, how much time do I have remaining?

The Acting CHAIRMAN (Mr. SIMPSON). The gentlewoman has 2 minutes remaining.

Ms. NORTON. Mr. Chairman, I yield the last 2 minutes to the gentleman from Oregon (Mr. BLUMENAUER).

Mr. BLUMENAUER. Mr. Chairman, I appreciate the gentlewoman's courtesy in permitting me to speak on this, and I agree with her very strongly. Make no mistake, our side of the aisle is supportive of this legislation. We want to work with the State and local authorities first to do it right. These are the people who feel these concerns every bit as strongly as Members of Congress. In fact, they are on the line every day providing for the safety and security of our constituents in a much more immediate sense than we are. Do not be afraid to work with them.

But with all due respect to the gentlewoman from the District of Columbia, I have one other provision that deeply offends me as a former elected official, as a Member of this body and somebody who believes in checks and balances.

I look at section 102. I wish that it were buried in the legislation, but it is not. It is right here in the beginning. If this provision, the waiver of all laws necessary for quote improvements of barriers at the border was to become law, the Secretary of Homeland Security could give a contract to his political cronies that had no safety standards, using 12-year-old illegal immigrants to do the labor, run it through the site of a Native American burial ground, kill bald eagles in the process, and pollute the drinking water of neighboring communities. And under

the provisions of this act, no member of Congress, no citizen could do anything about it because you waive all judicial review.

Now, bear in mind you are giving this authority to the head of Homeland Security, hardly a paragon of sensitivity and efficiency. Anybody who stands in those lines week after week or watches the bizarre color-coded warning system knows that that is hardly the exemplar.

Security at the borders is important; and if somebody has a problem with building a security fence, by all means, Congress should deal with it. But as far as I know, no committee has been called upon to do that yet. There are important waiver provisions that are available. But waiving all laws for construction is an inappropriate decision. And with all due respect, it is a dangerous precedent that anybody on either side of the aisle should be deeply offended by.

The Acting CHAIRMAN. The gentleman from Virginia (Mr. TOM DAVIS) has 1½ minutes remaining.

Mr. TOM DAVIS of Virginia. Mr. Chairman, I yield 1 minute to the gentleman from San Diego, California (Mr. CUNNINGHAM).

Mr. CUNNINGHAM. Mr. Chairman, I reject the statement made a minute ago that this is an anti-immigration bill. I support the Sensenbrenner bill. I think security is a national issue. But to suggest that this is an anti-immigrant bill is, in my opinion, wrong. We support legal immigration into this country. It is what has made this country so great. But we also need to take care of security.

If you want to come in on a visa, you want to come in to be a citizen, support it. But if you are here illegally, it is wrong.

Each year we have one family, just last year, the father survived. The wife died. He lost a child to illegal immigrants. I wish that was the only case. Each year we have several of these. Illegal immigrants driving and causing accidents, and people say, well, they are here; they have got to go to work. Well, they will go to work if we can get them to be legal. But not if they are here illegally. If they are in this country illegally, they need to go out and come back legally with a visa or proper method.

And that is why I support the Sensenbrenner bill, to make sure we do not have metricula cards, we do not have driver's licenses to illegals, and that the driver's license has a clip to ensure that it is proper by the Federal Government.

Mr. TOM DAVIS of Virginia. Mr. Chairman, I yield myself such time as I may consume.

Let me just sum up and say this does not require anything from the States as far as driver's licenses go. States do not have to do anything under this for their driver's licenses. They can issue driver's licenses to whomever they want. But if they intend to use those

licenses for Federal purposes, we have a right to say what the criteria should be and under those circumstances, they are going to have to show legal presence. It is not anti-immigrant. In fact, this allows the States to issue two different sets: one for illegal immigrants, one for everyone else. It takes the national security issue away from the argument there.

Finally, the opt-out provisions in the current legislation that was passed just a few months ago are disastrous. We were worse with the 9/11 response that passed this Congress than we were without it. This rectifies that. It closes that loophole.

Out of respect for the victims, the families, the work of the 9/11 Commission, I urge my colleagues to support this legislation.

Mr. Chairman, I yield back the balance of my time.

The Acting CHAIRMAN. The gentleman from California (Mr. COX) and the gentleman from Mississippi (Mr. THOMPSON) each will control 10 minutes of debate from the Committee on Homeland Security.

The Chair recognizes the gentleman from California (Mr. COX).

Mr. COX. Mr. Chairman, I yield myself such time as I may consume.

I am happy to join this debate as the chairman of the Committee on Homeland Security and welcome the gentleman from Mississippi (Mr. THOMPSON), my ranking member.

We are here because each day thousands of people illegally enter the United States. They know where to cross. They know how to get a driver's license. And if they are caught, they even know how to rig our legal system to stay in the country nonetheless. What has been the result of this broken system?

On January 25, 1993, Mir Aimal Kansi stood at the entrance of the Central Intelligence Agency and gunned down five people. A month later Ramzi Yousef masterminded the first bombing of the World Trade Center. Both men were in the country because they were awaiting the outcome of their asylum applications. This legislation will fix that loophole.

On September 11, 2001, according to the 9/11 Commission report, the 19 hijackers responsible for the 9/11 terrorist attacks carried between them 13 U.S. driver's licenses and 21 state-issued ID cards. Several of these hijackers had overstayed their visas, and they were unlawfully in this country. But their driver's licenses permitted them to board those airplanes nonetheless. This bill fixes that problem.

The laws that we are operating under today allow terrorists to enter our country and to plan and carry out attacks in the United States. The reality is that this homeland security vulnerability is being exploited by terrorists and criminal aliens every day. H.R. 418 makes necessary changes to ensure that terrorists do not obtain identification, as did the 9/11 hijackers, that will

permit them to board airplanes or access Federal facilities or easily travel within the United States.

The most literal security gap that this bill addresses is the 3-mile hole in the San Diego border fence. Recent press accounts have reported that al Qaeda operatives have joined forces with human smuggling rings in order to enter the United States. As we now know, the 9/11 hijackers were interviewed 25 times by U.S. consular officers; they had 43 contacts with Immigration and Customs authorities. But because of administration and congressional initiatives requiring the screening of all foreign nationals entering the United States, terrorists will be forced to resort to crossing our borders illegally. The border security fence, therefore, which thus far has been mired in bureaucratic delays, is part of our national security efforts and must be completed now.

For decades the border between San Diego and Mexico has been the preferred corridor for entry into the United States by unknown or undocumented persons. With highly populated cities both north and south of the border as well as relatively quick access to national transportation hubs such as LAX, it is the perfect place for aliens to slip across the border and gain quick access to U.S. communities and transportation networks. The important infrastructure assets in the area, including in particular the largest naval base on the west coast of the United States and the busiest seaport in the United States, makes securing this area even more important.

From September through November, 2004, the border patrol apprehended over 23,000 individuals with criminal records including 84 wanted for murder and 151 wanted for sexual assault. In 2004 border patrol agents arrested almost 1.2 million illegal aliens with 11.6 percent of those apprehended in the San Diego sector alone, despite the fact that the San Diego sector is roughly 1 percent of our border area. Over the past 2 years, the three border patrol stations responsible for patrol of the existing 14 miles of border fence in the San Diego sector have apprehended approximately 200 special interest aliens annually from countries such as Afghanistan, Iran, Iraq, Pakistan, and Turkey.

Completion of this fence will not only reduce the number of illegal crossings in the area but will also allow the Border Patrol to redeploy manpower and redirect precious resources to other important homeland security missions along the border. And like the other border fence areas, the San Diego sector can expect to see a reduction in crime, including murder, as well.

Of the 14 miles authorized by Congress several times, 9 miles of the triple fence have been completed. But only in Washington would people construct a fence with a big hole in it. The final 3½ miles has been held up due to

bureaucratic red tape and lawsuits. The border patrol has worked to alleviate the environmental concerns that have been raised. In fact, the U.S. Department of the Interior's Fish and Wildlife Service concluded in July, 2003, that construction of the fence "is not likely to jeopardize" the continued existence of any relevant endangered species in the area. Furthermore, not completing the fence will continue to cause other environmental damage in the area due to large numbers of persons crossing illegally through this area and subsequent pursuit by the border patrol, as well as large amounts of trash and refuse left in the wake of smugglers and illegal crossers.

As chairman of the Committee on Homeland Security and a California resident, I am extremely concerned by the roadblocks that different bureaucratic groups have used to justify thwarting this important project. For example, in September of 2003, the San Diego Border Patrol requested entry to a section of county-owned land located in the 3½ mile section in dispute and located about 300 feet from the U.S.-Mexican border in order to, first, improve the road for safety of the border patrol agents; and, two, take soil samples in order to address environmental concerns pertaining to construction of the fence.

□ 1545

But the San Diego County Department of Parks and Recreation denied access, saying there was no authority to enter upon the land.

After months of negotiation, I have been told that the issue was finally resolved, but this clearly demonstrates that Federal action is necessary to ensure that the fence is completed and that border security remains a priority. The time for delay and bureaucratic obstruction is over. We must complete this fence, and we must pass H.R. 418.

Mr. Chairman, I reserve the balance of my time.

Mr. THOMPSON of Mississippi. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, the Republican majority claims that this bill is an effort to prevent terrorists from entering the United States, not an effort to play partisan politics over immigration reform. I would like to take them at their word, but if this bill really were about keeping terrorists out of the country, why is the Republican majority not talking about the real threats of terrorists' entry? Why is the Republican majority not concerned about the complete lack of an interagency border security plan? And why does the President's budget not fully fund the mandates in the 9/11 intelligence bill, which we passed and he signed a few short months ago? Why sign a bill if you have no intention of actually funding the items in the bill?

Mr. Chairman, just one example: The President's budget only provides for 210

Case 5:20-cv-00106   Document 11-1   Filed on 09/14/20 in TXSD   Page 65 of 120

new border patrol agents, even though the 9/11 intelligence bill authorized up to 2,000. We have caught at least one suspected terrorist who illegally waded across the Rio Grande. Why is the Republican majority not talking about the failure of this administration to ensure that our frontline officers are able to check suspicious individuals against a comprehensive terrorist watch list?

More than 3 years after 9/11, why are more of our frontline personnel using obsolete name-checking systems, that have trouble telling the difference between ''bin Laden'' and ''Lyndon?'' Is this real security? Does this make America safer?

This bill wholly fails to address these and other critical gaps in our border security. The bill focuses on people already in the United States instead of keeping terrorists out.

The one aspect of this bill that seems directed at keeping people out of the United States is section 102. I understand this section originated from a desire to complete approximately 3 miles of a 14-mile fence along the border near San Diego. Let me be clear: I am not against building a fence, but I do not think a fence will keep terrorists out of America.

Homeland security expert Stephen Flynn, who is a retired commander of the U.S. Coast Guard, and Jeane Kirkpatrick, Senior Fellow in National Security Studies at the Council on Foreign Relations, testified before the Senate Foreign Relations Committee that ''Great powers have been building great walls throughout history. The Great Wall of China and the Berlin Wall went up at considerable expense and treasure and ultimately failed to block or contain the forces they purported to obstruct.''

Mr. Flynn says that efforts by the United States to ''protect'' the southwest border, including installing a fence between San Diego and Tijuana, are similarly fated to fail.

Mr. Chairman, it is clear that this is not a good bill, and we are completely in opposition to it.

Mr. Chairman, I reserve the balance of my time.

Mr. COX. Mr. Chairman, I yield 1 minute to the gentleman from Arizona (Mr. KOLBE).

Mr. KOLBE. Mr. Chairman, I thank the gentleman for yielding me time.

Mr. Chairman, I rise in support of the passage of H.R. 418. Many of these protections that are contained in this legislation are long overdue. They are necessary to protect our homeland.

In particular, I am supportive of the provisions that deal with enhancing our driver's licenses by providing for some uniformity in the standards used to issue those driver's licenses and for finishing the border fence in southern California. We ought not to let some vague problem of the environment keep us from finishing this important part of our border security. But that is one step in the process of border security.

I am serious about the problem of border security. I represent a district that has more apprehensions of illegal immigrants than any other district on the southern border, in fact, more apprehensions than all the other districts combined.

As someone working hard for a long time to help secure our border, I can confidently say the most effective and efficient way to deal with this is to have comprehensive immigration reform. The President of the United States has recognized this. We need to create an avenue for those not crossing for malicious reasons to be funneled through the ports-of-entry along the border. That will allow us to deal with the real problem.

Mr. Chairman, I urge us to support H.R. 418, and then turn our attention to comprehensive immigration reform legislation.

Mr. THOMPSON of Mississippi. Mr. Chairman, I yield 1½ minutes to the gentlewoman from California (Ms. Lofgren).

Ms. ZOE LOFGREN of California. Mr. Chairman, yesterday, the U.S. Commission on International Religious Freedom, a federally mandated bipartisan commission, released a comprehensive report documenting the mistreatment of asylees in America. For those seeking asylum, we strip-search them and then we thrown them in jail with criminals.

As we debate this bill, thousands of people seeking safety from persecution are in jail with criminals in the United States. They are here fleeing from torture, from rape; some are here seeking freedom because they have been denied the opportunity to practice their religion, say Christianity, in a place where religion is not permitted. But when they get here, we lock them up. And today we are considering a bill that will make it harder for those fleeing oppression, trying to find safe haven in our Nation.

This bill does nothing to make us safer. In fact, we have heard references to those who came prior to the first World Trade Center bombing. We made changes in the law subsequent to that. That fix has already been done. We do not need to do what is before us today.

So it is surprising we are not addressing today the shocking findings of the Commission Report.

Mr. Chairman, I want to say something else. This bill, despite the protestations, is in fact creating a de facto national ID card. It establishes one type of ID that most Americans will carry. All our information will be held in databases linked together and readymade for use by the Federal Government. How much will they really know about each and every one of you?

This is not just about immigrants, this is about all Americans; and I think we need a national conversation about whether we want that form of big brother.

Mr. COX. Mr. Chairman, I ask unanimous consent that debate be extended for 1 additional minute, to be divided equally between majority and minority.

The Acting CHAIRMAN (Mr. LaHOOD). Is there objection to the request of the gentleman from California?

There was no objection.

Mr. COX. Mr. Chairman, I yield 1 minute to the gentleman from Texas (Mr. McCAUL).

Mr. McCAUL. Mr. Chairman, I rise in support today of the REAL ID Act. As the former Chief of Counterterrorism in the U.S. Department of Justice for the Western District of Texas, I had jurisdiction over the Mexican-Texas border. I dealt, firsthand really, with the day-to-day threats our Nation faces, and asked the question, Why are we not doing more to secure our borders?

Many of those intent on doing our Nation harm claim political asylum as their Trojan horse to gain access to our borders. Individuals like the 1993 World Trade Center bomber, Ramzi Yousef, claimed political asylum and was ordered to appear at a hearing. Yet Yousef, like a majority of those given notices, failed to show up at the hearings. This bill will make it easier to deport suspected terrorists.

Terrorists have taken advantage of other holes in our laws. The 19 hijackers on September 11th had fraudulently obtained dozens of American visas, passports and driver's licenses, documents used to open bank accounts, establish residency and, yes, to fly airplanes.

This border security legislation provides the safety measure that to obtain a driver's license, the person must simply prove they have a legal right to remain in our Nation.

For the safety and security of our Nation, our families and our freedom, I urge my colleagues to support this bill. The 9/11 Commission recommended it. We owe it to the victims of the national tragedy to pass this legislation.

Mr. THOMPSON of Mississippi. Mr. Chairman, I yield 3 minutes to the gentleman from New Jersey (Mr. MENENDEZ), the chairman of the Democratic Caucus.

Mr. MENENDEZ. Mr. Chairman, as one of the conferees on the intelligence reform law enacted last December, I want to remind Members that it contained 43 sections and 100 pages of immigration-related provisions. These tough, but smart new measures enacted just 2 months ago include, among others, adding thousands of additional border patrol agents, Immigration and Customs investigators and detention beds, criminalizing the smuggling of immigrants and establishing tough minimum standards for driver's licenses, just as the 9/11 Commission recommended.

Now we need to implement and fully fund these tough measures to ensure our Nation's safety. Unfortunately, the President's budget chose not to fund the 2,000 new border patrol agents or 8,000 additional detention beds that

Case 5:20-cv-00106 Document 11-1 Filed on 09/14/20 in TXSD Page 66 of 120

were called for in the intelligence reform bill. So much for being tough.

H.R. 418 would further undermine these tough measures by repealing several of these provisions. The bill would repeal a GAO study to ascertain any vulnerability in the current asylum system and replace it with new burdens that would be impossible for many true asylum seekers to meet.

Proponents of this legislation have misled us by suggesting that different terrorists have received asylum. No terrorist has ever been granted asylum in the United States.

We further ensured that terrorists would not be granted asylum with the administrative changes of 1995 and the expedited removal system done legislatively in 1996. Now we detain anyone seeking asylum that arrives at our border without documents.

But asylum encourages citizens of other countries to fight for positive change in their own country, without risking U.S. military lives. If their life is endangered, they should have a chance to seek asylum in the United States. Unfortunately, the legislation before us would make that nearly impossible.

Finally, if a person is a terrorist, I do not want to deport them so they have another chance at doing harm to the United States. I want to detain them, prosecute them, imprison them to the fullest extent of the law.

The bill would repeal the tough minimum standards for driver's licenses called for by the 9/11 Commission and included in the intelligence reform law with provisions that federalize all driver's licenses, take away States' rights, place huge unfunded mandates on the States, without advancing the paramount objective of making State-issued identity documents more secure and verifiable. That is why the National Conference of State Legislatures strongly opposes this legislation.

Mr. Chairman, if you truly want to implement tough yet smart measures to ensure our Nation's security, vote down this legislation, and let us fully fund and implement the tough and smart provisions that were included in the intelligence reform bill.

Mr. COX. Mr. Chairman, I reserve the balance of my time.

Mr. THOMPSON of Mississippi. Mr. Chairman, I yield 2 minutes to the gentleman from Texas (Mr. REYES), someone who has significant knowledge about border patrol agents.

Mr. REYES. Mr. Chairman, I thank the gentleman from Mississippi for yielding me time.

Mr. Chairman, as the only Member of Congress with a background in immigration and experience in actually defending our Nation's borders, and after being here for 8 years in the House, I am profoundly disappointed at how much we talk about this issue and how little we do when it comes to immigration.

Prior to coming to Congress, I served for 26½ years in the United States Border Patrol, so I know firsthand about the effort to protect our borders and how to keep America secure. Since coming to Congress, I have heard a lot about how we need to crack down on illegal immigration in this country, but have seen very little action when it comes to providing adequate funding for the kinds of programs that I know work in dealing with the problem of illegal immigration.

For instance, just this week, with the release of the President's budget, as my colleague mentioned, last August we were tough on the issue of immigration by saying we wanted 10,000 new border patrol agents and we wanted to create 40,000 new detention beds. The administration in their budget wants to hire 210 border patrol agents. They are silent on the issue of detention.

The administration also has proposed zeroing out very important programs to communities that deal with undocumented aliens, programs like the State Criminal Alien Assistance program, the State Prosecutors program, all zeroed out in this budget.

Mr. Chairman, the reason I am going to oppose this legislation is because I am sick and tired of coming here and talking, talking about the issue. I am sick and tired of hearing arguments on who is going to do what. Just last Monday, I was with some of my former colleagues at a port of entry in El Paso, and they were asking me what kind of immigration reform would come out of this effort. Regrettably, Mr. Chairman, I told them, look, we said we were going to fund 10,000 agents; we got 210. That is why I am going to vote against this legislation, and I urge my colleagues to do the same. Let us have a real and earnest debate on what needs to be done to protect this country.

Mr. COX. Mr. Chairman, I reserve the balance of my time.

Mr. THOMPSON of California. Mr. Chairman, I yield the balance of the time to the gentleman from California (Mr. FARR).

Mr. FARR. Mr. Chairman, I thank the gentleman for yielding me this time.

I have been watching this debate all morning, and I am really concerned about what is happening here on the floor of the House of Representatives. I have never heard so much misstatement of fact about a piece of legislation that is very important.

The problem is, this legislation never had a hearing in committee, never had public review. We have never looked at the language; I doubt that any Members have read the bill in its entirety. That is not what this House is all about, because this law is a very, very serious law, and it is going to affect people's lives.

I have heard statements here on the floor that the recommendations in this bill are in the 9/11 Commission. Let me give an example. Section 102, which deals with the border fence, the com-

mission never even mentioned the border fence. Why? Because it is not a problem. We have been building it. What we have run into is a couple of environmental snags. So what does this bill do? It says okay, waive all that. Waive the law. This is a precedent that has never been done before in the United States Congress. Waive all laws, whether those laws pertain to Indian burial grounds, whether they are labor laws, discrimination laws, small business laws, environmental laws. We will just waive them. And guess what, no court, as it says, "no court shall have jurisdiction."

What kind of a measure is this? Do we just run into problems and we come to the floor of Congress and say, just get rid of the law? Here is a country that celebrated the tearing down of the Berlin Wall, a country that celebrated the elections in Iraq so people will have the rule of law; and then when we have the rule of law, we just waive it. There was no request from the State of California for this bill. Mexico, our biggest trade partner, nothing like this; and what we are saying to the world is, do not worry, we are just going to cram through everything and forget the law.

This is wrong, and I am going to have an amendment on the floor tomorrow to repeal it. I hope everyone votes for it.

Mr. COX. Mr. Chairman, I yield 1 minute to the gentleman from California (Mr. CUNNINGHAM).

Mr. CUNNINGHAM. Mr. Chairman, I would say to my friend, the gentleman from California (Mr. FARR), during the last debate I invited him to come down and look at the 7-mile area in that fence, because it is a problem. I am looking forward to working with him, because if you are an environmentalist, it is hard pan. I mean, it has totally destroyed the plants, the animals, the lizards, and it is like a venturi tube.

The gentleman from California (Mr. HUNTER) first came to me in 1990 and asked where we could get landing mat, and we put that up. Why? Because the number of rapes of Mexicans who were coming across, the number of drugs that were coming across. There is one strand of wire on the ground where you could just drive from one field to another with a loaded truck, and it has stopped a lot of that.

Does the fence stop illegal immigration? No. But it sure frees up a lot of the border patrol and makes it easier for them, and that 7 miles is like a venturi tube and it forces our border patrol into that area.

I agree with the gentleman from Texas (Mr. REYES), and I am going to work with anybody over there, especially him, because he does have the expertise and he is a good friend. I agree with him that the President's budget does not include the funding. But no Clinton budget ever passed either, and we are going to add that; and with the help of my friend, we are going to add the funding for those new border patrol.

☐ 1600

Mr. COX. Mr. Chairman, I yield the balance of our time to the distinguished majority leader, the gentleman from Texas (Mr. DELAY).

Mr. DELAY. Mr. Chairman, I would just say to my good friend from Texas (Mr. REYES), who is an expert, and we all value his input, we are going to do immigration reform in this Congress. We are looking forward to working with him on immigration reform. But what we are here today about is border security, border security and closing loopholes.

I just want to thank both sides of the aisle for the thoughtful way that they have conducted this debate. I want to thank the gentleman from Wisconsin (Chairman SENSENBRENNER) and the gentleman from Virginia (Chairman TOM DAVIS) and the gentleman from California (Chairman COX) for their hard work in getting this bill to the floor so early in the new session.

Of all of the issues being debated before us today, the controversy I find most confusing is the section regarding the standardization of driver's licenses. After all, Mr. Chairman, the war on terror is not being fought in a vacuum.

There was a time, to be sure, when identification fraud was a matter of concern principally to bouncers and bartenders, but that was before September 11, 2001. Since that day, Mr. Chairman, ID fraud has represented a clear and present danger to the national security of the United States, plain and simple. Without standards for the issuance or content of driver's licenses, the American people are needlessly put at risk. As long as America boasts the civilized world's most open laws concerning immigration and mobility while remaining its greatest terrorist target, we must ensure that people coming in and out of our country are not here to do our people harm.

When someone enters this country and can get a driver's license, he can board a plane, open a bank account, and get a job. If he plans to do these things not to make a better life for himself, but with the express intent of killing Americans, and that treachery could be curbed simply by reforming the way we issue driver's licenses, how can we not?

The REAL ID Act requires that applicants for driver's licenses prove that they are in the United States legally, very simple, and that a foreign traveler's license expires with his visa.

These are hardly Draconian measures, Mr. Chairman, nor are the sections of the bill that strengthen our deportation and asylum processes. These processes are not just loopholes; they are gaping, yawning chasms in the law waiting to be exploited. They are risks, threats even, to the security of our homeland and to our success in the war on terror. The reforms in the REAL ID Act are overdue, no less an authority than the 9/11 Commission itself says so.

So I just urge all of my colleagues to support this legislation to further help ensure that such events as three Septembers ago never again scar our homeland.

ANNOUNCEMENT BY THE ACTING CHAIRMAN

The Acting CHAIRMAN (Mr. LAHOOD). When proceeding in the Committee of the Whole under an order of the House that establishes time limits on general debate, the Committee of the Whole may not alter that order, even by unanimous consent. The Chair should not have entertained the earlier request of the gentleman from California.

Mr. CANNON. Mr. Chairman, I would like to submit a statement for the RECORD from the Americans for Tax Reform.

FEBRUARY 9, 2005.

Our nation's immigration and border control policies cry out for reform. While our best border control officers should be preventing the next terrorist incursion into our country, they are instead hunting down willing workers. The attacks of September 11th called for new and updated thinking in all areas of federal law enforcement, and immigration reform has been a glaring omission.

America's immigration system must be reformed in a responsible, welcoming, adult manner along the lines laid out by President Bush. Willing workers should be matched with willing employers, citizenship and residency applications must be streamlined, and the focus must shift to protecting the nation from terrorists.

Border security has been increased since 9/11, and should continue to be so. The latest technology must be used to make sure America's border is free of terrorist incursions. In order to let the border guard do their job of defending America, the President supports giving foreign laborers guest worker cards, "to match willing workers with willing employers."

President Bush is opposed to amnesty for illegal immigrants. He also does not want to give foreigners in the guest worker program any advantage over those who are trying to become citizens through normal, due process channels.

Congress should support President Bush's common-sense plan to reform and strengthen America's broken immigration system even as border security is addressed today in the House of Representatives.

GROVER NORQUIST,
*President.*

Ms. WOOLSEY. Mr. Chairman, when we shut our doors to the world we shut the door of democracy. President Bush wants the United States to be a leader in promoting freedom around the world, but we fail at home when we deny freedoms to those who desire the American dream. H.R. 418 fails to reform our system. Instead, it weakens our democracy.

If you vote for this bill you are saying we don't care if you have been persecuted because of your religion or beaten because of your gender. Stay in your own country. You are not entitled to our freedoms.

If you vote for this legislation you are saying that the United States doesn't care about federal or state laws as long as it means being able to close our border. Who cares if building a wall on our border endangers our environment? Out of 2,000 plus miles along our border with Mexico, you are saying that finishing 3 miles of that fenced area in Southern California is so important that we should throw out the principles of our democracy and let one man have the power to waive any laws that he wants without any oversight. Are you sure that this is a democratic country?

Mr. Chairman, shutting out people around the world from our democracy and throwing away the ideals of freedom that we hold so dear is no to way to be an example for the world. We need immigration reform but this legislation is not the right answer. I urge my colleagues to join me in opposing this legislation.

Mr. HOEKSTRA. Mr. Chairman, I rise to express my strong support of H.R. 418. Chairman SENSENBRENNER has presented for the consideration of the House a commonsense bill that will disrupt travel of would-be terrorists who would seek to do us harm right here in America. When enacted, these provisions will be yet another set of effective tools to help prevent another September 11-type attack.

All of these provisions are derived from provisions of the House-passed version of H.R. 10, the 9–11 Recommendations Implementation Act of 2004. During the conference with the other body on what became the Intelligence Reform and Terrorism Prevention Act of 2004, the provisions contained in H.R. 418 were either dropped in their entirety or modified so substantially as to virtually defeat the fundamental purpose of the provision.

A majority of the conferees on the part of the House very reluctantly agreed in order to get a conference agreement on the fundamental reform of the Nation's intelligence community. We are all original cosponsors of H.R. 418. As chairman of the conference, I thought that these provisions made sense then and they make sense now and should be enacted.

The core provisions of H.R. 418 establish a set of fundamental standards that state-issued identification cards, including driver's license, must meet to be recognized for Federal identification purposes, such as entering a Federal building. The bill provides the various States with 3 years to make any necessary modifications to their identification cards, if they so chose. The bill provides the Secretary of Homeland Security with discretion to extend the deadline for good cause upon application by an individual state. The bill does not impede the authority of individual states to determine who may operate a motor vehicle or who may be issued a State personal identification card for non-Federal purposes.

Some argue that the Intelligence Reform and Terrorism Prevention Act of 2004 already addresses this issue adequately. I simply disagree. The enacted provision requires a negotiated rulemaking process, without any absolute certitude that the negotiations on the proposed consensus regulations will be concluded by the date specified in the act. No hard date for implementation of these fundamental standards is specified.

H.R. 418 also restores the authority of an immigration judge to make a determination whether to grant or deny an individual application for asylum. At its core, the provision makes explicit the judge's authority to assess the creditability of the assertions of oppression being made by the applicant, just as judges and juries do each day with respect to criminal defendants. As some assert, H.R. 418 does not require the asylum applicant to produce documentary evidence in order to be granted asylum. It grants an immigration judge the authority to request the applicant to provide evidence to support the applicant's oral testimony and that of witnesses' supporting the applicant. H.R. 418 clearly states that the applicant is not required to provide documentary evidence if "the applicant does not have the evidence or cannot obtain the evidence without departing the United States."

H.R. 418 includes a provision specifying that offenses which currently provide grounds to deny a would-be terrorist entry into the United States are also grounds for the deportation of such persons, if they have somehow managed to enter the country illegally. Today, that is not the case. This glaring gap in the law must be closed.

Finally, H.R. 418 provides the Secretary of Homeland Security with authority to waive environmental laws, so that the border fence running 14 miles east from the Pacific Ocean at San Diego may finally be completed. Authorized by Congress in 1996, it has yet to be completed because of on-going environmental litigation. It is time to complete this much needed barrier to help secure one of the most used corridors for illegal entry, which is adjacent to the numerous facilities of the United States Navy and Marine Corps in San Diego.

Mr. Chairman, I commend Chairman SENSENBRENNER for his leadership and urge my colleagues to support H.R. 418.

Mrs. BONO. Mr. Chairman, I would like to thank Chairman SENSENBRENNER for his tireless efforts and leadership in getting the REAL ID Act to the floor and for championing national security issues and the crisis we face today with our Nation's border security. I would also like to thank my colleagues in the Southern California delegation for their efforts and for helping to protect not only their districts, but also the Nation's borders as well.

San Diego Border Fence: For too long our Nation has been playing chicken with our national security by ignoring the need to take a comprehensive approach to border security issues, particularly as they pertain to the Mexican border. The Mexican border has long been a porous and unguarded route for anyone wishing to sneak into the United States to inflict harm on our Nation and our citizens, including terrorists.

In particular, the San Diego sector covers an area of more than 7,000 square miles and 66 miles of international border with Mexico. Beyond that section of the border are the Mexican cities of Tijuana and Tecate, which boasts a combined population of more than 2 million people. This area of the border has been a heavily traveled route for illegal immigrants and potential terrorists due to the major cities and transportation hubs, such as LAX airport in Los Angeles. This area alone accounts for nearly 50 percent of national apprehensions of illegal immigrants nationwide.

A significant number of illegal immigrants that have been apprehended in this area can be directly attributed to the San Diego fence that was constructed a few years ago. The San Diego fence is a project that was started several years ago, but a 3.5-mile section of the fence was not completed due to environmental concerns. The portions of the San Diego fence that have been built have proven to be successful and are credited with significant declines in attempted border crossings in that area. The existing fence needs improvements and must be extended 3.5 miles to its originally planned length.

This legislation puts those priorities front and center by granting the Secretary of Homeland Security the authority to waive all Federal laws in order to complete the fence. In addition, this bill will increase the funding to improve the existing fence with a 3-tiered fence system and complete the original designed length. While environmental issues plays an appropriate role in our Nations' policies, the environmental and national security impacts of having illegal immigrants trample this portion of the border is greater than the concerns regarding building and completing the fence. Lastly, recent press accounts have reported that Al Qaeda operatives have joined forces with alien smuggling rings in order to enter the United States, particularly through the southern border with Mexico. The time to act on the San Diego border fence is now.

Drivers' License: REAL ID Act also bolsters stronger security standards for the issuance of drivers' licenses to aliens. This bill will establish requirements that help prove lawful presence in the United States prior to issuing a license to individuals. In addition, it is critical that all states must comply to eliminate weak links in the domestic identity security. We have all seen the failures of cards such as the Matriculate Consular cards and the widespread fraud that can take place. This bill requires tough physical security requirements to reduce counterfeiting and to ensure state compliance with such standards. Lastly, drivers' licenses that are issued in compliance with the new regulations will expire when an alien's visa expires to alleviate any confusion or ability for terrorists to maintain a false/fake drivers license while their visa has expired. Connecting the two forms of identification will ensure that law enforcement officers and federal agents will be on notice when a visa expires and will not be fooled by a separate and fake state ID that has not expired.

Asylum Provisions: Finally, the REAL ID Act will tighten the asylum system that has been abused and gamed by terrorists for years. This bill allows judges to determine a witnesses' credibility in their asylum cases. Without this change, judges have no discretion in determining the credibility of witnesses testifying that they are being persecuted. Judge's hands have been tied over the years and must just grant asylum in every case where persecution has been raised and have not been able to go beyond that point. This has allowed terrorists who have been persecuted in their home country for being terrorists to seek shelter in the United States. Currently, this argument cannot be used against them and is not grounds for deportation.

This bill gives the power to refuse terrorists entry to the United States and allows terrorists to be deported back to their home country. Terrorists have long been abusing our system in order to gain entry. This bill provides a list of long-accepted commonsense factors that an immigration judge can consider in assessing credibility, such as the demeanor, candor, responsiveness and consistency of an asylum applicant or other witness. It is essential for judges to be able to determine asylum cases based on the credibility or lack of credibility of witnesses.

Again, I would to thank Chairman SENSENBRENNER for his efforts in getting this bill to the floor and I strongly urge my colleagues to vote in favor of this bill because these reforms are necessary to our national security.

Mr. NEUGEBAUER. Mr. Chairman, I rise today in support of H.R. 418, the REAL ID Act of 2005. First, I would like to thank Chairman SENSENBRENNER and the Judiciary Committee for their leadership on this bill, and for their dedication to securing our borders and protecting Americans from terrorists.

My objective throughout debate over H.R. 10 was to get a bill that fully addressed all of our nation's security concerns. That means not only reforming how we gather and use intelligence, but also how we fight terrorism at home. I believe that the final bill that came to the floor fell short. That's why I voted against it.

However, the REAL ID Act implements crucial provisions that were dropped from H.R. 10 and fixes several glaring holes in our border security. One of the most important provisions in this legislation asks states to work with the Department of Homeland Security to establish and use standards for drivers' licenses.

Many states already have licenses that are difficult to counterfeit. Other states don't have stringent safeguards.

Some have argued that this bill creates a national ID. It doesn't. I would oppose any bill that did so. This bill simply requires states to make it harder for someone like Muhammad Atta to get a driver's license, and to use that license to carry out terror plans.

As the 9/11 Commission noted: "All but one of the 9/11 hijackers acquired some form of U.S. identification document, some by fraud." Increased ID security will make it more difficult for terrorists to obtain documents through fraud and conceal their identity. Deterring terrorists from receiving state issued IDs will make it more likely that they will be detected by law enforcement.

This bill also tightens our asylum system—a system that has been abused by terrorists with deadly consequences—by allowing judges to determine whether asylum seekers are truthful.

Additionally, the bill will protect the American people by ensuring that grounds for keeping a terrorist out of the country are also grounds for deportation. Incredibly, we have legal justification to prevent an individual from entering the country if they have known terrorist ties, however, under current U.S. law once they set foot inside the border we cannot deport them. This hinders our ability to protect Americans from foreign terrorists who have infiltrated the United States.

I think all Americans—and those of us on both sides of the aisle—can agree that the 9/11 Commission identified a number of improvements that will help upgrade our intelligence and enhance America's security. This bill provides common sense provisions to help prevent another 9/11-type attack by protecting our borders and disrupting terrorist travel in the United States. I urge members to vote in favor of the REAL ID Act.

The Acting CHAIRMAN. All time for general debate has expired. Under the rule, the Committee rises.

Accordingly, the Committee rose; and the Speaker pro tempore (Mr. McCAUL) having assumed the chair, Mr. LAHOOD, The Acting Chairman of the Committee of the Whole House on the State of the Union, reported that that Committee, having had under consideration the bill (H.R. 418) to establish and rapidly implement regulations for State driver's license and identification document security standards, to prevent terrorists from abusing the asylum laws of the United States, to unify terrorism-related grounds for inadmissibility and removal, and to ensure expeditious construction of the San Diego border fence, had come to no resolution thereon.

the gentleman from New York will be postponed.

The Acting CHAIRMAN. It is now in order to consider amendment Number 5 printed in part B the House report 109–4.

AMENDMENT NO. 5 OFFERED BY MR. FARR

Mr. FARR. Mr. Chairman, I offer an amendment.

The Acting CHAIRMAN. The Clerk will designate the amendment.

The text of the amendment is as follows:

Part B, Amendment No. 5 printed in House Report 109–4 offered by Mr. FARR.

Strike section 102 of the bill.

The Acting CHAIRMAN. Pursuant to House Resolution 75, the gentleman from California (Mr. FARR) and the gentleman from Wisconsin (Mr. SENSENBRENNER) each will control 10 minutes.

The Chair recognizes the gentleman from California (Mr. FARR).

(Mr. FARR asked and was given permission to revise and extend his remarks.)

Mr. FARR. Mr. Chairman, I yield myself such time as I may consume.

This amendment is simple and straightforward. It strikes Section 102, which is entitled the "Waiver of Laws Necessary for the Improvement of Barriers and Borders" from the bill. I think the provision is trying to fix a process that is not broken.

I offer this amendment to strike section 102, not to stop construction of the remaining 3 miles of the border fence, but to preserve the rule of law that this country was founded on.

I want my colleagues to listen. I want to make this very clear. The breadth of this provision is unprecedented. The border fence in San Diego is under construction right now: Of the 14 miles authorized to be constructed, more than 9 miles of triple fence have been completed. Only two sections have not been finished. In order to finish the fence, the Customs and Border Patrol has proposed to fill a canyon known as Smugglers Gulch with over 2 million cubic yards of dirt. The triple fence would then be extended across the filled gulch.

In February 2004, the Coastal Commission of California determined that the Customs and Border Patrol had not demonstrated, among other things, that the project was consistent to "maximize" to the extent practicable with the policies of the California Coastal Management program, the State program approved under the Federal Coastal Zone Management Act.

The Coastal Zone Management Act requires Federal agency activity within and outside the coastal zone that affects any land use, water or other natural resources in the coastal zone to be carried out in a manner that is consistent, to the maximum extent practicable, with the policies of an approved State management program.

However, as stringent as these requirements are, if a Federal court finds a Federal activity to be inconsistent

with an improved State program, the Secretary determines that the compliance is unlikely to be achieved through mediation, the President may exempt from compliance the activity if the President determines that the activity is in the paramount interest of the United States.

All the authority needed to build the barrier fence already exists in law. We can use laws and process that we have to get this fence built. There is no need for a blanket waiver to get any barrier constructed.

On October 26 of 2004 the Coastal Commission staff met with the Customs and Border Patrol/Homeland Security. In that meeting the Customs and Border Patrol explained why they did not believe additional comments, other than those that had already been agreed upon, were necessary to bring the project into compliance with the applicable coastal policies. Customs and Border Patrol maintained that it still wanted to continue to work with the Coastal Commission on measures they had agreed to, and the Coastal Commission indicated their continued willingness to work with them, despite the overall disagreement with some of the project components such as the Smugglers Gulch fill.

Coastal Commission informed Customs that in order to complete the Federal consistency review process, they would have to write a letter outlining their position. However, the Coastal Commission has not received any letter.

So why are we trying to fix something that is working through the established process of law? I ask because the reach of this amendment is actually the border fence in San Diego.

The proposed section 102 gives an unprecedented waiver and power to the Secretary of Homeland Security, not only for the border fence in San Diego but for any, any area. If enacted, the new 102 section would provide the Secretary of Homeland Security not only with the authority to waive all laws he determines necessary to ensure the expeditious construction of barriers and roads, but the requirement that the Secretary do so.

As I mentioned, there is no evidence that such an extraordinary rejection of the rule of law is necessary in the first instance.

Current law allows the DHS Secretary to waive the National Environmental Policy Act and the Endangered Species Act at the barrier, and this same provision was allowed to the Attorney General prior to the creation of the Department of Homeland Security.

This provision has never, to date, been used in San Diego nor am I aware at any other time the authority has been used on the barrier fence. So the remedies are there; they are in the law.

We forget in this debate that Mexico is the number one trading partner of California. It is the busiest border in the world for the legitimate transfer of people and commerce, and it is in the

city and County of San Diego, and neither of those jurisdictions has asked for this draconian waiver. Neither has the State of California.

Why would the Government of the United States of America, at a time when we are advocating the support and enforcement of law, why would the government now want to forbid the use of our own law to finish the fence? Not even the importance of securing the border can justify placing a government official above the law.

As I mentioned, my colleagues ought to be wary of what is proposed here. It grants authority to waive all laws notwithstanding any other provision of the law. This section also says, notwithstanding any other provision of the law, no court shall have jurisdiction to hear a claim, to order any relief.

How can we celebrate elections in Iraq and the honor of law when we in Congress are now asking that we waive all laws?

Mr. Chairman, I rise today in strong opposition to H.R. 418 and I urge my colleagues to do the same.

This bill is a misguided attempt to implement immigration reform under the guise of Homeland Security. This bill turns its back on a core principle that distinguishes America from other nations; that of being a safe haven for the tired, poor, and weak. The three specific policies that the bill addresses—the border fence, asylum provisions and driver's licenses standards—should have been vetted through the Committee process. Instead, this legislation has been rushed through the process—without hearings, without debate, and with very little input from the minority side of the aisle. This bill is being debated simply for politics instead of going through a legitimate legislative process, a fact that should be of concern to every Member, Republican and Democrat alike.

Today I will offer an amendment. My amendment is simple and straight forward. It strikes section 102 from the "REAL ID Act of 2005". The proposed provision is trying to fix a process that isn't broken. Section 102 gives an unprecedented waiver and power to the Secretary of Homeland Security. If passed, the Secretary has the sole discretion to waive all laws in order to expedite the construction of barriers and roads. There is no evidence that such an extraordinary rejection of the rule of law is necessary in the first instance. Current law already allows the DHS Secretary to waive the National Environmental Policy Act and the Endangered Species Act for the fence construction, the same exemption authorization that was allowed the Attorney General prior to creation of DHS. I look forward to the debate on my amendment.

As I stated before, H.R. 418 is not a good bill and even more troubling is that we had no hearings or committee debate on it. We need frank and productive dialogue about the state of our immigration system and this bill does nothing to open up the discussion that this country needs to have. I do not support illegal immigration, but I do support the people who have come to our country and played by the rules in order to obtain their citizenship status. Not only do we have a responsibility and a proud history of protecting those who seek

**H554**
CONGRESSIONAL RECORD — HOUSE
*February 10, 2005*

asylum in our country, which this bill is trying to thwart, we have a responsibility to legal immigrants who are contributing to our society to reduce the lengthy backlog to citizenship. Just earlier this week in meeting with some Bureau of Citizenship and Immigration Services employees, I was not surprised to learn that workers who were hired to help eliminate the backlog four years ago have been asked to stay on for another year. I do not often hear of temporary employees that are necessary for five years. I also learned that one of the reasons for the bureaucracy that legal immigrants experience is due to the antiquated state of technology the Bureau uses. As you can see, these are legitimate concerns about our immigration system that H.R. 418 does not address because it is a bill that has been brought up for political reasons, not legitimate policy reasons. The Republican Leadership of this Congress would do well to heed the President's comments to begin a dialogue on how to improve our immigration processes, and strengthen our national security, unlike the current legislation brought before us today.

The effects of the REAL ID Act are not only bad for domestic politics, they are destructive for the peace process in the Middle East. The Act states: "An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this Act, to be engaged in a terrorist activity." In the first place, the United States already has a formal, congressionally approved mechanism for designating foreign terrorist organizations and imposing sanctions on them. The PLO is not on the U.S. list of Foreign Terrorist Organizations. This sneaky, backdoor attempt to override the responsibility of the State Department and the will of Congress is an incredibly stupid way to execute U.S. diplomacy.

Second, we are now on the cusp of a historic moment in the Middle East peace process. The administration has promised that they will be actively engaged in the Middle East peace process. I find it hard to believe that they can be "actively" engaged in the peace process if the President will not be able to invite newly elected President Mahmoud Abbas to his Texas ranch, Camp David or any other location within the United States. President Abbas appears to be making considerable efforts in brokering peace, and the United States should be supporting his efforts. The effects of this provision will be a diplomatic nightmare and damage the United States's ability to be a fair broker in the peace process. This provision is an embarrassment to United States diplomacy—it is highly counterproductive to peace negotiations.

Furthermore, I have concerns with the national driver's license standards in this bill. Current law already addresses this issue, but the regulations have been implemented since this bill was passed only 10 weeks ago. National driver's license standards in this bill create an unfunded mandate for States. Under this bill, at least 10 States would be forced to make significant changes to their systems, despite the fact that security standards can be attained without the interference this bill creates. State control of the licensing and identification process is crucial to maintaining public safety, bolstering security, reducing fraud, keeping costs of car insurance down and protecting privacy and Federal standards for such documents should be limited to those enumerated in the Intelligence Reform Act of 2004.

Additionally, the proponents of this bill do not want you to know that H.R. 418 would not have prevented 9/11 hijackers from obtaining a driver's license or ID. The breach of our security was a result of the hijackers having been issued legal visas to come to the United States, which many of them used to apply for driver's licenses and identification cards. Does H.R. 418 seek to address the root of the problem here? No, obviously not. Again, this bill is political posturing under the guise of national security.

Instead of debating H.R. 418, the House of Representatives should be focused on ensuring the successful enactment of the Intelligence Reform and Terrorism Prevention Act of 2004 and working on comprehensively reforming our immigration system so that immigration is legal, safe, orderly, and reflective of the needs of American families, businesses, and national security.

Leadership should be ashamed to have brought a bill like this that will affect our environment, our citizens, and people from all around the world to the Floor in such a manner. I can not support the process nor the actual policy this bill proposes and I urge my colleagues vote no on H.R. 418.

Mr. CONYERS. Mr. Chairman, will the gentleman yield?

Mr. FARR. I yield to the gentleman from Michigan.

Mr. CONYERS. Mr. Chairman, what I would like to find out, if the gentleman knows, has this ever occurred in the history of Federal legislation before that for a given instance all laws, local, State, national, will be waived all at one time for one specific purpose?

Mr. FARR. Mr. Chairman, it has never been done before, waiving all labor laws, all contract laws, all small business laws, all laws relating to sacred places. It is a broad sweep, just a total repeal of all of those laws or a waiver of all those laws.

Mr. CONYERS. I thank the gentleman.

Mr. FARR. Mr. Chairman, how much time do I have remaining?

The Acting CHAIRMAN. The gentleman from California (Mr. FARR) has 4 minutes remaining.

Mr. FARR. Mr. Chairman, I reserve the balance of my time.

Mr. SENSENBRENNER. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, I rise in opposition to this amendment which continues to have endless litigation against plugging the hole in the fence south of San Diego. We were able to win World War II quicker than we were able to complete this fence. I think that shows why this amendment is a bad one.

I want to tell the membership the short story that illustrates why the fence has to be completed.

In early January, I sent two of my staff personally to inspect this area. On the day they visited the Imperial Beach Station at the Border Patrol, they asked to see a demonstration of the AFIS fingerprint system used to identify criminal aliens among those caught across the border. A man picked

at random from a holding area of high-risk detainees, who had been apprehended the night before, was selected for fingerprint check.

Within 15 minutes the system returned a rap sheet that was 17 pages long. Crimes he committed across three different States included abusing his spouse, raping his daughter and multiple counts of theft. This man was apprehended not far from Smuggler's Gulch and came through the area where the fence is not complete. The Border Patrol says he is typical of the one in three aliens they apprehend coming through the 3-mile unfenced area along the beach.

This person is a criminal, and membership of the California delegation complained about the cost of California incarcerating criminal aliens. We can cut down that cost and incarcerate fewer criminal aliens by plugging the hole in this fence and keeping them south of the border.

Mr. Chairman, I reserve the balance of my time.

Mr. FARR. Mr. Chairman, I yield 1 minute to the distinguished gentlewoman from California (Ms. HARMAN).

(Ms. HARMAN asked and was given permission to revise and extend her remarks.)

Ms. HARMAN. Mr. Chairman, many on this side of the aisle also support strong border protection. I certainly do, and I support the fence. This is not an argument, however, about whether to build a fence. It is about what process should be used, and this process is dead wrong.

Rather than reaching out to the governor of California, a leader in the party on the other side of the aisle, to reach compromise on this issue, the author of this bill has crafted language that will usurp all of Governor Schwarzenegger's power regarding the border fence. To take the radical steps of eliminating all State and local powers, let alone Federal, and rolling back all judicial review is the height of irresponsible legislating.

Mr. Chairman, this bill sets the dangerous precedent of policing a single Federal official, elected by no one, above all laws, and shields him from accountability, and the reach is beyond the San Diego border. According to the language in this legislation, it is all areas along and in the vicinity of our international borders with both Mexico and Canada.

This is the wrong way to do it. We need to do the right thing.

Mr. Chairman, I support this amendment.

Mr. SENSENBRENNER. Mr. Chairman, I yield 3 minutes to the gentleman from California (Mr. HUNTER), the Chairman of the Committee on Armed Services and one of the biggest supporters of Governor Schwarzenegger.

Mr. HUNTER. Mr. Chairman, I thank the gentleman for yielding me the time.

We started this fence about 20 years ago. We started it by building the first

steel fence across that 14-mile segment between the coastal hills of San Diego County and the Pacific Ocean. We did that because drug trucks were running that border at the rate of about 300 per month.

□ 1315

We had about 10 people being murdered each year, along with numerous robberies and rapes, to such a high degree that the best-selling book, "Lines and Shadows" by Joseph Wambaugh, was written depicting this "no man's land," where nobody wanted to be after dark. So we built that first line, which was the steel fence right on the border.

We then built the second fence, that is, the second tier of the so-called triple fence, after we passed a law signed by President Bill Clinton in 1996. And it was President Clinton who signed the bill waiving the Endangered Species Act and waiving NEPA because he thought it was so important that we have security at this, the most porous smugglers' corridor in the United States of America.

Now, I can just tell you, as a guy who has worked on this thing from the start, my staff went out and found those 79,000 steel landing mats to build this fence. If the extremists had discovered this fence before we got the first 12 miles built, that would not be built. We stopped those 300 drug trucks a month, stopped them dead. We eliminated the 10 murders a year, mostly of undocumented workers. We eliminated the hundreds of rapes of the people who were coming through there because we built that fence.

If the extremists had had their way, they would have gone to a sympathetic Federal court, tied us up in lawsuits and we would not have had the fence.

The Secretary of the Navy has written us a letter saying that completion of this project will enhance the security of our naval installations by reducing the potential threat environment created by an unsecured border. A few miles north of this gap in the fence is the biggest naval installation on the West Coast. Through this gap have come and been apprehended people from nations that sponsor terrorists, nations like North Korea, nations like Syria.

This is a security issue. And for people to say this is an environmental issue, this is the state of play right now, all these trails you see have been hammered into that ecosystem by the smugglers. None of my colleagues have been out there trying to stop them. They have hammered these trails by the hundreds into the ecosystem, hammered it into the marshlands and the estuary lands.

Good biologists say it will take hundreds of years for these areas to be restored, not by actions of the Border Patrol or by our security apparatus, but by the smugglers who come across this particular gap in the fence.

We need to secure this gap. The Secretary of the Navy recognizes that,

President Clinton recognized that and gave an unprecedented waiver. We need to complete the border fence.

Mr. FARR. Mr. Chairman, how much time do we have remaining?

The Acting CHAIRMAN (Mr. SIMPSON). The gentleman from California (Mr. FARR) has 3 minutes remaining and the gentleman from Wisconsin (Mr. SENSENBRENNER) has 5 minutes remaining.

Mr. FARR. Mr. Chairman, I yield myself such time as I may consume to respond, first, to the gentleman from California (Mr. HUNTER).

He is right, there is in existing law the authorization to waive those issues. It has never been used. It has never been used. This waives all laws, labor laws, every kind of law. This is a draconian approach to try to get the job done.

Mr. Chairman, I yield 30 seconds to the gentleman from Michigan (Mr. KILDEE).

Mr. KILDEE. Mr. Chairman, I rise in favor of the Farr amendment. This bill gives the Secretary unprecedented authority to waive all laws to finish the construction of the security barrier. This bill denies due process to anyone challenging the Secretary's decision by prohibiting judicial review of the Secretary's waivers.

These provisions would undermine the Federal trust responsibility to Indian nations by allowing waivers of Federal requirements of providing tribal notification that are specifically designed to protect Native American burial grounds, religious shrines, and cultural and historical sites.

I urge my colleagues to support the Farr amendment.

Mr. SENSENBRENNER. Mr. Chairman, I yield 2 minutes to the gentleman from California (Mr. CUNNINGHAM), another big supporter of Governor Schwarzenegger.

Mr. CUNNINGHAM. Mr. Chairman, the gentleman from California (Mr. HUNTER) talked about, in 1990, when he came to me while I was still in the military asking me about landing mats to put up for the border. He and I have actually been down there welding to get that up.

Why? Why would we do that?

Take this floor, if this was a farmer's field and you had a single strand of wire that was lying on the ground, that is what separated the United States and Mexico. We had truckloads of drugs coming across in a 100-mile sector that we could not stop. In 1 year, there were a number of rapes and a number of murders by the coyotes and people on the U.S. side of people trying to get across. When my colleague arranged to put up that fence, it stopped all of it.

Now, there are all kinds of ways in which you can stop something here in this body. We can have hearings and say we are going to do this or that, but with the fence area, these 7 miles, another way is to waive the environmental things.

The gentleman from California (Mr. HUNTER) also showed that President Clinton did this. If we do not do this, my colleagues, we will not get it done.

And it will help security. Documents that we have captured from al Qaeda show that they consider the border vulnerable, with cells in Mexico itself. And so it is not just sealing off the border for security, but it is other things too.

In San Diego, in California, we have about 800,000 illegals in K-through-12 education. Use half of that, use 400,000. That is $2 billion a year out of California. That does not account for the $1.5 million a day for the school lunch. Now, I cannot stop those kids. I have been in those schools. There is no way I would take that lunch away from those critters. But we need to secure our border to stop the flow coming in.

If we know, with the bill of the gentleman from Wisconsin (Mr. SENSENBRENNER), who is there legally, it is much easier to tell who is there illegally. So I ask my colleagues to give this support because we really need to complete this.

Mr. FARR. Mr. Chairman, how much time do I have remaining?

The Acting CHAIRMAN. The gentleman from California (Mr. FARR) has 2¼ minutes remaining and the gentleman from Wisconsin (Mr. SENSENBRENNER) has 3 minutes remaining.

Mr. FARR. Mr. Chairman, I yield 1 minute to the distinguished gentleman from Oregon (Mr. BLUMENAUER).

Mr. BLUMENAUER. Mr. Chairman, I yield to nobody my concern that this bill has regarding the environment, but that is not the point. We have already had our colleague, the gentleman from California (Mr. DUNCAN), talk about how we passed specific legislation signed by President Clinton that suspended the Endangered Species Act. What we are talking about here is far beyond this. It is talking about suspending all laws, health, safety, immigration, payment for private property. All laws, not the environment.

My colleagues would be creating not a couple of miles of exception to finish a fence, but you would be creating a zone 7,514 miles long under the terms of this bill, 5,500 in Canada, almost 2,000 with the border of Mexico, where all laws are suspended in the vicinity of the barrier. My colleagues have no idea how much land they are exempting from compensation.

Mr. Chairman, there are only 11,751 people who have been privileged to serve in this Chamber. I do not think any of them have ever been asked to vote on anything more irresponsible. It is a terrible precedent, unnecessary, and I urge its defeat.

Mr. SENSENBRENNER. Mr. Chairman, I yield 2 minutes to the gentleman from California (Mr. DREIER), a close adviser of Governor Schwarzenegger and the chairman of the Committee on Rules.

Mr. DREIER. Mr. Chairman, I thank my friend for yielding me this time,

and let me just say what it is that got us here. I have listened to the arguments propounded by my colleagues on the other side of the aisle.

We are here because, as the chairman of the Judiciary said, it has taken longer to complete this fence than it did to win the Second World War. The problem that we have is, there needs to be recognition that the environmentally sound vote is to complete this fence.

The gentleman from California (Mr. HUNTER) held up a poster. If you look at where the fence has been completed, it is pristine, it is clean, it looks great, and it is securing our borders. If you look at that 3½-mile gap, you see all kinds of trash and devastation and you, of course, exacerbate the pressure with the flow of people coming into this country illegally, creating a wide range of problems.

We came this close, when we had strong support, 257 Members of this body in the last Congress who voted for the Ose amendment that should have been included in the 9/11 Committee's recommendation in the conference agreement that we had. The other body prevented us when we were working in the conference to bring it back here. We had indications from Democrats and Republicans alike that if we brought this measure up we could have strong support of it.

It is imperative, it is imperative that we complete this fence. Smugglers Gulch is an area which is, I believe, posing a very serious threat to our stability in this country and in California. So I urge my colleagues to oppose the FARR amendment and cast the environmentally sound vote, which is a "no" vote.

Mr. FARR. Mr. Chairman, I yield 30 seconds to the gentleman from Minnesota (Mr. OBERSTAR).

Mr. OBERSTAR. Mr. Chairman, no person in our country should be given unfettered authority, unfettered discretion to waive any or all laws, for whatever the purpose.

Take this situation. In order to expedite construction of this fence, the Department of Homeland Security could select a contractor without competitive bidding, use undocumented workers, violate child labor laws, pay the workers less than the minimum wage, exempt contractors from Federal and State withholding; workers could be forced to put in 18-hour-days without overtime pay, in unsafe conditions, and be transported in trucks used for hazardous cargo; and allow the Secretary discretion to have these workers construct fences and roads through private property.

That is wrong. You can build a fence, but you do not have to violate all those laws.

Mr. FARR. Mr. Chairman, I yield myself the balance of my time.

We have heard a lot of talk here today, and I submit that this is not the answer, to emasculate all the laws. I would bet that if the gentleman from California (Mr. HUNTER), the gentleman from California (Mr. CUNNINGHAM), myself and any other interested party sat down, one meeting with all the interested parties, we could resolve this. But that is not the way they want to proceed.

This was not a recommendation of the 9/11 Commission. This is essentially emasculating all laws to get an environmental project completed. And emasculating all laws is not the way to do it.

This amendment is a good amendment because it does not allow my colleagues to emasculate all laws. What it allows us to do is to let this process work. And with the pressure that has been brought here today, we can get that fence built. The opposition on this side is not against the fence, it is against emasculating all the laws of the land in order to get there. So I ask for an "aye" vote.

Mr. Chairman, I submit for the RECORD a memorandum of the Congressional Research Service, dated February 7, 2005, regarding the REAL ID Act.

CONGRESSIONAL RESEARCH SERVICE,
*February 7, 2005.*

MEMORANDUM

To: House Committee on Homeland Security, Attention: Sue Ramanathan; and House Committee on the Judiciary, Attention: Kristin Wells.

From: Stephen R. Viña and Todd Tatelman, Legislative Attorneys, American Law Division.

Subject: Legal Analysis of Sec. 102 of H.R. 418, Waiver of Laws Necessary for Improvement of Barriers at Borders.

Pursuant to your request on February 3, this memorandum analyzes section 102 of H.R. 418, the REAL ID Act. Section 102, captioned "Waiver of Laws Necessary for Improvement of Barriers at Borders," provides the Secretary of Homeland Security with authority to waive all laws he deems necessary for the expeditious construction of the barriers authorized to be constructed by §102 of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA) (P.L. 104–208, Div. C, codified at 8 U.S.C. §1103 note) and removes judicial review from such waiver decisions. Specifically, this memorandum discusses the extent to which Congress has passed laws that provide waivers comparable to §102 of H.R. 418 and outlines some of the legal issues that could potentially arise if §102 is passed in its current form. In view of the short time frame for response, the following analysis is necessarily brief and we refer you to CRS Report RS 22226, Border Security: Fences Along the U.S. International Border for background information on §102 of IIRIRA and the border fence.

*H.R. 418, §102*

Section 102 of H.R. 418 would amend §102(c) of IIRIRA to read as follows:

(c) WAIVER.—

(1) IN GENERAL.—Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive, and shall waive, all laws such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section.

(2) NO JUDICIAL REVIEW.—Notwithstanding any other provision of law (statutory or nonstatutory), no court shall have jurisdiction—

(A) to hear any cause or claim arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1); or

(B) to order compensatory, declaratory injunctive, equitable, or any other relief for damage alleged to arise from any such action or decision.

*Waiver provisions*

If enacted, the new §102 would provide the Secretary of Homeland Security with not only the authority to waive all laws he determines necessary to ensure the expeditious construction of the barriers and roads under §102 of IIRIRA, but the requirement that the Secretary do so. This provision would provide the Secretary with broader waiver authority than what is currently in §102( c) of IIRIRA. This authority would apparently include laws other than the Endangered Species Act and the National Environmental Policy Act, but may not include a waiver of protections established in the Constitution. All laws waived, however, must be determined by the Secretary to be necessary to ensure expeditious construction of the barriers and roads. The waiver authority provided by this amendment would also seem to apply to all the barriers that may be constructed under the authority of §102 of IIRIRA (i.e., barriers constructed in the vicinity of the border and the barrier that is to be constructed near the San Diego area).

Congress commonly waives preexisting laws, though the process necessary to complete the waiver and the number of laws waived vary considerably from provision to provision. Even more common is the use of the phrase "notwithstanding any other provision of law." While the use of a broad "notwithstanding any other provision of law" infrequently governs interpretation, such directives seem facially preclusive, and some courts have determined that "notwithstanding" language may serve to explicitly preempt the application of other laws. Other courts, however, have held that such provisions are generally not dispositive in determining the preemptive effect of a statute.

After a review of federal law, primarily through electronic database searches and consultations with various CRS experts, we were unable to locate a waiver provision identical to that of §102 of H.R. 418—i.e., a provision that contains "notwithstanding language," provides a secretary of an executive agency the authority to waive all laws such secretary determines necessary, and directs the secretary to waive such laws. Much more common, it appears, are waiver provisions that (1) exempt an action from other requirements contained in the Act that authorizes the action, (2) specifically delineate the laws to be waived, or (3) waive a grouping of similar laws. The most analogous provisions that we located appear to be, at least on their face, the following:

43 U.S.C. §1652(c): Allows the Secretary of the Interior and other Federal officers and agencies the authority to waive any procedural requirements of law or regulation which they deem desirable for authorizations that are necessary for or related to the construction, operation, and maintenance of the Trans-Alaska oil pipeline system (e.g., rights-of-way, permits, and leases).

25 U.S.C. §3406: Allows the Secretaries of the Interior, Labor, Health and Human Services, and Education, notwithstanding any other law, to waive any statutory requirement, regulation, policy, or procedure promulgated by their agency that is identified by a tribal government as necessary to implement a submitted tribal plan under the Indian Employment, Training and Related Services Demonstration Act of 1992, as amended.

*February 10, 2005*          CONGRESSIONAL RECORD — HOUSE          **H557**

.20 U.S.C. §7426: Provides almost identical waiver language to that of 25 U.S.C. §3406, but for plans submitted by tribal governments for the integration of education and related services provided to Indian students.

There are many other provisions that arguably grant broad waiver authority similar to that of §102, but contain qualifications or reporting requirements that seem to limit their breadth. For example, 43 U.S.C. §3008 allows the President to waive provisions of federal law he deems necessary in the national interest to facilitate the construction or operation of crude oil transportation systems, but such waivers must be submitted to Congress, and Congress must pass a joint resolution before the President can act on the waivers. As mentioned above and as the examples we have set forth arguably demonstrate, the breadth of waiver authority granted by §102 of H.R. 418 does not appear to be common in the federal law searched.

*Judicial review provisions*

By including the language "no court," §102(c)(2) of H.R. 418 appears to preclude judicial review of a Secretary's decision to waive provisions of law by both federal and state courts. The preclusion of judicial review in state court and of state claims appears buttressed by the fact that §102(c) is explicitly intended to preclude judicial review of nonstatutory laws—a term which would seem to imply the inclusion of state constitutional and common law claims. It is generally accepted that Article III of the United States Constitution grants Congress the authority to regulate the jurisdiction, procedures, and remedies available in federal courts. However, what remains uncertain is whether Congress's authority, pursuant to Article III, extends to the jurisdiction, procedures, and remedies of state courts. In addition, it remains uncertain to what extent Congress has Article III authority to prevent courts, state or federal, from addressing and remedying issues arising under the United States Constitution.

With respect to Congress's ability to control the jurisdiction of state courts, the Supreme Court has ruled that subject to a congressional provision to the contrary, state courts have concurrent jurisdiction over all the classes of cases and controversies enumerated in Article III, except for suits between States; suits in which either the United States or a foreign state is a party, and those considered within the traditional jurisdiction of admiralty law. Thus, it appears possible to argue that Congress has a plenary power to allocate jurisdiction between the state and federal courts. In other words, if, for example, Congress can make jurisdiction over an area of law exclusively federal, thereby depriving state courts of any ability to hear the claim, it appears that Congress may also be able to remove a cause of action from state courts without concurrently granting jurisdiction to the federal courts.

State courts, however, are often considered to be independent and autonomous from the federal court system. This independent status has led some scholars to argue that because the Constitution appears to reserve to the states the authority to control the jurisdiction of their own courts, Congress's "only means of allocating jurisdiction is through control of the federal court's jurisdiction." The argument that state courts are autonomous can be derived, in part, from the Supreme Court's doctrine with respect to its ability to review decisions from state courts. While the Court has the authority to review a decision of a state's highest court, it has repeatedly held that it will not do so if the decision rests upon adequate and independent state grounds. This rule is arguably

designed to protect a state's interest in developing and applying its own laws. Thus, it would appear that an argument can be made that Congress does not possess the authority to regulate the jurisdiction of state courts directly. It may be the case, however, that Congress's ability to control the jurisdiction of the federal courts indirectly effects and alters the jurisdiction of the state courts, which would appear to preserve their autonomous status.

Turning to Congress's ability to remove jurisdiction with respect to claims arising under the Constitution, it appears that Supreme Court precedent requires that at least some forum be provided for the redress of constitutional rights. While it appears that the Supreme Court has not directly addressed whether there needs to be a judicial forum to vindicate all constitutional rights, it appears that the Court has taken to noting constitutional reservations about legislative denials for jurisdiction for judicial review of constitutional issues, as well as construction of statutes that purport to limit the Court's jurisdiction. At least one justice, however, has indicated that there have been particular cases, such as political question cases, where all constitutional review is in effect precluded.

Nevertheless, the Court has generally found a requirement that effective judicial remedies be present. For example, in cases involving particular rights, such as the availability of effective remedies for Fifth Amendment takings, the Court has held that "the compensation remedy is required by the Constitution." In addition, lower federal courts appear to have held that, in most cases, some forum must be provided for the vindication of constitutional rights. Cases such as these would seem to provide a basis for the Court to find that parties seeking to vindicate other particular rights must have a judicial forum for such challenges; therefore, the Court may construe the provisions of H.R. 418 in a manner that preserves this right.

Mr. SENSENBRENNER. Mr. Chairman, I yield the balance of my time to the gentleman from California (Mr. ROYCE).

Mr. ROYCE. Mr. Chairman, as chairman of the Subcommittee on International Terrorism and Nonproliferation, I have to ask, Who should be in charge of counterterrorism policy? Should it be the California Coastal Commission or should it be the Department of Homeland Security? That is the crux of this argument.

Now, environmental groups have successfully fought the completion of this fence over the years, claiming that it would have a serious impact on everything from the San Diego fairy shrimp to the San Diego button celery, all that in this 3.5 mile strip of desert along the border.

Does anyone think we can secure the border and save the button celery by putting up a fence to stop people from trampling on it? Yes, we can. Can we protect . ourselves from al Qaeda operatives who have joined forces with alien smuggling rings like MS 13 in order to enter the United States through our porous southern border by stopping them from squishing the fairy shrimp as they slip through the gap in the fence? Yes, we can. It is a win-win. In the interest of national security, we need to defeat this amendment.

Mrs. DAVIS of California. Mr. Chairman, I want to thank my colleague from Monterey for so clearly laying out the reasons that waiving all laws is a travesty of American governing principles.

I will focus on the issue driving this extreme language—completing the 3½ miles of border fencing, including the ocean section in my district.

A member stated that tens of thousands of illegal immigrants enter there and are chased all over the sensitive wetlands destroying them anyway. His facts were true 10 years ago. They are not today.

In 1993, the Border Patrol apprehended 165,000 people in this section. In 2003, the number had dropped 94 percent—to 10,000.

How many illegal entrants get past the Border Patrol today? They tell us 1,000 a year—three people per day. And that is with a fence you or I could easily walk around or through. What should we do?

Finish building a secondary fence with the proposed level of environmental destruction.

Compromise has occurred, and plans exist for alternative road alignment. Appoint a task force to meet and reach consensus by a deadline.

One issue remains—a one-half mile wide river bed called Smuggler's Gulch—leading to internationally recognized wetlands restored at the cost of tens of millions of dollars.

The proposal lops off two adjacent mesas to dump 2 million tons of dirt into the gap to a height of 165 feet!—as high as two of the new giant airbuses stacked on top of one another!

It would cost $40 million just to move the dirt—money better spent purchasing high grade technology and funding the President's proposed increase of Border Patrol agents.

I urge you to support the Farr amendment.

Mr. BOEHLERT. Mr. Chairman, today I rise to express my concern over a provision in H.R. 418, the REAL ID Act of 2005. Section 102 of this Act states that the Secretary of Homeland Security shall have the authority to waive, and shall waive, all laws necessary to ensure expeditious construction of barriers and roads in the vicinity of the U.S. border in areas of high illegal entry. The provision also bars judicial review of any claim arising from the construction of barriers and roads at borders.

I understand that this provision is intended to apply primarily to the fence along the border near San Diego. The construction of that fence is critical to our national security and has been delayed for far too long and I think it is imperative that it be constructed as soon as possible.

However, I believe the provision currently contained in this bill is far too sweeping. It should not be necessary to waive all laws and judicial review relating to the construction of roads and barriers along the border in order to complete the fence near San Diego.

I hope that as the bill moves forward we can find a solution that will lead to the swift construction of this fence without sweeping away important laws.

The Acting CHAIRMAN. The question is on the amendment offered by the gentleman from California (Mr. FARR).

The question was taken; and the Acting Chairman announced that the noes appeared to have it.

Mr. FARR. Mr. Chairman, I demand a recorded vote.

The Acting CHAIRMAN. Pursuant to clause 6 of rule XVIII, further proceedings on the amendment offered by the gentleman from California (Mr. FARR) will be postponed.

SEQUENTIAL VOTES POSTPONED IN COMMITTEE OF THE WHOLE

The Acting CHAIRMAN. Pursuant to clause 6 of rule XVIII, proceedings will now resume on those amendments on which further proceedings were postponed, in the following order: Amendment No. 4 printed in part B, offered by the gentleman from New York (Mr. NADLER) and amendment No. 5 printed in part B, offered by the gentleman from California (Mr. FARR).

The Chair will reduce to 5 minutes the time for any electronic vote after the first vote in this series.

AMENDMENT NO. 4 OFFERED BY MR. NADLER

The Acting CHAIRMAN. The pending business is the demand for a recorded vote on amendment No. 4 printed in part B of House Report 109–4, offered by the gentleman New York (Mr. NADLER), on which further proceedings were postponed and on which the noes prevailed by voice vote.

The Clerk will redesignate the amendment.

The Clerk redesignated the amendment.

RECORDED VOTE

The Acting CHAIRMAN. A recorded vote has been demanded.

A recorded vote was ordered.

The vote was taken by electronic device, and there were—ayes 185, noes 236, not voting 12, as follows:

[Roll No. 28]

AYES—185

| | | |
|---|---|---|
| Abercrombie | Delahunt | Larsen (WA) |
| Ackerman | DeLauro | Larson (CT) |
| Allen | Diaz-Balart, L. | Leach |
| Andrews | Diaz-Balart, M. | Lee |
| Baca | Dicks | Levin |
| Baird | Dingell | Lewis (GA) |
| Baldwin | Doggett | Lipinski |
| Bartlett (MD) | Doyle | Lofgren, Zoe |
| Bean | Emanuel | Lowey |
| Becerra | Engel | Lynch |
| Berkley | Etheridge | Maloney |
| Berman | Evans | McCarthy |
| Berry | Farr | McCollum (MN) |
| Bishop (GA) | Fattah | McDermott |
| Bishop (NY) | Filner | McGovern |
| Blumenauer | Frank (MA) | McIntyre |
| Boswell | Gonzalez | McKinney |
| Boucher | Green, Al | McNulty |
| Boyd | Grijalva | Meehan |
| Brady (PA) | Gutierrez | Meek (FL) |
| Brown (OH) | Harman | Meeks (NY) |
| Brown, Corrine | Hastings (FL) | Menendez |
| Butterfield | Herseth | Michaud |
| Capps | Higgins | Millender- |
| Capuano | Holt | McDonald |
| Cardin | Hooley | Miller (NC) |
| Cardoza | Hoyer | Miller, George |
| Carnahan | Inslee | Mollohan |
| Carson | Israel | Moore (KS) |
| Clay | Jackson (IL) | Moore (WI) |
| Cleaver | Jackson-Lee | Moran (VA) |
| Clyburn | (TX) | Murtha |
| Conyers | Johnson (IL) | Nadler |
| Costa | Johnson, E. B. | Napolitano |
| Costello | Jones (OH) | Neal (MA) |
| Crowley | Kanjorski | Oberstar |
| Cuellar | Kaptur | Obey |
| Cummings | Kennedy (RI) | Olver |
| Davis (AL) | Kildee | Ortiz |
| Davis (CA) | Kilpatrick (MI) | Owens |
| Davis (IL) | Kind | Pallone |
| DeFazio | Kucinich | Pascrell |
| DeGette | Langevin | Pastor |

| | | |
|---|---|---|
| Payne | Schakowsky | Towns |
| Pelosi | Schiff | Udall (CO) |
| Pomeroy | Schwartz (PA) | Udall (NM) |
| Price (NC) | Scott (VA) | Van Hollen |
| Rahall | Serrano | Velázquez |
| Rangel | Sherman | Visclosky |
| Reyes | Simmons | Walsh |
| Ros-Lehtinen | Slaughter | Wasserman |
| Ross | Smith (NJ) | Schultz |
| Rothman | Smith (WA) | Waters |
| Roybal-Allard | Snyder | Watson |
| Ruppersberger | Solis | Watt |
| Rush | Spratt | Waxman |
| Ryan (OH) | Stark | Weiner |
| Sabo | Strickland | Wexler |
| Salazar | Tauscher | Wilson (NM) |
| Sánchez, Linda | Thompson (CA) | Woolsey |
| T. | Thompson (MS) | Wu |
| Sanders | Tierney | Wynn |

NOES—236

| | | |
|---|---|---|
| Aderholt | Garrett (NJ) | Murphy |
| Akin | Gerlach | Musgrave |
| Alexander | Gibbons | Myrick |
| Bachus | Gilchrest | Neugebauer |
| Baker | Gillmor | Ney |
| Barrett (SC) | Gingrey | Northup |
| Barrow | Gohmert | Norwood |
| Barton (TX) | Goode | Nunes |
| Beauprez | Goodlatte | Nussle |
| Biggert | Gordon | Osborne |
| Bilirakis | Granger | Otter |
| Bishop (UT) | Graves | Paul |
| Blackburn | Green (WI) | Pearce |
| Blunt | Gutknecht | Pence |
| Boehlert | Hall | Peterson (MN) |
| Boehner | Harris | Peterson (PA) |
| Bonilla | Hart | Petri |
| Bonner | Hastings (WA) | Pitts |
| Bono | Hayes | Platts |
| Boozman | Hayworth | Poe |
| Boren | Hefley | Pombo |
| Boustany | Hensarling | Porter |
| Bradley (NH) | Herger | Portman |
| Brady (TX) | Hobson | Price (GA) |
| Brown (SC) | Hoekstra | Pryce (OH) |
| Brown-Waite, | Holden | Putnam |
| Ginny | Hostettler | Radanovich |
| Burgess | Hulshof | Ramstad |
| Burton (IN) | Hunter | Regula |
| Buyer | Hyde | Rehberg |
| Calvert | Inglis (SC) | Reichert |
| Camp | Issa | Renzi |
| Cannon | Istook | Reynolds |
| Cantor | Jefferson | Rogers (AL) |
| Capito | Jenkins | Rogers (KY) |
| Case | Jindal | Rogers (MI) |
| Castle | Johnson (CT) | Rohrabacher |
| Chabot | Johnson, Sam | Royce |
| Chandler | Jones (NC) | Ryan (WI) |
| Chocola | Keller | Ryun (KS) |
| Coble | Kelly | Saxton |
| Cole (OK) | Kennedy (MN) | Schwarz (MI) |
| Conaway | King (IA) | Scott (GA) |
| Cooper | King (NY) | Sensenbrenner |
| Cox | Kingston | Sessions |
| Cramer | Kirk | Shadegg |
| Crenshaw | Kline | Shaw |
| Cubin | Knollenberg | Shays |
| Culberson | Kolbe | Sherwood |
| Cunningham. | Kuhl (NY) | Shimkus |
| Davis (KY) | LaHood | Shuster |
| Davis (TN) | Latham | Simpson |
| Davis, Jo Ann | LaTourette | Skelton |
| Davis, Tom | Lewis (CA) | Smith (TX) |
| Deal (GA) | Lewis (KY) | Sodrel |
| DeLay | Linder | Souder |
| Dent | LoBiondo | Stearns |
| Doolittle | Lucas | Sullivan |
| Drake | Lungren, Daniel | Sweeney |
| Dreier | E. | Tancredo |
| Duncan | Mack | Tanner |
| Edwards | Manzullo | Taylor (MS) |
| Ehlers | Marchant | Taylor (NC) |
| Emerson | Marshall | Terry |
| English (PA) | Matheson | Thomas |
| Everett | McCaul (TX) | Thornberry |
| Ferguson | McCotter | Tiahrt |
| Fitzpatrick (PA) | McCrery | Tiberi |
| Flake | McHenry | Turner |
| Foley | McHugh | Upton |
| Forbes | McKeon | Walden (OR) |
| Fortenberry | McMorris | Wamp |
| Fossella | Melancon | Weldon (FL) |
| Foxx | Mica | Weldon (PA) |
| Franks (AZ) | Miller (FL) | Weller |
| Frelinghuysen | Miller (MI) | Westmoreland |
| Gallegly | Miller, Gary | |

| | |
|---|---|
| Whitfield | Wilson (SC) | Young (AK) |
| Wicker | Wolf | Young (FL) |

NOT VOTING—12

| | | |
|---|---|---|
| Bass | Green, Gene | Oxley |
| Carter | Hinchey | Pickering |
| Eshoo | Hinojosa | Sanchez, Loretta |
| Feeney | Honda | Stupak |

ANNOUNCEMENT BY THE ACTING CHAIRMAN

The Acting CHAIRMAN (Mr. SIMPSON) (during the vote). Members are advised that 2 minutes remain in this vote.

□ 1355

Mrs. BLACKBURN, Mrs. JOHNSON of Connecticut, and Messrs. REYNOLDS, SODREL, NEUGEBAUER, TOM DAVIS of Virginia, FORD, BACHUS, TANNER, MURPHY, and BRADY of Texas changed their vote from "aye" to "no."

So the amendment was rejected.

The result of the vote was announced as above recorded.

Stated against:

Mr. BASS. Mr. Chairman, on rollcall No. 28 I was unavoidably detained. Had I been present, I would have voted "no."

AMENDMENT NO. 5 OFFERED BY MR. FARR

The Acting CHAIRMAN. The pending business is the demand for a recorded vote on amendment No. 5 printed in Part B of House Report 109–4 offered by the gentleman from California (Mr. FARR) on which further proceedings were postponed and on which the noes prevailed by voice vote.

The Clerk will redesignate the amendment.

The Clerk redesignated the amendment.

RECORDED VOTE

The Acting CHAIRMAN. A recorded vote has been demanded.

A recorded vote was ordered.

The Acting CHAIRMAN. This will be a 5-minute vote.

The vote was taken by electronic device, and there were—ayes 179, noes 243, not voting 11, as follows:

[Roll No. 29]

AYES—179

| | | |
|---|---|---|
| Abercrombie | Cummings | Hooley |
| Ackerman | Davis (CA) | Hoyer |
| Allen | Davis (FL) | Inslee |
| Andrews | Davis (IL) | Israel |
| Baca | DeFazio | Jackson (IL) |
| Baird | DeGette | Jackson-Lee |
| Baldwin | Delahunt | (TX) |
| Becerra | DeLauro | Jefferson |
| Berkley | Dicks | Johnson (IL) |
| Berman | Dingell | Johnson, E. B. |
| Bishop (NY) | Doggett | Jones (OH) |
| Blumenauer | Doyle | Kanjorski |
| Boehlert | Edwards | Kaptur |
| Boswell | Ehlers | Kennedy (RI) |
| Boyd | Emanuel | Kildee |
| Brady (PA) | Engel | Kilpatrick (MI) |
| Brown (OH) | Etheridge | Kind |
| Brown, Corrine | Evans | Kucinich |
| Butterfield | Farr | Langevin |
| Capps | Fattah | Lantos |
| Capuano | Filner | Larsen (WA) |
| Cardin | Ford | Larson (CT) |
| Carnahan | Frank (MA) | Lee |
| Carson | Gonzalez | Levin |
| Case | Green, Al | Lewis (GA) |
| Clay | Grijalva | Lipinski |
| Cleaver | Gutierrez | LoBiondo |
| Clyburn | Gutierrez | Lofgren, Zoe |
| Conyers | Harman | Lowey |
| Costello | Hastings (FL) | Lynch |
| Crowley | Higgins | Maloney |
| Cuellar | Holt | Markey |

*February 10, 2005*          CONGRESSIONAL RECORD — HOUSE          **H559**

| | | |
|---|---|---|
| McCarthy | Pastor | Slaughter |
| McCollum (MN) | Paul | Smith (WA) |
| McDermott | Payne | Snyder |
| McGovern | Pelosi | Solis |
| McKinney | Peterson (MN) | Spratt |
| Meehan | Pomeroy | Stark |
| Meek (FL) | Price (NC) | Strickland |
| Meeks (NY) | Rahall | Tanner |
| Menendez | Rangel | Tauscher |
| Michaud | Ross | Thompson (CA) |
| Millender- | Rothman | Thompson (MS) |
| McDonald | Roybal-Allard | Tierney |
| Miller (NC) | Ruppersberger | Towns |
| Miller, George | Rush | Udall (CO) |
| Mollohan | Ryan (OH) | Udall (NM) |
| Moore (KS) | Sabo | Van Hollen |
| Moore (WI) | Salazar | Velázquez |
| Moran (VA) | Sánchez, Linda | Visclosky |
| Murtha | T. | Wasserman |
| Nadler | Sanders | Schultz |
| Napolitano | Saxton | Waters |
| Neal (MA) | Schakowsky | Watson |
| Oberstar | Schiff | Watt |
| Obey | Schwartz (PA) | Waxman |
| Olver | Scott (VA) | Wexler |
| Ortiz | Serrano | Wilson (NM) |
| Owens | Shays | Woolsey |
| Pallone | Sherman | Wu |
| Pascrell | Skelton | Wynn |

**NOES—243**

| | | |
|---|---|---|
| Aderholt | Dreier | Leach |
| Akin | Duncan | Lewis (CA) |
| Alexander | Emerson | Lewis (KY) |
| Bachus | English (PA) | Linder |
| Baker | Everett | Lucas |
| Barrett (SC) | Ferguson | Lungren, Daniel |
| Barrow | Fitzpatrick (PA) | E. |
| Bartlett (MD) | Flake | Mack |
| Barton (TX) | Foley | Manzullo |
| Bass | Forbes | Marchant |
| Bean | Fortenberry | Marshall |
| Beauprez | Fossella | Matheson |
| Berry | Foxx | McCaul (TX) |
| Biggert | Franks (AZ) | McCotter |
| Bilirakis | Frelinghuysen | McCrery |
| Bishop (GA) | Gallegly | McHenry |
| Bishop (UT) | Garrett (NJ) | McHugh |
| Blackburn | Gerlach | McIntyre |
| Blunt | Gibbons | McKeon |
| Boehner | Gilchrest | McMorris |
| Bonilla | Gillmor | McNulty |
| Bonner | Gingrey | Melancon |
| Bono | Gohmert | Mica |
| Boozman | Goode | Miller (FL) |
| Boren | Goodlatte | Miller (MI) |
| Boucher | Granger | Miller, Gary |
| Boustany | Graves | Moran (KS) |
| Bradley (NH) | Green (WI) | Murphy |
| Brady (TX) | Gutknecht | Musgrave |
| Brown (SC) | Hall | Myrick |
| Brown-Waite, | Harris | Neugebauer |
| Ginny | Hart | Ney |
| Burgess | Hastings (WA) | Northup |
| Burton (IN) | Hayes | Norwood |
| Buyer | Hayworth | Nunes |
| Calvert | Hefley | Nussle |
| Camp | Hensarling | Osborne |
| Cannon | Herger | Otter |
| Cantor | Herseth | Pearce |
| Capito | Hobson | Pence |
| Cardoza | Hoekstra | Peterson (PA) |
| Castle | Holden | Petri |
| Chabot | Hostettler | Pickering |
| Chandler | Hunter | Pitts |
| Chocola | Hulshof | Platts |
| Coble | Hyde | Poe |
| Cole (OK) | Inglis (SC) | Pombo |
| Conaway | Issa | Porter |
| Cooper | Istook | Portman |
| Costa | Jenkins | Price (GA) |
| Cox | Jindal | Pryce (OH) |
| Cramer | Johnson (CT) | Putnam |
| Crenshaw | Johnson, Sam | Radanovich |
| Cubin | Jones (NC) | Ramstad |
| Culberson | Keller | Regula |
| Cunningham | Kelly | Rehberg |
| Davis (AL) | Kennedy (MN) | Reichert |
| Davis (KY) | King (IA) | Renzi |
| Davis (TN) | King (NY) | Reyes |
| Davis, Jo Ann | Kingston | Reynolds |
| Davis, Tom | Kirk | Rogers (AL) |
| Deal (GA) | Kline | Rogers (KY) |
| DeLay | Knollenberg | Rogers (MI) |
| Dent | Kolbe | Rohrabacher |
| Diaz-Balart, L. | Kuhl (NY) | Ros-Lehtinen |
| Diaz-Balart, M. | LaHood | Royce |
| Doolittle | Latham | Ryan (WI) |
| Drake | LaTourette | Ryun (KS) |

| | | |
|---|---|---|
| Schwarz (MI) | Souder | Walden (OR) |
| Scott (GA) | Stearns | Walsh |
| Sensenbrenner | Sullivan | Wamp |
| Sessions | Sweeney | Weldon (FL) |
| Shadegg | Tancredo | Weldon (PA) |
| Shaw | Taylor (NC) | Weller |
| Sherwood | Taylor (NC) | Westmoreland |
| Shimkus | Terry | Whitfield |
| Shuster | Thomas | Wicker |
| Simmons | Thornberry | Wilson (SC) |
| Simpson | Tiahrt | Wolf |
| Smith (NJ) | Tiberi | Young (AK) |
| Smith (TX) | Turner | Young (FL) |
| Sodrel | Upton | |

**NOT VOTING—11**

| | | |
|---|---|---|
| Carter | Hinchey | Sanchez, Loretta |
| Eshoo | Hinojosa | Stupak |
| Feeney | Honda | Weiner |
| Green, Gene | Oxley | |

ANNOUNCEMENT BY THE ACTING CHAIRMAN

The Acting CHAIRMAN (during the vote). Members are advised that 2 minutes remain in this vote.

□ 1405

Mr. MURTHA and Mr. SHAYS changed their vote from "no" to "aye."

So the amendment was rejected.

The result of the vote was announced as above recorded.

Ms. JACKSON-LEE of Texas. Mr. Chairman, I recognize the importance of having standardized drivers' licenses and identification cards. This should be done on a bipartisan basis, however. The REAL ID Act was not bipartisan, and it was moved too quickly through the legislative process. It was passed without any Committee hearings or markups.

Mr. UDALL of Colorado. Mr. Chairman, I cannot in good conscience vote for the REAL ID Act, H.R. 418 because, despite the intention of the bill's sponsors to strengthen our borders, it has the opposite effect, by making homeland security and an effective war against terrorism more difficult with unnecessary provisions aimed at legitimate asylum seekers. Moreover, I am guided in my judgment about this bill by the opposition of the National Governors Association and the National Council of State Legislatures.

This bill tightens asylum laws in a way that inhibits, rather than enhances our national security. Currently individuals who participate in terrorist activity are not allowed to gain asylum status in this country. Terrorists have not been able to use the current asylum system to gain entry into the country, thus the tightening of these laws only makes gaining asylum status more difficult for those legitimately seeking asylum. Provisions such as requiring applicants to prove the "central reason" for their persecution or allowing judges to require applicants to produce corroborating evidence are unnecessary.

While national security must be our top priority, immigration policy should not create unnecessary requirements for legitimate asylum seekers who are arguably our best allies in the fight against international terrorism. The asylum provisions of this bill will not enhance our security or our standing in the world.

I also have concerns that the bill allows and directs the Secretary of Homeland Security to waive all laws which he or she deems necessary to complete the construction of barriers along any and all U.S. borders. Some have argued that this provision is needed to ensure the construction of a fence along three and a half miles of the U.S.-Mexico border near San Diego. However, the language of the bill is not limited to the construction of a fence in this lo-

cation. Instead, it instructs the Secretary to waive all laws for all U.S. borders; this includes the U.S.-Mexico border, the U.S.-Canada border, and maybe even the border between Alaska and Russia. The bill also removes any judicial review of the waiving of these laws.

This would give far too much unchecked authority to the Secretary of Homeland Security and does not provide the protection of judicial review of this authority.

There are two amendments, one offered by my colleagues Mr. Nadler and Mr. Meeks, and the other offered by Mr. Farr, which would strike portions of the bill that do not address our national security regarding the asylum system and our borders. However, in light of their failure, I am left no option but to vote against this bill.

I find the driver's license standards established in this bill to be unnecessary as well, as they already exist in current law. Last fall's Intelligence bill, which I supported, included a provision which already implements the 9/11 Commission Report's recommendations to create national minimum standards for driver's licenses. This provision allowed for States to participate with the Department of Transportation and the Department of Homeland Security in a rulemaking process.

H.R. 418 repeals these provisions and replaces them with standards established without State input. The issuance of driver's licenses has always been within State jurisdiction. Even with the measures passed in the Intelligence bill, States will largely be organizing and conducting the implementation of these standards. Their participation in establishing and implementing driver's license standards is essential for these provisions to be successful. This bill simply ignores State involvement altogether in these standards.

Though the bill does provide grants for the costs of implementing these standards, with the current fiscal climate, many States fear they will be left with the burden of paying a portion of these costs. Most States are faced with the same fiscal crisis that the Federal Government is currently experiencing. Creating an unfunded mandate for States is unfair, especially when they are excluded from the rulemaking process.

There are portions in this bill which I believe are beneficial to our national security. For instance, I am pleased the amendment offered by Mr. SESSIONS passed by a voice vote, as it will strengthen our ability to ensure the deportation of individuals who are illegally present in the United States.

Unfortunately, the egregious measures in the bill far outweigh the beneficial provisions. Thus, I must vote against this bill and hope that the Senate will remove the portions of this bill which are unnecessary and attack the balance of power in our country.

Mr. ISSA. Mr. Chairman, I rise today in strong support of H.R. 418, the REAL ID Act of 2005. This bill includes provisions that are essential to preventing terrorists and other criminals from obtaining fraudulent identification and provides security at our borders.

Last year, Congress passed legislation based on the recommendations of the 9/11 Commission but failed to address vital national security and homeland security issues. This Legislation addresses theses issues and further secures our Nation in a post 9/11 world.

H.R. 418 requires States to implement new minimum regulations for State drivers' license

*Office of the General Counsel*
**U.S. Department of Homeland Security**
Washington, DC 20528



April 9, 2019

**MEMORANDUM FOR THE SECRETARY**

FROM:              John M. Mitnick
                       General Counsel

SUBJECT:           Designation of an Order of Succession for the Secretary

<u>**Summary**</u>:  Pursuant to your authority set forth in section 113 of title 6, United States Code, you have expressed your desire to designate certain officers of the Department of Homeland Security (DHS) in order of succession to serve as Acting Secretary.  Your approval of the attached document will accomplish such designation.

<u>**Discussion**</u>: ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
██████████  The redacted information contains attorney-client communications and attorney work product which is privileged and not subject to disclosure.

<u>**Action**</u>:  By approving the attached document, you will designate your desired order of succession for the Secretary of Homeland Security in accordance with your authority pursuant to Section 113(g)(2) of title 6, United States Code.

Approve/date _____      Disapprove/date_____

Modify/date _____        Needs discussion/date_____

Attachment:  Annex A

**GOVERNMENT EXHIBIT**
_____
**6**

### Amending the Order of Succession in the Department of Homeland Security

By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows:

Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof:

Annex A. Order for Delegation of Authority by the Secretary of the Department of Homeland Security.

1. Deputy Secretary of Homeland Security;

2. Under Secretary for Management;

3. Commissioner of U.S. Customs and Border Protection;

4. Administrator of the Federal Emergency Management Agency;

5. Director of the Cybersecurity and Infrastructure Security Agency;

6. Under Secretary for Science and Technology;

7. Under Secretary for Intelligence and Analysis

8. Administrator of the Transportation Security Administration;

9. Director of U.S. Immigration and Customs Enforcement;

10. Director of U.S. Citizenship and Immigration Services;

11. Under Secretary for Strategy, Policy, and Plans;

12. General Counsel;

13. Deputy Under Secretary for Management;

14. Deputy Commissioner of U.S. Customs and Border Protection;

15. Deputy Administrator of the Transportation Security Administration;

16. Deputy Director of U.S. Immigration and Customs Enforcement;

17. Deputy Director of U.S. Citizenship and Immigration Services;

18. Director of the Federal Law Enforcement Training Center.

No individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation.

**Amendment to the Order of Succession for the Secretary of Homeland Security**

Section II.A of DHS Delegation No. 00106, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, is amended hereby to state as follows: "In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the order of succession of officials is governed by Annex A."

By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security by amending Annex A of DHS *Orders of Succession and Delegations of Authorities for Named Positions*, Delegation No. 00106. Annex A is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof:

Annex A, Order for Delegation of Authority by the Secretary of the Department of Homeland Security
*Pursuant to Title 6, United States Code, Section 113(g)(2)*

1. Deputy Secretary of Homeland Security;

2. Under Secretary for Management;

3. Commissioner of the U.S. Customs and Border Protection;

4. Under Secretary for Strategy, Policy, and Plans;

5. Administrator and Assistant Secretary of the Transportation Security Administration;

6. Administrator of the Federal Emergency Management Agency;

No individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation.

Dated: 11/08/19

Kevin K. McAleenan
Acting Secretary of Homeland Security

GOVERNMENT
EXHIBIT
7

Order Designating the Order of Succession
for the Secretary of Homeland Security

(a) By any authority vested in me as Acting Secretary of Homeland Security, including the Homeland
Security Act of 2002, 6 U.S.C. § 113(g)(2), and notwithstanding any Department of Homeland Security
(DHS) prior delegation, directive, instruction, policy, or other document of any kind, including without
limitation DHS Delegation No. 00106, I hereby designate the order of succession for the Secretary of
Homeland Security as follows:

Order of Succession for the Secretary of Homeland Security
*Pursuant to Title 6, United States Code, Section 113(g)(2)*

1. Deputy Secretary of Homeland Security;

2. Under Secretary for Management;

3. Commissioner of the U.S. Customs and Border Protection

4. Under Secretary for Strategy, Policy, and Plans;

5. Administrator and Assistant Secretary of the Transportation Security Administration; and

6. Administrator of the Federal Emergency Management Agency.

(b) No individual who is serving in an office listed in paragraph (a) in an acting capacity, by virtue of so
serving, shall act as Secretary pursuant to this order.

(c) I am issuing this Order out of an abundance of caution and to minimize any disruption occasioned by
a recent Government Accountability Office (GAO) opinion (B-331650 (Comp. Gen., Aug. 14, 2020))
and recent challenges filed in Federal court alleging that the November 8, 2019, order of succession
issued by then-Acting Secretary Kevin McAleenan was not valid.   I believe that the GAO's opinion and
the plaintiff's arguments in those court cases are incorrect and present an unnecessary distraction to the
mission of the Department of Homeland Security.   Nevertheless, under GAO's view, no Secretary has
ever properly invoked 6 U.S.C. § 113(g)(2) "[to] designate such other officers of the Department in
further order of succession to serve as Acting Secretary."   In that case, the Federal Vacancies Reform
Act (FVRA) would provide an alternative basis for an official to exercise the functions and duties of the
Secretary temporarily in an acting capacity.   As the most senior successor listed in Executive Order
13753, 81 Fed. Reg. 90667 (Dec. 9, 2016), in accordance with the President's advance exercise of his
authority to name an Acting Secretary under the FVRA, and without casting doubt on the continued
validity of the Amendment to the Order of Succession for the Secretary of Homeland Security issued by
Acting Secretary McAleenan on November 8, 2019, I am relying on any authority I may have been
granted by the FVRA to designate the order of succession for the Secretary of Homeland Security
pursuant to 6 U.S.C. § 113(g)(2), as specified and directed in paragraph (a) of this Order.   Upon my
signature, any authority that I may have been granted by the FVRA will terminate because 6 U.S.C.
§ 113(g)(2) applies "[n]otwithstanding chapter 33 of title 5."

(d) This Order Designating the Order of Succession for the Secretary of Homeland Security shall be
effective immediately upon the affixing of the signature of the undersigned.



GOVERNMENT
EXHIBIT
8

Dated: 10 SEPT 2020

_____

Peter T. Gaynor
Department of Homeland Security

**Department of Homeland Security**
**DHS Delegation Number: 00106**
**Revision Number: 08.5**
**Issue Date: 12/15/2016**
**Updated Date: 04/10/2019**

# DHS ORDERS OF SUCCESSION AND DELEGATIONS OF AUTHORITIES FOR NAMED POSITIONS

## I.    Purpose

This is a succession order for named positions and a delegation of authority for the continuity of essential functions of officials at the Department of Homeland Security (DHS) in case of absence, the inability of the incumbent to act during disasters or catastrophic emergencies, or vacancies in offices.

## II.    Succession Order/Delegation

A.    In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13753, amended on December 9, 2016.

B.    I hereby delegate to the officials occupying the identified positions in the order listed (Annex A), my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, in the event I am unavailable to act during a disaster or catastrophic emergency.

C.    The order of succession for the named positions, other than the Office of the Secretary, are provided in Annexes B through AC.

D.    I hereby delegate authority to the officials occupying the identified positions in the orders listed in Annexes B through AC to exercise the powers and perform the functions and duties of the named positions in case of death, resignation, inability to perform, absence, or inability to act during a disaster or catastrophic emergency until that condition ceases.



GOVERNMENT
EXHIBIT
9

1

Delegation # 00106
Revision # 08.5

E.      In terms of named positions in which appointment is required to be made by the President, by and with the advice and consent of the Senate (PAS), if positions are vacant as that term is used in the Federal Vacancies Reform Act of 1998, the First Assistant shall act as the incumbent until a successor is appointed, unless otherwise designated by the President.  The individual serving in the position identified as the first to succeed is designated the "First Assistant" for the purposes of the Federal Vacancies Reform Act of 1998.  If the First Assistant position is vacant, the next designated official in the order of succession may exercise all the powers, duties, authorities, rights, and functions authorized by law to be exercised by the incumbent, but may not perform any function or duty required by law to be performed exclusively by the office holder.

F.      For all other positions that are not subject to the Federal Vacancies Reform Act of 1998, any official in the order provided for in the succession order may exercise all the powers, duties, authorities, rights, and functions authorized to be performed by the incumbent, to the extent not otherwise limited by law.

G.      Only officials specifically designated in the order of succession for each of the named positions in Annexes B through AC are eligible, subject to modification in accordance with Section II.I.  Unless formally appointed by the Secretary, persons appointed on an acting basis, or on some other temporary basis, are ineligible to serve as a successor; therefore, the order of succession would fall to the next designated official in the approved order of succession.

H.      The prohibition on any re-delegation of powers, authorities, functions, and duties contained in Departmental Delegations, Directives, Management Directives, Instructions, Manuals, or similar internal documents is not applicable to restrict the authority of any individual who is exercising the authority of a vacant position under this Delegation.  Such an individual shall, however, be bound by such Departmental Delegations, Directives, Management Directives, Instructions, Manuals, or similar internal documents, and shall not further re-delegate powers to any individual.

I.      Each Annex may be updated separately.  A Component Head seeks modification of his/her order of succession by forwarding a proposed updated Annex to the Office of Operations Coordination (OPS), Continuity Division and the Office of the Under Secretary for Management (MGMT), Program Manager, Delegations and Directives; Annexes are processed by MGMT, in consultation with the Office of the General Counsel (OGC), for approval of the Secretary.  At a minimum, the Annex is coordinated with OGC and the White House Liaison.  Where possible, Component orders of succession should be at least three positions deep and geographically dispersed.

J.      The Office of the Executive Secretary, MGMT, and OPS are responsible for maintaining a current list of incumbents holding all positions identified in Annexes B through AC.

K.      Nothing in this delegation is intended to limit my discretion as Secretary to depart from this delegation.

# III.   Authorities

A.      Title 5, United States Code (U.S.C.) §§ 3345-49 (Federal Vacancies Reform Act of 1998, as amended)

B.      Title 6, U.S.C., § 112 (Secretary; functions)

# IV.   Office of Primary Interest

OPS and MGMT is the office of primary interest for maintaining and updating the Annexes to this Delegation.

Jeh Charles Johnson
Secretary of Homeland Security

Dec 15 2016
Date

**Legend**

| | |
|---|---|
| Career | C |
| Limited Term Appointment | L |
| Military Officer | M |
| Non-Career in the Senior Executive Service or Schedule C | N |
| Presidential Appointee | P |
| Presidential Appointee with Senate Confirmation | S |
| Scientific Professional | T |
| First Assistant pursuant to the Federal Vacancies Reform Act | * |

3

Delegation # 00106
Revision # 08.5

ATTACHMENT 1

# DHS ORDERS OF SUCCESSION AND ORDERS FOR DELEGATIONS OF AUTHORITIES

| Annex | Title | Issue Date |
|-------|-------|-----------|
| Annex A | Order For Delegation of Authority by the Secretary of the Department of Homeland Security | Revision 08.5, 04/10/2019 |
| Annex B | Deputy Secretary, Office of the | Revision 08.5, 04/10/2019 |
| Annex C | Citizenship and Immigration Service Ombudsman | Revision 06, 09/14/2016 |
| Annex D | Citizenship and Immigration Services, United States | Revision 06, 09/14/2016 |
| Annex E | Civil Rights and Civil Liberties, Office for | Revision 06, 09/14/2016 |
| Annex F | Coast Guard, United States | Revision 06, 09/14/2016 |
| Annex G | Countering Weapons of Mass Destruction Office | Revision 08.2, 05/21/2018 |
| Annex H | Customs and Border Protection, United States | Revision 06, 09/14/2016 |
| Annex I | Executive Secretariat | Revision 06, 09/14/2016 |
| Annex J | Federal Emergency Management Agency | Revision 06, 09/14/2016 |
| Annex K | Federal Law Enforcement Training Center | Revision 06, 09/14/2016 |
| Annex L | General Counsel, Office of the | Revision 06, 09/14/2016 |
| Annex M | Immigration and Customs Enforcement, United States | Revision 06, 09/14/2016 |
| Annex N | Inspector General, Office of | Revision 06, 09/14/2016 |
| Annex O | Intelligence and Analysis, Office of | Revision 06, 09/14/2016 |
| Annex P | Legislative Affairs, Office of | Revision 06, 09/14/2016 |
| Annex Q | Management Directorate | Revision 06, 09/14/2016 |
| Annex R | National Protection and Programs Directorate | Revision 08, 07/11/2017 |
| Annex S | Operations Coordination, Office of | Revision 06, 09/14/2016 |
| Annex T | Partnership and Engagement, Office of | Revision 06, 09/14/2016 |
| Annex U | Strategy, Policy, and Plans, Office of | Revision 08.4, 02/15/2019 |
| Annex V | Privacy Office, Chief | Revision 06, 09/14/2016 |
| Annex W | Public Affairs, Office of | Revision 06, 09/14/2016 |
| Annex X | Science and Technology | Revision 07, 01/19/2017 |
| Annex Y | Secret Service, United States | Revision 06, 09/14/2016 |
| Annex Z | Transportation Security Administration | Revision 08.3, 10/23/2018 |
| Annex AA | Chief Financial Officer (DHS) | Revision 06, 09/14/2016 |
| Annex AB | Deputy Administrator, Federal Emergency Management Agency (FEMA) | Revision 06, 09/14/2016 |
| Annex AC | Protection and National Preparedness (FEMA) | Revision 06, 09/14/2016 |

ANNEX A

# ORDER FOR DELEGATION OF AUTHORITY BY THE SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY

*Pursuant to Title 6, United States Code, Section 113(g)(2)*

1.  Deputy Secretary of Homeland Security
2.  Under Secretary for Management
3.  Commissioner of U.S. Customs and Border Protection
4.  Administrator of the Federal Emergency Management Agency
5.  Director of the Cybersecurity and Infrastructure Security Agency
6.  Under Secretary for Science and Technology
7.  Under Secretary for Intelligence and Analysis
8.  Administrator of the Transportation Security Administration
9.  Director of U.S. Immigration and Customs Enforcement
10. Director of U.S. Citizenship and Immigration Services
11. Under Secretary for Strategy, Policy, and Plans
12. General Counsel
13. Deputy Under Secretary for Management
14. Deputy Commissioner of U.S. Customs and Border Protection
15. Deputy Administrator of the Transportation Security Administration
16. Deputy Director of U.S. Immigration and Customs Enforcement
17. Deputy Director of U.S. Citizenship and Immigration Services
18. Director of the Federal Law Enforcement Training Centers

ANNEX B
ISSUE DATE: 04/10/2019          APPROVAL: 04/10/2019

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Deputy Secretary, Office of the** | |
| 1    Deputy Secretary | S |
| 2    Under Secretary for Management* | S |
| 3    Administrator, Transportation Security Administration | S |
| 4    Administrator, Federal Emergency Management Agency | S |
| 5    Under Secretary, National Programs and Protection Directorate | S |
| 6    Under Secretary, Science and Technology | S |
| 7    Under Secretary, Intelligence and Analysis | S |
| 8    Commissioner, U.S. Customs and Border Protection | S |
| 9    Director, U.S. Immigration and Customs Enforcement | S |
| 10    Director, U.S. Citizenship and Immigration Services | S |
| 11    Under Secretary, Office of Strategy, Policy, and Plans | S |
| 12    General Counsel | S |
| 13    Deputy Under Secretary for Management | C |
| 14    Deputy Commissioner, U.S. Customs and Border Protection | C |
| 15    Deputy Administrator, Transportation Security Administration | C |
| 16    Deputy Director, U.S. Immigration and Customs Enforcement | C |
| 17    Deputy Director, U.S. Citizenship and Immigration Services | C |
| 18    Director, Federal Law Enforcement Training Centers | C |

Delegation # 00106
Revision # 08.5

ANNEX C
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Citizenship and Immigration Services Ombudsman** | |
| 1    Ombudsman | N |
| 2    Deputy Director | C |
| 3    Senior Advisor | L |
| 4    Chief of Staff | C |
| 5    Director of Operations | C |
| 6    Chief of Casework | C |

C-1

ANNEX D
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| Citizenship and Immigration Services, United States | |
|---|---|
| 1 | Director | S |
| 2 | Deputy Director* | C |
| 3 | Associate Director, Management Directorate | C |
| 4 | Associate Director, Refugee Asylum and International Operations Directorate | C |
| 5 | Associate Director, Service Center Operations Directorate | C |
| 6 | Associate Director, Field Operations Directorate | C |
| 7 | Director, National Benefits Center | C |

D-1

ANNEX E
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                              Career Status

| | Civil Rights and Civil Liberties, Office for | |
|---|---|---|
| 1 | Civil Rights and Civil Liberties Officer | P |
| 2 | Deputy Officer, Programs and Compliance | C |
| 3 | Deputy Officer, Equal Employment Opportunity Programs | C |
| 4 | Executive Officer | C |

Delegation # 00106
Revision # 06

ANNEX F
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                    Career Status

| | Coast Guard, United States | |
|---|---|---|
| 1 | Commandant | M |
| 2 | Vice Commandant | M |
| 3-4 | Deputy Commandant for Mission Support or Deputy Commandant for Operations in precedence of their grade | M |
| 5-6 | Other Vice Admirals in precedence of their grade | M |

F-1

ANNEX G
ISSUE DATE: 05/21/2018          APPROVAL: 05/21/2018

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| Countering Weapons of Mass Destruction Office | |
|---|---|
| 1    Assistant Secretary | P |
| 2    Deputy Assistant Secretary | C |
| 3    Chief of Staff | C |
| 4    Deputy Director, Domestic Nuclear Detection Office | C |
| 5    Deputy Director, Office of Health Affairs | C |

Delegation # 00106
Revision # 08.2

ANNEX H
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                           Career Status

| | Customs and Border Protection, United States | |
|---|---|---|
| 1 | Commissioner | S |
| 2 | Deputy Commissioner* | C |
| 3 | Executive Assistant Commissioner, Office of Field Operations | C |
| 4 | Chief, U.S. Border Patrol | C |
| 5 | Executive Assistant Commissioner, Air and Marine Operations | C |
| 6 | Executive Assistant Commissioner, Trade | C |
| 7 | Executive Assistant Commissioner, Operations Support | C |
| 8 | Executive Assistant Commissioner, Enterprise Services | C |

H-1

ANNEX I
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| Executive Secretariat | | |
|---|---|---|
| 1 | Executive Secretary | N |
| 2 | Deputy Executive Secretary | C |
| 3 | Assistant Executive Secretary, Briefing Books/Interagency Coordination | C |

I-1

ANNEX J
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                    Career Status

| | Federal Emergency Management Agency | |
|---|---|---|
| 1 | Administrator | S |
| 2 | Deputy Administrator* | S |
| 3 | Deputy Administrator, Protection and National Preparedness | S |
| 4 | Associate Administrator, Response and Recovery | N |
| 5 | FEMA Region IX Administrator | C |
| 6 | FEMA Region VI Administrator | C |

J-1

ANNEX K
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                           Career Status

| | **Federal Law Enforcement Training Centers** | |
|---|---|---|
| 1 | Director | C |
| 2 | Deputy Director for Training | C |
| 3 | Deputy Director for Management | C |
| 4 | Assistant Director, Mission and Readiness Support | C |
| 5 | Assistant Director, Regional and International Training | C |
| 6 | Assistant Director, Chief Financial Officer | C |
| 7 | Assistant Director, Glynco Training | C |
| 8 | Assistant Director, Centralized Training Management | C |
| 8 | Assistant Director, Washington Operations | C |
| 9 | Assistant Director, Chief Information Officer | C |
| 10 | Chief of Staff | C |

K-1

ANNEX L
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                        Career Status

| | General Counsel, Office of the | | |
|---|---|---|---|
| 1 | General Counsel | | S |
| 2 | Principal Deputy General Counsel* | | C |
| 3 | Deputy General Counsel | [Senior ranking by time in position and in DHS][1] | N |
| 4 | Deputy General Counsel | [Senior ranking by time in position and in DHS] | N |
| 5 | Deputy General Counsel | [Senior ranking by time in position and in DHS] | N |
| 6 | Chief of Staff | | C |
| 7 | Associate General Counsel, Operations and Enforcement | | C |
| 8 | Associate General Counsel, General Law | | C |
| 9 | Chief Counsel, Transportation Security Administration | | C |
| 10 | Chief Counsel, Federal Law Enforcement Training Center | | C |

---

[1] For the Deputy General Counsel positions identified in lines 3-5, seniority is determined by length of time in the position.  In the event more than one Deputy General Counsel has the same appointment date, time in service in the Department is the second determining factor for seniority.

L-1

ANNEX M
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                              Career Status

| Immigration and Customs Enforcement, United States | |
|---|---|
| 1    Assistant Secretary | S |
| 2    Deputy Director* | C |
| 3    Executive Associate Director,  Homeland Security Investigations | C |
| 4    Executive Associate Director, Enforcement and Removal Operations | C |
| 5    Executive Associate Director, Management and Administration | C |
| 6    Principal Legal Advisor | N |
| 7    Special Agent in Charge – Denver | C |
| 8    Field Officer Director – San Antonio | C |

M-1

ANNEX N
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| | Inspector General, Office of | |
|---|---|---|
| 1 | Inspector General | S |
| 2 | Deputy Inspector General* | C |
| 3 | Counsel to the Inspector General | C |
| 4 | Assistant Inspector General, Audits | C |
| 5 | Assistant Inspector General, Inspections | C |
| 6 | Assistant Inspector General, Emergency Management Oversight | C |

ANNEX O
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                                Career Status

| | Intelligence and Analysis, Office of | |
|---|---|---|
| 1 | Under Secretary for Intelligence and Analysis/DHS Chief Intelligence Officer | S |
| 2 | Principal Deputy Under Secretary for Intelligence and Analysis* | C |
| 3 | Deputy Under Secretary for Intelligence Operations | C |
| 4 | Deputy Under Secretary for Mission Support | C |
| 5 | Associate Deputy Director, El Paso Intelligence Center/ Strategic Analysis Section | C |

O-1

ANNEX P
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Legislative Affairs, Office of** | |
| 1    Assistant Secretary for Legislative Affairs | P |
| 2    Deputy Assistant Secretary (Senate) | N |
| 3    Deputy Assistant Secretary (House) | N |
| 4    Chief of Staff | C |
| 5    Director, Management Team | C |
| 6    Director, FEMA Team | C |
| 7    Director, Borders and Immigration | C |

P-1

ANNEX Q
ISSUE DATE: 9/14/2016           APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Management Directorate** | |
| 1    Under Secretary for Management | S |
| 2    Deputy Under Secretary for Management* | C |
| 3    Chief Financial Officer | S |
| 4    Chief Information Officer | P |
| 5    Chief Human Capital Officer | C |
| 6    Chief Procurement Officer | C |
| 7    Chief Readiness Support Officer | C |
| 8    Chief Security Officer | C |
| 9    Chief of Staff | C |
| 10    Deputy Director, Federal Law Enforcement Training Center | C |

Delegation # 00106
Revision # 06

ANNEX R
ISSUE DATE: 07/11/2017          APPROVAL: 07/11/2017

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **National Protection and Programs Directorate** | |
| 1    Under Secretary | S |
| 2    Deputy Under Secretary for NPPD* | N |
| 3    Assistant Secretary, Office of Infrastructure Protection | P |
| 4    Assistant Secretary, Office of Cybersecurity and Communications | N |
| 5    Deputy Assistant Secretary, Office of Infrastructure Protection | C |
| 6    Deputy Assistant Secretary, Office of Cybersecurity and Communications | C |
| 7    Director, Management | C |
| 8    Office of Infrastructure Protection, Regional Director for Region 8 | C |

R-1

ANNEX S
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Operations Coordination, Office of** | |
| 1    Director | C |
| 2    Deputy Director | C |
| 3    Director, Current Operations Division | C |
| 4    Director, National Operations Center | C |
| 5    Chief of Staff | C |

S-1

ANNEX T
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Partnership and Engagement, Office of** | |
| 1   Assistant Secretary | N |
| 2   Assistant Secretary for State and Local Law Enforcement | N |
| 3   Deputy Assistant Secretary, Intergovernmental Affairs | C |
| 4   Deputy Assistant Secretary, Private Sector Office | N |
| 5   Director of Local Affairs | C |

T-1

ANNEX U
ISSUE DATE: 2/15/2019          APPROVAL: 2/15/2019

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|----------|---------------|
| **Strategy, Policy, & Plans, Office of** | |
| 1    Under Secretary | S |
| 2    Assistant Secretary for Strategy, Plans, Analysis, and Risk* | N |
| 3    Deputy Under Secretary | C |
| 4    Assistant Secretary for International Affairs | N |
| 5    Assistant Secretary for Threat Prevention and Security Policy | N |
| 6    Assistant Secretary for Border, Immigration, and Trade | N |
| 7    Assistant Secretary for Cyber, Infrastructure, and Resilience | N |
| 8    Deputy Assistant Secretary for Screening Coordination Office | C |
| 9    Deputy Assistant Secretary for International Affairs | C |

U-1

ANNEX V
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| **Privacy Officer, Chief** | |
|---|---|
| 1    Chief Privacy Officer | N |
| 2    Deputy Chief Privacy Officer | C |
| 3    Deputy Chief FOIA Officer | C |
| 4    Senior Director, Privacy Compliance | C |
| 5    Chief of Staff | C |

V-1

ANNEX W
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Public Affairs, Office of** | |
| 1    Assistant Secretary | P |
| 2    Principal Deputy Assistant Secretary | C |
| 3    Deputy Assistant Secretary for Media Operations/Press Secretary | N |
| 4    Deputy Assistant Secretary for Strategic Communications | N |
| 5    Director of Communications | N |
| 6    Chief of Staff | C |
| 7    Director, Incident Communications | C |

ANNEX X
ISSUE DATE: 1/19/2017          APPROVAL: 1/19/2017

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| | Science and Technology | |
|---|---|---|
| 1 | Under Secretary | S |
| 2 | Deputy Under Secretary* | C |
| 3 | Chief of Staff | C |
| 4 | Director, Homeland Security Advanced Research Projects Agency | C |
| 5 | Director, Office of Support to the Homeland Security Enterprise and First Responders Division | C |
| 6 | Director, Capability Development Support Division | C |
| 7 | Director, Research and Development Partnerships | C |
| 8 | Director, Finance and Budget Division | C |
| 9 | Director, Administrative Support Division | C |

X-1

ANNEX Y
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Secret Service, United States** | | |
| 1 | Director | P |
| 2 | Deputy Director | C |
| 3 | Chief Operating Officer | C |
| 4 | Assistant Director - Protective Operations | C |
| 5 | Assistant Director - Investigations | C |
| 6 | Assistant Director - Government and Public Affairs | C |
| 7 | Assistant Director -  Human Resources | C |
| 8 | Assistant Director - Professional Responsibility | C |
| 9 | Assistant Director - Strategic Intelligence and Information | C |
| 10 | Assistant Director - Training | C |
| 11 | Chief - Uniformed Division | C |
| 12 | Chief Counsel | C |
| 13 | Chief Technology Officer | C |
| 14 | Chief Financial Officer | C |
| 15 | Chief - Strategic Planning and Policy | C |
| 16 | Deputy Assistant Director(s) - Protective Operations | C |
| 17 | Deputy Assistant Director(s) - Investigations | C |
| 18 | Deputy Assistant Director(s) - Government and Public Affairs | C |
| 19 | Deputy Assistant Director(s) -  Human Resources | C |
| 20 | Deputy Assistant Director(s) - Professional Responsibility | C |
| 21 | Deputy Assistant Director(s) - Strategic Intelligence and Information | C |
| 22 | Deputy Assistant Director(s) - Training | C |
| 23 | Deputy Assistant Director(s) - Technical Development and Mission Support | C |
| 24 | Deputy Assistant Director(s) - Strategic Planning and Policy | C |
| 25 | Special Agent in Charge - Washington | C |
| 26 | Special Agent in Charge - New York | C |
| 27 | Special Agent in Charge - Miami | C |
| 28 | Special Agent in Charge - Los Angeles | C |

Y-1

ANNEX Z
ISSUE DATE: 10/23/2018        APPROVAL: 10/23/2018

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Transportation Security Administration** | | |
| 1 | Administrator | S |
| 2 | Deputy Administrator | P |
| 3 | Chief of Staff | N |
| 4 | Executive Assistant Administrator, Security Operations | C |
| 5 | Executive Assistant Administrator, Operations Support | C |
| 6 | Executive Assistant Administrator, Law Enforcement/Federal Air Marshal Service | C |
| 7 | Executive Assistant Administrator, Enterprise Support | C |
| 8 | Regional Director, Atlanta, Security Operations | C |
| 9 | Regional Director, Dallas, Security Operations | C |

Z-1

ANNEX AA
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

**DESIGNATION OF FIRST ASSISTANTS FOR NON-COMPONENT HEAD PRESIDENTIAL
APPOINTEES WITH SENATE CONFIRMATION POSITIONS**

| Position | | Career Status |
|---|---|---|
| **Chief Financial Officer (DHS)** | | |
| 1 | Chief Financial Officer | S |
| 2 | Deputy Chief Financial Officer* | C |

AA-1

ANNEX AB
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

**DESIGNATION OF FIRST ASSISTANTS FOR NON-COMPONENT HEAD PRESIDENTIAL
APPOINTEES WITH SENATE CONFIRMATION POSITIONS**

Position                                                                 Career Status

| | Deputy Administrator, Federal Emergency Management Agency (FEMA) | |
|---|---|---|
| 1 | Deputy Administrator, FEMA | S |
| 2 | Deputy Administrator, Protection and National Preparedness* | S |
| 3 | Associate Administrator, Mission Support | C |
| 4 | Deputy Associate Administrator, Office of Policy and Program Analysis | C |
| 5 | Region IX Administrator | C |
| 6 | Region VI Administrator | C |

AB-1

ANNEX AC
ISSUE DATE: 09/14/2016       APPROVAL: 09/14/2016

**DESIGNATION OF FIRST ASSISTANTS FOR NON-COMPONENT HEAD PRESIDENTIAL
APPOINTEES WITH SENATE CONFIRMATION POSITIONS**

| Position | | Career Status |
|---|---|---|
| **Protection and National Preparedness (FEMA)** | | |
| 1 | Deputy Administrator, Protection and National Preparedness | S |
| 2 | Assistant Administrator, National Preparedness Directorate* | C |
| 3 | Assistant Administrator, Grant Programs | P |
| 4 | Assistant Administrator, National Continuity Programs | N |

AC-1

Office of the General Counsel
Department of Homeland Security
Washington, DC 20528

APR 1 6 2018



The Honorable Michael R. Pence
President of the Senate
S-212, Capitol Building
Washington, DC  20510

Re:  Federal Vacancies Reform Act Submission

Dear Mr. Vice President:

On behalf of the Department, I submit the attached form for a *notice of a vacancy and designation of an acting officer* for a position covered by the Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277 as codified in 5 U.S.C. § 3345 *et seq*.

Should you have any questions or otherwise require agency contact in this matter, please contact Mr. Leo Boucher at (202) 447-3623 or via email at leo.boucher@hq.dhs.gov.

Sincerely,

Neal J. Swartz
Associate General Counsel for General Law

Attachment:
DHS Deputy Secretary Vacancy, Designation as Acting

GOVERNMENT
EXHIBIT
10

## Submission Under the Federal Vacancies Reform Act

**Addressees**

| ● President of the United States Senate | ○ Speaker of the U.S. House of Representatives | ○ Comptroller General of the United States |
|---|---|---|

**This Report Provides Notification of:**

| ● Vacancy | ● Designation of acting officer | ○ Nomination | ○ Action on nomination |
|---|---|---|---|

○ Change in previously submitted reported information    ○ Discontinuation of service in acting role

(date: _____ )

Name of Department or Agency and Any Suborganization

**U.S. Department of Homeland Security**

| Vacancy Title | Date Vacancy Began |
|---|---|
| Deputy Secretary | 04/14/18 |

| Name of Acting Officer | Date Service Began | Authority for Acting Designation if Other Than Vacancies Act |
|---|---|---|
| Grady, Claire M. | 04/15/18 | |

| Name of Nominee for Position | Date Nomination Submitted |
|---|---|
| | |

| Action on Nomination: | ○ Confirmed | ○ Rejected, withdrawn, returned | Date of Action |
|---|---|---|---|

**Agency Contact**

Name and Title

**Leo E. Boucher III, Asst. General Counsel, Administrative Law, General Law Division**

Contact's Address

**Department of Homeland Security**

| Contact's Phone Number | Contact's E-Mail Address |
|---|---|
| (202) 447-3623 | leo.boucher@hq.dhs.gov |

**Submitted By**

| Name and Title | Telephone Number |
|---|---|
| Neal J. Swartz, Associate General Counsel for General Law | (202) 282-8377 |

| Signature | Date |
|---|---|
| | APR 1 6 2018 |

**For Congressional Use Only**

Committee of Jurisdiction

Date Received

**For GAO Use Only**

GAO Control Number

2/8/00

Office of the General Counsel
Department of Homeland Security
Washington, DC 20528


**Homeland Security**

APR 1 1 2019

The Honorable Michael R. Pence
President of the Senate
S-212, Capitol Building
Washington, DC 20510

Re:  Federal Vacancies Reform Act Submission

Dear Mr. Vice President:

On behalf of the Department, I submit the attached form for a *vacancy* and *designation of an acting role* for a position covered by the Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277 as codified in 5 U.S.C. § 3345 *et seq*.

Should you have any questions or otherwise require agency contact in this matter, please contact Mr. Leo Boucher at (202) 447-3623 or via email at leo.boucher@hq.dhs.gov.

Sincerely,

Neal J. Swartz
Associate General Counsel for General Law

Attachments:
Vacancy & Designation of an acting officer, DHS –Under Secretary for Management

GOVERNMENT
EXHIBIT
11

## Submission Under the Federal Vacancies Reform Act

**Addressees**

● President of the United States Senate   ○ Speaker of the U.S. House of Representatives   ○ Comptroller General of the United States

**This Report Provides Notification of:**

● Vacancy   ● Designation of acting officer   ○ Nomination   ○ Action on nomination

○ Change in previously submitted reported information   ○ Discontinuation of service in acting role

(date: _____)

Name of Department or Agency and Any Suborganization

**U.S. Department of Homeland Security, Management Directorate**

| Vacancy Title | | Date Vacancy Began |
|---|---|---|
| Under Secretary for Management | | 04/10/19 |

| Name of Acting Officer | Date Service Began | Authority for Acting Designation if Other Than Vacancies Act |
|---|---|---|
| Charles H. Fulghum | 04/11/19 | |

| Name of Nominee for Position | Date Nomination Submitted |
|---|---|
| | |

| Action on Nomination: ○ Confirmed   ○ Rejected, withdrawn, returned | Date of Action |
|---|---|

**Agency Contact**

Name and Title

**Leo E. Boucher III, Asst. General Counsel, Administrative Law, General Law Division**

Contact's Address

**U.S. Department of Homeland Security**

| Contact's Phone Number | Contact's E-Mail Address |
|---|---|
| (202) 447-3623 | leo.boucher@hq.dhs.gov |

**Submitted By**

| Name and Title | Telephone Number |
|---|---|
| Neal J. Swartz, Associate General Counsel for General Law | (202) 282-8377 |

| Signature | Date |
|---|---|
| *[signature]* | APR 1 1 2019 |

**For Congressional Use Only**

Committee of Jurisdiction

Date Received

**For GAO Use Only**

GAO Control Number

2/8/00



# Congressional Record

## United States of America

## PROCEEDINGS AND DEBATES OF THE 116th CONGRESS, FIRST SESSION

*Vol. 165*     WASHINGTON, WEDNESDAY, NOVEMBER 13, 2019     *No. 181*

# Senate

The Senate met at 10 a.m. and was called to order by the President pro tempore (Mr. GRASSLEY).

### PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Eternal God, hear us when we cry to You. You have been our help in ages past and our hope for the years to come.

You don't keep a record of our transgressions but shower us daily with mercy and forgiveness. Great is Your faithfulness.

As our Senators wait for the unfolding of Your powerful providence, give them Your peace. Lord, may they cling to Your promises knowing that You will lead them to a desired destination. Give them the wisdom to trust Your unconditional love and Your willingness to save those who call on Your Name.

We pray in Your mighty Name. Amen.

### PLEDGE OF ALLEGIANCE

The President pro tempore led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

The PRESIDING OFFICER (Mr. CRAMER). The Senator from Iowa.

Mr. GRASSLEY. Mr. President, I ask unanimous consent to speak for 1 minute as in morning business.

The PRESIDING OFFICER. Without objection, it is so ordered.

### NATIONAL ADOPTION MONTH

Mr. GRASSLEY. Mr. President, November is National Adoption Month. This year, we have very good news.

In 2018, over 63,000 young people were adopted from foster care. That is an increase of 4,000 from the previous year. However, the number of children waiting for adoption also increased. That number rose to 125,000. Unfortunately, teenagers, sibling groups, and those with medical challenges often wait much longer to be adopted. Every child deserves a safe, permanent, loving home, so I want to commend all those who have chosen to adopt children in foster care.

If you wonder where I get the opinion that it is unfortunate that people want a permanent, safe, and loving home, all you have to do is listen to the kids in the foster care system, and you always get this response: What I would like to have is a mom and dad, and I would like to have a home. In other words, they get tired of being shuffled around from one foster home to another foster home, to another foster home. That is where I come from in recognizing November as National Adoption Month.

I yield the floor.

### RECOGNITION OF THE MAJORITY LEADER

The PRESIDING OFFICER. The majority leader is recognized.

### NOMINATION OF STEVEN J. MENASHI

Mr. McCONNELL. Mr. President, after we confirm Chad Wolf to serve in a senior position at the Department of Homeland Security, the Senate will turn to President Trump's nominee to serve on the Second Circuit Court of Appeals.

Steven Menashi's nomination continues an already distinguished career studying, teaching, and practicing law. After earning degrees from Dartmouth and Stanford, he clerked for Judge Douglas Ginsburg on the DC Court of Appeals and Justice Alito on the Supreme Court. Mr. Menashi has held a research fellowship at the New York University School of Law and taught at George Mason University's Antonin Scalia Law School.

Even the American Bar Association's Standing Committee on the Federal Judiciary, which has lately—lately made headlines for treating President Trump's nominees in a less-than-evenhanded way, has rated this nominee "well-qualified."

Obviously, a majority of our colleagues on the Judiciary Committee concurred, and now the entire Senate will have the opportunity to confirm yet another outstanding jurist to the Federal bench.

I urge each of my colleagues to join me in supporting Steven Menashi's nomination this week.

### TURKEY AND SYRIA

Mr. McCONNELL. Mr. President, now on another matter, today President Trump will host the leader of Turkey at the White House. Although I have expressed concerns about granting President Erdogan such an honor in light of his recent actions, I hope the meeting produces better behavior from this important NATO ally.

We recognize Turkey's legitimate national security concerns about the destabilizing conflict in Syria. Indeed, no NATO ally has suffered more terrorist attacks or hosts more refugees than Turkey. Nevertheless, we have legitimate national security concerns of our own, and I know the vast majority of my colleagues share my concerns about Turkey's recent behavior.

It is important for the region and the fight against ISIS that Turkey's incursion into Syria not further jeopardize the anti-terrorism campaign of the Syrian Democratic Forces. It is important for Turkey's 80 million people that Turkey's Government moves to restore its democratic traditions—freedom of the press, religious freedom, respect for secularism and ethnic minorities, and a robust space for civil society. Despite the optimism from the

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



Printed on recycled paper.

S6515



Federal court ruled that using students' private Social Security data violated the Federal Privacy Act. The court ordered the Department to stop using the students' private information and to stop collecting on their student loans.

Even after this Federal court ruling, the Department failed to comply. The Department continued to illegally collect on the student loans of at least 16,000 defrauded students. The Department garnished wages, seized tax refunds, and wiped out some students' credit ratings.

Less than 3 weeks ago, a Federal court held Secretary Betsy DeVos in contempt of court and fined the Department $100,000. The Federal magistrate judge who issued the contempt order said, ''[T]here have to be some consequences for the violation of my order 16,000 times.''

Mr. Menashi should not be rewarded for providing such bad legal advice with a lifetime appointment to the Federal bench.

While at the Department, Mr. Menashi also helped push new rules on campus sexual assault that the administration's own analysis concluded would dramatically reduce the number of sexual assault investigations. Under these new rules, a student who is the survivor of sexual assault would be subject to cross-examination by their attacker's representative at a live hearing.

In 2018, Mr. Menashi joined the White House Counsel's Office, where he has been a member of Stephen Miller's White House Immigration Strategic Working Group. This working group has helped push a number of extreme anti-immigrant policies, including the White House's policy of separating children from their families, a problem that still has not been fully remedied, despite a court order to do so.

At his hearing, Mr. Menashi refused to answer numerous basic questions about his work, including about his role in the administration's family separation policy. He also refused to answer written questions about whether he has worked or advised on matters relating to the whistleblower complaint and President Trump's call with Ukraine's President. Importantly, none of these questions asked Mr. Menashi about the substance of his advice. These questions simply sought to understand what matters he has worked on. His refusal to answer makes it difficult for us to fulfill our constitutional duty to advise and consent.

Mr. Menashi's earlier career is equally troubling. He criticized ''Take Back the Night marches,'' which aim to stop campus sexual assault. He also wrote that the Supreme Court's decision in Roe v. Wade had codified the ''radical abortion rights advocated by campus feminists.'' He wrote that gun control legislation is ''pointless [and] self-defeating, because guns reduce crime,'' and he claimed that a major LGBT-rights organization had ''incessantly

exploited the slaying of Matthew Shepard for both financial and political benefit.'' Mr. Menashi wrote that ''charges of racism are typically overblown,'' and he compared affirmative action in college admissions to Nazi Germany's Nuremberg laws.

I want to close with a quote from a letter of opposition submitted by the Congressional Black Caucus. The CBC rarely takes a position on judicial nominees, but in this instance, felt compelled to do so. The CBC writes: ''Menashi's writings show a willingness to discriminate against minorities, women and the LGBTQ community. Menashi, who has consistently spoken against diversity and inclusiveness, does not deserve a lifetime position on one of the most important appellate courts in this country.''

In light of Mr. Menashi's record, it is hardly surprising that there is bipartisan opposition to his nomination.

I will vote no on Mr. Menashi's nomination, and I urge my colleagues on both sides of the aisle to do the same.

---

### NOMINATION OF CHAD F. WOLF

Mr. VAN HOLLEN. Mr. President, I rise to object to the nomination of Chad Wolf to serve as DHS Undersecretary of the Office of Strategy, Policy, and Plans.

This nomination is yet another example of the Trump administration's chaotic and inhumane approach to immigration issues. DHS is the third largest Federal agency, and under the Trump administration, it has had four directors in less than 3 years. It has been widely reported that Republicans are rushing to confirm Mr. Wolf so that President Trump can then appoint him Acting DHS Secretary. He will be the fifth DHS Secretary and the third Acting. Rather than go through the normal channels of selecting a nominee and allowing Senators to properly vet and question the nominee, Republicans are going along with Trump's plan to circumvent Federal law.

When asked directly by my colleague, Senator ROSEN, about his role in formulating the family separation policy, Mr. Wolf denied any direct knowledge of that policy. Leaked emails later revealed that, as Secretary Nielsen's chief of staff, he presented her with a memo with options to deter migrants coming to the border. Separating parents from their children was the second option on that list. The family separation policy is repugnant to our country's values.

The timing of this nomination is especially concerning in light of the Supreme Court oral arguments this week on DACA. The Trump administration ended DACA and then rejected compromise legislation, written by a bipartisan group of Senators, that would have given over 700,000 Dreamers who have grown up here stability and, ultimately, a path to citizenship. When those Senators were negotiating an immigration deal, in an unprecedented

action, DHS Secretary Nielsen sent a letter lambasting the negotiations and accused them of undermining U.S. security.

The Trump administration has weaponized and poorly managed DHS, and I cannot support this nominee.

Mr. DURBIN. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. CRAMER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. SASSE). Without objection, it is so ordered.

The PRESIDING OFFICER. Under the previous order, all postcloture time is expired.

The question is, Will the Senate advise and consent to the Wolf nomination?

Mr. CRAMER. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. THUNE. The following Senator is necessarily absent: the Senator from South Dakota (Mr. ROUNDS).

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. BOOKER), the Senator from California (Ms. HARRIS), the Senator from Vermont (Mr. SANDERS), and the Senator from Massachusetts (Ms. WARREN) are necessarily absent.

The result was announced—yeas 54, nays 41, as follows:

[Rollcall Vote No. 354 Ex.]

YEAS—54

| | | |
|---|---|---|
| Alexander | Fischer | Paul |
| Barrasso | Gardner | Perdue |
| Blackburn | Graham | Portman |
| Blunt | Grassley | Risch |
| Boozman | Hawley | Roberts |
| Braun | Hoeven | Romney |
| Burr | Hyde-Smith | Rubio |
| Capito | Inhofe | Sasse |
| Cassidy | Isakson | Scott (FL) |
| Collins | Johnson | Scott (SC) |
| Cornyn | Kennedy | Shelby |
| Cotton | Lankford | Sinema |
| Cramer | Lee | Sullivan |
| Crapo | Manchin | Thune |
| Cruz | McConnell | Tillis |
| Daines | McSally | Toomey |
| Enzi | Moran | Wicker |
| Ernst | Murkowski | Young |

NAYS—41

| | | |
|---|---|---|
| Baldwin | Hassan | Reed |
| Bennet | Heinrich | Rosen |
| Blumenthal | Hirono | Schatz |
| Brown | Jones | Schumer |
| Cantwell | Kaine | Shaheen |
| Cardin | King | Smith |
| Carper | Klobuchar | Stabenow |
| Casey | Leahy | Tester |
| Coons | Markey | Udall |
| Cortez Masto | Menendez | Van Hollen |
| Duckworth | Merkley | Warner |
| Durbin | Murphy | Whitehouse |
| Feinstein | Murray | Wyden |
| Gillibrand | Peters | |

NOT VOTING—5

| | | |
|---|---|---|
| Booker | Rounds | Warren |
| Harris | Sanders | |

The nomination was confirmed.

CONGRESSIONAL RECORD — SENATE *November 13, 2019*

The PRESIDING OFFICER. Under the previous order, the motion to reconsider is considered made and laid upon the table, and the President will be immediately notified of the Senate's action.

## CLOTURE MOTION

The PRESIDING OFFICER. Pursuant to rule XXII, the Chair lays before the Senate the pending cloture motion, which the clerk will state.

The legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the nomination of Steven J. Menashi, of New York, to be United States Circuit Judge for the Second Circuit.

Mitch McConnell, John Hoeven, Steve Daines, James E. Risch, Roger F. Wicker, Pat Roberts, John Thune, Mike Rounds, Roy Blunt, Mike Crapo, John Boozman, John Cornyn, Lindsey Graham, Thom Tillis, David Perdue, Chuck Grassley, Rick Scott.

The PRESIDING OFFICER. By unanimous consent, the mandatory quorum call has been waived.

The question is, Is it the sense of the Senate that debate on the nomination of Steven J. Menashi, of New York, to be United States Circuit Judge for the Second Circuit, shall be brought to a close?

The yeas and nays are mandatory under the rule.

The clerk will call the roll.

The bill clerk called the roll.

Mr. THUNE. The following Senator is necessarily absent: the Senator from South Dakota (Mr. ROUNDS).

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. BOOKER), the Senator from California (Ms. HARRIS), the Senator from Vermont (Mr. SANDERS), and the Senator from Massachusetts (Ms. WARREN) are necessarily absent.

The PRESIDING OFFICER (Mr. LANKFORD). Are there any other Senators in the Chamber desiring to vote?

The yeas and nays resulted—yeas 51, nays 44, as follows:

[Rollcall Vote No. 355 Ex.]

YEAS—51

| | | |
|---|---|---|
| Alexander | Fischer | Paul |
| Barrasso | Gardner | Perdue |
| Blackburn | Graham | Portman |
| Blunt | Grassley | Risch |
| Boozman | Hawley | Roberts |
| Braun | Hoeven | Romney |
| Burr | Hyde-Smith | Rubio |
| Capito | Inhofe | Sasse |
| Cassidy | Isakson | Scott (FL) |
| Cornyn | Johnson | Scott (SC) |
| Cotton | Kennedy | Shelby |
| Cramer | Lankford | Sullivan |
| Crapo | Lee | Thune |
| Cruz | McConnell | Tillis |
| Daines | McSally | Toomey |
| Enzi | Moran | Wicker |
| Ernst | Murkowski | Young |

NAYS—44

| | | |
|---|---|---|
| Baldwin | Cardin | Cortez Masto |
| Bennet | Carper | Duckworth |
| Blumenthal | Casey | Durbin |
| Brown | Collins | Feinstein |
| Cantwell | Coons | Gillibrand |

| | | |
|---|---|---|
| Hassan | Menendez | Sinema |
| Heinrich | Merkley | Smith |
| Hirono | Murphy | Stabenow |
| Jones | Murray | Tester |
| Kaine | Peters | Udall |
| King | Reed | Van Hollen |
| Klobuchar | Rosen | Warner |
| Leahy | Schatz | Whitehouse |
| Manchin | Schumer | Wyden |
| Markey | Shaheen | |

NOT VOTING—5

| | | |
|---|---|---|
| Booker | Rounds | Warren |
| Harris | Sanders | |

The PRESIDING OFFICER. On this vote, the yeas are 51, and the nays are 44.

The motion is agreed to.

## EXECUTIVE CALENDAR

The PRESIDING OFFICER. The clerk will report the nomination.

The bill clerk read the nomination of Steven J. Menashi, of New York, to be United States Circuit Judge for the Second Circuit.

The PRESIDING OFFICER. The Senator from Connecticut.

UNANIMOUS CONSENT REQUEST—S. 1416

Mr. BLUMENTHAL. Mr. President, I am proud to be here to advocate on behalf of a bill that has enjoyed, rightly, bipartisan support: the Affordable Prescriptions for Patients Act.

We all know that the astronomically rising costs of prescription drugs are a burden—in fact a bane for Americans regardless of where they live, regardless of their party, race, religion, or age, but particularly for our seniors. The choice between paying the mortgage, putting food on the table, and buying prescription drugs has become a daily challenge for people across the country.

This bill offers a positive, solid step toward ending abuses in the use of patents—abuses that are called patent thicketing and product hopping—that all too commonly raise the cost of prescription drugs and preclude access for the people who need those drugs the most.

This effort has been a bipartisan one involving many of us in this Chamber. It passed from the Judiciary Committee unanimously. It is a testament to the still-possible bipartisan cooperation on an issue of paramount concern to the people of America that we have reached this point of bringing it to the floor of the Senate.

I am proud to have worked on this measure with my colleague from Texas who has really helped to lead this effort, Senator CORNYN, who is here on the floor with me, and I am happy to yield to him now.

The PRESIDING OFFICER. The Senator from Texas.

Mr. CORNYN. Mr. President, I thank the Senator from Connecticut for his leadership.

At a time when people see bipartisanship in short supply in Washington, DC, this is one area where we can actually make some real progress for the people we represent.

We all know that climbing healthcare costs are keeping people up at night. Many people reached out to me in my office about the impossible decisions they are required to make in order to keep pace with rising prescription drug costs—particularly the out-of-pocket costs—whether they pay some bills and have to defer or not pay others; whether they cut their pills in half or self-ration the medications, which is dangerous to their health, or don't fill prescriptions altogether because they simply can't afford the out-of-pocket costs. No family should be required to make those sorts of decisions.

Sadly, I know my constituents in Texas are not alone. The Kaiser Family Foundation poll in September found that the No. 1 healthcare concern of the American people is prescription drug prices. This is something the President has said he wants to address, the House has said they want to address, and the Senate has said we want to address, and this legislation we are talking about will help move the ball in the right direction.

A whopping 70 percent of people think growing prescription drug costs should be the top priority for Congress, which should make it our No. 1 item on our to-do list. The good news is, we are making some progress. Here in the Senate, we have taken a bipartisan approach, which is the only way to actually get things done in Congress. We talked to every major player in the supply chain, and we asked questions about whether confusing practices that are not transparent to outsiders are all combining to drive up costs.

What I find seriously concerning are the anti-competitive behaviors of some of the drug manufacturers, the gamesmanship, particularly when it comes to our patent system. We know companies pour a lot of time and money into the research and development of new medications, and we don't want to do anything to stop that. We want to incentivize that so that they are able to recover their costs and perhaps make a profit when the drug turns out to be successful. But we don't want them playing games with the patent system in a way that prevents others at some point, after that period of exclusivity, from being able to compete with a generic alternative.

Ninety percent of the drugs we take are generic, and that is why they are so affordable and so inexpensive, but for the top 10 percent of branded drugs that people take, many of them simply are unaffordable. These patents I refer to do protect the intellectual property for these key drugs and are an important part of the incredible innovation that occurs here in the United States, but increasingly we are seeing companies using the patent system as a shield for competition beyond the life of the patent.

It is time to put a stop to that. We can do that today. We can begin that process today. That is exactly why I introduced the Affordable Prescriptions for Patients Act with the Senator from